Ben M. Harrington (SBN 313877)
Benjamin J. Siegel (SBN 256260)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
benh@hbsslaw.com
bens@hbsslaw.com

*Attorneys for Plaintiff and the Proposed Class*
*[Additional counsel on signature page]*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

JULIANNA FELIX GAMBOA and THOMAS
DOROBIALA, individually and behalf of all
others similarly situated,

               Plaintiff,

      v.

APPLE INC.,

          Defendant.

Case No. 5:24-cv-01270-EKL

**PLAINTIFFS' OPPOSITION TO DEFENDANT APPLE INC.'S MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT**

Date:      December 11, 2024
Time:      10:00 a.m. PDT
Dept:     Courtroom 7, 4th Floor
Judge:    Honorable Eumi K. Lee

1

**TABLE OF CONTENTS**

2
**Page**

3  I.    INTRODUCTION ...........................................................................................1

4  II.   FACTUAL ALLEGATIONS............................................................................3

5  III.  ARGUMENT ...................................................................................................5

6        A.    Plaintiffs Have Alleged a Tying Claim .................................................5

7        B.    Plaintiffs Have Alleged Actionable Monopolization Claims ...............8

8              1.    Apple's ability to impose supracompetitive prices and restrict
                     output is direct proof of its monopoly power. ............................9
9
                     a.    Plaintiffs have alleged supracompetitive prices. ..............9
10
11                   b.    Plaintiffs have alleged a reduction in output. .................12

12             2.    Plaintiffs have pleaded monopoly power indirectly by alleging
                     relevant antitrust markets that Apple dominates. .....................12

13                   a.    Plaintiffs have alleged plausible antitrust markets. .........12

14                   b.    Apple has a dominant share of all relevant markets...........17

15                   c.    Barriers to entry are significant. ......................................19

16             3.    Plaintiffs allege anticompetitive conduct. ................................19

17             4.    Plaintiffs have alleged specific intent to monopolize sufficient to
                     support their attempted monopolization claim.............................21
18
19      C.    Plaintiffs Have Alleged a UCL Claim .................................................21

20      D.    All Of Plaintiffs' Claims Are Timely ..................................................22

21             1.    Plaintiff Gamboa brought suit within four years of being
                     overcharged and thus her claims are plainly timely. ...................22
22             2.    Plaintiff Dorobiala's claims are timely under the continuing
                     violations doctrine. ....................................................................23
23
24             3.    Laches does not bar Plaintiffs' claims for injunctive relief. .........25

25  IV.   CONCLUSION................................................................................................25

26

27

28

1

**TABLE OF AUTHORITIES**

2

**Page(s)**

3

Cᴀꜱᴇꜱ

4

*Affinity v. Apple,*
No. 22-cv-4174, Dkt. No. 64 (N.D. Cal. Sept. 27, 2023)..........................................................7

5

6

*In re Aggrenox Antitrust Litig.,*
199 F. Supp. 3d 662 (D. Conn. 2016) ....................................................................................10

7

*U.S. ex rel. Air Control Techs., Inc. v. Pre Con Indus., Inc.,*
720 F.3d 1174 (9th Cir. 2013)...............................................................................................22

8

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP,*
592 F.3d 991 (9th Cir. 2010)..................................................................................................20

9

10

*In re Animation Workers Antitrust Litig.,*
87 F. Supp. 3d 1195 (N.D. Cal. 2015)....................................................................................22

11

*Apple iPod iTunes Antitrust Litig.,*
2014 WL 12719194 (N.D. Cal. Nov. 25, 2014) .....................................................................20

12

13

*Arista Networks, Inc. v. Cisco Sys. Inc.,*
2018 WL 11230167 (N.D. Cal. May 21, 2018) ......................................................................18

14

*In re ATM Fee Antitrust Litig.,*
768 F. Supp. 2d 984 (N.D. Cal. 2009)..............................................................................16, 17

15

16

*Backus v. Gen. Mills, Inc.,*
122 F. Supp. 3d 909 (N.D. Cal. 2015)....................................................................................22

17

*Blix Inc. v. Apple, Inc.,*
2021 WL 2895654 (D. Del. July 9, 2021)................................................................................7

18

19

*Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic,*
65 F.3d 1406 (7th Cir. 1995) ..................................................................................................10

20

*Brown Shoe Co. v. U.S.,*
370 U.S. 294 (1962) ...............................................................................................................14

21

22

*Catch Curve, Inc. v. Venali, Inc.,*
519 F. Supp. 2d 1028 (C.D. Cal. 2007) ..................................................................................21

23

*CollegeNet, Inc. v. Common Application, Inc.,*
355 F. Supp. 3d 926 (D. Or. 2018)...................................................................................17, 18

24

25

*Cover v. Windsor Surry Co.,*
2015 WL 4396215 (N.D. Cal. July 17, 2015) ........................................................................22

26

*Danjaq LLC v. Sony Corp.,*
263 F.3d 942 (9th Cir. 2001)..................................................................................................25

27

28

Hᴀɢᴇɴꜱ Bᴇʀᴍᴀɴ
Sᴏʙᴏʟ Sʜᴀᴘɪʀᴏ LLP
Attorneys at Law

Pʟᴀɪɴᴛɪꜰꜰꜱ' Oᴘᴘᴏꜱɪᴛɪᴏɴ ᴛᴏ
Aᴘᴘʟᴇ Iɴᴄ.'ꜱ Mᴏᴛɪᴏɴ ᴛᴏ Dɪꜱᴍɪꜱꜱ – ii

Case No. 5:24-cv-01270-EKL

*Digidyne Corp. v. Data Gen. Corp.*,
   734 F.2d 1336, 1345 (9th Cir. 1984) .................................................................8

*Dream Big Media Inc. v. Alphabet Inc.*,
   2022 WL 16579322 (N.D. Cal. Nov. 1, 2022) .................................................7

*Dreamstime.com, LLC v. Google LLC*,
   54 F.4th 1130 (9th Cir. 2022) .......................................................................20

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
   504 U.S. 451 (1992) ...............................................................................*passim*

*Eastman v. Quest Diagnostics Inc.*,
   108 F. Supp. 3d 827 (N.D. Cal. 2015) ............................................................11

*Epic Games, Inc. v. Apple, Inc.*,
   67 F.4th 946 (9th Cir. 2023) .....................................................................*passim*

*Fed. Trade Comm'n v. Facebook, Inc.*,
   560 F. Supp. 3d 1 (D.D.C. 2021) ....................................................................18

*Flaa v. Hollywood Foreign Press Ass'n*,
   55 F.4th 680 (9th Cir. 2022) ...........................................................................18

*Foremost Pro Color, Inc. v. Eastman Kodak Co.*,
   703 F.2d 534 (9th Cir. 1983) ..........................................................................20

*Giuliano v. SanDisk Corp.*,
   2014 WL 4685012 (N.D. Cal. Sept. 19, 2014) .................................................9

*In re Glumetza Antitrust Litig.*,
   611 F. Supp. 3d 848 (N.D. Cal. 2020) ............................................................25

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
   392 U.S. 481 (1968) .........................................................................................24

*Hicks v. PGA Tour, Inc.*,
   897 F.3d 1109 (9th Cir. 2018) ........................................................................13

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
   903 F.2d 612 (9th Cir. 1990) ...............................................................6, 7, 8, 16

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
   125 F.3d 1195 (9th Cir. 1997) ...................................................................13, 19

*Intell. Ventures I LLC v. Cap. One Fin. Corp.*,
   2013 WL 6682981 (E.D. Va. Dec. 18, 2013) .................................................11

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*,
   466 U.S. 2 (1984) ...............................................................................................8

*Kamakahi v. Am. Soc. for Reprod. Med.*,
   2013 WL 1768706 (N.D. Cal. Mar. 29, 2013) ...............................................14

HAGENS BERMAN
SOBOL SHAPIRO LLP
Attorneys at Law

PLAINTIFFS' OPPOSITION TO
APPLE INC.'S MOTION TO DISMISS – iii

Case No. 5:24-cv-01270-EKL

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018) ............................................................................................. 5

*Klein v. Facebook, Inc.*,
   580 F. Supp. 3d 743 (N.D. Cal. 2022) .............................................................................. 18

*Korea Kumho Petrochemical v. Flexsys Am. LP*,
   2008 WL 686834 (N.D. Cal. Mar. 11, 2008) ................................................................... 18

*Lambrix v. Tesla, Inc.*,
   2024 WL 3403777 (N.D. Cal. June 17, 2024) .................................................................. 20

*Matthews v. Nat'l Football League Mgmt. Council*,
   688 F.3d 1107 (9th Cir. 2012) .......................................................................................... 24

*Med Vets Inc. v. VIP Petcare Holdings, Inc.*,
   2019 WL 1767335 (N.D. Cal. Apr. 22, 2019) .................................................................. 18

*MetroNet Servs. Corp. v. U.S. West Commc'ns*,
   329 F.3d 986 (9th Cir. 2003) ............................................................................................ 19

*Montana Consumer Couns. v. FERC*,
   659 F.3d 910 (9th Cir. 2011) .............................................................................................. 9

*Newcal Indus., Inc. v. Ikon Off. Sol.*,
   513 F.3d 1038 (9th Cir. 2008) ...................................................................................... 9, 14

*Ohio v. Am. Express Co.*,
   585 U.S. 529 (2018) ......................................................................................................... 11

*Oliver v. SD-3C LLC*,
   751 F.3d 1081 (9th Cir. 2014) ...................................................................................... 23, 24

*Pac. Coast Agr. Exp. Ass'n v. Sunkist Growers, Inc.*,
   526 F.2d 1196 (9th Cir. 1975) .......................................................................................... 17

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
   2024 WL 278565 (E.D.N.Y. Jan. 25, 2024) ...................................................................... 9

*PLS.com, LLC v. Nat'l Ass'n of Realtors*,
   32 F.4th 824 (9th Cir. 2022) .............................................................................................. 9

*Process Specialties, Inc. v. Sematech, Inc.*,
   2002 WL 35646610 (E.D. Cal. Jan. 18, 2002) ................................................................ 25

*RealPage, Inc. v. Yardi Sys., Inc.*,
   852 F. Supp. 2d 1215 (C.D. Cal. 2012) .......................................................................... 6, 7

*Rebel Oil Co. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995) ........................................................................................ 9, 19

*Retail Prop. Tr. v. United Bhd. of Carpenters & Joiners of Am.*,
   768 F.3d 938 (9th Cir. 2014) .............................................................................................. 5

HAGENS BERMAN
SOBOL SHAPIRO LLP
Attorneys at Law

PLAINTIFFS' OPPOSITION TO
APPLE INC.'S MOTION TO DISMISS – iv

Case No. 5:24-cv-01270-EKL

*Retrophin, Inc. v. Questcor Pharms., Inc.*,
   41 F. Supp. 3d 906 (C.D. Cal. 2014) ................................................................. 18

*Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys.*,
   778 F.3d 775 (9th Cir. 2015) ............................................................................. 13

*Samsung Elecs. Co. v. Panasonic Corp.*,
   747 F.3d 1199 (9th Cir. 2014) ..................................................................... 23, 24

*Shields v. World Aquatics*,
   2024 WL 4211477 (9th Cir. Sept. 17, 2024) ....................................................... 9

*Sidibe v. Sutter Health*,
   2021 WL 879875 (N.D. Cal. Mar. 9, 2021) ....................................................... 17

*Spectrum Sports, Inc. v. McQuillan*,
   506 U.S. 447 (1993) ........................................................................................... 21

*Surgical Instr. Serv. Co. v. Intuitive Surgical, Inc.*,
   2024 WL 1975456 (N.D. Cal. Mar. 31, 2024) ................................................... 10

*Syufy Enters. v. Am. Multicinema, Inc.*,
   793 F.2d 990 (9th Cir. 1986) ............................................................................. 10

*Telink, Inc. v. U.S.*,
   24 F.3d 42 (9th Cir. 1994) ................................................................................. 25

*Times-Picayune Pub. Co. v. U.S.*,
   345 U.S. 594 (1953) ..................................................................................... 13, 14

*U.S. v. Grinnell Corp.*,
   384 U.S. 563 (1966) ........................................................................................... 12

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
   401 U.S. 321 (1971) ........................................................................................... 23

### STATUTES

Cal. Bus. & Prof. Code § 17200 ............................................................................. 21

### OTHER AUTHORITIES

Fed. R. Civ. P. 8(d)(3) ........................................................................................... 13

Phillip E. Areeda & Herbert Hovenkamp, *Fundamentals of Antitrust Law* (2024
   Supp.) ........................................................................................................ *passim*

U.S. Dep't of Justice & FTC, *Horizontal Merger Guidelines* (2023 ed.) § 4.3 ........... 13

William M. Landes & Richard A. Posner, *Market Power in Antitrust Cases*, 94 Harv.
   L. Rev. 937, 939 (1981) ...................................................................................... 9

HAGENS BERMAN
SOBOL SHAPIRO LLP
Attorneys at Law

PLAINTIFFS' OPPOSITION TO
APPLE INC.'S MOTION TO DISMISS – v

Case No. 5:24-cv-01270-EKL

1

## I.    INTRODUCTION

2        Mobile devices are ubiquitous in modern life and they amass an abundance of data with everyday

3 use, including apps, pictures, videos, messages and all manner of content. Because local storage on

4 mobile devices is limited, users rely increasingly on cloud platforms to host and back up their files. *See*

5 ¶ 1.[1] Cloud storage is soon to be a trillion-dollar industry. *See id.*

6        Apple markets the cloud storage platform iCloud, which dominates cloud storage on Apple's

7 mobile devices. Measured conservatively, iCloud sustains a greater than 70% market share of all

8 available cloud platforms on Apple's devices, and a 100% share for full-service cloud platforms (*i.e.*,

9 cloud platforms that can host all file types). *See* ¶ 3. Apple did not achieve this dominant position by

10 building a better mousetrap. Instead, leveraging its control at the operating system level, Apple rigged

11 the system to handicap would-be competitors and self-privilege its own product. *See* ¶ 4.

12        Apple accomplished this by quarantining a set of files (mainly device settings and app data) and

13 denying all but iCloud permissions to host them. From a technological and security standpoint, these

14 "Restricted Files" are no different from other files. They are significant only because they include the

15 settings (apps, page layout, ring tones, etc.) needed to restore a device when it is replaced, a feature most

16 cloud customers want. *See* ¶¶ 5-6. Without access to Restricted Files, would-be rivals cannot

17 meaningfully compete with iCloud. They can only offer Apple users a partial-storage solution for some

18 files but, due to Apple's restraints, their offerings necessarily lack the basic device restoration

19 functionality most users demand. A consumer using a different cloud provider for storing photos and

20 videos, will still need to use iCloud for Restricted File storage, and juggling multiple cloud accounts is

21 an unappealing and cumbersome process, as Apple knows. *See* ¶ 6. Many customers want one full-

22 service cloud platform that can satisfy all their storage needs. *See* ¶ 38. Apple has secured and maintained

23 a monopoly by ensuring that only iCloud can provide this full-service functionality. *See id.*

24        Having neutralized competition to achieve market dominance, Apple imposes supracompetitive

25 iCloud prices that yield staggering gross margins (exceeding 70-80%)—margins that essentially *double*

26 Apple's already high company-wide returns. *See* ¶¶ 8, 63. Apple's restraints also reduce output and stifle

27

28        _____

[1] All "¶" citations refer to the paragraphs of the Amended Class Action Complaint, ECF No. 24 (June 21, 2024) (hereinafter, "complaint"), unless otherwise indicated.

innovation by preventing other cloud providers from offering full-service cloud storage in competition with Apple. *See* ¶¶ 965. In a market without Apple's anticompetitive restraints, competition between full-service cloud providers would do precisely what the antitrust laws contemplate. It would spark innovation and enhance consumer choice, while driving prices down to the competitive level. *See* ¶ 9.

In their Amended Class Action Complaint, Plaintiffs assert tying and monopolization claims under the Sherman Act, as well as unfair competition claims under California law. Apple's motion to dismiss identifies no pleading deficiencies. This case should proceed to discovery and the merits.

*First*, Apple's argument on tying is foreclosed by controlling law distinguishing between "positive" and "negative" ties. Apple asserts that ties require a compelled purchase of the tied product (here full-service cloud storage), but the law is clear: a compelled purchase is required only for *positive* ties. This case involves a *negative* tie. A negative tie operates not by compelling a purchase of the tied product, but rather by preventing the customer from taking the tied product from a rival. Negative ties are equally actionable under the Sherman Act. *See infra* at § III.A.

*Second*, Plaintiffs' monopolization claims are supported by detailed allegations of supracompetitive prices and reduced output, which provide direct evidence of monopoly power. To the extent the Court reaches market definition, Plaintiffs more than adequately allege an aftermarket for Full-Service Cloud Storage on Apple Mobile Devices. Apple's discussion of aftermarkets completely disregards the controlling aftermarkets decision—*Epic Games v. Apple*—which rejected many of Apple's arguments. Moreover, even if the relevant market was expanded to include *all* cloud platforms on Apple devices (it need not be), Apple enjoys a monopoly share of that market as well (at least 70-80%). Apple's arguments to the contrary, at best, implicate factual issues. *See infra* at § III.B.

*Third*, Apple asserts that the complaint does not plead *intent* to monopolize, but only by ignoring the substance of Plaintiffs' allegations—*i.e.*, that "Apple's restraints can be coherently explained only as an attempt to stifle competition." ¶ 8. The complaint is replete with allegations of intent. *See infra* at § III.B.4.

*Fourth*, Apple barely addresses Plaintiffs' UCL claim, and then mainly to assert that it rises and falls on Plaintiffs' Sherman Act claims. That is not correct. Apple confuses the UCL's unlawful prong, which requires a predicate unlawful act, with the broader "unfairness" prong, which does not. Apple's

1   restraints could readily be deemed "unfair" under the fact-intensive balancing test that governs consumer

2   UCL claims. *See infra* at § III.C.

3         *Finally*, all of Plaintiffs' claims are timely. Apple launched iCloud in 2011, but Plaintiff Gamboa

4   did not purchase an iCloud plan or suffer an injury until 2022, and thus her claims are plainly timely

5   under the applicable four-year statutes of limitations. Plaintiff Dorobiala's claims are timely under the

6   continuing violations doctrine because Apple's anticompetitive conduct is ongoing and unabated. *See*

7   *infra* at § III.D.

8                  **II.      FACTUAL ALLEGATIONS**

9         Apple is the world's dominant mobile device manufacturer, but it relies increasingly on

10  aftermarket services to drive revenue growth. *See* ¶ 27. As one of Apple's most profitable services,

11  iCloud generates an estimated $16 billion in annual revenues. *See id.* Launched in 2011, iCloud is a full-

12  service cloud storage platform that can host and backup all file types generated by Apple's mobile

13  devices. *See* ¶ 26. iCloud users get 5GB of free storage, which is generally insufficient for their storage

14  needs. *See* ¶ 28. Once the 5GB is exhausted, users can obtain additional storage with one of iCloud's

15  subscription plans (ranging from 50GB to 12 TB). *See id.*

16        As Apple's own guidelines acknowledge, cloud storage "is agnostic about what is being stored

17  and handles all file content the same way, as a collection of bytes." ¶ 31. Accordingly, if authorized,

18  other cloud platforms could (like iCloud) store Restricted Files and be used to restore devices at

19  replacement. *See* ¶ 37. In fact, other leading device manufacturers (*e.g.*, Samsung) offer a proprietary

20  cloud storage platform but give their users the choice to backup all files (including those needed for

21  device restoration) on an alternative third-party platform. *See* ¶¶ 36, 114.

22        Apple has strategically eliminated this competitive choice within its ecosystem. By sequestering

23  Restricted Files and granting only iCloud permission to access them, Apple has ensured that only iCloud

24  can provide full-service cloud storage to Apple device owners. This makes iCloud a far more attractive

25  option, and the only option for customers who want one cloud platform for all their storage. *See* ¶¶ 6, 34.

26  Because they can only offer partial storage to Apple device owners, rival cloud platforms simply cannot

27  meaningfully compete with iCloud. *See* ¶¶ 4, 6. Considering all cloud storage options available on

28  Apple's devices, iCloud's market share (measured most conservatively) is *72.5%*. *See* ¶ 106. This is a

remarkable share given that iCloud's would-be competitors include some of the most sophisticated, well-resourced and motivated technology firms in the world (*e.g.*, Google and Microsoft) as well as cloud-storage specialists with brand recognition (*e.g.*, Dropbox). *See* ¶ 4. These companies are excelling at providing cloud storage *outside* Apple's ecosystem, but within it, Apple's restraints have prevented them from gaining meaningful traction.

In a competitive market without Apple's restraints, these cloud providers (and others) could offer full-service cloud platforms, giving consumers a competitive choice between real market alternatives. *See* ¶ 65. As is expected with competition, this would drive innovation up, and prices down. *See* ¶¶ 9, 65. But Apple's restraints prevent this competition from unfolding. Facing no real competitive threat, Apple has diminished incentives to invest and improve iCloud's functionality to deliver better value to its customers. To that point, analysts describe iCloud as a "fairly sparse offering, with lots of common cloud storage features missing completely," a "rather insecure and expensive platform," and one with persistent "problems with its most basic functionality." ¶ 109. Undisciplined by real competition, Apple also has "marked up its iCloud prices to generate almost pure profit," ¶ 8, with gross margins that, measured most conservatively, are likely to exceed 70-80%. *See* ¶ 63.



While Apple repeatedly asserts that it sequesters Restricted Files for security reasons, this assertion cannot be credited, much less at this stage when Plaintiffs' well-pleaded allegations control. For example, Apple asserts that its restraints arise from a so-called "sandboxing" policy to protect against viruses. MTD at 5. That pre-discovery assertion finds no basis in the complaint and should be disregarded. Apple's security defense is also dubious. Apple does not even maintain Restricted Files on its own servers—it uses storage infrastructure provided by the very cloud providers (Google, Microsoft,

and Amazon) subject to Apple's restraint. *See* ¶ 117. If Restricted Files were so sensitive that mainstream cloud providers could not host them, as Apple asserts in this litigation, then Apple would not outsource iCloud storage infrastructure from these very providers and use it to store Restricted Files. *See id.* Restricted Files are not even sensitive relative to the other files Apple permits third-party cloud platform to host. Restricted Files include apps and device settings, like ringtones and screen layout. *See* ¶ 116. Far more sensitive are the photos and videos that Apple permits third-party cloud providers to access. As Plaintiffs allege, "[i]f security objectives were truly driving Apple's restraints, Apple would not permit users to backup photos of their children (Accessible Files) on any alternative cloud platform, but not their ringtone (a Restricted File)." *Id.*

The reality, alleged in detail in the FAC, is that Apple's restraints "can be coherently explained only as an attempt to stifle competition, and that is their manifest effect." ¶ 8.

## III.    ARGUMENT

In deciding motions to dismiss, courts are limited to the factual allegations of the complaint and must disregard purported facts from outside the pleadings. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1012 (9th Cir. 2018). Dismissal is inappropriate if, accepting as true all allegations in the complaint and drawing all inferences in the nonmovants favor, the pleading contains "enough facts to state a claim to relief that is plausible on its face." *Retail Prop. Tr. v. United Bhd. of Carpenters & Joiners of Am.*, 768 F.3d 938, 945 (9th Cir. 2014).[2]

### A.    Plaintiffs Have Alleged a Tying Claim

Tying is an arrangement by which a party sells "one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461 (1992). Ties violate § 1 of the Sherman Act when the seller has market power in the tying product market and the tie "affects a substantial volume of commerce in the tied market." *Id.*

Apple does not dispute the market-power and volume-of-commerce elements of Plaintiffs' tying claim. Instead, Apple asserts there is no tying arrangement at all. But the tie is unmistakable. Leveraging

---

[2] Internal quotation marks and citations omitted here and throughout this submission.

1    its market power in the smartphone and tablet markets, Apple strictly bars the owners of those devices

2    from obtaining Full-Service Cloud Storage from any rival cloud provider. Under this restraint, if Apple's

3    customers want Full-Service Cloud Storage, they must use iCloud rather than any rival service. That is

4    a tie. *See* Phillip E. Areeda & Herbert Hovenkamp, *Fundamentals of Antitrust Law* ¶ 1752a (2024 Supp.)

5    ("A tying condition occurs when its 'practical effect' is to foreclose, even partially, rival suppliers of the

6    allegedly tied product.").

7         Apple's position is that this arrangement cannot amount to a tie because no one is *required* to

8    purchase iCloud (or any cloud storage), and some elect not to. As Apple would have it, actionable ties

9    must involve a compelled purchase of the tied product. *See* MTD at 7-9. Apple's argument is foreclosed

10   by controlling Ninth Circuit and Supreme Court law distinguishing between "positive" ties (the scenario

11   Apple describes) and "negative" ties (this case). Both types of ties are actionable.

12        To summarize, a "positive tie" involves a situation where the consumer is compelled to purchase

13   "some amount of the defendant's product." *See* Areeda & Hovenkamp, *Antitrust Law*, *supra*, ¶ 1752c &

14   n.9. But tying jurisprudence does not end with positive ties. Ties can also be "negative." In contrast to a

15   positive tie, a negative tie does not compel a purchase of the tied product. Instead, a negative tie is a

16   restraint that prohibits the plaintiff from taking the tied product *from a rival*. *See id.* at n.9; *see also*

17   *RealPage, Inc. v. Yardi Sys., Inc.*, 852 F. Supp. 2d 1215, 1223-24 (C.D. Cal. 2012) (upholding negative

18   tying claim).

19        The seminal negative tying case is *Eastman Kodak*. *See Image Tech. Servs., Inc. v. Eastman

20   Kodak Co.*, 903 F.2d 612, 614 (9th Cir. 1990), *aff'd*, 504 U.S. 451 (1992). There, Kodak sold both parts

21   and service to its equipment owners, but it refused to sell parts to anyone who used a third party (rather

22   than Kodak) for service. *See id.* at 614. The plaintiff alleged that Kodak had unlawfully "tied parts to

23   service." *Id.* at 615. Like Apple in this case, Kodak argued that it had not engaged in tying because its

24   policy did not "force owners to buy service"—*i.e.*, the tied product. *Id.* That is, equipment owners may

25   not require service at all and, if they did, they could "self-service their machines." *Id.* The Ninth Circuit

26   had little difficulty rejecting Kodak's argument. With a language that equally disposes of Apple's tying

27   defense here, the Ninth Circuit reasoned:

28

> Kodak, however, misconceives the nature of tying agreements. As we stated above, a tying arrangement is an agreement by a party to sell one product but only on the condition that the buyer also purchase a different (or tied) product, *or at least agrees that he will not purchase that product from any other supplier*.

*Id.* The Supreme Court affirmed this holding, reiterating that the Sherman Act's prohibition on tying extends to situations where a restraint prevents purchase of the tied product "from any *other* supplier." *Eastman Kodak*, 504 U.S. at 461 (emphasis added).    Lower courts agree. *See RealPage*, 852 F. Supp. 2d at 1223-24 (relying on *Eastman Kodak* to reject argument that compelled purchase of tied product required to state a "negative tie").

This case is on all fours with *Eastman Kodak*. In *Kodak*, equipment owners could not take the tying product (parts) without restricting their ability to acquire the tied product (service) from a rival. Here, Apple device holders cannot take the tying products (smartphones and tablets) without restricting their ability to acquire the tied product (Full-Service Cloud Storage) from a rival. As *Eastman Kodak* teaches, these types of tying arrangements are actionable.

Failing to acknowledge negative ties, Apple plucks inapt language from cases involving positive ties. *See* MTD at 7-9. Because most tying cases involve positive ties, it is easy to find language discussing compulsion or coercion with respect to the tied product. But as the leading antitrust treatise explains, while "courts have often asked whether the plaintiff's purchase of the defendant's bundle was 'coerced' and 'forced' or merely 'voluntary,' … these terms must be understood merely as shorthand for a more nuanced inquiry into whether the defendant has acted as to constrain buyer choice illegitimately." *See* Areeda & Hovenkamp, *Antitrust Law*, *supra*, ¶ 1752a.  Apple's other tying citations are equally distinguishable. *See Dream Big Media Inc. v. Alphabet Inc.*, 2022 WL 16579322, at *3 (N.D. Cal. Nov. 1, 2022) (finding no tie because, unlike here, defendant did "not preclude" customers from "using a competitor's [] services"); *Affinity v. Apple*, No. 22-cv-4174, Dkt. No. 64 (N.D. Cal. Sept. 27, 2023) (accepting argument that tied product cannot be "free to consumers," whereas here, most users pay for iCloud (*see* ¶ 28)); *Blix Inc. v. Apple, Inc.*, 2021 WL 2895654, at *5 (D. Del. July 9, 2021) (no tie because, unlike here, defendant gave option to select between the allegedly "tied" product—Apple's sign-in service—and competing sign-in services).

1    Apple further asserts (in a footnote) that Full-Service Cloud Storage is not "tied" to

2    Apple's devices because it supposedly is not a "separate product." MTD at 9 n.4. This fact-based

3    contention is contrary to the complaint. *See* ¶¶ 40-42. "[W]hether one or two products are

4    involved turns not on the functional relation between them, but rather on the character of the

5    demand for the two items." *See Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 19 (1984).

6    There plainly is separate demand for Apple's mobile devices and Full-Service Cloud Storage.

7    Apple sold its mobile devices for years before launching iCloud and offering Full-Service Cloud

8    Storage, something that would not be possible if the products were inseparable. *See* ¶ 40. Even

9    now, consumers can purchase Apple devices without also acquiring Full-Service Cloud Storage,

10   and iCloud can be used by consumers who have a computer but no mobile device. *See id.* This

11   is powerful proof of separate demand, and it all goes unaddressed in Apple's motion to dismiss.

12   *See Jefferson Par.*, 466 U.S. at 22 (treating ability to purchase tying and tied products separately

13   in "actual practice" as proof of separate demand).

14       Last, Apple contends that the ability to backup files on a computer hard drive somehow

15   alleviates the tie. *See* MTD at 8. It does not. Such local storage is a *different product* than the tied

16   product—*i.e.*, Full-Service Cloud Storage. It is situated in a different product market, and it does

17   not reasonably substitute for the tied product, as the complaint explains. *See* ¶¶ 76-79. Tying

18   claims cannot be defeated with the expedient assertion that products *other* than the tied product

19   are available. *See Digidyne Corp. v. Data Gen. Corp.*, 734 F.2d 1336, 1345 (9th Cir. 1984)

20   (observing that tying law is concerned with whether there is foreclosure in "the market for a tied

21   product"). If Apple's argument were accepted, there could never be an actionable tie because

22   there is always some distant alternative for a tied product. For example, under Apple's theory

23   there was no tie in *Eastman Kodak* because, while Kodak had tied parts to service, equipment

24   holders could still self-service their machines. The Ninth Circuit and Supreme Court obviously

25   did not agree. *See Eastman Kodak*, 903 F.2d at 612.

26   **B.    Plaintiffs Have Alleged Actionable Monopolization Claims**

27       Monopolization claims require proof of "(1) the possession of monopoly power in the relevant

28   market and (2) the willful acquisition or maintenance of that power." *Epic Games, Inc. v. Apple, Inc.*, 67

F.4th 946, 998 (9th Cir. 2023). Monopoly power is a "substantial ability to control prices or exclude competition." *Id.* It can be established (1) directly with proof of "restricted output and supracompetitive prices" or (2) indirectly with proof of a relevant market with "significant barriers to entry," in which the defendant maintains a "dominant share." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995); *see also Epic Games*, 67 F.4th at 998.

At the motion to dismiss stage, "[m]onopoly power need not be pled with specificity, and whether a defendant actually possesses monopoly power is a factual question." *Giuliano v. SanDisk Corp.*, 2014 WL 4685012, at *6 (N.D. Cal. Sept. 19, 2014); *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008) ("There is no requirement that [market power and relevant market] elements of the antitrust claim be pled with specificity."). Here, Plaintiffs have more than adequately pled each element of their monopolization claims.

### 1. Apple's ability to impose supracompetitive prices and restrict output is direct proof of its monopoly power.

Apple's motion to dismiss focuses overwhelmingly on market definition, but while Apple's arguments are all flawed (*see infra*), a market need not be precisely defined if Apple's monopoly power can be established with direct evidence. *See Epic Games*, 67 F.4th at 974-75, 998 & n.6; *PLS.com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 838 (9th Cir. 2022); *Shields v. World Aquatics*, 2024 WL 4211477, at *3 (9th Cir. Sept. 17, 2024). It can here. Plaintiffs thus start with the direct evidence.

### a. Plaintiffs have alleged supracompetitive prices.

It is textbook economics that "in a competitive market," "price is close to marginal cost." *Montana Consumer Couns. v. FERC*, 659 F.3d 910, 916 (9th Cir. 2011); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2024 WL 278565, at *24 (E.D.N.Y. Jan. 25, 2024) (same); *see also* Areeda & Hovenkamp, *Antitrust Law*, *supra*, ¶ 502b; William M. Landes & Richard A. Posner, *Market Power in Antitrust Cases*, 94 Harv. L. Rev. 937, 939 (1981) ("A simple economic meaning of the term 'market power' is the ability to set price above marginal cost."). Marginal cost is the "increment to cost that results from a small (one-unit) increase in production," a measure that excludes fixed costs. *See* Areeda & Hovenkamp, *Antitrust Law*, *supra*, ¶ 503a & n.2.

Courts thus routinely recognize that prices set significantly above marginal costs are indicative of monopoly power. *See Syufy Enters. v. Am. Multicinema, Inc.*, 793 F.2d 990, 996 (9th Cir. 1986) (describing "profit margins" as one "basic indicator[] of monopoly power"); *Surgical Instr. Serv. Co. v. Intuitive Surgical, Inc.*, 2024 WL 1975456, at *16 (N.D. Cal. Mar. 31, 2024) (gross margins of 60 to 65% provided "sufficiently reliable assessment of [] market power"); *In re Aggrenox Antitrust Litig.*, 199 F. Supp. 3d 662, 667 (D. Conn. 2016) ("There are generally accepted economic means of analyzing the probability that given prices are supracompetitive using price and marginal cost.").

Although monopoly power need only be generally alleged, the complaint here includes an extended analysis demonstrating that iCloud's gross margins, measured most conservatively, fall in the 70-80% range. *See* ¶ 63. These extraordinary profits, which double Apple's already high company-wide gross margins, are a powerful indicator that iCloud is extracting monopoly rents. *See id.*

Apple does not dispute that 70-80% gross margins are extraordinarily high. Rather, Apple takes issue with Plaintiffs' calculations, asserting (MTD at 15) that the complaint does not account for marginal costs on iCloud's free plan. Apple is wrong. *See* ¶ 63 (margins analysis accounts for "infrastructure costs Apple incurs for users of its free (0-5GB) plan"). Apple also contends that other costs should be considered, but it does not specify what these might be. To evaluate monopoly power, marginal costs are what matter and, as the complaint explains (without meaningful rebuttal), the price Apple pays for cloud storage infrastructure "provides a reasonable estimate of its marginal costs, because it is the cost Apple bears to sell each additional GB of cloud storage." ¶ 60.

Apple relies on *Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 65 F.3d 1406, 1411-12 (7th Cir. 1995), for the proposition that it is "treacherous" to infer monopoly power from gross margins. MTD at 15. But *Blue Cross's* ultimate holding was that "when dealing with a heterogenous product," a jury could not infer monopoly power from high margins alone. *See* 65 F.3d at 1412. This case involves a homogenous product (*see* ¶¶ 4, 7), and Plaintiffs are not relying on margins alone for proof of monopoly power (*see* ¶¶ 66-67). Moreover, the court's concern—that high margins could result from "having low costs as a result of superior efficiency" (*id.*)—is not in play here because Apple has not built out an infrastructure to achieve cost efficiencies. Far from it, Apple's marginal costs reflect the market rate it pays Google and other third parties for storage infrastructure. *See* ¶ 60.

1    Apple also cherry picks pricing information for other cloud platforms to claim that iCloud pricing

2    *cannot* be supracompetitive. *See* MTD at 16. But to the extent this information is considered, at most it

3    interjects premature factual questions on the comparability of iCloud's pricing. For one, Apple's

4    selective chart is limited to five alternative platforms and does not reveal what *other* cloud providers

5    charge. Moreover, the chart only shows headline rates for various storage tiers, not the effective rate

6    charged per-unit of storage actually purchased. *See Epic Games*, 67 F.4th at 985 (holding that reliance

7    on headline rates "suspect" because they do not reveal "effective" prices in the market). Even on its face,

8    the chart shows that at each storage tier, there are more cost-effective options, indicating that Apple

9    would face downward pricing pressure on each tier in a more competitive market. For example, Apple

10   provides only 5GB of free storage, whereas other providers provide double (10GB) and triple (15GB)

11   that amount. Last, the chart is misleading (comparing apples to oranges) because the GB ranges for

12   storage tiers do not align across platforms. For example, Apple states that Google's $1.67/month plan is

13   higher than Apple's $0.99/month plan. *See* MTD at 16 (chart at column 2). But Google gives users

14   100GB of storage for $1.67, and Apple gives just 50GB for $0.99, meaning Google's per-GB prices are

15   significantly *lower*, not higher as Apple asserts. *See id.*

16   Discovery may ultimately be brought to bear on how iCloud's effective pricing compares. At this

17   stage, the complaint more than adequately alleges that iCloud's prices—in gross excess to marginal

18   costs—are supracompetitive. That, after all, is the textbook definition of a supracompetitive price.

19   Plaintiffs' detailed margins analysis also distinguishes this case from the cases Apple invokes,

20   all of which involved threadbare pleadings that merely asserted, without more, that the defendant's prices

21   were "supracompetitive." *Intell. Ventures I LLC v. Cap. One Fin. Corp.*, 2013 WL 6682981, at *6 (E.D.

22   Va. Dec. 18, 2013) ("Capital One provides nothing other than conclusory allegations that IV has

23   demanded and received 'supracompetitive prices.'"); *Eastman v. Quest Diagnostics Inc.*, 108 F. Supp.

24   3d 827, 835 (N.D. Cal. 2015) (plaintiff only asserted that defendant "must add a monopoly premium").

25   Apple also cites *Ohio v. American Express Co.*, 585 U.S. 529 (2018), but that post-trial decision proves

26   Plaintiffs' point. The Supreme Court faulted the plaintiffs there for not presenting "any evidence" of

27   supracompetitive prices at trial, specifically noting that such proof could have come from a "profit

28   margin" analysis. *See id.* at 548. The complaint presents such an analysis here.

**b.    Plaintiffs have alleged a reduction in output.**

In *Epic Games*, the Ninth Circuit made clear that reduced output is not required to prove anticompetitive effects, provided there is evidence of supracompetitive prices. *See* 67 F.4th at 984. Although the Ninth Circuit did not squarely address whether supracompetitive prices alone can likewise establish monopoly power, there is no logical reason why a different standard should apply, particularly because the Supreme Court has defined monopoly power as "the power to control prices *or* exclude competition." *U.S. v. Grinnell Corp.*, 384 U.S. 563, 571 (1966) (emphasis added). But even if a reduction in output were required to establish monopoly power, Plaintiffs allege one here.

To begin with, Apple does not even dispute that Plaintiffs have alleged an output reduction in their preferred relevant market—the market for Full-Service Cloud Storage. *See* MTD at 17. Apple's only contention is that the complaint falls short of alleging an output restriction if the market is *broadened* to include all Cloud Storage on Apple's devices. *Id.* Apple is wrong. As the complaint explains, without Apple's restraints cloud providers could meaningfully compete with iCloud for the first time and, given the billions in revenues at stake, they would be "highly incentivized to compete and appeal to a larger segment of Apple's users, generating more cloud service transactions overall"—that is, more output. *See* ¶ 66. Notably in this regard, a substantial segment (potentially 30-48%) of Apple's users do not currently purchase an iCloud subscription, meaning there is "a significant population" of untapped consumers to whom cloud providers could appeal with lower prices and innovative offerings. *See* ¶ 67. Apple does not address these output allegations.

**2.    Plaintiffs have pleaded monopoly power indirectly by alleging relevant antitrust markets that Apple dominates.**

Even if Plaintiffs' direct proof of monopoly power was insufficient, the complaint provides indirect proof by plausibly alleging (1) relevant antitrust markets, in which (2) Apple maintains a dominant share, and (3) for which barriers to entry are significant.

**a.    Plaintiffs have alleged plausible antitrust markets.**

Plaintiffs contend that there is a relevant antitrust market for Full-Service Cloud Storage on Apple Mobile Devices, *i.e.*, cloud storage platforms that can host all file types, including Restricted Files. *See* ¶¶ 68-102. But if that market were expanded to encompass cloud storage options that cannot host

1    Restricted Files (*e.g.*, Google Drive, Microsoft OneDrive, etc.), Plaintiffs contend that Apple unlawfully

2    monopolizes that larger market as well. *See* ¶¶ 105-106. In short, however, the market is defined,

3    Plaintiffs' monopolization claims are viable.

4          Before addressing Apple's specific challenges to these markets, Plaintiffs first address some

5    misconceptions that pervade Apple's entire discussion of market definition. *First*, contrary to Apple's

6    claims, there is nothing "inconsistent" about Plaintiffs pleading a proposed relevant market and a broader

7    alternative market with more expansive boundaries. *See, e.g.*, *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109,

8    1121 (9th Cir. 2018) (within one relevant market "well-defined submarkets may exist which, in

9    themselves, constitute product markets for antitrust purposes"); U.S. Dep't of Justice & FTC, *Horizontal*

10    *Merger Guidelines* (2023 ed.) § 4.3 ("Market definition ensures that relevant antitrust markets are

11    sufficiently broad, but it does not always lead to a single relevant market"); *see also Saint Alphonsus*

12    *Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys.*, 778 F.3d 775, 784 (9th Cir. 2015) (noting that the

13    Horizontal Merger Guidelines "are often used as persuasive authority"). And even if there were

14    something "inconsistent" about alternative markets, Rule 8 specifically allows pleading in the alternative

15    "regardless of consistency." Fed. R. Civ. P. 8(d)(3).

16          One reason markets are pled in the alternative is that market definition is "ultimately … a factual

17    determination for the jury," *Image Tech. Servs. v. Eastman Kodak Co.*, 125 F.3d 1195, 1203 (9th Cir.

18    1997), and a case does not "immediately end[]" if the plaintiff's preferred market definition fails, *Epic*

19    *Games*, 67 F.4th at 978, n.9. Even if the fact finder rejects a plaintiffs' preferred market, it can properly

20    assess whether the plaintiff's claims would nonetheless be viable under "the defendant's proposed

21    market (or a third in-between market…)." *Id.*

22          *Second*, hoping to evade the factual inquiry inherent in market definition, Apple repeatedly

23    implies that *any* amount of competition or substitution between products requires that they be grouped

24    in the same antitrust market. *See, e.g.*, MTD at 12 (arguing Plaintiffs' market depends on notion that

25    "iCloud faces zero competition from other cloud-based storage solutions"). This is not how market

26    definition works. Some degree of substitution outside a relevant product market is normal, indeed

27    expected. As the Supreme Court put it, "[f]or every product, substitutes exist" but "a relevant market

28    cannot meaningfully encompass that infinite range." *Times-Picayune Pub. Co. v. U.S.*, 345 U.S. 594,

612 n.31 (1953). Market definition is more nuanced. It requires assessment of "the *reasonable* interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325 (1962) (emphasis added). This not a binary question of whether there is any substitution between two products, but instead a question of *degree—i.e.*, whether there is a "*sufficient* cross-elasticity of demand" between two products to include them in the same market. *Epic Games*, 67 F.4th at 975 (emphasis added). Determining the degree of substitution between two products "often … involves empirical evidence." *Id.*

Because market definition is a question of fact and degree, courts "hesitate to grant motions to dismiss for failure to plead [a] relevant product market." *Kamakahi v. Am. Soc. for Reprod. Med.*, 2013 WL 1768706, at *10 (N.D. Cal. Mar. 29, 2013). This is not one of the rare cases where dismissal would be appropriate.

### (1)    Full-service cloud storage on Apple mobile devices is a relevant antitrust market.

Apple contends that Plaintiffs have not alleged a viable "aftermarket," but only by disregarding the leading Ninth Circuit decision dispatching its arguments. *See Epic Games*, 67 F.4th at 976. The omission is startling given Apple's involvement in *Epic Games*.

As *Epic Games* makes clear, "one brand of a product can constitute a separate market," most commonly when the case involves an "aftermarket" related to a durable good. *Id.*; *Newcal Indus.*, 513 F.3d at 1048 ("[T]he law permits an antitrust claimant to restrict the relevant market to a single brand of the product."). The seminal case is again *Eastman Kodak*, which recognized aftermarkets for "parts and service" of Kodak equipment. *See* 504 U.S. at 477-79. In *Epic Games*, the Ninth Circuit clarified the four elements of proving aftermarket claims.  Plaintiffs must show:

> (1) the challenged aftermarket restrictions are not generally known when consumers make their foremarket purchase; (2) significant information costs prevent accurate life-cycle pricing; (3) significant monetary or non-monetary switching costs exist; and (4) general market-definition principles regarding cross-elasticity of demand do not undermine the proposed single-brand market.

67 F.4th at 977.

Apple essentially ignores these elements in its motion to dismiss. Each element is alleged in detail in the complaint.

**Lack of Knowledge**. For purposes of its motion to dismiss, Apple does not dispute that its challenged restrictions on cloud storage are not generally known to consumers when they transact in foremarket for Apple's devices. *See* ¶¶ 93-94. Notably, the restraints are nowhere mentioned in Apple's the detailed Software Licensing Agreements. *See* ¶ 93. Nor could Apple reasonably challenge this element on the pleadings, given that consumers' state of knowledge when they transact in the foremarket is obviously a factual question. This element is satisfied for pleading purposes.

**Life-Cycle Pricing**. The complaint further demonstrates that because Apple's restraints are generally unknown at the point of foremarket purchase, there is no way to accurately estimate their "life-cycle" price, *i.e.*, how much the restraints elevate prices throughout their life-cycle. *See* ¶ 96. In addition, life-cycle pricing of cloud storage is not feasible because storage needs change significantly and unpredictably over time. *See* ¶¶ 97-98. Apple does not mention this element either, much less contest the adequacy of Plaintiffs' allegations supporting it.

**High Switching Costs**. Switching in the foremarket (away from Apple device to a different device type) is restricted by significant monetary and non-monetary costs. *See* ¶¶ 72-75, 100. Switching requires purchasing an entirely new mobile device (which generally cost hundreds of dollars), *see* ¶ 73, as well as new apps and app content that cannot be ported outside Apple's ecosystem, *see* ¶ 74. As one senior Apple executive has admitted: "Who's going to buy a Samsung phone if they have apps, movies, etc. already purchased? They now need to spend hundreds more to get to where they are today." ¶ 74. Apple's motion does not address or contest the adequacy of Plaintiffs' allegations on the switching cost element. It too is satisfied for pleading purposes.

**General Market Definition Principles**. The complaint also addresses "general market-definition principles" at length, demonstrating how the proposed aftermarket does not exclude any reasonable substitutes based on cross-elasticity of demand, *see* ¶¶ 69-82, and further that the market would satisfy a SSNIP test, which is the standard empirical test for defining antitrust markets, *see* ¶¶ 83-91. A SSNIP test evaluates the extent to which consumers would switch away from a product in response to a "**S**mall, **S**ignificant, **N**on-transitory **I**ncrease in **P**rice above a competitive level." *Epic Games*, 67 F.4th at 975. As the complaint illustrates, Apple has sustained a greater than 20% increase in the price of iCloud (far above the 5% level used in SSNIP tests) without any evidence of significant substitution

1      away from iCloud. *See* ¶ 87. This is powerful evidence that the relevant market does not include other

2      cloud storage options. *See* ¶¶ 87-89. As with the other elements of an aftermarket claim, Apple does not

3      address Plaintiffs' SSNIP test or other general principles of market definition, including cross-elasticity

4      of demand.

5              So what does Apple argue on aftermarkets? Primarily, Apple asserts that aftermarkets can exist

6      "only where a defendant changes its policy relating to the aftermarket product (here, iCloud)" after the

7      plaintiff transacts in the foremarket. *See* MTD at 5, 12. This supposed "change-in-policy" requirement

8      was pointedly rejected in *Epic Games*, 67 F.4th at 979. As the Ninth Circuit held, plaintiffs need only

9      show a general "lack of consumer awareness regarding aftermarket restrictions" at the foremarket

10     purchase. *See id.* A "change in policy is of course *one* way of doing so," but it is "not the *exclusive*

11     means." *See id.* (emphasis in original).  Here, Plaintiffs rely on more direct evidence to establish lack of

12     knowledge—specifically, the fact that consumers are not apprised of, and have no reason to be aware of,

13     Apple's cloud storage restraints when they purchase an Apple device. *See* ¶¶ 93-94. Those unrebutted

14     allegations support an aftermarket theory absent any change in policy.

15             Rehashing its tying arguments, Apple also asserts that aftermarkets only arise when the consumer

16     "is *compelled* to purchase the aftermarket product." MTD at 11. This argument is likewise foreclosed by

17     controlling law. The leading aftermarket case—*Eastman Kodak*—involved aftermarket products (Kodak

18     parts and service) that no one was *compelled* to purchase. *See supra* at 6-7. As noted, Kodak's customers

19     could "self-service" if they wanted, and they were not required to buy any parts. *See* 903 F.2d at 615.

20     But this did not defeat the aftermarkets claim there. At bottom, Apple misapplies the "lock-in" concept

21     that appears in aftermarkets jurisprudence. *See Epic Games*, 67 F.4th at 976-77. Courts recognize that if

22     the elements Apple generally ignores are present (*i.e.*, general lack of consumer knowledge, inability to

23     life-cycle price, and high switching costs), this can effectively "lock" customers into their *foremarket*

24     purchase (*i.e.*, make it difficult to switch foremarket products) and thereby insulate the aftermarket from

25     competition. *See id.* Apple flips this concept on its head, arguing that aftermarket claims require that the

26     customer be "locked" into purchasing—or compelled to purchase—the *aftermarket* product. No court

27     has announced or applied this supposed requirement and, in addition to defying *Kodak*, it would serve

28     no rationale purpose.  Apple relies on *In re ATM Fee Antitrust Litig.*, 768 F. Supp. 2d 984, 997 (N.D.

Cal. 2009), but that decision nowhere suggests that aftermarkets require a compelled aftermarket purchase. *See id.* at 997 (holding only that account holders not "locked in" to bank services foremarket because they can readily switch to another bank).

Apple further asserts that Plaintiffs' aftermarkets depend on there being "zero competition" from other means of storage. *See* MTD at 12. This is a strawman, as already addressed. Plaintiffs do not need to show zero competition between iCloud and other storage platforms. Plaintiffs need only show that any competition is not sufficiently robust to include these other storage platforms in the relevant market. Plaintiffs have done this with allegations that go completely unrebutted. *See, e.g.*, ¶¶ 72-75 (cloud storage on Android devices not a reasonable substitute); ¶¶ 76-79 (local storage is not a reasonable substitute); ¶¶ 80-82 (cloud platforms without access to Restricted Files not reasonable substitutes); ¶¶ 83-91 (proposed market would pass a SSNIP test). Having failed to respond to these detailed allegations, Apple cannot fairly assert that Plaintiffs' aftermarket claims are "conclusory." MTD at 13. That is just not a reasonable characterization of the complaint.

### (2)     Apple does not dispute that there can be a relevant antitrust market for all cloud storage platforms on Apple's mobile devices.

If the factfinder were to conclude that the market for Full-Service Cloud Storage is too narrow, Plaintiffs could nevertheless prevail on their monopolization claims in a broader market that includes all other cloud platforms available on Apple's mobile devices. *See* ¶ 105. Notably, Apple does not dispute that this broader market could be a relevant antitrust market. *See* MTD at 14. Instead, Apple argues that in this broader market (1) iCloud does not have a monopoly share and (2) barriers to entry are insignificant. Apple is wrong on both counts, as addressed below.

### b.     Apple has a dominant share of all relevant markets.

While some courts have applied a 65% market share threshold for monopoly power, *see, e.g.*, *Sidibe v. Sutter Health*, 2021 WL 879875, at *8 (N.D. Cal. Mar. 9, 2021), the Ninth Circuit has not fixed an unyielding lower bound, and many courts have found shares below 65% sufficient, particularly where there is other evidence of monopoly power. *See, e.g.*, *Pac. Coast Agr. Exp. Ass'n v. Sunkist Growers, Inc.*, 526 F.2d 1196, 1204 (9th Cir. 1975) (upholding jury verdict where market share "ranged from 45 to 70%"); *CollegeNet, Inc. v. Common Application, Inc.*, 355 F. Supp. 3d 926, 959

1    (D. Or. 2018) (60% share "plausibly alleges monopoly power"); *Arista Networks, Inc. v. Cisco Sys.*

2    *Inc.*, 2018 WL 11230167, at *18 (N.D. Cal. May 21, 2018) (considering 50% share sufficient to

3    survive summary judgment); *Retrophin, Inc. v. Questcor Pharms., Inc.*, 41 F. Supp. 3d 906, 909 & n.7

4    (C.D. Cal. 2014) ("more than 50%" share enough to allege monopoly power).

5        Here, Apple concedes, as it must, that it has a 100% share of the market for Full-Service Cloud

6    Storage. *See* MTD at 13. That is a pure monopoly. As for the broader market that includes all cloud

7    platforms on Apple's mobile devices, publicly available data indicate that iCloud's share is at least

8    72.5%. *See* ¶ 106. That, too, is a monopoly-level share.

9        Apple quibbles with Plaintiffs' 72.5% calculation, *see* MTD at 17-18, but "there is no authority

10   which suggests that antitrust plaintiffs must explain in their complaints how they calculated market

11   share." *See Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 778 (N.D. Cal. 2022). Far from it, "courts have

12   repeatedly held that a rough estimation of the defendant's market share, with no explanation of how that

13   estimation was made, is sufficient at the pleading stage." *Id.* Even cases Apple cites acknowledge that a

14   complaint "need not necessarily quantify [defendant's] market share with precision." *Korea Kumho*

15   *Petrochemical v. Flexsys Am. LP*, 2008 WL 686834 (N.D. Cal. Mar. 11, 2008).  Apple's cases also

16   involved pleadings that, unlike the complaint here, contained no market share information at all (*Flaa v.*

17   *Hollywood Foreign Press Ass'n*, 55 F.4th 680, 693 (9th Cir. 2022); *Fed. Trade Comm'n v. Facebook,*

18   *Inc.*, 560 F. Supp. 3d 1, 18 (D.D.C. 2021)), or market shares for the *wrong* market (*Med Vets Inc. v. VIP*

19   *Petcare Holdings, Inc.*, 2019 WL 1767335, at *6 (N.D. Cal. Apr. 22, 2019)).

20       By contrast, the complaint here lays out a market share estimate and, while not required, the

21   underlying calculations as well. *See* ¶ 106. When it comes to the math, Apple's only specific contention

22   is that iCloud subscribers may have multiple cloud storage accounts (*e.g.*, an iCloud account and Google

23   Drive). *See* MTD at 18. Apple does not attempt quantify the prevalence of such multi-homing or its

24   claimed impact on iCloud's overall share of volume. But regardless, the argument only takes Apple from

25   the frying pan to the fire. If significant numbers of iCloud users are simultaneously using iCloud and

26   other storage platforms, that means the products are not substitutes, but rather "complements." *See*

27   Areeda & Hovenkamp, *Antitrust Law*, *supra*, ¶ 565 (noting that complements are goods "most efficiently

28   made or used together" and that it is "economic nonsense" to group them in same market); *see also* ¶ 81.

1    Accordingly, Apple's argument on market share, at most, serves only to confirm that Plaintiffs' narrower

2    proposed market is properly defined.

3                    **c.      Barriers to entry are significant.**

4        Apple concedes that Plaintiffs allege significant barriers to entry in their preferred Full-Service

5    Cloud Storage market. *See* MTD at 19. It must, given that Apple strictly forbids rivals from accessing

6    the Restricted Files needed to participate in this market.

7        Regarding the broader market for all cloud storage platforms, Apple contends that because a

8    number of other companies can (and do) offer cloud storage on Apple's devices, this means barriers to

9    entering the broader market must be low. *See* MTD at 18-19. But Apple misses the point of the barriers-

10   to-entry inquiry. The purpose of the inquiry is to determine whether entry by competitors will have a

11   "self-correcting" effect on anticompetitive conduct by the incumbent. *See Eastman Kodak*, 125 F.3d at

12   1208. In other words, "barriers to entry are insignificant when natural market forces will likely cure the

13   problem." *Rebel Oil*, 51 F.3d at 1439. That "entry has occurred does not necessarily prelude the existence

14   of 'significant' entry barriers," particularly when the entrants are "unable to take significant business

15   away" from the incumbent." *Id.* at 1440; *MetroNet Servs. Corp. v. U.S. West Commc'ns*, 329 F.3d 986,

16   1006 (9th Cir. 2003) ("key question" is whether "existing competitors and immediate potential entrants"

17   can "*take business away* from the incumbent monopolist").  Only then are barriers to entry low.

18       Here, entrants are not taking business away from Apple in any meaningful extent, as evidenced

19   by Apple's *72.5%* market share. As the complaint shows, operating under Apple's restraints, would-be

20   rivals simply cannot offer a full-service cloud solution and meaningfully compete. Thus, the market

21   demonstrably is *not* self-correcting and any ability to enter is *not* constraining Apple's market power.

22               **3.      Plaintiffs allege anticompetitive conduct.**

23       Apple's contention that the complaint alleges no anticompetitive conduct (MTD at 19-21) can be

24   easily rejected. The complaint details at length how Apple has arbitrarily barred access to Restricted Files

25   to impede competition. *See generally* ¶¶ 4-8, 31-38; *see also* ¶ 4 ("Apple has achieved market dominance

26   by rigging the competitive playing field so that only iCloud can win."); ¶ 112 (Apple has "handicapp[ed]

27   all would-be rivals" by restricting permissions to Restricted Files."); ¶ 22 (Apple's restraints "impede

28

competition to privilege its own apps over competing offerings"). Disregarding these allegations, Apple asks the Court to accept its competing characterization of the restraints as a mere product design promoting security to make iCloud "more attractive to users." MTD at 21. Apple's counternarrative has no basis in the complaint and cannot be credited at this stage. *See Lambrix v. Tesla, Inc.*, 2024 WL 3403777, at *13 (N.D. Cal. June 17, 2024) (whether alleged conduct is ultimately "anticompetitive" is a "factual question").

Apple strains even further to argue that the mere existence of other cloud platforms means, *ipso facto*, Apple could not have restricted competition. *See* MTD at 19-20. This argument presupposes, contrary to the FAC, that other cloud platforms are engaging in unrestrained competition with iCloud. But as alleged in the FAC, and as iCloud's 70-80% market share attests, Apple's restraints prevent this from happening. Indeed, that is the whole purpose of the restraints. *See supra* at § II.

Apple's citations do not suggest any pleading deficiency on the antitrust conduct element. Apple primarily relies on *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1141 (9th Cir. 2022), but the plaintiff there alleged only that it had been "mistreated" by Google *Id.* at 1141. As courts have long recognized, "mistreatment of customers" does not constitute harm to *competition* necessary for antitrust liability. *See id.* Plaintiffs here, by contrast, are alleging harm to competition. *See, e.g.*, ¶ 8 ("Apple's restraints can be coherently explained only as an attempt to stifle competition, and that is their manifest effect."). Apple's other cases—*Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534 (9th Cir. 1983), and *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991 (9th Cir. 2010)—stand "for the uncontroversial proposition that product improvement by itself does not violate Section 2." *Allied Orthopedic*, 592 F.3d at 999. Plaintiffs here are not challenging a product redesign, much less a "product improvement." They are challenging a restraint that Apple imposes on *competitors'* products, specifically to prevent them from meaningfully competing with iCloud. Even if this were somehow considered a product redesign case (it is not), whether a redesign constitutes a "genuine product improvement[]," or something else, is a question of fact. *See Apple iPod iTunes Antitrust Litig.*, 2014 WL 12719194, at *2 (N.D. Cal. Nov. 25, 2014); *Lambrix*, 2024 WL 3403777, at *13.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**4.    Plaintiffs have alleged specific intent to monopolize sufficient to support their attempted monopolization claim.**

Apple contends that Plaintiffs do not allege a "specific intent to monopolize" (MTD at 21), but only by ignoring the FAC's detailed allegations. The central theory of the complaint is that Apple "achieved market dominance by rigging the competitive playing field so that only iCloud can win." ¶ 4; *see also* ¶ 150 ("Apple's actions are designed to destroy competition as alleged herein."); ¶ 156 ("Apple has a specific intent to achieve monopoly power"). These allegations more than adequately plead a specific intent to monopolize. Even if they did not, an intent to monopolize can be inferred from "unfair or predatory" tactics, *see Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993), or "anticompetitive conduct alone," *Catch Curve, Inc. v. Venali, Inc.*, 519 F. Supp. 2d 1028, 1035 (C.D. Cal. 2007). Plaintiffs have alleged these surrogates for intent as well. *See supra* at §§ II & III.B.3.

**C.    Plaintiffs Have Alleged a UCL Claim**

The UCL prohibits "any [1] unlawful, [2] unfair or [3] fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. The parties agree that, to prevail under the "unlawful" prong of the UCL, Plaintiffs must establish a violation of some other legal regime. Because Plaintiffs have stated a claim under the Sherman Act, they have, perforce, stated a claim under the unlawful prong of the UCL.

Plaintiffs also allege a violation of the "unfair" prong of the UCL. Contrary to Apple's assertions (MTD at 22-23), this claim does not reduce to whether Apple has violated the Sherman Act. As the Ninth Circuit has emphasized, "a business practice may be 'unfair,' and therefore illegal under the UCL, even if not specifically proscribed by some other law." *Epic Games*, 67 F.4th at 1000 (upholding a plaintiffs' verdict on UCL claims where Sherman Act claims predicated on the same conduct were rejected for failure of proof at trial). Squarely rejecting the argument Apple recycles in this court, the Ninth Circuit explained: "Apple's rule would convert any Rule of Reason shortcoming into a UCL defense and undermine the UCL's three-prong structure by collapsing the 'unfair' and 'unlawful' prongs into each other." *Id.* at 1001.

To the extent Apple discusses the "unfairness" standard, it does so in one conclusory paragraph (MTD at 23) that fails to meaningfully address the applicable "balancing test" for consumer UCL claims. That test "weighs the utility of the defendant's conduct against the gravity of the harm to the alleged

victim." *Epic Games*, 67 F.4th at 1000. On this score, Apple ignores the wealth of complaint allegations showing that the challenged restraints cause massive harm to consumers in the form of supracompetitive prices, ¶¶ 58-65, and suppressed innovation, ¶¶ 9, 66. And on the opposing side of the scale, Apple's security "justifications" are contrary to the complaint and do not withstand scrutiny. ¶¶ 7, 36, 116. Plaintiffs can readily establish an "unfair" claim under the balancing test. Apple does not even engage in the balancing because, at bottom, it knows this is a fact-intensive inquiry that cannot be performed on the pleadings. *See Backus v. Gen. Mills, Inc.*, 122 F. Supp. 3d 909, 929 (N.D. Cal. 2015) ("Courts are reluctant to grant motions to dismiss 'unfair' UCL claims under the balancing test, because the test involves weighing evidence that is not yet properly before the court.").

**D.    All Of Plaintiffs' Claims Are Timely**

A complaint can be dismissed as untimely only when "the running of the statute of limitations is apparent on the face of the complaint" and it "appears beyond doubt that the plaintiff can prove no set of facts that would establish the timeliness of the claim." *U.S. ex rel. Air Control Techs., Inc. v. Pre Con Indus., Inc.*, 720 F.3d 1174, 1178 (9th Cir. 2013). Plaintiffs' claims are timely under the four-year limitations period applicable to Sherman Act and UCL actions.

**1.    Plaintiff Gamboa brought suit within four years of being overcharged and thus her claims are plainly timely.**

It is a "basic principle of antitrust law that antitrust claims accrue at the time of injury," and UCL claims can accrue no earlier. *See In re Animation Workers Antitrust Litig.*, 87 F. Supp. 3d 1195, 1209 (N.D. Cal. 2015); *Cover v. Windsor Surry Co.*, 2015 WL 4396215, at *3 (N.D. Cal. July 17, 2015). Ms. Gamboa was not injured by Apple's anticompetitive conduct until September 2022 when she purchased her first iCloud subscription, paying a $2.99 monthly price she alleges to be inflated. *See* ¶ 17. Ms. Gamboa brought this lawsuit in March 2024, less than two years after paying her first overcharges. Her claims are thus plainly timely.

It makes no difference whether Apple's restraints on Restricted Files were first adopted 2011, as Apple asserts. *See* MTD at 23. Ms. Gamboa had no injury to redress in 2011. Had Ms. Gamboa brought suit in 2011, or at any time prior to purchasing an iCloud plan and suffering an injury in 2022, her lawsuit would have been dismissed (rightfully) at the threshold for lack of standing. Nothing in Sherman Act or

1    UCL jurisprudence requires plaintiffs to speculatively assert claims *before* they are overcharged and

2    suffer a compensable injury.

3    While the timeliness of Ms. Gamboa's claims is obvious under the applicable "time of injury"

4    accrual rule, she could also avail herself of the "speculative damages" exception to limitations periods.

5    As the Supreme Court has explained, "it is hornbook law, in antitrust actions as in others, that even if

6    injury and a cause of action have accrued as of a certain date, future damages that might arise from the

7    conduct sued on are unrecoverable if the fact of their accrual is speculative or their amount and nature

8    unprovable." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 339 (1971). It would plainly be

9    speculative for a plaintiff to claim damages for anticompetitive conduct affecting a product she has not

10   even purchased yet. *See Oliver v. SD-3C LLC*, 751 F.3d 1081, 1087 (9th Cir. 2014) (applying speculative

11   damages exception in analogous circumstances because "[b]efore Plaintiffs purchased [product at issue],

12   it would have been pure speculation whether Plaintiffs would have been harmed by Defendants' alleged

13   unlawful acts").

14   **2.    Plaintiff Dorobiala's claims are timely under the continuing violations doctrine.**

15   While Mr. Dorobiala purchased his first iCloud subscription more than four years before this

16   lawsuit was initiated,[3] his claims are still timely under the continuing violations doctrine.[4] The continuing

17   violations doctrine seeks to "differentiate those cases where a continuing violation is ongoing—and an

18   antitrust suit can therefore be maintained—from those where all of the harm occurred at the time of the

19   initial violation" prior to the limitations period. *Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199,

20   1202 (9th Cir. 2014). The doctrine applies whenever the defendant "completed an overt act during the

21   limitations period that meets two criteria: 1) it must be a new and independent act that is not merely a

22   reaffirmation of a previous act; and 2) it must inflict new and accumulating injury on the plaintiff." *Id.*

23   The continuing violations doctrine applies here. This is a monopoly maintenance case involving

24   ongoing restraints on competing cloud services. *See* ¶¶ 146-148. At any point Apple could allow

25   competing cloud providers to access Restricted Files, but it continuously refuses that access. ¶ 167 ("The

---

[3] Mr. Dorobiala's records indicate that he purchased a 50GB iCloud plan in or around 2016.
[4] This same doctrine would apply to Ms. Gamboa's claims, but she need not rely on this tolling doctrine for reasons stated above.

illegal conduct alleged herein is continuing and there is no indication that Apple will cease such activity in the future."); ¶ 131 ("Apple continues to engage in the anticompetitive practices alleged in this Amended Complaint."). The Supreme Court long ago recognized that the continuing violations doctrine applies to monopoly maintenance. *See Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 502 n.15 (1968) ("Although Hanover could have sued in 1912 for the injury then being inflicted, it was equally entitled to sue in 1955.").

It thus makes no difference whether, as Apple contends, it started denying competitors access to Restricted Files in 2011. As in *Hanover Shoe*, Apple has continued to impose that restraint. *See id.* (holding that continued refusal to sell equipment to competitors was a "continuing violation" tolling limitations period). Apple could only escape the continuing violations doctrine if it made a decision in 2011 that was "irrevocable, immutable, permanent and final." *Samsung*, 747 F.3d at 1202. Such irrevocable restraints are a rare occurrence, as the Ninth Circuit has observed. *See id.*; *Oliver*, 751 F.3d at 1087 n.5. Even actions taken pursuant to a contract restart the limitations period if the "defendant had the ability not to take the challenged action, even if that would have required breaching the allegedly anti-competitive contract." *Samsung*, 747 F.3d at 1202.

Here, Apple points to nothing that might render its restraints on Restricted Files "irremovable, immutable, permanent and final." To the contrary, in the last four years Apple has released multiple new operating systems, and untold numbers of operating system updates. *See Apple Security Releases*, available at: https://support.apple.com/en-us/100100; *see also Matthews v. Nat'l Football League Mgmt. Council*, 688 F.3d 1107, 1113 (9th Cir. 2012) (taking judicial notice of materials on opposing party's website). At each these points (and more), Apple modifies developer entitlements to files and software.[5] Every time Apple has released a new operating system and update it could have permitted cloud providers to access Restricted Files. But every time, Apple made a decision not to permit that access. These determinations (at a minimum) are overt acts within the limitations period that, by maintaining

---

[5] For example, Apple recently announced that "[s]tarting with iOS 18.1," Apple will lift its restriction preventing third-party digital wallets from accessing the NFC technology needed to offer "tap" payments. *See* Apple Newsroom, *Developers can soon offer in-app NFC transactions using the Secure Element* (Aug. 14, 2024), available at: https://www.apple.com/newsroom/2024/08/developers-can-soon-offer-in-app-nfc-transactions-using-the-secure-element/.

1    Apple's monopoly, impose new and accumulating injury on Plaintiffs. The continuing violations

2    doctrine thus applies.

3        Beyond that, Apple's continued imposition of supracompetitive iCloud prices—which all

4    Plaintiffs continue to pay—can be considered a separate overt act that restarts the limitations period with

5    each purchase. *See In re Glumetza Antitrust Litig.*, 611 F. Supp. 3d 848, 861 (N.D. Cal. 2020)

6    (recognizing split of authority but noting that "most other cases to address this question have concluded

7    that continued overcharges constitute a continuing violation."); *Process Specialties, Inc. v. Sematech,*

8    *Inc.*, 2002 WL 35646610, at *12 (E.D. Cal. Jan. 18, 2002) (applying same principles to monopolization

9    and UCL claims, holding that "each new sale" by monopolist is an "independent act that potentially

10   inflicts new and accumulating injury").

11       **3.    Laches does not bar Plaintiffs' claims for injunctive relief.**

12       Apple asserts that Plaintiffs' injunctive relief claims should be barred by the doctrine of laches.

13   But because Plaintiffs' claims for damages are timely, laches should not apply to bar their claims for

14   injunctive relief. *See Telink, Inc. v. U.S.*, 24 F.3d 42, 45 (9th Cir. 1994). Moreover, Plaintiffs seek

15   *prospective* injunctive relief requiring that Apple "cease" the anticompetitive practices alleged in the

16   complaint. *See* Am. Compl. at Prayer for Relief § B. It is well-established that "laches typically does not

17   bar prospective injunctive relief." *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 959 (9th Cir. 2001). As the

18   Ninth Circuit reasoned, "laches stems from prejudice to the defendant occasioned by the plaintiff's past

19   delay, but almost by definition, the plaintiff's past dilatoriness is unrelated to a defendant's ongoing

20   behavior that threatens future harm." *Id.*

21                              **IV.    CONCLUSION**

22       For the foregoing reasons, Defendant's motion to dismiss should be denied in full.

23

24

25

26

27

28

DATED: October 11, 2024

Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By */s/ Ben M. Harrington*
    Ben M. Harrington (SBN 313877)
Benjamin J. Siegel (SBN 256260)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
benh@hbsslaw.com
bens@hbsslaw.com

Steve. W. Berman (*pro hac vice* forthcoming)
Robert F. Lopez (*pro hac vice* forthcoming)
Catherine Y. N. Gannon (*pro hac vice* forthcoming)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
robl@hbsslaw.com
catherineg@hbsslaw.com

*Attorneys for Plaintiffs and the Proposed Class*

1

### CERTIFICATE OF SERVICE

2   I hereby certify that this document filed through the CM/ECF system will be sent electronically

3 to the registered participants as identified on the Notice of Electronic Filing (NEF).

4 Dated:  October 11, 2024      _s/ Ben M. Harrington_
               Ben M. Harrington

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28