UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JULIANNA FELIX GAMBOA, et al.,

Plaintiffs,

v.

APPLE INC.,

Defendant.

Case No.  24-cv-01270-EKL

**ORDER GRANTING MOTION TO DISMISS IN PART**

Re: Dkt. No. 27

This action arises out of Defendant Apple Inc.'s restrictions that prevent third-party cloud storage providers from accessing certain files on iPhones and iPads.  Plaintiffs allege that these file restrictions prevent Apple's competitors from offering "full-service" cloud storage that can compete effectively with iCloud, Apple's own cloud storage service.  Plaintiffs claim that Apple's conduct violates the Sherman Antitrust Act and California's Unfair Competition Law ("UCL") and causes them to overpay for their iCloud subscriptions.  Apple moves to dismiss the complaint. Mot. to Dismiss, ECF No. 24 ("Motion").  The Court carefully reviewed the parties' briefs and heard argument on December 11, 2024.  For the following reasons, the Court GRANTS in part and DENIES in part Apple's Motion.

## I.    BACKGROUND

Apple is a leading manufacturer of mobile devices, including the prolific iPhone and the popular iPad tablet.  First Am. Compl. ¶ 2, ECF No. 24 ("Compl.").  Apple also offers many applications and services to users of its mobile devices.  *Id*.  Relevant here, Apple offers a cloud storage platform called iCloud, which Apple launched in 2011.  *Id*. ¶¶ 3, 26.  "iCloud permits Apple's users to store all types of data on remote or 'cloud' servers, and then access that data across their devices.  File types that can be stored on iCloud include, without limitation, user

United States District Court
Northern District of California

photos, videos, music, device settings, and apps." *Id.* ¶ 26. All Apple device users have access to a free tier of iCloud storage for up to 5 gigabytes ("GB") of data. *Id.* ¶ 28. Users who want to store more data with iCloud can select between monthly subscription tiers ranging from 50 GB for $0.99, up to 12 terabytes for $59.99. *Id.* According to the complaint, 69% of iCloud users opt for the free tier or the $0.99-per-month tier. *Id.* ¶ 29.

No Apple device user is required to use or purchase iCloud or any other cloud storage service. *Id.* ¶ 40 ("[C]onsumers can buy smartphones and tablets without also purchasing or using any cloud storage."). Apple device users can transfer data to external drives or to other computers with larger storage capacity. *Id.* ¶ 24. And Apple device users who choose to use cloud storage can select from many different options. Indeed, "[c]loud storage is offered by every major technology company (*e.g.*, Google and Microsoft) and numerous cloud-storage specialists (*e.g.*, Dropbox, Sync.com, IDrive, to name a few)," *id.* ¶ 4, and "many well-known technology firms offer[] cloud storage products that are available on Apple's mobile devices," *id.* ¶ 94. Apple device users can even mix and match multiple cloud storage options on one device, storing some files with iCloud and other files with third-party services. *See id.* ¶ 81.

Third-party cloud storage providers can store most types of data on Apple mobile devices. *Id.* ¶ 6. But iCloud is the only cloud storage service that can store "restricted files," which include "app data and device settings" that are "needed to restore a device when it is replaced" or after a factory reset. *Id.* ¶¶ 5, 32-33. Plaintiffs allege that this file restriction gives iCloud "an enormous structural advantage" and "prevents rival cloud platforms from offering a full-service cloud solution that can compete effectively against iCloud." *Id.* ¶¶ 5, 34. According to the complaint, there is no legitimate justification for Apple's restriction. *Id.* ¶¶ 7, 31-32, 35.

Plaintiffs are two iCloud subscribers who seek to represent a nationwide class of consumers who allegedly overpaid for iCloud due to Apple's file restrictions. Plaintiff Julianna Felix Gamboa "purchased a 200GB iCloud storage plan in or around September 2022." *Id.* ¶ 17. Plaintiff Thomas Dorobiala purchased a 50GB iCloud plan "in or around 2016." Opp. at 23 n.3, ECF No. 31. Plaintiffs claim that Apple's conduct constitutes tying in violation of Section 1 of the Sherman Act, monopolization and attempted monopolization in violation of Section 2 of the

1   Sherman Act, and unlawful and unfair competition in violation of the UCL.  Apple moves to

2   dismiss all claims as time-barred and for failure to state a claim.

3   ## II.    LEGAL STANDARD

4          Under Federal Rule of Civil Procedure 12(b)(6), a court must dismiss a complaint if it fails

5   to state a claim upon which relief can be granted.  To avoid dismissal, the plaintiff must allege

6   "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*,

7   550 U.S. 544, 570 (2007).  A claim is facially plausible when the pleaded facts allow the court "to

8   draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*

9   *v. Iqbal*, 556 U.S. 662, 678 (2009).  For purposes of a Rule 12(b)(6) motion, the court generally

10  "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light

11  most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d

12  1025, 1031 (9th Cir. 2008).  However, the court need not "assume the truth of legal conclusions

13  merely because they are cast in the form of factual allegations." *Fayer v. Vaughn*, 649 F.3d 1061,

14  1064 (9th Cir. 2011) (per curiam) (quoting *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th

15  Cir. 1981)).

16         If the court finds that dismissal is warranted, the "court should grant leave to amend even if

17  no request to amend the pleading was made, unless it determines that the pleading could not

18  possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir.

19  2000) (en banc) (quoting *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995)).

20  ## III.   DISCUSSION

21         Apple moves to dismiss on several grounds.  First, Apple argues that all Plaintiffs' claims

22  are time-barred because Apple's file restriction policy was implemented more than a decade ago.

23  Second, Apple argues that it does not unlawfully tie Apple devices to iCloud because device users

24  are not required to buy iCloud, and they can buy cloud storage from many other suppliers.  Third,

25  Apple argues that it has not monopolized or attempted to monopolize any relevant market for

26  cloud storage on Apple devices.  Finally, Apple argues that it has not violated the UCL because

27  none of its alleged conduct is unlawful or unfair.  The Court addresses each of these arguments in

28  turn.

United States District Court
Northern District of California

**A.    It Is Not Clear that Plaintiffs' Claims Are Time-Barred.**

Apple argues that all Plaintiffs' claims should be dismissed as time-barred under the applicable statutes of limitations and the equitable doctrine of laches. Mot. at 23-25. "If the running of the statute [of limitations] is apparent on the face of the complaint, the defense may be raised by a motion to dismiss." *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980). However, "a complaint cannot be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts that would establish the timeliness of the claim." *Supermail Cargo, Inc. v. United States*, 68 F.3d 1204, 1207 (9th Cir. 1995). The limitations period for Sherman Act and UCL claims is four years. 15 U.S.C. § 15(b); Cal. Bus. & Prof. Code § 17208. The same period presumptively applies to the laches defense. *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835-36 (9th Cir. 2002). The complaint was filed on March 1, 2024; thus, Plaintiffs' claims are time-barred if they accrued before March 1, 2020, absent tolling or an exception to the default accrual rules.

Apple argues that Plaintiffs' claims are time-barred because Plaintiffs "challenge a design decision that Apple implemented *nearly 15 years ago* – in 2011 – when iCloud first launched." Mot. at 3. But, as Apple acknowledges, the complaint "omit[s] the date Apple implemented" its decision to restrict files from cloud storage rivals. Mot. at 23 n.8. Thus, it is not "apparent on the face of the complaint" when Plaintiffs' claims accrued. *Jablon*, 614 F.2d at 682. Apple contends that the answer lies in a document incorporated by reference in the complaint. Mot. at 23 n.8. But incorporation by reference requires that the complaint "refers extensively to the document" or that "the document forms the basis of the plaintiff's claims." *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003). Here, the document was cited just twice in the 41-page complaint and does not form the basis of Plaintiffs' claims. *See* Compl. ¶¶ 7, 31. Plaintiffs' passing reference to the document does not satisfy the incorporation-by-reference standard. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1003 (9th Cir. 2018) (holding that a quotation of "a few lines in a footnote of a 67-page complaint" was "not sufficiently extensive" for incorporation by reference).

United States District Court
Northern District of California

Additionally, Apple's document does not establish "beyond doubt" that Plaintiffs' claims are untimely. *See Supermail Cargo*, 68 F.3d at 1207. The document states that "third-party apps are 'sandboxed,' so they are restricted from accessing files stored by other apps or from making changes to the device." *See* Apple, *iOS Security* (Oct. 2014) at 17, https://www.apple.com/mx/privacy/docs/iOS_Security_Guide_Oct_2014.pdf. Apple asks the Court to infer from this general statement that Apple made a design decision in 2011 "and it has remained unchanged since then." Mot. at 23. But nothing in the document or the complaint addresses how Apple has implemented and enforced its file restrictions over time.

The complaint alleges that Apple maintains an illegal monopoly through ongoing enforcement of its file restrictions. *See* Compl. ¶¶ 109-13. This conduct may constitute a continuing violation of the Sherman Act. *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 502 n.15 (1968) (holding that decades-long enforcement of a restrictive policy "inflicted continuing and accumulating harm"); *MedioStream, Inc. v. Microsoft Corp.*, 869 F. Supp. 2d 1095, 1105 (N.D. Cal. 2012) (holding that active enforcement of mutable policies is a continuing violation). If Apple's alleged conduct is a continuing violation of the Sherman Act, Plaintiffs' claims may be timely.[1] *See Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1202 (9th Cir. 2014).

---

[1] Gamboa argues that her claims are timely even without the "continuing violation" exception because she sued "within four years of purchasing iCloud." Opp. at 22. The Court disagrees. The reasoning underlying Gamboa's argument would "effectively swallow[] the statute of limitations rule." *SaurikIT, LLC v. Apple Inc.*, No. 4:20-CV-08733-YGR, 2022 WL 1768845, at *3 (N.D. Cal. May 26, 2022), *aff'd*, 22-16527, 2023 WL 8946200 (9th Cir. Dec. 28, 2023). All conduct, no matter how old, would expose a defendant to a new lawsuit each time a new consumer buys the defendant's product for the first time. Moreover, this argument ignores the principle that the accrual of an antitrust claim depends on the "defendant's 'acts'" that harm competition, *not* on the ripple effect those acts have on a particular plaintiff years later. *Aurora Enters., Inc. v. Nat'l Broad. Co.*, 688 F.2d 689, 694 (9th Cir. 1982); *see also Pace Indus. v. Three Phoenix Co.*, 813 F.2d 234, 237 (9th Cir. 1987) ("[T]he statute of limitations runs from the commission of the act."). Plaintiffs alternatively argue that the "continued imposition of supracompetitive iCloud prices . . . restarts the limitations period with each purchase." Opp. at 25. This argument fails because charging monopoly prices is not unlawful on its own. *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004); *Eichman v. Fotomat*, 880 F.2d 149, 160 (9th Cir. 1989) ("[T]he passive receipt of profits . . . is not an overt act of enforcement which will restart the statute of limitations."). Plaintiffs rely in part on a price-fixing case to support this argument. Opp. at 25. But the rule is different in price-fixing cases because charging a fixed price, on its own, is anticompetitive conduct because each sale of a price-fixed product enforces the unlawful price-fixing conspiracy. *See, e.g.*, *Oliver v. SD-3C LLC*, 751 F.3d 1081, 1086 (9th Cir. 2014).

1    At this early stage, the Court cannot conclude that Plaintiffs' claims are time-barred.  The

2    timing of Apple's file restriction, and the details of how it is implemented, are not sufficiently

3    clear from the face of the complaint.  Apple's statute-of-limitations and laches defenses are more

4    appropriately addressed at a later stage, on a more complete record.  Accordingly, Apple's Motion

5    to Dismiss all claims as time-barred is DENIED without prejudice.

6         **B.    Plaintiffs Fail to Plausibly Allege a Tying Claim.**

7    Plaintiffs allege that Apple engages in illegal tying in violation of Section 1 of the Sherman

8    Act, which prohibits unreasonable restraints of trade.  15 U.S.C. § 1; *State Oil Co. v. Khan*, 522

9    U.S. 3, 10 (1997).  Courts "generally evaluate whether a practice unreasonably restrains trade in

10   violation of Section 1 under the 'rule of reason.'"[2] *Brantley v. NBC Universal, Inc.*, 675 F.3d

11   1192, 1197 (9th Cir. 2012).  To state a Section 1 claim, Plaintiffs must plausibly allege "(1) a

12   contract, combination or conspiracy among two or more persons or distinct business entities;

13   (2) by which the persons or entities intended to harm or restrain trade or commerce . . . ; (3) which

14   actually injures competition," and (4) harms the plaintiff as a result.  *Id*. (quoting *Kendall v. Visa

15   U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008)).

16   A tying arrangement is one kind of restraint of trade:  It is "an agreement by a party to sell

17   one product but only on the condition that the buyer also purchases a different (or tied) product, or

18   at least agrees that he will not purchase that product from any other supplier."  *Eastman Kodak

19   Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461 (1992) (quoting *N. Pac. Ry. v. United States*,

20   356 U.S. 1, 5-6 (1958)).  "[T]he essential characteristic of an invalid tying arrangement lies in the

21   seller's exploitation of its control over the tying product to force the buyer into the purchase of a

22   tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere

23   on different terms."  *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984).

---

[2] The complaint alleges that Apple "engaged in a per se illegal tying arrangement."  Compl. ¶ 138
(emphasis omitted).  But at the motion hearing, Plaintiffs conceded that the tying claim is "subject
to a rule of reason analysis."  12/4/24 Hr'g Tr. 22:18-23:3, ECF No. 49 ("Hr'g Tr.").  *See also
Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 998 (9th Cir. 2023); *Ohio v. Am. Express*, 585 U.S.
529, 540-41 (2018) ("Typically only 'horizontal' restraints – restraints 'imposed by agreement
between competitors' – qualify as unreasonable per se." (quoting *Business Elecs. Corp. v. Sharp
Elecs. Corp.*, 485 U.S. 717, 730 (1988))).

Here, Plaintiffs' theory is that Apple unlawfully ties its mobile devices (the tying good) to cloud storage (the tied good).  Compl. ¶¶ 4, 133.  Accordingly, Plaintiffs must plausibly allege: (1) that mobile devices and cloud storage are separate products; (2) that Apple has sufficient market power in mobile devices to coerce buyers to purchase iCloud; (3) that Apple sells mobile devices only on the condition that buyers also purchase iCloud, or that buyers agree not to purchase cloud storage from other suppliers; and (4) that the tying arrangement forecloses a substantial volume of commerce in the cloud storage market.  *See Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 913 (9th Cir. 2008) (setting forth the specific elements required for a tying claim).  The elements of a tying claim supplement the elements that apply to Section 1 claims generally.  At this stage, the Court focuses on the lack of concerted conduct and the lack of a tying arrangement, as Apple does not challenge the remaining elements.

Plaintiffs' tying claim fails at the outset because Plaintiffs do not allege concerted conduct, which is a requirement for a Section 1 claim.  *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 775-76 (1984) (Section 1 is "limited to concerted conduct. . . ."); *see also Epic Games*, 67 F.4th at 981.  Here, Plaintiffs allege that "[w]hen consumers purchase an Apple mobile device, they are nowhere advised that iCloud is the only cloud service capable of storing or backing up Restricted Files on their device," Compl. ¶ 93, and they "learn of this limitation only after they have purchased their mobile device," *id.* ¶ 94.  Thus, as alleged, Apple unilaterally decided to restrict access to certain files and imposed this restriction on buyers without their knowledge or acquiescence.  To treat Apple's purely unilateral conduct as a Section 1 violation "would be to read the words 'contract' and 'combination' out of [S]ection 1."  *Systemcare v. Wang Labs. Corp*., 117 F.3d 1137, 1142-43 (10th Cir. 1997) (en banc) ("The essence of [S]ection 1's contract, combination, or conspiracy requirement in the tying context is the agreement, however reluctant, of a buyer to purchase from a seller a tied product or service along with a tying product or service."); *see also* Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles & Their Application ¶ 1755c (Sept. 2024 update) (A tying condition must be "announced or reasonably understood.").  Accordingly, Plaintiffs' tying claim fails for lack of concerted conduct.

Plaintiffs' tying claim also fails for lack of a tying arrangement because the complaint does not plausibly allege that Apple conditions the sale of its mobile devices on buyers' agreement to purchase iCloud from Apple (a "positive" tie) or on their agreement not to purchase cloud storage from Apple's rivals (a "negative" tie).  "The common element in both situations is that a seller explicitly or implicitly imposes conditions linking the sale of a tying product with the sale of the tied product."  *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1178 (9th Cir. 2016).  As to a positive tie, Plaintiffs do not allege that Apple sells mobile devices only on the condition that buyers also purchase iCloud.  Instead, Plaintiffs allege just the opposite:  "[C]onsumers can buy smartphones and tablets without also purchasing or using any cloud storage," Compl. ¶ 40, and "approximately 30-48% of Apple users do not purchase an iCloud subscription," *id*. ¶ 67. Because buyers can and do obtain the tying product (Apple mobile devices) without buying the tied product (iCloud), there is no positive tie.  As to a negative tie, Plaintiffs do not allege that Apple sells mobile devices only on the condition that buyers agree not to purchase cloud storage from Apple's rivals.  To the contrary, Plaintiffs allege that "many well-known technology firms offer[] cloud storage products that are available on Apple's mobile devices," *id*. ¶ 94, and "Apple mobile device holders can select from [these] other cloud-based storage providers," *id*. ¶ 32. These allegations foreclose a negative tying claim.

In sum, Apple device buyers are free to:  (1) purchase iCloud, (2) purchase cloud storage from Apple's rivals, or (3) choose not to purchase cloud storage at all.  Based on these allegations, there is no tying arrangement between Apple mobile devices and cloud storage for those devices.

Plaintiffs argue that this case is just like the "seminal negative tying case," *Eastman Kodak*.  Opp. at 6-7.  It is not.  In that case, Kodak "implemented a policy of selling replacement parts" for Kodak photocopiers "only to buyers . . . who use Kodak service or repair their own machines."  *Eastman Kodak*, 504 U.S. at 458.  Kodak's policy involved an expressly conditioned sale:  "Kodak would sell parts to third parties only if they agreed not to buy service from" Kodak's rivals.  *Id*. at 463.  Through these conditioned sales, Kodak exploited its control over replacement

United States District Court
Northern District of California

parts to coerce buyers not to purchase service from Kodak's rivals.[3]  By contrast, in the present case, there is no conditioned sale of Apple mobile devices, either express or implicit.  Consumers can buy an Apple mobile device and they can purchase cloud storage from Apple's rivals.  Accordingly, there is no coercion of buyers and no negative tie.

For the foregoing reasons, the Court GRANTS Apple's Motion to Dismiss the Section 1 tying claim with leave to amend because this is the Court's first ruling on the legal sufficiency of Plaintiffs' claims.  However, the Court is skeptical that Plaintiffs could cure the pleading deficiencies discussed above.  What Plaintiffs are really challenging is Apple's product design decision to shield restricted files from third-party cloud storage providers.  Compl. ¶¶ 6, 34.  This type of unilateral anticompetitive conduct is properly challenged under Section 2 of the Sherman Act, not under Section 1.  Areeda & Hovenkamp ¶ 1757a ("[P]roduct design is ordinarily, although not invariably, a unilateral act.  If it is, then it does not satisfy [the] Sherman [Act] § 1 . . . requirement of an agreement."); *see also Apple iPod iTunes Antitrust Litig.*, No. C 05-00037 JW, 2009 WL 10678940, at *5 (N.D. Cal. Oct. 30, 2009) (dismissing technological tying claim because plaintiffs failed to make a "threshold showing" of concerted action required for a Sherman Act § 1 claim).  The Court turns to Plaintiffs' Section 2 claims.

### C.    Plaintiffs Fail to Plausibly Allege a Monopolization Claim.

Section 2 of the Sherman Act makes it unlawful to monopolize, or to attempt to monopolize, interstate or foreign commerce.  15 U.S.C. § 2.  To state a claim for monopolization, Plaintiffs must plausibly allege:  (1) a relevant market; (2) that Apple has monopoly power in the relevant market; (3) Apple's willful acquisition or maintenance of monopoly power through anticompetitive conduct; (4) harm to competition; and (5) resulting injury to Plaintiffs.  *See Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1137-38 (9th Cir. 2022).  Apple primarily contests the first two elements.

---

[3] At the motion hearing, Plaintiffs argued that *Eastman Kodak* involved "an implicit policy" not an "express tying condition."  Hr'g Tr. 24:2-24.  That is incorrect.  As the Ninth Circuit observed: "Kodak entered into agreements with its equipment owners, expressly set out in its 'Terms of Sale,' that it will sell parts only to users 'who service only their own Kodak equipment.'"  *Image Tech. Serv., Inc. v. Eastman Kodak Co.*, 903 F.2d 612, 619 (9th Cir. 1990); *see also Eastman Kodak*, 504 U.S. at 463 n.8.

United States District Court
Northern District of California

### 1.    Market definition

The first step in analyzing Plaintiffs' Section 2 claims "is to accurately define the relevant market." *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020); *see also Thurman Indus. v. Pay'N Pak Stores, Inc.*, 875 F.2d 1369, 1373 (9th Cir. 1989) ("[D]efining the relevant market is indispensable to a monopolization claim."). "Without a definition of [the] market there is no way to measure [the defendant's] ability to lessen or destroy competition." *Am. Express*, 585 U.S. at 543 (quoting *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965)). And although Plaintiffs "need not plead a relevant market with specificity, . . . a complaint may be dismissed under Rule 12(b)(6) if the complaint's 'relevant market' definition is facially unsustainable."[4] *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018) (quoting *Newcal Indus. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008)).

"The relevant market is the field in which meaningful competition is said to exist." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997). It includes two components: a relevant product market and a relevant geographic market. *Hicks*, 897 F.3d at 1120. The relevant product market must include "the product at issue as well as all economic substitutes for the product." *Newcal*, 513 F.3d at 1045. Including all economic substitutes is necessary because the purpose of defining a relevant market is to understand the competitive forces that constrain a seller's ability to raise prices profitably. Substitutes constrain a seller's pricing because buyers can switch to substitutes in response to a seller's attempt to charge supracompetitive prices. *See* Areeda & Hovenkamp ¶ 562a.

Here, Plaintiffs allege that the geographic market is the United States, which Apple does not dispute at this stage. Plaintiffs allege two product markets. First, Plaintiffs allege an

---

[4] Plaintiffs argue that "a market need not be precisely defined if Apple's monopoly power can be established with direct evidence." Opp. at 9. This is incorrect. Plaintiffs rely on cases that stand for a more limited proposition: Precise market definition is not always required in Section 1 cases where the "per se" or "quick look" standard applies, or where the plaintiff challenges a horizontal restraint. *See Epic Games*, 67 F.4th at 974 n.6 (discussing "per se" and "quick look" cases as examples where precise market definition was not required); *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 831, 838 & n.7 (9th Cir. 2022) (addressing Section 1 horizontal restraint); *see also Shields v. World Aquatics*, Nos. 23-15092, 15156, 2024 WL 4211477, at *1 (9th Cir. Sept. 17, 2024) (same). These conditions do not apply here. In any event, Plaintiffs have not plausibly alleged direct evidence of monopoly power. *See infra* Section III.C.2.a.

extremely narrow market for "full-service" cloud storage on Apple mobile devices – that is, "cloud platforms that can host all file types."  Compl. ¶ 42.  Second, in the alternative, Plaintiffs allege a broader market for all cloud storage on Apple mobile devices.  *Id*.  Apple focuses its argument on the first product market, and does not challenge the broader market.

Apple argues that Plaintiffs' narrower "full-service" cloud storage market is implausible.  The Court agrees.  The alleged "full-service" cloud storage market is a special type of market called a "single-brand aftermarket" because it includes only one brand's product:  Apple's iCloud.  Ordinarily, a product market is not defined by just one seller's product.  However, courts do recognize single-brand aftermarkets in limited circumstances where the buyer has already purchased a "foremarket good" (here, an Apple mobile device) that restricts the buyer's choice in the aftermarket.  *Epic Games*, 67 F.4th at 977 (stating the requirements for alleging an aftermarket).[5]

An aftermarket, like any relevant market, must satisfy "general market-definition principles," including the requirement to include all economic substitutes, *Epic Games*, 67 F.4th at 977, not just perfect substitutes.  Here, Plaintiffs' "full-service" cloud storage market fails to include economic substitutes – principally, cloud storage services offered by Apple's rivals.  The market cannot be limited to a single-brand product (iCloud) because non-Apple storage offerings work on Apple devices.  *See* Compl. ¶¶ 4, 94.  Plaintiffs allege that iCloud has one feature (storing restricted files) that some unknown subset of Apple device users value.  *See id.* ¶ 81.  But the complaint lacks any plausible allegation that Apple device users value this single feature so much

---

[5] Apple argues that the "law recognizes an exception for single-brand aftermarkets only where a defendant changes its policy relating to the aftermarket product (here, iCloud) *after* a customer is locked-in by having first purchased the foremarket product (an Apple mobile device)."  Mot. at 12.  The Ninth Circuit has expressly rejected this argument.  *Epic Games*, 67 F.4th at 979.  Apple also argues that an aftermarket "arises only when one is *compelled* to purchase the aftermarket product by virtue of being locked-in after first purchasing the foremarket product."  Mot. at 11.  It is true that aftermarkets typically arise when a foremarket good requires a consumable aftermarket good to function properly.  For example, photocopiers need replacement parts and service, printers need ink, and cameras need film.  But Apple has not cited any legal authority holding that a "compelled purchase" is a necessary element of an aftermarket, and the Ninth Circuit has not expressly incorporated such a requirement.  *See Epic Games*, 67 F.4th at 977.  In any event, Plaintiffs plausibly allege that mobile devices do need cloud storage to function properly because they "have limited local storage capacity" but "accumulate an enormous amount of data."  Compl. ¶ 24.

United States District Court
Northern District of California

United States District Court
Northern District of California

that it distinguishes iCloud from all other cloud storage options. Markets often include products that differ in some regard but still "compete with one another sufficiently" to constrain pricing. Areeda & Hovenkamp ¶ 563a. Here, Plaintiffs acknowledge that Apple device users can substitute between iCloud and other cloud storage options for all other data storage needs.[6] Compl. ¶ 81. Thus, it is implausible that iCloud faces no meaningful competition from the numerous other cloud storage options available to Apple mobile device users. *Hicks*, 897 F.3d at 1121 (holding that a market definition was implausible because it "omit[ted] many economic substitutes").

Plaintiffs' other allegations in support of the narrower "full-service" cloud storage market are implausible. First, Plaintiffs describe functional and quality differences between iCloud and other storage options, like local storage on external drives. Compl. ¶¶ 76-79. But other cloud storage services that are compatible with Apple mobile devices have all the same features, *see id.* ¶ 70, so at the very least, they must be included in the relevant market as well.

Second, Plaintiffs point to a so-called "SSNIP test," which examines how consumers respond to a hypothetical or actual Small but Significant Non-transitory Increase in Price (a "SSNIP") in a product market. *Id.* ¶¶ 83-91. If enough consumers respond by purchasing products *outside* of the proposed product market, and the SSNIP becomes unprofitable, then the market has been defined too narrowly: The market failed to include products that consumers viewed as economic substitutes for the product subject to the SSNIP. By contrast, if the SSNIP is profitable, it suggests that the proposed product market includes all economic substitutes because consumers were not able to sufficiently switch their purchasing to other products in response to the price increase. *See Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1002 (9th Cir. 2008). Market definition does not necessarily require a SSNIP test at the pleading stage – but if Plaintiffs choose to rely on one, it must be plausible. *Apple Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1198 (N.D. Cal. 2008) (rejecting conclusory SSNIP test allegations).

---

[6] Plaintiffs allege that 55% of iCloud users use the service for "back-up," Compl. ¶ 81, but other cloud storage services provide this same feature, *id.* ¶ 70. The complaint does not allege in any detail how many Apple device users use iCloud to back up restricted files in particular.

United States District Court
Northern District of California

Here, Plaintiffs say that Apple "substantially increased the price of iCloud in the UK and other regions (outside the US)," and thus iCloud is its own product market. Compl. ¶ 86. This allegation has a host of deficiencies. First, Plaintiffs do not allege that iCloud's price increased *relative to* other products in the market, which is a necessary condition for a SSNIP test. *See Psystar*, 586 F. Supp. 2d at 1196. If the price of iCloud increased, but at the same time all other cloud storage services increased their prices comparably (*e.g.*, due to a market-wide cost increase), the fact that consumers did not change their purchasing behavior tells us nothing about substitutability because the relative prices have not changed. Second, the price change was imposed in "the UK and other regions," but here the relevant geographic market is the United States. Plaintiffs do not allege any facts to establish that even a *valid* SSNIP test conducted in the UK would apply to the United States geographic market. Finally, a SSNIP test requires a profitable price increase, but Plaintiffs do not allege that the price change in the UK was profitable. Instead, they ask the Court to infer this fact based on the conclusory allegation that "[b]y all accounts, Apple has been able to retain these substantial price hikes." Compl. ¶ 87. For all these reasons, Plaintiffs' SSNIP test does not plausibly support their market definition.[7]

Accordingly, Plaintiffs' narrower "full-service" cloud storage market is implausible. However, as previously noted, Apple did not challenge Plaintiffs' market for all cloud storage on Apple devices. Thus, the Court turns to Apple's argument that it lacks monopoly power in the broader alleged market.

### 2.    Monopoly power

Plaintiffs allege that Apple possesses monopoly power in the relevant market for cloud storage on Apple mobile devices. Monopoly power is "the ability to raise price profitably *by*

---

[7] Apple did not challenge Plaintiffs' broader cloud storage market, so the Court does not address whether other potential substitutes, such as local storage, should be included in the relevant market at this stage. However, with respect to local storage, Plaintiffs argue that "Apple already charges more than 5% more for iCloud storage" than local storage, which is free. Compl. ¶ 91. This is a misapplication of a SSNIP test because it conflates a *price difference* with a *price increase*. "[A] mere price differential alone does not necessarily signal a distinct market" or that the higher-priced product "is unconstrained by competition." *Psystar*, 586 F. Supp. 2d at 1198-99; *see also Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1477 (9th Cir. 1997).

*restricting output*." *Am. Express*, 585 U.S. at 549 (quoting Areeda & Hovenkamp ¶ 501).

Monopoly power may be demonstrated through direct or indirect evidence. *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986). Plaintiffs' allegations are insufficient under either approach.

### a.    Direct evidence

Direct evidence of monopoly power may be shown through proof of "restricted output and supracompetitive prices." *Forsyth*, 114 F.3d at 1475. Both elements are required: A showing of high prices by itself, with "no accompanying showing of restricted output," does not permit an inference of monopoly power. *Id.* at 1476; *see also Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 237 (1993) (If "output is expanding at the same time prices are increasing, rising prices are equally consistent with growing product demand.").

Here, Plaintiffs do not allege that Apple charges higher prices for iCloud than competitors charge for substitute cloud storage services.[8] Instead, Plaintiffs ask the Court to infer supracompetitive prices from Apple's high gross margin (*i.e.*, its rate of profit) on iCloud. Compl. ¶¶ 8, 59, 63 (alleging gross margins ranging from 65% to 80%). Under certain circumstances, persistent high gross margins may serve as direct evidence of supracompetitive pricing. Areeda & Hovenkamp ¶ 516a. The theory is that, in a competitive market, the price of a good or service tends toward a firm's marginal cost of producing it. If a firm can sell at a price that significantly exceeds marginal cost for a sustained period of time, it suggests that the firm does not face meaningful competition. *See id.* ¶ 516b.

Apple argues that gross margins offer a weak foundation for inferring supracompetitive pricing. Mot. at 15. It is true that a firm's high margins can be explained by factors other than a lack of competition. For example, high margins could reflect that the firm is more efficient than its competitors, or that market-wide supply is not keeping up with demand. Areeda & Hovenkamp ¶ 516b. But these circumstances are not alleged in the complaint, thus the Court cannot infer that

---

[8] Apple asks the Court to consider an article that shows iCloud pricing is "on par with – and often lower than – the alleged competition." Mot. at 16. The article is not incorporated by reference in the complaint because it is cited just once in a footnote, Compl. ¶ 109 n.51, and it does not form the basis of Plaintiffs' claims. *Khoja*, 899 F.3d at 1003.

1    they explain Apple's allegedly high gross margin on iCloud.

2        Apple also argues that Plaintiffs' gross margin allegations are implausible because they

3    make inaccurate assumptions about Apple's costs.  Mot. at 15.  But Apple's actual costs are not

4    before the Court, and the Court must accept the specific facts alleged in the complaint.  At this

5    early stage, Plaintiffs' allegations permit an inference of supracompetitive pricing, even if just

6    barely.  *Cf. Garnica v. HomeTeam Pest Def., Inc.*, 230 F. Supp. 3d 1155, 1159-60 (N.D. Cal.

7    2017) (finding that a flawed analysis of gross margins was insufficient at the class certification

8    stage based on evidence that margins were not reflective of "the amount of competition" in the

9    market); *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1412 (7th

10   Cir. 1995) (addressing whether evidence of gross margins was sufficient to sustain a jury verdict).

11   Accordingly, Plaintiffs plausibly allege supracompetitive pricing, the first requirement for direct

12   evidence of monopoly power.

13       However, Plaintiffs fail to plausibly allege the other requirement for direct evidence of

14   monopoly power – that Apple has restricted output of cloud storage for Apple mobile devices.

15   Plaintiffs do not take the ordinary approach of alleging that Apple, the purported monopolist, has

16   restricted *its own* output of cloud storage.  Instead, Plaintiffs allege that Apple restricts the output

17   of *other* cloud storage providers by preventing them from storing restricted files.  Compl. ¶ 66.

18   This allegation is circular and conclusory.  The main question raised by Plaintiffs' complaint is

19   whether Apple's restriction of certain files excludes other cloud storage providers from competing

20   to offer cloud storage services.  Plaintiffs assume the answer to that question by alleging, without

21   any basis, that Apple's cloud storage competitors would produce more cloud storage in the

22   absence of Apple's file restrictions.  This conclusory allegation does not permit an inference that

23   market-wide output has been restricted.

24       Plaintiffs also argue that the allegedly high price of iCloud depresses demand for cloud

25   storage.  Plaintiffs claim that "if prices were lower . . . more consumers would purchase cloud

26   storage and in larger amounts."  *Id.* ¶ 67.  This argument has several flaws.  First, Plaintiffs must

27   allege both supracompetitive prices *and* restricted output, *Forsyth, Inc.*, 114 F.3d at 1475-76, but

28   they are asking the Court to infer restricted output from high prices alone.  Second, the argument

United States District Court
Northern District of California

falsely equates depressing demand with restricting output.  A restriction of output is a constraint on production of cloud storage.  Nothing about Apple's pricing restricts other cloud storage providers from offering cloud storage – if anything, Apple's allegedly high prices would incentivize rivals to increase production to take share from Apple.  Third, Plaintiffs' "depressed demand" theory is not supported by any facts.  Plaintiffs point to a survey indicating that "30-48% of Apple users do not purchase an iCloud subscription . . . meaning there is a significant population of potential iCloud subscribers" who might purchase cloud storage at lower prices.  *Id.* ¶ 67.  But this statistic says only that *some* Apple device users do not buy *iCloud* – it does not permit an inference that a significant portion of Apple device users do not purchase *any* cloud storage because prices are too high.

Because Plaintiffs do not plausibly allege that Apple restricts output of cloud storage on Apple mobile devices, Plaintiffs have not alleged direct evidence of Apple's monopoly power.

### b.    Indirect evidence

To establish monopoly power through indirect evidence, Plaintiffs must plausibly allege: (1) that Apple has a high share of the market for cloud storage; (2) "that new competitors face high market barriers to entry"; and (3) "that current competitors lack the ability to expand their output to challenge [the] monopolist's high prices."  *Image Tech. Servs.*, 125 F.3d at 1207-08; *see also Los Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1425 (9th Cir. 1993) (Even a firm with 100% market share does not possess monopoly power if new firms can enter the market, or if existing rivals could increase their output, to constrain the firm's supracompetitive pricing.).  Barriers to entry are "additional long-run costs that were not incurred by incumbent firms but must be incurred by new entrants," or "factors in the market that deter entry while permitting incumbent firms to earn monopoly returns."  *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1439 (9th Cir. 1995) (quoting *Los Angeles Land*, 6 F.3d at 1427-28).  Barriers to expansion include the "lack of excess capacity" of firms that have entered the market.  *Id.* at 1441.  "If existing competitors are producing at full capacity, they may lack the ability to quickly expand supply."  *Id.*

With respect to the first requirement for indirect evidence of monopoly power, *i.e.*, high market share, Plaintiffs allege that "iCloud's share of the market for all cloud storage on Apple

United States District Court
Northern District of California

mobile devices exceeds 70 percent."  Compl. ¶ 105.  But this figure is not supported by any direct measure of Apple's share of the relevant market, and it is both mathematically and analytically wrong.  Plaintiffs' allegations contain a mathematical error that, when corrected, results in a 51.4% market share.[9]  But the more fundamental flaw is that even this corrected figure does not represent a market share.  Plaintiffs are relying on a survey that says 33% of cloud storage users use iCloud.  But market share is measured by a firm's share of output, or the portion of market demand served by the firm.  Areeda & Hovenkamp ¶ 535c ("Generally, market shares should and have been based on output (whether measured by revenue or physical units).").  A share of "consumers served" is not the same because each consumer may purchase a different amount of cloud storage, and even the consumers that use iCloud may use other cloud storage services as well.  Accordingly, Plaintiffs have not plausibly alleged that Apple has a sufficiently high market share required to show monopoly power.  *Cf. Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 776 (N.D. Cal. 2022) (recognizing that 65% market share may be sufficient for monopoly power, when combined with barriers to entry and expansion).

With respect to the second requirement for indirect evidence of monopoly power, *i.e.*, barriers to entry, Plaintiffs allege that building a cloud storage platform "requires a substantial outlay of capital to procure sufficient server capacity" and data security protections.  Compl. ¶¶ 100, 107.  Apple argues that there must not be barriers to entry because, as Plaintiffs acknowledge, "every major technology company" and "numerous cloud-storage specialists" have entered the market.  Mot. at 18 (quoting Compl. ¶ 4).  "The fact that entry has occurred does not necessarily preclude the existence of 'significant' entry barriers" if the market entrants are "small" and unable to "take significant business away" from Apple.  *Rebel Oil*, 51 F.3d at 1440.  It is doubtful that the entrants in the cloud storage market (*e.g.*, Google and Microsoft) could be called

---

[9] Plaintiffs mistakenly state that 33% of the U.S. population uses iCloud.  The complaint alleges that 33% of *cloud storage users* use iCloud, and that just 71% of the U.S. population uses cloud storage.  Therefore, assuming these facts are true, just 23.4% of the U.S. population uses iCloud (33% * 71% = 23.4%).  Plaintiffs argue that iCloud's share of Apple device users can be estimated by applying iCloud's usage among the U.S. population to the share of the U.S. population that uses an Apple device, which is 45.5%.  Assuming this methodology is valid, the correct share would be 51.4% (23.4% divided by 45.5%).

United States District Court
Northern District of California

"small."  But the complaint does not allege whether and to what extent these entrants have taken significant business from Apple, so the Court will not infer a lack of barriers to entry from the fact of entry alone.  Thus, Plaintiffs plausibly allege barriers to entry to the cloud storage market.

However, Plaintiffs fail to plausibly allege the third requirement for indirect evidence of monopoly power, *i.e.*, that the firms that have already entered the cloud storage market face barriers to expansion.  A firm's monopoly power "depends largely on the ability of existing firms to quickly increase their own output in response to a contraction by the defendant."  *Id.* at 1441.  Here, the complaint simply does not address barriers to expansion.  Plaintiffs do not allege, for example, that the major technology companies and numerous cloud-storage specialists that have entered the market are all operating at full capacity, such that they could not increase production to constrain Apple's exercise of monopoly power.  Accordingly, Plaintiffs' allegations of monopoly power based on indirect evidence fail for lack of barriers to expansion, and for lack of high market share discussed above.

In sum, because Plaintiffs fail to plausibly allege that Apple has monopoly power in a relevant market through either direct or indirect evidence, the Court GRANTS Apple's Motion to Dismiss the monopolization claim.  Dismissal is with leave to amend because Plaintiffs may be able to plausibly allege monopoly power based on additional facts.  For example, at the motion hearing, Plaintiffs' counsel referenced a survey of iCloud subscribers that purportedly bears on Apple's share of the alleged relevant market.  Hr'g Tr. 22:21-25, 34:2-12.  Of course, if Plaintiffs choose to allege monopoly power based on indirect evidence, the second amended complaint must also plausibly allege barriers to entry and barriers to expansion, in addition to high market share.

### D.     Plaintiffs Fail to Plausibly Allege an Attempted Monopolization Claim.

Plaintiffs also claim that Apple has attempted to monopolize the market for cloud storage on Apple mobile devices.  Plaintiffs must plausibly allege:  "(1) specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct directed toward accomplishing that purpose; (3) a dangerous probability of [achieving monopoly power]; and (4) causal antitrust injury."  *Forsyth*, 114 F.3d at 1477.  Evaluating a defendant's probability of achieving monopoly power requires the threshold step of defining the relevant market, *id.*, and consideration of the

United States District Court
Northern District of California

same monopoly power principles addressed above, *Rebel Oil*, 51 F.3d at 1438.  The market share required for a "dangerous probability" of achieving monopoly power is lower, but Plaintiffs still must plausibly allege barriers to entry and expansion.  *Id.* (observing that 30% market share is "presumptively insufficient" for attempted monopolization, but 44% market share is sufficient "if entry barriers are high and competitors are unable to expand their output in response to supracompetitive pricing").

Here, Plaintiffs' insufficient allegations of monopoly power also fail to allege that Apple has a dangerous probability of achieving monopoly power.  *See supra* Section III.C.2.  The Court need not reach the other elements of attempted monopolization.  The Court GRANTS Apple's Motion to Dismiss the attempted monopolization claim.  Dismissal is with leave to amend for the same reasons indicated above with respect to the monopolization claim.

### E.    Plaintiffs Fail to Plausibly Allege an Unfair Competition Law Claim.

Plaintiffs also challenge Apple's conduct under the UCL.  The UCL prohibits "unlawful," "unfair," and "fraudulent" business acts and practices.  Cal. Bus. & Prof. Code § 17200.  Here, Plaintiffs allege unlawful and unfair conduct.  Compl. ¶¶ 163-69.

Plaintiffs argue that Apple's conduct is unlawful under the UCL because it violates the Sherman Act.  *Id.* ¶ 165.  For the reasons discussed above, Plaintiffs fail to plausibly allege a violation of the Sherman Act, so their UCL "unlawful" prong claim necessarily fails as well.  *In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 54 n.7 (9th Cir. 2022).

Apple argues that Plaintiffs' failure to plausibly allege a Sherman Act claim automatically dooms Plaintiffs' UCL unfair prong claim too.  This argument misstates California law.  In *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co*., the California Supreme Court addressed the circumstances under which a UCL "unfairness" claim may be precluded.

> [A] plaintiff may not bring an action under the unfair competition law if some other
> provision bars it.  That other provision must actually bar it, however, and not merely
> fail to allow it.  In other words, courts may not use the unfair competition law to
> condemn actions the Legislature permits.  Conversely, the Legislature's mere failure
> to prohibit an activity does not prevent a court from finding it unfair.

20 Cal. 4th 163, 184 (1999).  Applying these principles, the Ninth Circuit has held that a UCL unfair prong claim is precluded only if there is a "categorical legal bar" that shields the conduct from liability.  *Epic Games*, 67 F.4th at 1001.  By contrast, if a Sherman Act claim fails due to a mere "proof deficiency," a UCL unfair prong claim challenging the same conduct is not barred.  *Id*.[10]

Here, the crux of Plaintiffs' complaint is that Apple designed its products in an exclusionary manner that disadvantages other cloud storage providers and coerces consumers.  Generally, courts are "very skeptical" of claims that a firm's product design is anticompetitive.  *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 652 (2d Cir. 2015).  But a firm's product design decisions are not categorically barred from antitrust liability.  Indeed, the Ninth Circuit has recognized that "changes in product design are not immune from antitrust scrutiny and in certain cases may constitute an unlawful means of maintaining a monopoly," even though "product improvement by itself does not violate Section 2."  *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 998-1000 (9th Cir. 2010); *see also Foremost Pro Color v. Eastman Kodak*, 703 F.2d 534, 544-45 (9th Cir. 1983).  Accordingly, the Sherman Act does not categorically preclude Plaintiffs' UCL claim for unfair conduct relating to Apple's product design.  Therefore, under *Cel-Tech*, the UCL unfair prong claim may survive, notwithstanding that Plaintiffs failed to plausibly allege Sherman Act claims based on the same conduct.

---

[10] In *Epic Games*, the Ninth Circuit held that a mere "proof deficiency" on a Sherman Act claim does not preclude a UCL unfair prong claim.  *Epic Games*, 67 F.4th at 1001.  Apple relies on *Hicks* to argue the contrary – that Plaintiffs' UCL unfair prong claim necessarily fails because Plaintiffs "fail to plead tying and monopolization claims."  Mot. at 22-23 (citing *Hicks*, 897 F.3d at 1123).  *Hicks* appears to support Apple's position:  In that case, the plaintiffs' Sherman Act claims failed for lack of a plausibly alleged relevant market.  *Id*. at 1121-23.  The *Hicks* court held that the Sherman Act pleading deficiency "also confirms" that the UCL unfair prong claim was properly dismissed, without explaining why.  *Id*. at 1124.  But this holding is inconsistent with the Ninth Circuit's more recent holding in *Epic Games*.  Importantly, *Hicks* is also inconsistent with *Cel-Tech*, which is controlling on this question of state law.  *Doe v. Uber Techs., Inc.*, 90 F.4th 946, 949 (9th Cir. 2024).  *Cel-Tech* instructs that the UCL cannot be used to challenge conduct that "the Legislature permits."  *Cel-Tech*, 20 Cal. 4th at 184.  The fact that a Sherman Act claim fails by happenstance due to a proof or pleading deficiency is not a reasoned determination by the legislature (or the courts) that the conduct at issue is lawful.  Accordingly, a mere proof or pleading deficiency of a Sherman Act claim does not mandate dismissal of a UCL unfair prong claim premised on the same conduct.

United States District Court
Northern District of California

Apple argues that, if "the same conduct is alleged to be both an antitrust violation and an 'unfair' business act or practice for the same reason . . . the determination that the conduct is not an unreasonable restraint of trade necessarily implies that the conduct is not 'unfair' towards consumers."  Reply at 14, ECF No. 36 (quoting *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (2001)).  But Apple misinterprets the holding and the reasoning in *Chavez*.  In that case, the court addressed conduct that is immune from Sherman Act and Cartwright Act liability under the *Colgate* doctrine, which provides that a "manufacturer can announce its resale prices in advance and refuse to deal with those [distributors] who fail to comply."  *Chavez*, 93 Cal. App. 4th at 370 (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984)).  Because the defendant's conduct was "deemed reasonable and condoned under the antitrust laws," the conduct was not "unfair" for purposes of the UCL.  *Id.* at 367, 374-75.  This core principle from *Chavez* does not apply here because Plaintiffs' Sherman Act claims fail due to pleading deficiencies.  The legislature has not "deemed reasonable and condoned" Apple's alleged conduct, and the courts have not held that product design is immune from Sherman Act liability under all circumstances.

Apple also relies on *Beverage v. Apple, Inc.*, 101 Cal. App. 5th 736 (2024).  That case follows the same reasoning from *Chavez*:  "[L]ogic dictates that there can be no harm to consumers under the UCL based on the same unilateral practices that have been historically accepted as procompetitive and categorically shielded from antitrust liability by the *Colgate* doctrine."  *Id.* at 755-56.  This logic does not apply here because Plaintiffs' Sherman Act claims fail due to pleading deficiencies, not because Apple's alleged conduct has been "historically accepted as procompetitive."  Additionally, the *Beverage* court carefully limited its holding "to situations . . . where the same conduct found immune from antitrust liability by the *Colgate* doctrine is also alleged to violate the 'unfair' prong of the UCL."  *Id.* at 755.  Apple does not, and could not, argue that the *Colgate* doctrine applies here because that doctrine addresses a manufacturer's conduct toward distributors with respect to resale pricing.[11]

---

[11] Apple argues that *Beverage* "confirmed that the Ninth Circuit's analysis in *Epic* was incorrect." Reply at 14 n.6.  But *Beverage* departed from the Ninth Circuit's reasoning in *Epic Games* only with respect to the narrow question of whether certain conduct was immune under the *Colgate* doctrine.  *Beverage*, 101 Cal. App. 5th at 756 n.6 (finding *Epic Games* unpersuasive "on the

Although a failure to state a Sherman Act claim does not necessarily preclude a UCL unfair prong claim as a matter of law, as a practical matter, Sherman Act and UCL unfair prong claims may fail for the same reasons. That is the case here.

Courts apply several tests in consumer actions to determine whether a business practice is "unfair." *Doe v. CVS Pharm., Inc.*, 982 F.3d 1204, 1214-15 (9th Cir. 2020). Plaintiffs oppose dismissal by invoking the "balancing test," Opp. at 21-22, which asks whether the impact on consumers outweighs "the reasons, justifications and motives of the alleged wrongdoer." *CVS Pharm.*, 982 F.3d at 12-15. Plaintiffs fail to allege an impact on consumers because Apple mobile device users are not required to purchase iCloud; they are free to purchase any other cloud storage service from Apple's many competitors. *See supra* Section III.B. Additionally, Plaintiffs fail to allege an impact on consumers who choose to purchase iCloud because Plaintiffs do not allege that iCloud is priced higher than other cloud storage options.

Plaintiffs also fail to plausibly allege that the impact on consumers, if any, outweighs the security justifications for Apple's file restriction. On this point, Plaintiffs allege that Samsung does not restrict files on its devices, Compl. ¶¶ 7, 36, so presumably Apple does not need to restrict files, either. But Plaintiffs do not allege that Samsung devices offer the same level of data security that Apple devices offer, and thus the Court cannot infer that Apple's approach lacks a security benefit. Plaintiffs also allege that data security is a pretext because Apple allows device users to store other type of sensitive data (*e.g.*, a user's "photos of their children") on third-party cloud storage services. *Id.* ¶ 116. Although personal photos certainly are sensitive, they are distinguishable from the types of "sensitive" files at issue here – device settings that Apple shields from third parties, purportedly to prevent them from making changes to a user's device.

Accordingly, because Plaintiffs fail to plausibly allege that Apple engaged in unlawful or unfair business acts or practices, Apple's Motion to Dismiss the UCL claim is GRANTED. Dismissal is with leave to amend because Plaintiffs may be able to plausibly allege a Sherman Act

---

precise issue presented by this appeal"). Otherwise, the *Beverage* court agreed with the Ninth Circuit's analysis in *Epic Games* as to when a UCL claim may be precluded, holding that the *Colgate* doctrine precluded the UCL claim because it "operates as a categorical rule exempting certain business conduct from the reach of the antitrust laws." *Id.* at 755.

claim, which would support a UCL unlawful prong claim.  Moreover, Plaintiffs may be able to allege additional facts to support a UCL unfairness prong claim.

## IV.    CONCLUSION

For the foregoing reasons, Apple's Motion to Dismiss is GRANTED in part and DENIED in part.  As indicated throughout this Order, dismissal is with leave to amend.  Within 21 days of this Order, Plaintiffs may file a second amended complaint to address the pleading deficiencies identified above.

**IT IS SO ORDERED.**

Dated: February 28, 2025

Eumi K. Lee
United States District Judge