# EXHIBIT A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

<table>
<tr><td>

ANDREA M. WILLIAMS and
JAMES STEWART, on behalf of
themselves and all others similarly
situated,

Plaintiffs,

            v.

APPLE Inc.,

Defendant.

</td><td>

Case No. 5:19-cv-4700-LHK

</td></tr>
</table>

Expert Report of Dr. Carol Scott

January 29, 2021

## I.    QUALIFICATIONS

1.        I am a Professor of Marketing Emeritus at the Anderson Graduate School of Management ("Anderson School") at UCLA and an expert in marketing strategy and consumer and market research.  I hold a Ph.D. in Marketing from Northwestern University, where my minor field of study was Social Psychology.  I also received a Master of Science in Management degree from Northwestern University and a Bachelor of Science in Business and History Education degree from the University of Texas at Austin.  From 1986 through 1994, I held several administrative positions with the Anderson School, including Chairman of the Faculty and Associate Dean for Academic Affairs.  I served as the faculty director of the Anderson School's Executive Program, a non-degree, certificate program for mid-level and senior managers, from 2009 through 2019, and the Anderson School leadership program for international women executives co-sponsored by Banco Santander, from 2012 through 2019.  I continue to teach in various executive education short courses for the Anderson School.

2.        Over the past 30 years, I have taught courses on Marketing Strategy and Management, Consumer Behavior, Advertising, Distribution Strategy, and International Marketing to students in undergraduate and graduate education programs at UCLA, Stanford Business School, Harvard Business School, and Ohio State University.  I also have published numerous journal articles, research reports, and book chapters on Consumer Behavior, Marketing Research, and other marketing topics, a complete list of which is included in my Curriculum Vitae, attached as Exhibit 1.  I have served on the editorial boards of the *Journal of Marketing*, *Journal of Marketing Research*, and *Journal of Consumer Research*.  I have been a member of the board of directors for Sizzler International, A-Fem Medical Corporation, Inc., and most recently, United Online, Inc.

3.        I am also a founding partner at Crossfield Associates, a litigation analysis and support firm.  I have more than 30 years of experience in providing expert marketing analysis and testimony in cases involving class certification, trademarks, copyrights, damages related to

infringement of intellectual property, and other questions of marketing strategy, such as advertising, distribution, purchasing processes, and aspects of consumer behavior.  My expertise includes the development of surveys to determine consumer perceptions and beliefs, the assessment of drivers of purchase, consumer perceptions of product features and advertising claims, factors that influence pricing products in the marketplace, and consumers' understanding of various marketing materials.  My expert testimony work includes three recent instances in which my work was cited by the judge in her ruling on these cases.[1]  A list of my recent testimony is attached as Exhibit 2.

4.      In these assignments, I have used my doctoral level training, approximately 40 years of conducting and teaching various topics within the field of marketing, and my experience serving as a marketing expert on various boards of directors, to inform my work.  Specifically, with respect to my assignment in this matter, I have had extensive doctoral level education in social and consumer psychology, which informs the determination of the methodology appropriate for a particular research question for the construction of surveys designed to investigate consumer attitudes, beliefs, and perceptions.  I have had extensive doctoral level education in the design, analysis, and interpretation of experiments designed to determine causal relations (*i.e.*, those studies that show test and control stimuli and observe reactions); have published research using this methodology in the most prestigious, peer-reviewed social psychological journals (*Journal of Personality and Social Psychology*, *Journal of Experimental Social Psychology*) and consumer behavior and marketing journals (*Journal of Consumer*

---

[1] *See, e.g.*, *Davidson v. Apple, Inc.*, No. 16-cv-04942, 2019 WL 2548460, *18 (N.D. Cal. June 20, 2019) (denying plaintiffs' third motion to certify class; expert report submitted on behalf of Defendant Apple Inc); *Bruton v. Gerber Prods. Co.*, No. 12-cv-02412, 2014 WL 2860995, *6 (N.D. Cal. June 23, 2014), *rev'd on other grounds*, 703 Fed App'x 468 (denying plaintiffs' motion for class certification; expert report submitted on behalf of Defendant Gerber Products Company);  *Brazil v. Dole Packaged Food LLC*, No. 12-cv-01831, 2014 WL 5794873, *9–10, 12 (N.D. Cal. Nov. 6, 2014) (granting in part defendant's motion to decertify; expert report submitted on behalf of Defendant Dole Packaged Foods, LLC).

*Research*, *Journal of Marketing Research*, *Journal of Behavioral Decision Making*); and have conducted many such studies for litigation in state and federal courts.  I also have had extensive doctoral level education in the design, analysis, and interpretation of consumer surveys that are used in experimental as well as non-experimental studies to investigate consumer attitudes, beliefs, and perceptions.  I have personally designed and implemented many consumer attitudinal surveys and experimental studies for litigation in state and federal courts, including several where my survey findings and testimony were specifically cited by the judge or otherwise allowed to be presented to the jury at trial.[2]

5.      Documents considered in forming my opinions are cited herein.  A listing of documents received from counsel is provided in Exhibit 3.

## II.      SCOPE OF ASSIGNMENT

6.      I have been asked by counsel for Apple Inc. ("Apple" or "Defendant") to respond to certain assertions made in Plaintiffs' Complaint[3] and to portions of the Expert Report of Dr. Scott Swain submitted on behalf of named Plaintiffs Andrea M. Williams and James Stewart ("Plaintiffs") and the putative class. Specifically, I was asked to determine and analyze the decision process by which current and past users of the iCloud Service ("iCloud" or "iCloud Service" or the "Service") came to subscribe to iCloud for a monthly fee, including users' awareness, evaluation, and consideration of other cloud storage providers, the factors that were important to them in deciding to subscribe to a paid iCloud storage plan, and the manner in

---

[2] *See, e.g.*, *Gucci Am., Inc. v. Guess?*, Inc., 868 F. Supp. 2d 207, 232–33 (S.D.N.Y. 2012); *E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*, 444 F. Supp. 2d 1012, 1045–47 (C.D. Cal. 2006), aff'd, 547 F.3d 1095 (9th Cir. 2008); *Brighton Collectibles, Inc. v. Marc Chantal USA, Inc.*, No. 06-cv-1584, 2009 WL 10674076, *6 (S.D. Cal. 2009) (trial testimony on April 8, 2009); *Excelligence Learning Corp. v. Oriental Trading Co.*, No. 03-cv-4947, 2004 WL 2944048, *9–11 (N.D. Cal. Dec. 20, 2004); *Hoffman vs. Am. Express Travel Related Servs. Co.*, No. 2001-022881, 2009 WL 2984934, *18 (Cal. Super. Ct. Aug. 20, 2009), *aff'd*, No. A127347, 2012 WL 6063003 (Cal. Ct. App. Dec. 7, 2012).

[3] *Williams, et al. v. Apple, Inc.*, First Amended Class Action Complaint, April 27, 2020.

which they use the iCloud Service (the "Perceptions Study"). I was also asked to address consumers' responses and behavior with respect to statements in the iCloud Terms and Conditions and Apple's Privacy Policy they may have been presented with around the time they subscribed to the iCloud Service. The findings from this investigation allow me to assess the reliability, validity and relevance of the survey that Dr. Swain used to collect the data for his conjoint study.

## III.    SUMMARY OF OPINIONS

7.      In addition to my own expertise and experience in analyzing consumer purchasing behavior, my opinions in this matter are based on (1) the results of the Perceptions Study, (2) prior consumer research on the iCloud Service conducted in the ordinary course of business by Apple,[4] (3) deposition testimony by named Plaintiffs James Stewart and Andrea M. Williams,[5] and (4) deposition testimony and expert report of  Dr. Scott Swain submitted in this matter.[6]  I have organized my opinions around five major areas of investigation:

(1) consumers' decisions to purchase a paid iCloud Service subscription,

(2) consumers' knowledge and consideration of other cloud storage providers,

(3) consumers' expectations based upon receiving an offer to upgrade their iCloud Service storage plan,

---

[4] APL-ICSTORAGE_00036105, APL-ICSTORAGE_00033684, APL-ICSTORAGE_00034157, APL-ICSTORAGE_00035615, APL-ICSTORAGE_00034157.

[5] Deposition of James Stewart, December 15, 2020. Deposition Andrea M. Williams, December 18, 2020.

[6] Expert Report of Scott D. Swain, January 8,2021 ("Swain Report"). Deposition of Scott D. Swain, January 22, 2021 ("Swain Deposition").

(4) consumers' behavior with respect to the iCloud Terms and Conditions and Apple's Privacy Policy consumers may have been presented with at the time they first began using the iCloud Service or when signing up for a paid iCloud storage plan, and

(5) the lack of reliability and validity of the conjoint analysis conducted by Dr. Scott Swain.

8.    **Consumer Preferences and Purchasing Decisions:** With respect to consumers' decisions to purchase a paid iCloud Service subscription, I conclude the following:

      a.   Most U.S. consumers who upgraded to a paid iCloud Service subscription ("iCloud Purchasers") had first used the free iCloud Service, and over half of iCloud Purchasers did not consider any other cloud storage providers prior to upgrading to a paid subscription even though many are aware of other cloud storage providers and some either currently use or have used them in the past.  Those who did not consider any other providers most frequently cited factors such as ease of use, convenience or familiarity, or other positive aspects of Apple products as reasons for not doing so.

      b.   iCloud Purchasers cite many features that factor into their reasons for purchasing an iCloud Service subscription, but ease of use and "the ability to restore or set up your device from an iCloud backup" and/or the "ability to automatically backup all content and device and app settings" are the features or capabilities most frequently mentioned by respondents as most important.  The feature "iCloud data is stored on Apple-owned servers" on the other hand was not ranked as one of the four most important factors by approximately 80% of respondents in my survey.

      c.   The most important iCloud Service features/capabilities are also among those most frequently used by iCloud Purchasers:  storing photos or videos

taken on an iPhone or iPad, backing up all content and device and accounts settings for an iPhone or iPad, storing the contacts in their iPhone or iPad, restoring or setting up a new Apple device from a backup, storing the apps on an iPhone or iPad, and automatically syncing and accessing data on all Apple devices.  These features/capabilities are used by 70% or more of the survey respondents.

9.    **Other Cloud Storage Providers:**  My opinions regarding consumers' consideration of, knowledge about, and evaluations of other cloud storage providers relative to the iCloud Service are as follows:

a.   Google Drive, Dropbox, Amazon, and Microsoft Azure or OneDrive were the cloud storage providers most likely to be considered <u>if</u> iCloud Purchasers considered any other providers at the time they decided to upgrade to a paid iCloud Service subscription.  Even so, only approximately 14% of the total sample of iCloud Purchasers considered Google Drive.  Seven percent or less of iCloud Purchasers considered Dropbox, Amazon, or Microsoft OneDrive/Azure.  A portion of paid iCloud Service users may view some of these cloud storage providers as complements to the iCloud Service rather than competitors. Approximately 42% of iCloud Purchasers in my study also use Google Drive, and 31% use Dropbox.  A smaller percentage, 25%, use Microsoft OneDrive as well as a paid version of the iCloud Service.

b.   iCloud Purchasers' knowledge of Google Drive, Dropbox, and Microsoft OneDrive is likely to vary as approximately half of iCloud respondents had used Google and Dropbox at some point (either currently or in the past), while the other half had either never heard of it or had never used it. Approximately 40% of respondents had ever used Microsoft OneDrive,

while 56% had never heard of it or had never used it.  When asked whether or not these cloud storage providers could accomplish certain tasks such as "backup all content" for your iPhone and iPad or "restore or set up a new Apple device with all of your backup content," between 13% and 31% answered incorrectly, while 46% to 52% correctly indicated that Google Drive, Amazon Drive, Microsoft OneDrive, or Dropbox cannot do them.   iCloud Purchasers are most knowledgeable about the ability of other cloud storage providers to store and share documents and photos, and less knowledgeable about the ability of other cloud storage providers to store other types of content from Apple devices.

c.  iCloud Purchasers exhibit a high degree of satisfaction with the iCloud Service, and more iCloud Purchasers rate it higher than Google Cloud/Drive, Microsoft Azure/OneDrive or Amazon Cloud/Amazon Drive on 12 dimensions.

10.    **Offer to Upgrade to iCloud Service Subscription:**  After being shown a screen shot of a low storage notice based on one actually used by Apple in the class period, few iCloud Purchasers noted any information related to Apple's use of third-party partners in general or about Apple's use of third-party servers to store iCloud data.[7]  Almost half of iCloud Purchasers in my sample had no specific expectations about how Apple would manage and operate the iCloud Service, and almost half had no specific expectations about Apple's use of any partners to store iCloud data.  When asked what pieces of information mentioned on this screenshot, if any,

---

[7] As provided in Exhibit 5, the image respondents saw was based upon an actual notification that I received from counsel for Apple and that I understand was used by Apple for a version of Apple iOS (iOS 9.3) that would have been shown to users earlier in the putative class period. The image was altered using photo editing software to add the phrase "Important:  iCloud is a service provided by Apple.  When it is enabled, your content will be automatically sent to and stored by Apple." This particular language was used by Apple in similar prompts shown to users in a later version of Apple iOS during the class period.

would be most important to them in deciding whether to sign up for the iCloud Service, only price of the Service and amount of storage were mentioned by more than 10% of survey respondents. Something related to "security" was mentioned by approximately six percent of respondents, but "stored by Apple" was mentioned by only four percent of respondents.

11.      **iCloud Terms and Conditions and Disclosures:** A large majority of iCloud Purchasers recalled being presented with some "terms and conditions" when they signed up for an iCloud subscription and with Apple's Privacy Policy at some point during their use of iCloud, but 40% of subscribers indicated that they automatically agreed with the terms and conditions or privacy policies without reading them. Approximately 48% of respondents read all or some portions of them, but 60% of them could not remember any specific topics or pieces of information from those documents.

12.      **Reliability and Validity of Dr. Swain's Conjoint Survey and Data:** Dr. Swain's conjoint survey does not provide a valid test of the central allegation in this matter and violates central principles of reliable consumer research methods.

13.      Dr. Swain estimates the effect of a disclosure regarding Apple's practices with respect to iCloud data that does not accurately describe them, and thus his findings are irrelevant.

14.      Dr. Swain failed to ensure that product attribute descriptions and instructions in his conjoint survey were clear to respondents, and thus his findings cannot be reliably interpreted.

15.      Dr. Swain failed to follow standard research principles to ensure that his survey accurately represented important characteristics of the real-world environment in which consumers make their choice decisions, and thus its results cannot be reliably or validly generalized to the real world. In particular, the attributes that Dr. Swain included in his conjoint analysis were selected arbitrarily and did not include product attributes that are most important to consumers. This problem is compounded by his inclusion of brand alternatives that iCloud

consumers in the real world would be unlikely to consider and that are likely to be unfamiliar to many iCloud users. In the real world, but not in Dr. Swain's conjoint world, consumers have the ability to seek out information that is important to them. Dr. Swain included incorrect information about some attribute levels, and his market simulation apparently did not pit Apple's iCloud against the descriptions of other storage providers as they actually exist in the marketplace nor allow for consumers to choose more than one provider as they often do in the real world.

16.    I reserve the right to supplement or revise this report and my opinions if additional information becomes available to me that is inconsistent with them.

## IV.    BASES OF OPINIONS

17.    My opinions are based primarily on the results of the Perceptions Study that I conducted in January 2021, as well as my background and knowledge of consumer behavior, survey construction, and consumer research methods in general. The study, which included current and past paid users of the iCloud Service on Apple devices, was designed to investigate certain aspects of the decision-making process whereby consumers decided to subscribe to a paid iCloud Service account including consideration of any other cloud storage providers, their knowledge of and evaluation of those providers, and factors that were important to them in deciding to subscribe to a paid iCloud Service subscription. This survey also investigated consumers' exposure to and understanding of various documents that they may have been presented with during their use of the iCloud Service.

18.    A copy of the survey, containing both screening questions as well as questions for the main survey, can be found in Exhibit 4. Copies of images that were shown to respondents as part of the survey are shown in Exhibit 5. Copies of the screen images that respondents would have seen for the survey are included in Appendix A.

19.     I designed the survey and the specific survey questions, all data were collected under my supervision, members of my staff coded any verbatim answers to open-ended questions, and I directed and supervised the analysis of the data.  The survey was prepared and conducted in accordance with standard scientific principles governing survey research[8] which are commonly used in academic and commercial consumer research.[9]

### A.  Sample Selection

20.     The survey was conducted online, and all participants were recruited by Dynata, a well-known marketing research firm that I have used for almost all of my survey needs for over 20 years.[10]  In my experience, Dynata has thorough quality controls to ensure the integrity of consumer data for studies such as mine.  Dynata hosted the website on which the survey ran, respondents typed in their own answers to the survey online, and the data was sent to me and my staff for analysis.  The survey was designed and conducted in a such a way that neither Dynata nor any of the respondents knew the hypotheses that were of interest to me or that the survey was in any way connected to this litigation.

21.     Potential respondents initially were asked a set of screening questions which are shown at the beginning of the survey document in Exhibit 4.[11]  Basic demographic information, *i.e.*, gender, age, and state of residence, was collected in the first three questions.  Quotas were

---

[8] *See, e.g.*, Diamond, Shari Seidman, *Reference Guide on Survey Research*, *in* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 359–423 (Federal Judicial Center, 3d ed. 2011) ("Diamond 2011"); Aaker, David A., V. Kumar, George S. Day, and Robert P. Malone, MARKETING RESEARCH Chas. 11–12 (11th ed. 2016).

[9] These principles include sampling from the appropriate population, asking clear and unbiased questions, accurately recording and coding the data obtained from respondents, and accurately analyzing the data.

[10] Dynata's website can be found at https://dynata.com.  It has operated under several corporate names over the years during which I have used them, as they have acquired or merged with other companies.  Most recently, the firm was called Survey Sampling International.

[11] Screening questions are those with the notation "SQ" before the question number.

set such that the final set of respondents would include no more than 55% females[12] and so that the distribution of ages, from 18 to 74 would reflect the distribution of the U.S. census for those age groups.  Respondents were not allowed to participate if they indicated in the next two questions (a) that they had taken a survey on smartphones, cell/mobile phones, table computers, or computer storage or cloud storage providers or services used for a personal computer, smartphone, or tablet computer; or (b) that they or a member of their immediate household work for a company that manufactures, sells, promotes, or distributes smartphones, cell/mobile phones, tablet computers, a company that provides, sells, promotes or distributes cloud computer or cloud storage products or services,  an advertising agency, public relations firm, or market research company.

22.     Next, screening questions established that the smartphone or tablet computer that the respondent owned in the last 12 months was an Apple device.[13]  The sample for the study was composed of respondents who had used the paid version of the iCloud Service currently or sometime in the past five years so that purchase decisions could be investigated.

23.     A total of 351 respondents completed the survey.  However, several respondents were eliminated from the final analysis because they failed to pass several data quality checks. Specifically, two respondents were eliminated because they took an unusually long amount of time to complete the survey, indicating that they may not have completed it in one sitting as requested.  An additional 14 respondents were eliminated because they indicated that one or more questions were unclear to them and this was confirmed by an examination of the

---

[12] Consumer surveys conducted by Apple in 2014, 2016, and 2017 used samples that consisted of 48% to 55% females.  Therefore, I allowed up to 55% female respondents to participate in my study.  *See* "iCloud Use Among iPhone Owners," presentation by Apple Market Research and Analysis, Fielded August 2017, slide 8.

[13] Exhibit 4, QS7A.

information they provided about questions they had.[14]  Another respondent was eliminated because they provided non-responsive or nonsense answers to open-ended questions.  Thus, the final sample includes 334 respondents.[15]

24.     As a final quality control check, an independent marketing research firm, Field Solutions, was employed to conduct a validation of survey participation.  Approximately 60% of all respondents agreed to provide a telephone number for validation purposes, and Field Solutions was able to reach approximately 90%.  These validations found no discrepancies, *i.e.*, everyone who was contacted confirmed their participation in the study.  A summary of the validation findings is shown in Exhibit 6.

## B.  Survey Methodology

25.     A total of 334 respondents participated in the survey, which focused on aspects of respondents' past decisions to purchase a paid iCloud subscription.  All participants owned at least one Apple smartphone or tablet device—*i.e.*, iPhone or iPad, and all had paid for the Apple's iCloud service at some time in the last five years.

26.     To begin the survey, respondents were first told that they would be asked some questions about their use of Apple's iCloud Service. They were given general instructions to respond with their honest opinions and beliefs and to indicate if they did not know or did not have an answer to a question rather than guessing.  Respondents were asked to complete the survey without stopping in the middle, and not to consult or open another browser while working

---

[14]  A total of 18 respondents initially indicated that some question was unclear or confusing. However, four of these respondents gave an answer to the question asking which part of the survey was unclear or confusing to them that was unrelated to any specific survey question (*e.g.*, "Nothing," "Nothing confusing").  These four respondents were included in the final analysis, leaving 14 who were excluded.  No question was mentioned as being confusing by more than one respondent.

[15] Including all respondents excluded for quality reasons would not change the conclusions I reach in this report.

on it.  They were also asked to make sure they were wearing their contact lenses or glasses if they would normally wear them when viewing the computer screen.  If the respondents agreed to these instructions, they were asked to click on an arrow to begin the survey.

27.    The initial questions of the survey were designed to provide further information about the background and characteristics of the sample.  Specifically, survey questions q1 – 4 determined the level of iCloud Service the respondent pays (paid) for, whether the respondent used a free iCloud storage plan prior to signing up for a paid subscription, when the respondent started using the iCloud Service, and when they started paying for a storage plan.  Those respondents who no longer pay for the iCloud Service were asked if they still use the Service, and why they stopped paying for a storage plan (q 5 and 6).

28.    With respect to their decision to purchase a paid iCloud Service storage plan, respondents were asked if they had considered using another cloud storage provider instead of the iCloud Service, *i.e.*, "did you think about or consider putting your files or data on another cloud storage provider rather than paying a fee for additional storage space using iCloud?"  If other providers had been considered, respondents were asked to write in the specific providers they had considered.  Respondents who indicated that they had not considered any other cloud storage providers were asked why they had not done so.[16]

29.    Next, respondents were asked a series of questions about their choice of a paid iCloud Service subscription and how they use the Service.  Specifically, respondents were asked why they decided to sign up for the paid iCloud Service rather than use a different cloud storage provider to store data (q10).  This was an open-ended question for which respondents were asked to write in their own answer using their own words.  Because open-ended questions may capture only the most important or the most salient or "top-of-mind" factors, respondents were then asked a closed-ended question that showed them a list of 12 features characteristics or

---

[16] *See* survey questions q7 – q9.

capabilities of Apple iCloud (q11).  Respondents were asked to indicate how important each of these were to them in deciding whether or not to sign up for a paid iCloud Service subscription using a "1" to "7" scale where "1" meant that the item was "not at all important to me", and "7" meant that the item was "very important to me."  The list of characteristics that iCloud Purchasers were asked to respond to was developed by examining prior consumer surveys conducted on behalf of Apple and descriptions of the iCloud Service on the Apple website.  In addition, respondents were given the option to write in any other feature or characteristic that had been important to them or indicate that they did not know. The item "iCloud data is stored on Apple-owned servers" was added as a feature because the named Plaintiffs in this matter allege that this was a material consideration in their decision to pay for an iCloud subscription.  After rating the importance of each of the 11 items (plus "other", if written in), respondents were asked to review the list again, and to indicate which four of the attributes were the most important to them by clicking on the most important item first, the second most important item second, and so on.

30.     Lastly in this section, respondents were shown a list of 19 tasks that can be done using the iCloud Service and asked to indicate for which task(s) they currently use the iCloud Service (q13).  This list of possible tasks (*e.g.*, store photos or videos you take on your iPhone or iPad, backup all content and device and account setting for your iPhone or iPad) was derived from an examination of Apple materials such as prior consumer surveys and the Apple website and the iCloud application on an iPhone.  Respondents were also allowed to write in any other feature or task that they use(d) iCloud to do.

31.     The next set of questions (q14 – q18) once again focused on other cloud storage providers.  In question 14 respondents were asked to indicate which cloud storage provider(s), if any, they believe could be used to accomplish each of the tasks listed in the prior question.  The other cloud storage providers listed were Google (such as Google Drive, Google Photos), Amazon (such as Amazon Photos, Amazon Cloud/Amazon Drive), Microsoft (such as

OneDrive), and Dropbox.  Respondents were allowed to write in any other cloud storage

provider that they wished and could check "none" if they did not believe any other provider

listed could be used for the task.  The final set of questions (q15 through q18) asked the

respondents to rate Apple's iCloud Service and any of three cloud storage providers that they had

ever used on a list of 12 attributes using a scale of "1" to "7" where "1" meant "poor" and "7"

meant "excellent.

32.     For the next set of questions, respondents were asked to look at an image of a

screen shot that "you may see on your iPhone or iPad if you are using the free version of iCloud

but are almost out of iCloud storage space", and to read the information as if they were trying to

decide whether or not to upgrade to a plan with more storage for which they would have to pay a

monthly fee.  This image could be enlarged for easier viewing if respondents wished to do so.

After a required 10 second delay, a "next" button appeared that respondents could click to

continue the survey with questions pertaining to the image.  The particular notification that was

shown was based on one actually used by Apple in the class period.[17]  A copy of it is provided in

Exhibit 5.  As shown, this upgrade notice contains the phrase, "Important:  iCloud is a service

provided by Apple.  When it is enabled, your content will be automatically sent to and stored by

Apple."

33.     After viewing this image, respondents were asked several questions about it.

First, they were asked in an open-ended question (q19), to write in any expectations for the

iCloud Service that they would have based on the screen shot, *i.e.*, what attributes,

characteristics, or features did they believe they would get if they agreed to sign up for the offer.

This was followed by a single probe of "anything else? (q20)."  Respondents were then asked

three more specific questions about any expectations they would have.  First, they were asked

about any expectations they would have about how Apple will manage and operate the iCloud

---

[17] This image is provided in Exhibit 5.

Service, *i.e.*, expectations regarding what Apple will do to provide consumers with this Service (q21).  Next, the respondents were asked whether or not they had any expectations about Apple's use of any partners to provide the iCloud Service (q22).  If respondents had any expectations about Apple's use of any third-party partners, they were asked to write those in (q23).  A final question about the image they had been shown asked respondents to write in the pieces of information mentioned on the screen shot that would be most important to them in deciding whether or not to sign up for a paid iCloud Service subscription (q24).

34.     The penultimate set of questions pertained to agreements and disclosures that respondents may have been presented with.  Question 25 asked respondents if they recalled whether they had indicated that they agreed to certain "terms and conditions".   Next, they were asked if they recalled being presented with Apple's Privacy Policy at some point during their use of the iCloud Service (q26).  Respondents were then asked to indicate, by checking the appropriate alternative given, the process by which they came to agree with the "terms and conditions" or the "privacy policy presented" (q27).  The alternative answers ranged from "I automatically indicated that I agreed with the "terms and conditions" or "privacy policies" that were presented to me without reading them" to "I read all of the "terms and conditions" or "privacy policies" that were presented to me before indicating that I agreed with them", along with a "don't know/can't recall" option.  Lastly with respect to the "terms and conditions" or "privacy policies", respondents who indicated that they read some portion of all of these agreements were asked to list the topics or pieces of information they recall reading.

35.     The survey ended by asking respondents if any of the questions they were asked in the survey were confusing or unclear (q29), and if so, to indicate which questions were confusing or unclear (q30).  Respondents were also asked if they would (voluntarily) provide a first name and phone number so that a follow up phone call could be made to validate their participation in the study, and 202 respondents did so.

## C.  Study Results

36.     The tabulated results for all questions are shown in Exhibits 7-1A – Exhibit 7-20.  As shown in Exhibit 7-1A, the final sample of 334 respondents was composed of slightly more females than males (51.2% versus 48.8%).  The distribution of age shows that the percentage of respondents in the age categories between 25 and 64 are roughly equal, *i.e.*, around 20% for each 10-year category, while smaller percentages of respondents fell into the youngest and the oldest age categories.  Respondents represented 41 states (Exhibit 7-1B).

37.     All respondents had used a smartphone or tablet computer that they owned within the last year;[18] 97.0% of respondents had used an Apple iPhone, and 66.2% had used an Apple iPad.  Approximately 63.2% of respondents owned both an iPhone and an iPad.  A smaller number of respondents, 87.4%, had used a desktop or laptop computer that they owned, and 51.4% of these computers were Apple products.[19]  In terms of use of the iCloud Service, almost all respondents, 95.5%, currently use the Service.[20]  Almost all respondents, 94%, currently pay for the iCloud Service,[21] with the largest percentage of these, 47%, subscribing to the 50GB plan that costs $0.99 per month.[22]  Only 20 respondents were former users of the paid iCloud Service, and 10 of these also had subscribed to a plan for which they paid $0.99 per month.[23]  Approximately half of the sample, then, pays (or did pay) for the least expensive iCloud Service plan.

---

[18] Exhibit 7-1E.

[19] Exhibit 7-1G.

[20] Exhibit 7-1H.  Only 15 respondents, or 4.5% of the sample no longer use any version of iCloud.

[21] Exhibit 7-1I.

[22] Exhibit 7-2.

[23] The amount of storage associated with a $0.99/month plan during the proposed class period was either 20GB or more recently 50GB.

iCloud Purchasers' Decision Process

38.     Any attempt to understand and predict consumer choices in the marketplace must take into account the context and important elements of consumers' decision processes with respect to the product.  In this case, the study was designed in part to provide data on the context in which consumers' selection of a paid iCloud Service plan or decision to upgrade to the next tier of service is made as well as to determine the most important factors in shaping those decisions.  It also was designed to understand the problems or tasks that consumers use the iCloud Service to solve or do.  The "solutions" provided by the iCloud Service can then be compared to any other cloud storage providers in the marketplace to determine the degree to which they compete to provide the same cloud storage functionality.

39.     In terms of the context in which a consumer purchases an iCloud Service storage plan, an important data point is that three-quarters of iCloud Purchasers in the survey were not new to the Service when they made their decision to purchase a storage plan or move to the next pay tier, but instead had used the free storage plan available with the Service.[24]  Thus they were already knowledgeable about the iCloud Service, most likely had already invested in learning about some of its features and methods of operation (even though 21.6% of respondents had begun using a paying for a storage plan only in the past year),[25] and therefore would incur some amount of switching costs[26] if they moved their data to a different app to store their data.

40.     The information and preference advantage that the iCloud Service had over other cloud storage providers is evident in the findings that 64.1% of respondents did not even

---

[24] *See* Exhibit 7-3, survey q2.

[25] Exhibit 7-3, survey q4.

[26] Switching costs are those one-time costs facing the buyer of switching from one supplier's product to another's.  See Porter, Michael E., *Competitive Strategy: Techniques for Analyzing Industries and Competitors* (New York:  Free Press, 1980, reissued in 1998), p. 10.

consider using anything other than the Service at the time they purchased a storage plan,[27] despite the fact that most respondents had at least heard of other cloud storage providers such as Google Drive, Dropbox and Microsoft OneDrive/Azure.[28]  These "incumbent" advantages are also evident in the reasons that respondents gave for not doing so.  These reasons related to the ease of use, and the convenience, of using the iCloud Service, familiarity with it, and not knowing how to use others (30% of those who did not consider other providers) or not even being aware of or knowing about other options (6.5% of these respondents).  Other reasons given were related to being in the Apple ecosystem, *i.e.*, "all of my products are Apple; because I have an iPhone" (16.4% of those not considering any other providers).[29]

    41.    Some other users of the iCloud Service, however, may also have based their decision not to consider other cloud storage providers such as Google, Dropbox, or Microsoft OneDrive on their own personal experience with them.  As shown in Exhibit 7-1H (survey question QS8B), 64.4% of all respondents in the survey had used or currently use Dropbox, 58.1% had used or currently use Google Drive, and 40.7% had used or currently use Microsoft OneDrive/Azure.[30]

    42.    Factors that were most important to iCloud Purchasers were investigated through both an open-ended and two closed-ended questions.  Open-ended questions are recommended for determining what responses consumers think of when not prompted to consider any specific answer by the researcher.  Although they are not likely to elicit every item of importance to the respondent, they are thought to elicit those responses that are most salient to the respondent, or most "top-of-mind" or important.  Closed-ended questions typically elicit more responses,

---

[27] Exhibit 7-6, survey q7.

[28] Exhibit 7-1H, survey QS8B.

[29] *See* Exhibit 7-8, survey q9.

[30] This survey question does not indicate whether respondents had used or currently use a paid version of these providers or whether they use(d) only the free versions.

although some of these may not be ones that the respondents would think about absent a researcher bringing them to their attention. Both types of questions were used in my survey, capturing the strengths and weaknesses of each type.

43. When asked in an open-ended question why they had purchased iCloud Service storage plan, respondents gave a variety of answers (*See* Exhibit 7-9, survey q10). The most frequently mentioned reasons, beyond the obvious fact that they needed more storage, related to the ease of use of the iCloud Service, familiarity with the Service, and that the Service works well with Apple products, which accounted for 27.5% of all respondents. Only 5.4% of respondents mentioned that Apple has great security, is more secure or that the respondent trusts Apple in this "unaided" question where any pre-ordained reasons were not presented in the question.

44. When asked a closed-ended question (q11)[31] in which respondents were asked to rate a list of 12 features, characteristics or capabilities of the iCloud Service (plus any others that the respondent chose to write in) in terms of how unimportant or important they were to them in deciding to purchase a paid iCloud subscription, however, each of the items was given a "top-two box" rating, *i.e.*, a "6" or "7" on a "1" to "7" scale where "7" indicates "very important to me", by over 50% of the respondents.[32] It is not unusual for respondents to give high ratings to many items in a list of this sort, and thus, it is important to look at the differences in the percentage of respondents who gave these high ratings across the set of items in the list. For this question, "ease of using iCloud", "ability to restore or set up your device from an iCloud backup", and "ability to automatically backup all content and device and app settings on an iPhone or iPad" were given a "top-two box" rating by 85.9%, 82.3%, and 80.8% of respondents,

---

[31] *See* Exhibit 7-10.

[32] Examining the extreme ends of scale respondents is a common way in which marketing research practitioners analyze survey data. Apple has used this same "top-two box" approach in a 2016 survey. *See* for example APL-ICSTORAGE_00033684.

respectively.  Six features in the list were given "top-two box" scores by 73.4% to 79.9% of respondents, and three features were given these high ratings by 65% to 70.7% of respondents. The feature "iCloud data is stored on Apple-owned servers" was given a "top-two box" score by 70.7% of respondents, or the third lowest of the items in the list.

45.    A final closed-ended question (q12) was asked to provide another indication of which features, characteristics or capabilities were most important to iCloud Purchasers.[33]  In this question, respondents were asked to look again at the list of 12 features, characteristics, or capabilities, and to click on the most important item first, the second most important item next, the third most important next, and finally the fourth most important item.  In other words, respondents were asked to indicate the four items that they considered to be most important to them.

46.    As shown in Exhibit 7-11, the four items most frequently included in the set of those most important to respondents were (1) the ability to automatically backup all content and device and app settings on an iPhone or iPad, (2) ease of using the iCloud Service, (3) the ability to automatically synchronize all of my data between multiple computer and mobile devices with one cloud service, and (4) the ability to restore or set up one's device from an iCloud backup. These features/capabilities were closely followed in frequency of inclusion by the price of the

---

[33] *See* Exhibit 7-11.

service.[34,35]  The item, "iCloud data is stored on Apple-owned servers," on the other hand, was not included as one of the top four most important features/capabilities by 79.9% of survey respondents, a percentage that was exceeded only by "availability of customer support either by phone, chat, or in-person at an Apple Store."

47.     This set of the four features/capabilities of the iCloud Service that were most important in respondents' decision to purchase an iCloud Service storage plan closely mirrors the most widely used capabilities of the iCloud Service.  As shown in Exhibit 7-12 (survey question 13), iCloud Purchasers who took the survey report using a large number of iCloud Service capabilities, many of which are unique to the Service, indicating the versatility and "one-stop shop" nature of the iCloud Service.

48.     Out of a list of 19 capabilities shown to respondents, 50% or more of respondents indicated that they use 13 of them.  The remaining six capabilities are used by between 35.3% (storing your Safari tabs) and 48.8% (storing your Keychain and passwords) of respondents.  The four most widely used capabilities are (1) the storage of photos/videos taken on an iPhone or iPad, (2) backing up all content including data and apps as well as device and account settings for an iPhone or iPad, (3) storing the contacts in an iPhone in the Contacts app, and (4) restoring

---

[34] Compared to the cloud storage providers Google Drive, Dropbox, and Microsoft OneDrive, Apple offers the lowest priced entry to a paid subscription.  That is, the first paid tier for iCloud offers 50 GB of storage for $0.99.  The first paid tier for Google Drive costs $1.99 for 100 GB. The first paid tier beyond the free 5 GB of storage for Microsoft is also 100 GB for $1.99, but it is included in an Office 365 subscription.  Dropbox requires the largest increase in cost.  After exhausting the free 2 GB of storage, a consumer must pay $9.99 for 2 TB of storage.  Since half of the respondents in my survey pay for this lowest priced iCloud subscription that provides 50GB of storage, the other three storage providers may be less attractive in part because they offer more storage space than many consumers need at a higher price than Apple's 50 GB for $0.99 a month plan.

[35] An efficient way to examine this exhibit is to note the percentage of respondents who did not rank each item as one of the four most important. The larger the percentage of respondents who did include an item in their set of the four most important is an indicator of the consensus around the importance of that item.

or setting up a new Apple device with all of your backed up content.  The ability to automatically backup all content and device and app settings was the feature most frequently ranked as one of the four most important iCloud Service features and the ability to restore or set up a new device from an iCloud backup was the fourth most frequently included feature in the set of one's four most important features/capabilities.

49.     In summary, the data shows that for most iCloud Purchasers, the decision to purchase a paid iCloud Service subscription was facilitated by a generally positive experience using the free storage plan, such that over half of these purchasers did not even consider using another cloud storage provider instead of the iCloud Service.  Any decision to switch to a different application such as Google Drive, Microsoft OneDrive, or Dropbox would be complicated by the need for many iCloud Service users to learn how to use another storage product or platform, by the number of the iCloud Service's capabilities that many iCloud Service users take advantage of, and the uniqueness of two features considered most important by purchasers, *i.e.*, the ability to create a backup of all data and device and app settings on an iPhone or iPad and the ability to restore or set up a new Apple mobile device.[36]

Awareness of, Knowledge about and Evaluations of Alternative Cloud Storage Providers

50.     Several survey questions were designed to assess consumers' perceptions about alternative cloud storage providers such as Google, Dropbox, Microsoft One Drive, and Amazon Cloud/Amazon Drive.  In general, data from my survey shows considerable variation in consumers' awareness of and knowledge about these other cloud storage providers, with almost half of the respondents being fairly familiar with them due to their own use of them while approximately one-third of respondents being fairly unfamiliar with them.

51.     Two survey questions were designed to first determine which cloud storage providers iCloud Purchasers would consider if they were trying to decide whether or not to sign

---

[36] Declaration of Evan Krasts, January 28, 2021, ¶¶11-23.

up for a paid iCloud subscription.  As shown in Exhibit 7-6 (q7), only 29.9% of respondents considered any alternative cloud storage provider other than iCloud.  The most frequently mentioned alternative considered, Google Drive or other Google storage product, was mentioned by 44% of those who considered any alternative.  Fewer respondents considered any other alternative with the percentages considering Dropbox, Amazon or Microsoft OneDrive ranging from 22% for Dropbox to 18% for both Microsoft OneDrive and Amazon.  Thus, to the extent to which iCloud purchasers consider any alternative, it is likely to be Google Drive.  Even so, only 13% of the entire sample of iCloud Purchasers considered it at the point of purchase for a paid iCloud storage plan.  Only 5.4% of all respondents considered Microsoft One Drive.  These findings call into question whether iCloud Purchasers consider these other storage providers to be true competitors in the sense of being substitutes for the iCloud Service.

52.     Other survey data suggests that some other cloud storage providers may be considered by a portion of iCloud Purchasers to be complements rather than cloud storage competitors to iCloud.  As shown in Exhibit 7-1H (QS8B), fully 95.5% of respondents in my study currently use iCloud, and 42.2% of iCloud purchasers use Google Drive.    Smaller percentages of respondents also currently use Dropbox (31.4%) and Microsoft OneDrive (24.6%).  Respondents in my study, on average, currently use approximately three different cloud storage providers of some type.

53.     Personal knowledge about other cloud storage providers is also likely to vary as a large portion of iCloud users have never heard of or used other cloud storage providers such as Dropbox, Google, Drive and Microsoft OneDrive, while another large portion have used these providers at some point in time (*i.e.*, now or in the past).[37]  Well over half of respondents, 64.4%, have used Dropbox and 58.1% have ever used Google Drive.  Approximately 41% have ever used Microsoft OneDrive.  On the other hand, 34.1% of respondents have never heard of or

---

[37] *See* Exhibit 7-1H, QS8B.

never used Dropbox, 41% have never heard of or used Google Drive and 56% have never heard of or used Microsoft OneDrive.

54. This disparity in experience with other cloud providers is reflected in the accuracy of respondents' beliefs about their capabilities. Exhibit 7-13 (q14) shows the number of respondents who believe that Google, Amazon, Microsoft, and Dropbox could be used to accomplish 19 tasks that can be done using Apple's iCloud service. In particular, approximately half of the respondents correctly understand that none of these providers can accomplish two of the most used and more important capabilities of the iCloud Service. That is, 45.8% of all respondents (correctly) do not believe that any of these cloud storage providers can be used to backup all content (that is, data and apps) and device and account settings for your iPhone or iPad, while 51.8% (correctly) do not believe that any of these cloud storage providers can be used to restore or set up a new Apple device with all your backup content. On the other hand, 31.1% and 25.1% of all respondents incorrectly believe that Google cloud storage can be used for these two important tasks, respectively.[38] Fewer respondents have incorrect beliefs about Dropbox's capability for these two tasks, which corresponds to the findings that more iCloud Purchasers have ever used that application. Respondents are somewhat more knowledgeable about other cloud storage providers ability to store such things as documents, photos, music, and videos, share them with others and access them on your laptop or desktop, with lower percentages of respondents indicating that none of these providers can accomplish those tasks, when in fact, all of them can, between 25.1% to 36.2% for these tasks.

55. Finally, with respect to perceptions of the iCloud Service versus other cloud storage providers, iCloud Purchasers demonstrate a high level of satisfaction with it. I asked respondents in my study to rate Apple's iCloud, Google Cloud/Google Drive, Microsoft Azure/OneDrive, and Amazon Cloud/Amazon Drive on 12 product-related dimensions such as

---

[38] https://support.google.com/drive/answer/7070690?co=GENIE.Platform%3DiOS&hl=en. Accessed 1/28/21.

"reliability, that is, data will be available when you need it", "stores every kind of data that is important to me," and "ease of synchronizing files across multiple devices" (q15-q18).  Exhibit 7-14E summarizes the percent of respondents who gave each of these services a 'top-two' box score or "6" or "7" on a "1" to "7" scale, where "7" meant "Excellent".

56.     As shown, Apple's iCloud Service was given a "top-two" box rating by 70% or more by the respondents, all of whom had actually used it, on all 12 dimensions, and in general the percentage of respondents giving iCloud these high ratings is between 10% and 25% higher than the percentage that gave this high rating to the other cloud storage providers.  Most noticeably, 74.6% of respondents gave the iCloud Service a top-two box rating on "ability to restore or set up a new Apple device with all your backed-up content and settings", while the corresponding percentages for Google, Microsoft, and Amazon were 50.2%, 49.3% and 56.3% of those respondents who had used them, respectively.  On the dimension of "stores every kind of data that is important to me", iCloud was given a top-two box rating by 77.2% of respondents versus 53.9%, 55.9%, and 57.7% for Google, Microsoft, and Amazon.  Given the large difference in the frequency of these ratings for iCloud versus the other cloud storage providers, it is not surprising that the iCloud Service was given a top-two box rating by 73.7% of respondents on the dimension of "good value for the money," while Google, Microsoft, and Amazon received this rating from 59.4%, 62.5% and 59.2% of respondents, respectively, or a difference of between 11.2% (for Microsoft) and 14.5% (for Amazon).

57.     In summary, only a third of iCloud Purchasers even considered an alternate cloud storage provider when deciding to purchase an iCloud subscription, with Google being the most frequently considered alternative by these subscribers.  Even so, Google was considered by only 14% of iCloud Purchasers.  The low probability of consideration of other cloud storage providers is most likely due at least in part to switching costs that may be incurred if a consumer decided to move from his/her free iCloud storage plan to (a) the time and effort to migrate data from iCloud to another cloud storage provider, (b) the knowledge on the part of a portion of iCloud users that

the other cloud storage providers cannot accomplish two of the most frequently used and important tasks done by iCloud, and (c) the high degree of satisfaction that most iCloud Purchasers have with the iCloud Service.

<u>Expectations for iCloud Service Based on iCloud Upgrade offer</u>

58.     For many consumers, the instigator for considering upgrading a to a paid storage plan or upgrading to a Service plan with more storage is a message from Apple letting the user know that he/she is about to run out of storage space on their current plan and that more storage can be added for a (additional) monthly price.  Such a message often comes to the user on his/her iPhone or iPad in the form of a notification in settings or a prompt on the user-interface like the one shown in Exhibit 5.[39]  A message contained in this notification reads: "Important:  iCloud is a service provided by Apple.  When it is enabled, your content will be automatically sent to and stored by Apple," which is language that is similar to that which the Plaintiffs have claimed caused them to believe that their iCloud content would be stored using only servers actually owned by Apple.[40]

59.     Respondents were asked four survey questions (plus one follow-up probe) about this message in order to determine which pieces of information a reasonable consumer would attend to if he/she were trying to make a decision whether or not to purchase a paid storage plan and what expectations they might have for the iCloud Service being offered especially with respect to any third parties that may or may not be involved.  To avoid artificially directing the respondent's attention to any particular portion of the message, the first question was a general open-ended one designed to elicit any expectations the respondent would have, based on this message, regarding any attributes, characteristics, or features that they believed they would get if they agreed purchase a storage plan.  This was followed by a single probe of "anything else", and

---

[39] *See supra* at ¶10.

[40] First Amended Complaint ¶3.

then two increasingly more narrow open-ended questions.  The first of these asked for any
expectations about how Apple will manage and operate the iCloud Service or expectations about
what Apple will do to provide the Service. The second question asked for any expectations about
Apple's use of any partners to provide the iCloud Service.

60.     As shown in Exhibits 7-15 through 7-23, very few respondents mentioned any
expectations related to "data stored by Apple" or "not stored by a third party."  When asked for
expectations about any attributes, characteristics, or features (q19), respondents gave a variety of
answers, but the two most frequently mentioned responses simply referred to the basic terms of
the prompt, *i.e.*, more storage and 50 GB of storage for $0.99; and these were mentioned by only
18% and 16.5% of respondents, respectively.  Only 3.3% of respondents mentioned "data stored
by Apple" or anything related to storage only on Apple-owned servers and not on servers owned
by third parties.  Approximately 11% of respondents did mention something related to the
"safety" or "security" of their data in general, but these responses did not mention anything about
what attribute or feature would provide safety or security.

61.     Even when asked questions about more narrowly defined expectations, few
respondents mentioned "data stored by Apple" or anything related to storing data only on Apple
servers/not on third party servers.  Expectations for how Apple will manage and operate the
iCloud Service included "data stored by Apple" which was mentioned by 3.6% of all
respondents.  Again, responses related to "keep information safe" were mentioned by more
respondents, *i.e.*, 18.6%.  Further, when asked even more narrowly about any expectations they
had about Apple's use of any partners to provide the iCloud Service, only 3% of those
respondents who indicated they had any expectations about the use of partners mentioned
something related to a belief that Apple won't "share" or "sell" data to third parties, and only two
respondents said that they expected that there would be no partners or third parties.  In addition,
one respondent mentioned that they expected "them to let me know if they use partners and who
the partners are."  These six respondents account for only 1.8% of all respondents in my survey

(*i.e.*, 6 out 334 total respondents). Once again, of the small percentage of consumers that mentioned something related to safety or security, only one of these responses was connected to any notion of where one's iCloud Service data would be stored.[41]

62.     Lastly, respondents were asked to write in the pieces of information on the image, if any, that would be most important to them in deciding whether to purchase a storage plan. Once again, a variety of answers were provided, but the two most frequently cited items were related to the price or cost, and to the amount of storage and cost of the service, mentioned by 20.7% and 14.4% of the respondents, respectively.  This was followed by something related to safety or security, not connected to any specific piece of information in the message, mentioned by only 6.3% of respondents.  Only approximately four percent of respondents mentioned the phrase "data stored by Apple."

63.     It is apparent that the language in the promotional message did not result in spontaneous expectations about where one's data would be stored or the participation of Apple's use of any third parties to store data for many respondents.  Nor does it appear that the phrase "stored by Apple" was particularly salient or important to most respondents when evaluating the offer.

_Behavior with respect to terms and conditions and privacy policies_

64.     The last set of substantive questions in this survey pertained to respondents recall of, and approach to, the terms and conditions that they would have been presented at the time of purchasing a storage plan, and Apple's Privacy Policy that users would have likely seen at some point during their use of the Service.  As shown in Exhibits 7-19 and 7-20, a large majority of respondents, 70.1%, recalled accepting the "terms and conditions" and being presented with Apple's Privacy Policy, 66.8%.  However, 40.4% of respondents admitted that they automatically indicated agreement with the "terms and conditions" or "privacy policies", while

---

[41] This person was already counted in q21 as one of the 3.6% of respondents whose expectations for how Apple will manage and operate the Service included "data stored by Apple."

27.8% indicated that they read only some portions of them and 12% did not know or couldn't recall how they had behaved.  Only 19.8% of respondents indicated that they read all of the "terms and conditions" or "privacy policies" that they were shown.

65.    Those who indicated that they had read some portions or all of the "terms and conditions" or "privacy policies" were asked what portions they recalled reading, but 59% of that group of respondents could not remember or otherwise didn't know or weren't sure.  Only 9.4% of these respondents mentioned something related to "data privacy or data security" which may or may not be connected to any use of third-party storage servers.  Being unable to recall a portion, of course, does not definitively demonstrate that they did not read it.  But it does indicate that the information was not sufficiently important or salient to leave a trace in their memory.

### D.  Summary of Study Results

66.    Taken together, the results of the Perceptions Study provide important information regarding the context in which consumers make a decision to purchase an iCloud subscription for a monthly fee and the information that is available to them at that time.  That is, most iCloud Purchasers are already users of the iCloud Service and already make use of a variety of its features and capabilities.  Awareness of and knowledgeable about the features and capabilities of other storage providers among iCloud Purchasers, however, is bimodal.  Although a significant portion of them have used, and even currently use, other storage providers and correctly understand that these other storage providers cannot accomplish all of the tasks that are important that they are accustomed to doing with the iCloud Service, another significant portion of Purchasers are not aware of, or are not knowledgeable about other storage providers.  In particular, they incorrectly believe that other storage providers can back up all of their iPhone or iPad content and device and app settings and allow the user to restore all of this information on a new Apple phone or tablet.  These findings have important implications for how consumers may or may not have interpreted the descriptions of iCloud and other storage providers used by Dr. Swain in his conjoint survey.

30

67.     The findings also demonstrate that, in the real world, a majority of iCloud users do not even consider other storage providers when deciding to subscribe to a paid level of the iCloud Service, perhaps because of their high level of satisfaction with the Service, lack of knowledge about providers, or knowledge that other storage providers cannot accomplish some tasks that many iCloud Purchasers accomplish with the iCloud Service and which are important reasons for their decision to subscribe to the paid storage plan.  To the extent to which iCloud users do consider another cloud storage provider, they are most likely to consider Google Cloud/Drive.  Only 22% of my respondents who considered other providers considered Dropbox, and only 18% considered Microsoft Azure/OneDrive, which indicates that few consumers in the real world may consider them to be relevant to their choice of storage services or providers.  In fact, my study suggests that a number of iCloud Purchasers may view Google, in particular, as a complement rather than a cloud storage competitor as over 40% of respondents in my study pay for their iCloud Service and use Google Cloud/Drive as does Plaintiffs' expert Dr. Swain.[42] These findings also go to the issue of the representativeness of the choice situation modeled by Dr. Swain in his conjoint survey.

68.     Lastly, the findings of the Perceptions Study are not consistent with Plaintiffs' assertions that the language "iCloud is a service provided by Apple" and data will be "stored by Apple" will spontaneously lead consumers to expect that only Apple-owned servers will be used to store their data.  In a series of open-ended questions designed to probe consumers' expectations based on this language without artificially prompting them as to possible ideas or answers, 45% of respondents had no specific expectations about Apple's use of any partners to provide the iCloud Service, and of those who did have expectations, only five mentioned something related to an expectation that Apple would not "share" data or that Apple would not use partners or third parties.  Although most of my respondents recalled accepting certain 'terms and conditions" when they subscribed to iCloud for a monthly fee and being presented with

---

[42] Swain Deposition at 85:15-86:9.

"privacy policies" at some point during their use of the iCloud Service, less than 20% could recall any specific topics or pieces of information in them.  These findings pertain to consumers' expectations and knowledge as they would have been in the real world.

### E.  Analysis of Dr. Swain's Conjoint Survey

69.     It is well known that the reliability and validity of any conjoint study is dependent upon the quality of the survey instrument used to collect the data and the procedures by which it is administered.  At a minimum, the survey must ask the right question of the right people.[43]  Dr. Swain has failed to do the latter.  In addition, a survey questions must be framed to be clear, precise, and unbiased.  Dr. Swain has failed to do this for at least one very important item in his survey.

70.     Second, it is also well known that the degree to which the results of a survey can be generalized to the real word depends on the extent to which the survey accurately and fully incorporates important elements that characterize that real world environment, as consumers are highly adaptive and respond to the cues and circumstances available to them.[44]  Indeed, Dr. Swain, himself, states in his report that it was his intention to, among other things, select attributes for his survey that "would simulate realistic market options and shopping

---

[43] *See* Diamond 2011, p. 373:  " . . the content and execution of a survey must be scrutinized whether or not the survey was designed to provide relevant data on the issue before the court," citing to *Merisant Co., v. McNeil Nutritionals, LLC*, 242 F.$.D. 315 (E.D. Pa. 2077).

[44] *See* Allenby, Greg, Geraldine Fennell, Joel Huber, Thomas Eagle, Tim Gilbride, Dan Horsky, Jaehwan Kim, Peter Lenk, Rich Johnson, Eli Ofek, Bryan Orme, Thomas Otter, and Joan Walker, "Adjusting Choice Models to Better Predict Market Behavior," *Marketing Letters, vol.16, no. 3-4*, Sixth Invitational Choice Symposium, December 2005 ("Allenby et al. 2005"), pp. 197-208. *See* also Simonson, Itamar and Kivetz, Ran, "Demand Effects in Likelihood of Confusion Surveys: The Importance of Marketplace Conditions," Chapter 11 in Shari Diamond and Jerre B. Swann (eds), *Trademark and Deceptive Advertising Surveys: Law, Science, and Design* (Chicago, IL: American Bar Association Section of Intellectual Property Law, 2012), pp. 145-154, for a discussion of the failure to replicate marketplace conditions and the resulting inability to generalize the findings of a research study to the marketplace in litigation matters.

experiences."[45]  However, he failed to accomplish this.  Dr. Swain conducted no meaningful

empirical research among iCloud users to understand the purchase experience of iCloud users

deciding whether or not to purchase an iCloud subscription, but instead made critical survey

design decisions on an arbitrary basis.  He failed to account for consumers' search capabilities in

the real world, did not accurately represent attributes, and apparently did not assess the market

share Apple's iCloud would attain versus other providers as they exist in the marketplace or

allow for respondents to select more than one provider as they sometimes do in the real world.

Because of these critical flaws, as well as other failures to abide by standard research principles,

Dr. Swain's conjoint survey cannot be used to provide relevant, reliable and valid estimates of

consumer choices in the marketplace of cloud services and storage.

71.     An initial, fatal failure of Dr. Swain's conjoint survey is that it tests the wrong

description of Apple's practice with respect to storage of iCloud data on third-party partners'

servers.  In particular, Dr. Swain's survey purports to test the reduction in market value of the

iCloud Service if potential consumers were told that Apple partly outsources its storage location,

*i.e.*, that it "diverts some of your iCloud content for storage on other companies' servers located

at other companies' facilities."[46]  This description presents the "diversion" as a certainty, *i.e.*,

some of your iCloud data will be diverted to these other servers.

72.     I understand, however, that all iCloud Purchasers did not have data stored using

third-party partners' servers during the class period. [47] Instead, some users may have had some

data stored on third-party partners' servers, while other users may not have had any. Given those

facts, a study of a disclosure that tells consumers that some of their data <u>will</u> be stored on outside

servers is irrelevant, as consumers are likely to value the certainty of an occurrence differently

than the probability of an occurrence. To be relevant to the current matter, Dr. Swain's survey

---

[45] Swain Report, ¶35.

[46] *See* Swain Report, Figure 1:  Example Conjoint Task, p. 11, ¶32 and page 102.

[47] *See* Bashir Decl. ¶¶ 5–10; *see also* Aconfora Decl. ¶¶ 4, 6.

should have tested a disclosure that informs some consumers that some of their iCloud <u>may</u> be stored on third-party partners' servers, or that there is a chance, or some possibility, that some portions of their data might be stored in this way.

73.    Dr. Swain also failed to do any research to ensure that perhaps one of the most important attributes included in his study was clearly and accurately understood by respondents. Specifically, Dr. Swain included "brand" as one of his attributes, with the various "levels" of it being Dropbox, Google Drive, iCloud, and OneDrive (Microsoft).  However, it is not clear how respondents were supposed to use this attribute in evaluating the different cloud storage providers.

74.    Dr. Swain instructed respondents in his survey to "assume any features not shown to you <u>are the same for all options</u>" [underscore contained in the original].  Respondents were required to check a box to confirm that they understood those instructions. Dr. Swain also testified is his deposition as follows:[48]

> Q:    Now, in your survey respondents were told to, quote, "assume any features not shown to you are the same for all options," unquote.
>
> …
>
> Can you explain to me what that instruction means to you?
>
> A    I think in a general sense it means, you know, they are looking at the options and there's a feature they are thinking about that they don't see it, that they should assume that whatever their thought is about it that it would be the same for each of the options.
>
> …
>
> Q:    So our response is to assume that the brand features are equal across the brands?
>
> A:    Those features, yes.
>
> …

---

[48] Swain Deposition, 92:10-93:23.

> Q:   … so for any feature that is not listed in the conjoint, they are to assume that the feature is the same across brands; is that correct?
>
> A:   Correct.

In this case, the "Brand" feature presumably would represent only the overall positive or negative feelings that a respondent might have about it rather than any unique features that it offers.

75.     On the other hand, Dr. Swain also testified in other portions of his deposition that respondents would not assume that all other features were same across brands, but rather would use their own knowledge of the features of different brand to help them make their choices.  For example, Dr. Swain testified that to the extent to which "those [features] are important sort of Apple distinctive features then . . . that does come in through the brand." (46-58).   And further, he testified, "If you just want to kind of keep going back to this one attribute, if it's that important and, you closely identified with Apple, then, you know it would be reflected in the brand attribute."[49]  Presumably the same process would occur for the other brands included in the choice set.  Indeed, this is often how researchers attempt to use the "brand" attribute, *i.e.*, to stand in for all of those unique attributes or features or an alternative that are not otherwise specified in the study.

76.     Apparently, Dr. Swain himself is confused as to which of these two ways the "Brand" feature should be interpreted by survey respondents.  Survey results cannot be interpreted reliably, however, unless survey respondents all know and follow a particular interpretation of what "brand" stands for.   Clearly, if respondents followed the survey instructions to assume all brand are equal on all attributes not explicitly listed in the survey,  then they would be making choices based on false information.  The various brands included in Dr. Swain's study actually do differ on many features and capabilities not explicitly mentioned by

---

[49] Swain Deposition at 63:12-16.

Dr. Swain, several of which my Perceptions Study found to be very important to iCloud Purchasers.[50]  Thus, those choices cannot be generalized to the real world.

77.     If, on the other hand, respondents are supposed to use their knowledge of specific brands to help them make their choices, then it is reasonable to ask what level of knowledge they might have about the alternative brands.  As I noted in my Perceptual Study, most purchasers of an iCloud subscription were upgrading from the free storage plan, and they would be familiar with it.  But, they may or may not know the features offered by other brands— and indeed the Perception Study showed that consumers' knowledge varies considerably. An analysis of Dr. Swain's own survey data indicates that only 38.9% of his respondents had used Dropbox at least once since 2015, and only 30.7% had used Microsoft OneDrive during that time period.  Even Google Drive was used at least once since 2015 by only 46% of Dr. Swain's respondents.  Since respondents are forced to make their choices based only on the information presented in the survey and that they have in their memories, they may have made their choices with almost no knowledge of the brands particular attributes and benefits.  Those with very little information about a brand may simply heed the survey instructions and assume that all brands are equal on all feature not explicitly mentioned.

78.     Dr. Swain apparently did no testing among respondents to determine how they were interpreting the Brand variable.  Dr. Swain's findings cannot be interpreted reliably since we do not know what information respondents were using in order to make their choices.

79.     Next, Dr. Swain also failed to follow standard research principles to ensure that his survey accurately represented important characteristics that, in the real world, are likely to influence consumers' choices. An examination of his study indicates that (1) he arbitrarily

---

[50] Notably, features that were of most important to iCloud users in deciding to purchase an iCloud subscription included ease of use, the ability to automatically create a backup or all content and device and app settings, and the ability to use that backup of the entire device to restore a device or set up a new one.

selected the product features or attributes to include in his survey, and there is evidence that his survey did not include attributes that are particularly important to iCloud users, but did include two that may not be very important; (2) he failed to account for consumers' ability in the real world to search for information about the features and capabilities of other storage providers; (3) he did no empirical research among consumers to determine which other brands consumers in the real world would consider if they were deciding whether to purchase an iCloud subscription; (4) the levels of one attribute do not reflect actual marketplace values; and (5) his market simulation does not allow for consumers to select more than one storage providers, and apparently does not pit an accurately described Apple iCloud plan against alternatives that are also accurately described.

80.     One of the most important decisions in any conjoint study is which attributes to use (and not use) to describe the various product alternatives from which respondents will be asked to choose.  As noted in one of the most widely used basic texts on conjoint analysis, the success of a market simulation such as that conducted by Dr. Swain is dependent on a number of assumptions, one of which is that the relevant attributes have been included in the simulation model.[51]    While it is neither possible nor advisable to include every possible attribute of a product, if a conjoint survey fails to include a feature or features that consumers weight heavily in making their decisions in the real world, the choices observed in the conjoint study will not resemble the choices made in the real world.  A conjoint analysis cannot measure the trade-offs consumers make among features that are not included in the study.

81.     Similarly, including unimportant attributes that respondents would not consider in the real world wastes respondents' valuable attention and may artificially increase the observed

---

[51] Orme, Bryan, *Getting Started with Conjoint Analysis, 3rd edition*, Manhattan Beach, CA: Research Publishers LLC, 2014, p. 92.

relative importance or weight of some or all of the other attributes in the study.[52]  And, as Dr. Swain writes in his report, forcing respondents to consider a large number of attributes that respondents find irrelevant or unimportant in a choice-based conjoint exercise runs the risk of overwhelming, confusing, or boring respondents and thus the likelihood of lower quality data.[53]

82.     The standard, recommended practice, then is to select attributes based on consumer research indicating which factor consumers, themselves, view as most important.  Dr. Swain ignored this practice, however.  Instead he selected attributes other than the focal feature of "Storage Location" by first generating a large list of possible features based on a review of a number of sources such as websites for Apple and iCloud and for other storage providers that he viewed as competitors, Plaintiffs' First Amended Class Action Complaint, consumer and analyst articles, consultations with Plaintiffs' counsel and with Plaintiffs' economics expert, and the like, and then selecting those that, in his view would be "recognizable to a common audience and would simulate realistic market options and shopping experiences."[54] Notably missing from these criteria is "important or relevant to consumers."

83.     Only after selecting attributes based on his own opinions did Dr. Swain conduct any consumer research, and even then, he, himself, conducted one-on-one interviews with only

---

[52] In conjoint analysis, the importance of an attribute is calculated as the range of the part-worth utilities for that attribute divided by the sum of the ranges for all attributes included in the study, or the percent of the variation in part-worth utilities accounted for by the attribute.  Since the percentage importance scores must sum to 100%, a lower importance score for one attribute must be accompanied by an increase in the importance score for one or more other attributes. *See Id.*

[53] Swain Report, ¶33.

[54] Swain Report ¶35.

six respondents.[55]  In his report, Dr. Swain describes these interviews as "semi-structured".  Dr. Swain testified at his deposition that, contrary to standard scientific principles that require information about a study to be sufficient to allow an independent researcher to replicate the work, he could not provide an interview guide or specific questionnaire that he used, nor did he keep any notes regarding comments or information gleaned from the interviewees.  Dr. Swain testified  that he did not ask the interviewees about the ability to create a full backup of one's device using a cloud storage service, but instead that "I let them lead the discussions."[56]  He also testified that "I wouldn't generalize from just a set of interviews," but that based on everything he reviewed, he did "include important attributes that are familiar and important and relevant to consumers in this market."[57]

84.     Data that I collected in the Perception Study that was collected from 334 iCloud Purchasers similar to those interviewed by Dr. Swain is inconsistent with his belief.  As noted in my prior discussion of this study, two attributes that consumers say are most important to them "the ability to automatically backup all content and device and app settings on an iPhone or iPad" and "the ease of using iCloud."  Neither of these were included in Dr. Swain's survey.  Neither was the next most frequently noted attribute, the ability to restore or set up one's device from an iCloud backup.

85.     On the other hand, Dr. Swain did include "the number of users you can add to your cloud storage account," or Family Share, even though only 17% of iCloud users actually

---

[55] Dr. Swain also reported that he conducted "cognitive interviews" with five additional iCloud users, but those interviews, however, appear to have been focused on respondents' views of the survey that Dr. Swain had already constructed.  Again, Dr. Swain was unable to provide any interview guide or set of questions that were asked, nor was he able to provide any notes that he had taken to record comments made by the interviewees.  Swain Report, ¶37.

[56] Swain Deposition at 45:3-9.

[57] Swain Deposition, 45:23-46:2.

use Family Share.[58] Dr. Swain included a feature called "Multi-device sync" which was defined as "the ability to sync multiple devices across different operating systems." This is not the same as "ability to automatically synchronize and access data on all of their Apple devices" which my Perception Study showed was important to many iCloud users. Dr. Swain does not present any information on how many iCloud users own and use devices that run different operating systems or the extent to which this feature is important to them in selecting a cloud storage provider.

86.     These deficiencies with the manner in which attributes were selected for inclusion in the study do not even account for an inherent flaw in using a conjoint survey to estimate consumer choices in the real world. That is, in the real world, consumers select the pieces of information that they wish to process. In the conjoint survey context, consumers are forced to examine the attribute data provided. Indeed, respondents in Dr. Swain's conjoint survey were required to check a box next to each item to indicate that they had reviewed it.

87.     As discussed previously, the inclusion of the "Brand" feature does not cure the failure to include attributes that are important to consumers because of Dr. Swain's confusing instructions to respondents about how to interpret "Brand." In addition, Dr. Swain did not measure whether, or to what extent, respondents came to the survey with any pre-existing knowledge of untested attributes associated with the particular brands that were included. Most importantly, in the real world, consumers would be free to search for information about the characteristics of different storage providers that are important to them. To the extent that consumers would search for information in the real world, choices made in the context of a conjoint survey regarding alternative products that respondents may not be familiar with and where there is no ability to search for relevant information are not likely to accurately represent choices that would be made in the real world.

---

[58] *See* "iCloud Use Among iPhone Owners" August 2017, APL-ICSTORAGE_00036105 at 00036124.

88.     Similarly, Dr. Swain conducted no consumer research to ensure that he included other storage provider brands that consumers would consider if they were actually trying to decide whether or not to purchase a subscription to the iCloud Service.  As one conjoint expert notes, however, "Because a product purchase usually constitutes a choice among specific alternatives, the competitive context is a critical part of the purchase situation."[59]  This expert goes on to illustrate that one's willingness to pay for a particular product depends upon the number and type of alternatives with which he/she is presented.  The fewer the alternatives that actually satisfy one's needs, the higher the price one might be willing to pay for one that does.

89.     The standard way that marketers recommend to define competition is to take the consumer's point of view and ask what set of products consumers would consider to be substitute solutions for their needs.[60]  Dr. Swain, however, did not follow this standard.  Instead, he apparently assumed that iCloud users would consider alternatives and then based his selection of competitors to include on his own review of the storage providers that exist in the market. Two pieces of consumer data suggest that two of the storage providers that Dr. Swain included are unlikely to have been of interest to respondents.  First, in my Perceptions Study, I asked respondents who were similar to those who participated in Dr. Swain's study, whether they had considered any other storage providers at the time that they decided to purchase an iCloud subscription, and if they had considered any others, which ones they had considered.

90.     As shown in Exhibit 7-6, 63% of iCloud purchasers did not consider using any cloud storage provider rather than the iCloud service.  For the 30% of respondents who did recall

---

[59] Orme, Bryan, *Getting Started with Conjoint Analysis, 3rd edition*, Manhattan Beach, CA: Research Publishers LLC, 2014, p. 90.

[60] Kotler, Philip and Kevin Lane Keller, *Marketing Management, 15th ed.* (Boston: Pearson, 2016), see p. 277; Ratneshwar, S. and Allan D. Shocker, "Substitution in Use and the Role of Usage Context in Product Category Structures," Journal of Marketing Research, vol. 28, no. 3, 1991, 281-295; Day, George S., Allan D, Shocker, and Rajendra K. Srivastava, "Customers-Oriented Approaches to Identifying Products-Markets," *Journal of Marketing, vol 43, no. 4*, 1979, 8-19.

considering using another cloud storage provider, the most frequently mentioned brand
considered was Google which was mentioned by almost half of those who considered any other
brand.  Dropbox was mentioned by only 20% of those who considered other brands, while the
corresponding percent for Microsoft OneDrive was only 14%.  These findings imply that
considering any other brands of cloud storage providers is not typical for a significant portion of
iCloud Purchasers, and it is unlikely that many, if any, purchasers would consider Microsoft
OneDrive in particular.  And, Dr. Swain's own data shows that only approximately a third of his
respondents had ever used Dropbox or Microsoft OneDrive at least once since 2015, and only
15% or fewer had paid for these two services since 2015.[61]

91.     Another reason that Dr. Swain's conjoint survey does not represent the real world
is that he does not use attribute level values that accurately represent real-world options.
Specifically, he does not use real-world values for the levels for the Family Share feature.  In the
Swain survey, Family Sharing plans allow the user to add either one additional user to their
account for no extra charge, or up to six additional users.  In reality, none of the four brands
included in the analysis offer a Family Sharing plan that allows only one additional user.  For all
practical purposes, Microsoft OneDrive does not offer this feature; there is only one plan that
allows for sharing and this is requires the purchase of a family Microsoft Office 365
subscription.  The same is true for DropBox, that allows account sharing only as part of a
"family plan" that offers 2,000 GB of storage for $19.99 per month.  Both Google and iCloud, at
the time the survey was conducted, allow up to five additional users at no charge.  Therefore, the
appropriate range of values levels of this attribute would be "none" or "up to 5".  Brands that do

---

[61] Dropbox has fewer storage plan options from which to choose.  If a user runs out of the 2 GB
of storage that Dropbox provides for free, the next available plan for individual is one that offers
2 TB for $9.99/month, whereas iCloud provides 5 GB of storage for free, and there are two plans
offered before the 2 TB one, also for $9.99/month.  If a user has no need to 2 TB of data and/or
doesn't wish to pay $9.99, then Dropbox is irrelevant.  Microsoft OneDrive, on the other hand, is
associated with its Office 365 software.  *See* https://www.dropbox.com/basic  for the free
Dropbox Basic, and https://www.dropbox.com/plans for pay plans.

not offer a family share option may be valued differently than those who allow one or more additional users to share a subscription.

92.     Similarly, the Dr. Swain's conjoint survey implies that all of the brands included in his survey could be characterized as offering a 50 GB storage subscription. Apple, however, is the only brand in Dr. Swain's survey that offers a plan with this amount of storage, and Apple is the only brand in the survey that offers a plan for only $0.99. The first pay storage level offered by Google and Microsoft is 100 MB for $1.99 per month. The 50GB subscription is Apple's most popular of its pay options, perhaps in part because it allows users to upgrade to a larger, but still modest storage allocation for a very modest outlay of funds, *i.e.*, less than $1 a month.

93.     Finally, Dr. Swain's survey (and market simulation) does not allow respondents to choose more than one cloud storage provider if they, like Dr. Swain[62], perceive some storage providers to be complements to another, *e.g.*, one is best for some types of files like photos, while the other may be better for files like documents, reminders, notes, or calendars. Or one might be better for personal use while the other may make it easier to share files with other family, friends, or co-workers. To the extent to which respondents would not make a single choice in the real world, the market share estimates in the conjoint survey world may be affected.

94.     Finally, a valid market share simulation requires that the relevant, real products in the marketplace can be represented along important dimensions using the attribute levels measured in the conjoint survey so that good representations of real-world products in terms of dimensions that consumers actually care about can be pitted against each other. To the extent to

---

[62] Swain Deposition at 84:11-14.

which this cannot be done, the share of preferences indicated by the market simulation will be less likely to resemble likely marketplace outcomes.[63]

## V.    SUMMARY

95.    In summary, Dr. Swain's conjoint analysis fails to provide any relevant, reliable of valid conclusions with respect to consumers' likely response, in the real world, to a disclosure that Apple may store portions of user's iCloud data on third-party partner servers.  The reason for this failure is that Dr. Swain's survey was not built on a solid foundation of knowledge and understanding of the context in which consumer choices are made with respect to cloud storage providers and the manner in which those choices are made which my Perception Study provides. Because survey design decisions instead were made arbitrarily, the attribute at issue in this matter was incorrectly specified and the instructions for the survey as well as another key attribute used to describe the alternative cloud storage providers were so unclear even to Dr. Swain.  And, as my Perception Study showed, Dr. Swain did not include attributes of most importance to iCloud purchasers, and thus he cannot determine how consumers would trade these off against the possibility that some of their iCloud data might be stored on third-party partners' servers.

96.    Similarly, Dr. Swain's lack of knowledge of iCloud users resulted in a study that did not replicate the important features of a real-world choice environment.  He included alternative cloud storage products in his survey that would be unfamiliar to many respondents and prevented them from searching for information about them as they actually would in the real world.  And, he constructed a market share simulation which cannot accurately represent a choice environment in which consumers have been allowed to search for information and are not constrained to purchase only one option.  Because Dr. Swain's conjoint analysis provides him with no measure of the value of important characteristics of cloud storage brands, he cannot

---

[63] *See* Orme, Bryan, *Getting Started with Conjoint Analysis, 3rd edition*, Manhattan Beach, CA: Research Publishers LLC, 2014, pp. 95-96.

determine how Apple's iCloud would fare in a marketplace of other accurately described storage providers.

## VI.    COMPENSATION

97.    I am being compensated for my work in this case at my usual rate of $750 per hour.


_Carol A. Scott_

Carol A. Scott
January 29, 2021