# EXHIBIT B

1    COOLEY LLP
     BEATRIZ MEJIA (190948) (mejiab@cooley.com)
2    KYLE C. WONG (224021) (kwong@cooley.com)
     LAUREN J. POMEROY (291604) (lpomeroy@cooley.com)
3    101 California St., 5th Floor
     San Francisco, CA  94111
4    Telephone:  (415) 693-2000
     Facsimile:  (415) 693-2222
5
     MICHELLE C. DOOLIN (179445) (mdoolin@cooley.com)
6    JAYME B. STATEN (317034) (jstaten@cooley.com)
     4401 Eastgate Mall
7    San Diego, CA  92121
     Telephone:  (858) 550-6000
8    Facsimile:  (858) 550-6420

9
     Attorneys for Defendant
10   APPLE INC.

11

12                        UNITED STATES DISTRICT COURT

13                     NORTHERN DISTRICT OF CALIFORNIA

14                            SAN JOSE DIVISION

15

16   ANDREA M. WILLIAMS AND JAMES          Case No.  5:19-cv-04700-LHK
17   STEWART, On Behalf of Themselves And
     All Others Similarly Situated,         **DEFENDANT APPLE INC.'S OPPOSITION
18                                           TO PLAINTIFFS' MOTION FOR CLASS
                        Plaintiffs,          CERTIFICATION**
19
             v.
20
     APPLE INC.,
21                                           Judge:    The Hon. Lucy H. Koh
                        Defendant.           Crtrm:    8, 4th Floor
22                                           Date:     March 4, 2021
                                             Time:     1:30 p.m.
23

24

25              **REDACTED VERSION OF DOCUMENT**

26                  **SOUGHT TO SEALED**

27

28

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

APPLE'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
19-CV-04700-LHK

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ........................................................................................................... 1

II. FACTUAL BACKGROUND ......................................................................................... 2

    A.   The iCloud Service and iCloud Terms & Conditions ......................................... 2

    B.   The Location of iCloud Data Storage Is Not Uniform ...................................... 4

    C.   Apple's iCloud Storage Records Do Not and Cannot Identify All U.S. Paid iCloud Subscribers Whose Data Was Stored Using Third-Party Servers ...................................... 4

    D.   Plaintiffs' Motion, Testimony, and Proposed Damages ..................................... 5

III. LEGAL STANDARD .................................................................................................... 6

IV. ARGUMENT ................................................................................................................. 7

    A.   Plaintiffs Fail to Show Predominance .............................................................. 7

        1.   Determining breach requires individualized inquiries ........................... 7

            a.   Plaintiffs' theory of breach defies the record and logic. ............... 8

        2.   Determining actual injury requires individualized inquiries ................. 9

        3.   Determining class members' intent requires individualized inquiries................. 11

            a.   Plaintiffs' proffered canons of contract interpretation do not apply ........... 13

        4.   Determining if waiver or laches apply to class members defeats predominance . 14

    B.   Plaintiffs' Damages Model Fails to Satisfy *Comcast* ...................................... 15

        1.   Plaintiffs' damages calculations are inherently flawed ....................... 15

            a.   Swain's conjoint survey is methodologically flawed and unreliable.......... 16

            b.   Swain's conjoint survey improperly excludes supply-side considerations.. 18

            c.   Mangum's report highlights the flaws of Swain's conjoint analysis ........... 20

            d.   Mangum's report is flawed because he too fails to account for supply-side factors........... 20

        2.   Plaintiffs' damages model cannot calculate class-wide damages because it is not based on the facts of this case. ............... 21

        3.   Plaintiffs' damages model is not tied to their theory of liability ........................ 22

    C.   Plaintiffs' Testimony Raises Significant Typicality and Adequacy Issues ...................... 24

    D.   Plaintiffs Cannot Certify a Class for Injunctive Relief....................................... 25

V. CONCLUSION ............................................................................................................ 25

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

i.

APPLE'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
19-CV-04700-LHK

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
    568 U.S. 455 (2013) ........................................................................................................ 6

*In re Anthem, Inc. Data Breach Litig.*,
    2016 WL 3029783 (N.D. Cal. May 27, 2016) ...................................................... 10

*Apple Inc. v. Samsung Elecs. Co.*,
    2014 WL 976898 (N.D. Cal. Mar. 6, 2014) ......................................... 18, 19, 20, 21

*Arabian v. Sony Elecs., Inc.*,
    2007 WL 627977 (S.D. Cal. 2007) ...................................................................... 24

*Bally v. State Farm Life Ins. Co.*,
    335 F.R.D. 288 (N.D. Cal. 2020) ........................................................................ 13

*Bazuaye v. INS*,
    79 F.3d 118 (9th Cir. 1996) ................................................................................. 13

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) ...................................................................................... *passim*

*In re Conseco Life Ins. Litig.*,
    920 F. Supp. 2d 1050 (N.D. Cal. 2013) .............................................................. 13

*Davidson v. Apple Inc.*,
    2018 WL 2325426 (N.D. Cal. May 8, 2018) ..................................... 15, 21, 22, 25

*Davidson v. Apple Inc.*,
    2019 WL 6251180 (N.D. Cal. Nov. 22, 2019) .................................................... 20

*Dulberg v. Uber Technologies., Inc.*,
    2018 WL 932761 (N.D. Cal. Feb. 16, 2018) ...................................................... 15

*Ellsworth v. U.S. Bank N.A.*,
    2014 WL 2734953 (N.D. Cal. June 13, 2014) .................................................... 15

*Ewert v. eBay, Inc.*,
    2010 WL 4269259 (N.D. Cal. Oct. 25, 2010) .................................................... 13

*In re Facebook Privacy Litig.*,
    2016 WL 4585817 (N.D. Cal. Sept. 2, 2016) ................................................... 7, 8

*Faulk v. Sears Roebuck and Co.*,
    2013 WL 1703378 (N.D. Cal. Apr. 19, 2013) ...................................................... 8

*Feller v. Transamerica Life Ins. Co.*,
    2017 WL 649680 (C.D. Cal. Dec. 11, 2017) ...................................................... 16

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

ii.

APPLE'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
19-CV-04700-LHK

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Gonzales v. Comcast Corp.,*
   2012 WL 10621 (E.D. Cal. Jan. 3, 2012) .......................................................7, 10

*In re Google Inc. Gmail Litig.,*
   2014 WL 1102660 (N.D. Cal. Mar. 18, 2013)...........................................................12

*Gregurek v. United of Omaha Life Ins. Co.,*
   2009 WL 4723137 (C.D. Cal. Nov. 10, 2009)......................................................12, 13

*Gulf Ins. Co. v. First Bank,*
   400 F. App'x 188 (9th Cir. 2010) ...............................................................................15

*Hadley v. Kellogg Sales Co.,*
   324 F. Supp. 3d 1084 (N.D. Cal. 2018) .....................................................................19

*Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.,*
   103 F. Supp. 2d 268 (S.D.N.Y. 2000) ........................................................................18

*Kirby v. Cullinet Software, Inc.,*
   116 F.R.D. 303 (D. Mass. 1987)..................................................................................25

*MacDougall v. Am. Honda Motor Co.,*
   2020 WL 5583534 (C.D. Cal. Sept. 11, 2020) .......................................16, 17, 18, 19

*Magic Kitchen LLC v. Good Things Int'l, Ltd.,*
   153 Cal. App. 4th 1144 (2007) ...................................................................................14

*Mazza v. Am. Honda Motor Co.,*
   666 F.3d 581 (9th Cir. 2012) ........................................................................................6

*Melton ex rel. Dutton v. Carolina Power & Light Co.,*
   283 F.R.D. 280 (D.S.C. 2012) ....................................................................................14

*Monaco v. Bear Sterns Cos.,*
   2012 WL 10006987 (C.D. Cal. Dec. 10, 2012) ....................................................12, 13

*Moore v. Apple Inc.,*
   309 F.R.D. 532 (N.D. Cal. 2015)......................................................................8, 10, 11

*In re NJOY, Inc. Consumer Class Action Litig.,*
   2016 WL 787415 (C.D. Cal. Feb. 2, 2016).................................................................19

*Opperman v. Kong Techs., Inc.,*
   2017 WL 3149295 (N.D. Cal. July 25, 2017).......................................................21, 22

*Oracle Am., Inc. v. Google, Inc.,*
   2012 WL 850705 (N.D. Cal. Mar. 13, 2012)........................................................17, 18

*Petrovic v. Amoco Oil Co.,*
   200 F.3d 1140 (8th Cir. 1999) ....................................................................................24

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*In re Prudential Ins. Co. of Am. SGLI/VGLI Contract Litig.*,
   286 F.R.D. 155 (D. Mass. 2012)........................................................................10

*Pryor v. Aerotek Scientific, LLC*,
   278 F.R.D. 516 (C.D. Cal. 2011) ......................................................................24

*Rainier Credit Co. v. W. Alliance Corp.*,
   171 Cal. App. 3d 255 (1985) .............................................................................13

*Rodman v. Safeway, Inc.*,
   2014 WL 988992 (N.D. Cal. Mar. 10, 2014)....................................................13

*Rodman v. Safeway Inc.*,
   2015 WL 2265972 (N.D. Cal. May 14, 2015) ...................................................15

*Rosenfeld v. Abraham Joshua Heschel Day Sch., Inc.*,
   226 Cal. App. 4th 886 (2014) ...........................................................................11

*Saavedra v. Eli Lily & Co.*,
   2014 WL 7338930 (C.D. Cal. Dec. 18, 2014) ..................................................19

*Schechner v. Whirlpool Corp.*,
   2019 WL 4891192 (E.D. Mich. Aug. 13, 2019) ...............................................19

*In re SFPP Right-of-Way Claims*,
   2017 WL 2378363 (C.D. Cal. May 23, 2017) ..................................................14

*Singleton v. Fifth Generation, Inc.*,
   2017 WL 5001444 (N.D.N.Y. Sept. 27, 2017)..........................................22, 23, 24

*Susman v. Lincoln Am. Corp.*,
   561 F.2d 86 (7th Cir. 1977) ..............................................................................24

*Svenson v. Google Inc.*,
   2016 WL 8943301 (N.D. Cal. Dec. 21, 2016) ............................................16, 24

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liability Litig.*,
   -- F. Supp. 3d ---, 2020 WL 6688912 (N.D. Cal. Nov. 12, 2020) ...................15, 18

*Wind Dancer Prod. Grp. v. Walt Disney Pictures*,
   10 Cal. App. 5th 56 (2017) ...............................................................................14

*Zakaria v. Gerber Prods. Co.*,
   2017 WL 9512587 (C.D. Cal. Aug. 9, 2017), *aff'd*, 755 F. App'x 623 (9th Cir.
   2018) ............................................................................................16, 19, 21

*Zakaria v. Gerber Prods. Co.*,
   755 F. App'x 623 (9th Cir. 2018) .....................................................................18

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iv.

APPLE'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
19-CV-04700-LHK

**TABLE OF AUTHORITIES**
(continued)

*Zhang v. Am. Franchise Reg'l Ctr., LLC,*
   766 F. App'x 438 (9th Cir. 2019) ...........................................................13

**Statutes**

Cal. Civ. Code
   § 1649..............................................................................................14
   § 1654..............................................................................................13

**Other Authorities**

Federal Rule of Civil Procedure
   23(a)...................................................................................................6
   23(b)...............................................................................................6, 15

Page(s)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

v.

APPLE'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
19-CV-04700-LHK

# I.    INTRODUCTION

Plaintiffs move to certify ("Motion") a class of U.S. paid subscribers of Apple Inc.'s ("Apple") iCloud Service ("iCloud" or "Service"), seeking ███ million for Apple's alleged breach of its iCloud Terms and Conditions ("Terms")[1], by using third-party servers to store iCloud data.[2] Plaintiffs fail to show that there is any common proof of injury or damages on a class-wide basis. Rather, Plaintiffs admit that they have suffered no harm; in fact, both testified that knowledge of Apple's use of third-party servers would not have deterred them from paying for the service. And both continue to use iCloud, testified they are "thrilled" with the Service, and have no intention of giving it up.

As an initial matter, Plaintiffs have not shown by common proof that every U.S. paid iCloud subscriber actually had any of their iCloud data stored using third-party servers in alleged violation of the Terms. The record shows that for much of the Damages Period, ████████████ ████████████████████████████████████████████████████████ ████████████████████████ Without such proof, they have failed to carry their burden to establish breach of contract or resulting injury on a class-wide basis. Moreover, ████████████ ████████████████████████████████████████████████████████ █████████████████████████████████████████████ This lawyer-driven lawsuit, thus, not only suffers from fatal predominance problems but also improperly sweeps in an untold number of individuals that likely did not suffer the harm Plaintiffs assert here.

Likewise, the interpretation of the Terms is not subject to common proof. Apple has long made clear its use of third-party servers in various disclosures from its Privacy Policy ("iCloud data is stored in encrypted form including when *we utilize third party storage*") (emphasis added) to its Apple ID and Privacy ("Your backup data is encrypted when sent over the Internet and stored in an encrypted format *on Apple's, its subsidiaries, or third party partners' servers*") (emphasis added). These disclosures were collectively viewed by millions of individuals over the Class Period. Indeed, Plaintiffs' testimony illustrates the differences in knowledge that permeate the class and require a user-

---

[1] *See* Plaintiffs' First Amended Complaint ("FAC") (ECF No. 38), Ex. 1.
[2] Plaintiffs seek to certify two classes of U.S. iCloud paid subscribers: a damages class for the period September 16, 2015-October 31, 2018 ("Damages Class Period"), and an injunctive relief class starting from the date of any order certifying the class ("Injunctive Class Period) (collectively "Class Period").

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1.

APPLE'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
19-CV-04700-LHK

by-user analysis: Mr. Stewart admitted that he read several disclosures prior to agreeing to the Terms while Ms. Williams did not. At the same time, widely read publications, including The Wall Street Journal, BBC.com, and Business Insider, have disclosed these same facts in articles titled "***Apple stores iCloud data with Google***" and "***Apple Using Google's Cloud, Moving Some Data From Amazon***." (emphasis added). Given these varied sources of disclosures, the Court would have to engage in individual inquiries to determine each class member's understanding of the Terms.

Finally, Plaintiffs' two expert reports do nothing to cure the fundamental problems in the Motion. Among other flaws, the conjoint survey is divorced from reality–it did not select iCloud attributes that consumers actually value, it excluded supply-side considerations, and it asked respondents to assume their iCloud data would be placed on third-party servers, when in fact, that was only a possibility. The results of conjoint are inconsistent with rational consumer behavior. These flaws spread to the damages report, which relies on the flawed conjoint survey.

For the reasons raised herein, the Court should deny the Motion.

## II.    FACTUAL BACKGROUND

### A.    The iCloud Service and iCloud Terms & Conditions

The Service is a multifaceted and integrated service launched by Apple in October 2011 that encrypts and stores the contents of an Apple device, allowing for comprehensive device backups in the event the device is lost, stolen, or upgraded. (Krasts Decl.[3] ¶¶ 2, 3, 13.) The first 5 GB of iCloud storage are free. (FAC ¶ 20; Terms at I.C.) "Additional storage is available for purchase on a subscription basis." (Terms at III; *see* FAC ¶ 26.) The Service can be used on many different types of devices, including iPhone, iPad, iPod, MacBook, and iMac. (Krasts Decl. ¶¶ 4, 7.) The Service also syncs a user's files and data across their Apple devices, provides the Find My feature for lost or stolen Apple devices, and integrates Apple's Family Sharing product, which allows iCloud storage to be shared among up to six family members. (*Id.* ¶¶ 13-18, 25.)

When a user logs into an Apple device for the first time, they are presented with, and agree to, the Terms, which state that "Apple is the provider of the Service" and that user content is "sent to and

---

[3] References to the declarations filed with Apple's Opposition are cited using the shortened format of the declarants' last names and "Decl.".

stored by Apple." (Terms at p.1; Davis ¶¶ 3-6.) The Court held that the phrase "sent to and stored by Apple" is ambiguous. (ECF No. 34 at 18.) Plaintiffs contend that Apple breached the Terms because it stored iCloud data using cloud storage services procured from third parties. (Mot. at 9.) During the Damages Class Period, Apple used its own servers and those of third parties, including Google Cloud Platform, Amazon Web Services, Microsoft, and AT&T to store iCloud data. (Bashir. Decl. ¶ 5.)

**Apple Disclosures.** Throughout the Class Period, Apple provided numerous public disclosures about Apple's storage of iCloud data using its own and third-party servers, including[4]:

- **iCloud and Privacy disclosure.** During the set up process for an Apple device running iOS 6–8 (approx. 2012 to 2015), users that signed in using an Apple ID would be presented with linked content answering the questions "What is iCloud?" and "What is iCloud backup?" Any user that clicked on those links would have read that: "Your contacts, calendars, reminders, bookmarks, photos, documents, and backup data are sent and stored on Apple's, its subsidiaries', or *third-party partners' servers*, and are used to enable iCloud services on your Devices." (Keller Decl. ¶¶ 7-8 (emphasis added).)

- **Apple ID and Privacy disclosure.** During the set-up process for an Apple device running iOS 9–12 (approx. 2015 to 2019), a consumer could have clicked on the hyperlink "Apple ID & Privacy" or "See how your data is managed," and read that "Your backup data is encrypted when sent over the Internet and stored in an encrypted format on Apple's, its subsidiaries, or *third party partners' servers*" (iOS 9-11) or "In some cases, your iCloud data may be stored *using third-party partners' servers* . . . ." (iOS 12) (*Id.* ¶ 9 (emphasis added); (Wong Decl. Exs. G-K.).) An Apple device user could have read the same disclosure on the Settings menu of their device or on Apple's website. The web version of the disclosure was viewed approximately 200,000 times per month during the months it was available. (Benson Decl. ¶ 3.)

- **Privacy Policy.** Between March 2014 and March 26, 2018, in the same screen where the Terms appeared during the device set up process, Apple presented a link to the Privacy Policy. (Davis Decl. ¶¶ 3-6.) Any user who clicked on the link would have read that "iCloud data is stored in encrypted form including when we utilize *third party storage*." (*Id.* ¶ 5; Wong Decl. Exs. L-S (emphasis added).) The web version of disclosure was viewed approximately 220,000 times per month in those months for which Apple has data. (Benson Decl. ¶ 4.)

**Disclosures in Mainstream and Popular Technical Media Platforms.** Users could have also learned that iCloud data is stored using third-party servers if they had read any one of various widely circulated publications, including The Financial Times, The Wall Street Journal, Macworld, Fortune, and Business Insider. (*See* Wong Decl. ¶ 32.) For example, in an article first published on March 16,

---

[4] To keep the brief succinct, Apple has not listed here every way that a user may have found or been presented with various disclosures about Apple's use of third-party servers; that discussion can be found in the Keller Declaration at ¶¶ 7-12.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

3.

APPLE'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
19-CV-04700-LHK

2016, Business Insider reported that "[Apple's] use of [AWS], as well as Microsoft's cloud Azure, has been widely reported since at least 2011 and was confirmed by Apple in a security document. (*Id.* ¶ 46.)

### B. The Location of iCloud Data Storage Is Not Uniform

Contrary to Plaintiffs' blanket assertion based on a single sentence in a single document (Mot. at 19–21), iCloud data was not all stored using third-party servers across the proposed Damages Class Period. ██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

When a user's device seeks to store a file using iCloud—for example, to backup the device or upload a photo—the iCloud software follows a multi-step process. (Bashir Decl. ¶ 4.) The software splits the file into small pieces, called "chunks." (*Id.*) Each chunk is separately encrypted. (*Id.*) Apple refers to encrypted chunks as "objects" – undecipherable sequences of 1s and 0s. (*Id.*) The encryption keys for each chunk and the file's metadata are stored on an Apple server. (*Id.*)

During the Class Period, ████████████████████████ ▄ ███████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

### C. Apple's iCloud Storage Records Do Not and Cannot Identify All U.S. Paid iCloud Subscribers Whose Data Was Stored Using Third-Party Servers

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

---

[5] For ease of reference, the term "iCloud data" refers to a user's encrypted objects that *could* have been stored using third party object storage, and not to the metadata corresponding to each file, which was stored using Apple servers. Further, the term "third-party servers" to refer to object storage services procured by Apple through contracts with third parties, such as AWS and Google Cloud Platform.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4.

APPLE'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
19-CV-04700-LHK

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17      **D.**     **Plaintiffs' Motion, Testimony, and Proposed Damages**

18         Plaintiffs contend that Apple stored iCloud data using third-party servers in a uniform manner

19 across its Damages Class Period based on their interpretation of a single sentence in the iOS Security

20 Guide, which stated between March 2015–October 2018: "[t]he encrypted chunks of the file are stored,

21 without any user-identifying information, using third party storage services, such as S3 and Google

22 Cloud." They argue this sentence means that from March 2015–October 2018 Apple stored some

23 iCloud data from every class member using third-party servers.[6] This interpretation not only ignores,

24 but is directly contradicted, by numerous documents and data produced by Apple in discovery showing

25                                                        (*E.g.*,

26 Aconfora Decl. ¶¶ 4-10; Wong Decl., Exs. A-D; *see infra*, n.7.)

27     [6]

28                           (*See* Wong Decl. Ex. F; Krasts Decl. ¶¶ 28-29.)

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO
5.
**APPLE'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
19-CV-04700-LHK**

Plaintiffs' deposition testimony further highlights the heterogeneity of the class. Mr. Stewart read most of the disclosures regarding the use of third-party servers described above—including the document iCloud and Privacy ("Your [data] are sent and stored on…third-party partners' servers")—*before* signing up for an iCloud subscription (Wong Decl. Ex. T ("Stewart Dep. Tr.") at 82:10-15, 83:11-18, 93:4-96:2); while Ms. Williams testified that she did not (Wong Decl. Ex. U ("Williams Dep. Tr.") at 32:5-33:9, 45:9-24, 50:8-15, 63:1-64:12). And both agreed that these statements disclose Apple's use of third-party servers. (Stewart Dep. Tr. at 95:23-96:2; Williams Dep. Tr. at 64:9-65:15, 67:4-8.) Plaintiffs also both testified that they would have signed up for the Service regardless of iCloud's storage practices and that they have and plan to continue to use iCloud even knowing Apple stores data using third-party servers. (*See, e.g.*, Stewart Dep. Tr. at 66:11-23; ("Q. So if that information had been in the iCloud terms of service, would it have changed your decision to purchase iCloud? A: No. . . . "); Williams Dep. Tr. at 101:6-15.) Plaintiffs further testified that they are happy iCloud users. (Stewart Dep. at 25:14-19 ("we have been happy with the products themselves"); Williams Dep. Tr. at 85:8-11 ("Q. How happy have you been with iCloud? A. Thrilled.").)

Plaintiffs' expert reports also contain numerous factual flaws. Plaintiffs' expert Dr. Swain claims to identify a price premium associated with iCloud's presumed storage of iCloud data on Apple-owned servers through a choice-based conjoint analysis. But Swain's conjoint analysis is not premised on the actual facts of this case, does not use appropriate benchmark products, does not factor in supply-side considerations, and is methodologically flawed. The report of Plaintiffs' second expert, Dr. Mangum, faces its own independent methodological challenges in addition to the inaccuracies stemming from reliance on Swain's flawed conjoint analysis.

## III.   LEGAL STANDARD

To certify the class, Plaintiffs must establish Rule 23(a)'s requirements, *Mazza v. American Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012), and they "must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b)." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). The court's "analysis must be rigorous and may entail some overlap with the merits . . . ." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 465-66 (2013) (internal quotations omitted).

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

6.

APPLE'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
19-CV-04700-LHK

1  **IV.   ARGUMENT**

2        **A.   Plaintiffs Fail to Show Predominance**

3             **1.   Determining breach requires individualized inquiries**

4       Plaintiffs bear the burden to show breach, causation, and injury—that every class member's

5  iCloud data was stored using third-party servers—by common proof. As Plaintiffs cannot meet this

6  burden, predominance is lacking and class certification is inappropriate. *See In re Facebook Privacy*

7  *Litig.*, 2016 WL 4585817, at *9 (N.D. Cal. Sept. 2, 2016) (denying certification when plaintiff did not

8  prove contract claims "are predominantly subject to common proof"); *Gonzales v. Comcast Corp.*,

9  2012 WL 10621, at *19 (E.D. Cal. Jan. 3, 2012) (denying certification when there was no common

10 proof of fact of damage for breach of contract claim). Plaintiffs have not come forward with common

11 proof that every member of the class had their iCloud data placed on third-party servers during the

12 Damages Class Period. Indeed, numerous documents and the Bashir and Aconfora Declarations make

13 crystal clear that:

14

15

16

17

18

19

20

21

22      Further, as detailed above, Plaintiffs' have no common proof that could be used to determine

23 *which* U.S. paid iCloud subscribers may have had some data stored historically on third-party servers.

24

25

26

27

28                                   In short, Plaintiffs have no common proof to show that proposed

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

7.

APPLE'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
19-CV-04700-LHK

1   class—all U.S. paid iCloud subscribers from September 16, 2015 to October 31, 2018—had data

2   stored using third-party servers.

3       *In re Facebook Privacy Litigation* is instructive here. Plaintiffs in that case alleged breach of

4   contract based on Facebook's transmission of information that allowed advertisers to identify the user

5   who clicked the ad. 2016 WL 4585817, at *8. The parties did not dispute that Facebook's data showed

6   that advertisers received identifying information in the form of referer headers. *Id.* Facebook argued

7   that "ad click data cannot serve as common proof of breach or misrepresentation because the data does

8   not reliably reflect the content of the referer headers that were transmitted to third party advertisers"

9   and the software Facebook used to transmit referer headers may have changed the content of those

10  referrer headers. *Id.* The court thus held "Facebook has produced unrefuted evidence that the questions

11  of breach and misrepresentation cannot be resolved through Facebook's ad click data alone" such that

12  the issue was not capable of "common proof on a class-wide basis." *Id.* at *9.

13      As with the plaintiffs in *Facebook Privacy*, Plaintiffs here cannot prove their claims with

14  common proof. The record Plaintiffs have created in this case is devoid of any common evidence that

15  would allow Plaintiffs to separate by common evidence those paid U.S. subscribers whose iCloud data

16  was stored partially using third-party servers from those paid U.S. subscribers who had none of their

17  data stored using third-party servers. Plaintiffs' failure to meet their burden mandates denial of the

18  Motion. *See Moore v. Apple Inc.*, 309 F.R.D. 532, 542-43 (N.D. Cal. 2015) (Koh, J.) ("the question of

19  whether [breach occurred] is not subject to common proof and will require individual inquiries.");

20  *Faulk v. Sears Roebuck and Co.*, 2013 WL 1703378, at *9 (N.D. Cal. Apr. 19, 2013) (denying class

21  certification where there was no predominance on UCL claim when plaintiff had no common proof of

22  breach on the underlying contract claim).

23           **a.    Plaintiffs' theory of breach defies the record and logic**

24      Plaintiffs rely on a single sentence in the iOS Security Guide in a misguided effort to

25  demonstrate common proof of breach. (Mot. at 20–21.) Plaintiffs extrapolate that *all* class members

26  had data stored using third-party servers because the iOS Security Guide states that Apple stored

27  iCloud data using third party storage services, such as S3 and Google Cloud, instead of stating that

28  iCloud data could be stored using Apple servers as well as third-party servers. (*Id.*) Plaintiffs' reading

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

8.

APPLE'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
19-CV-04700-LHK

of this single sentence is belied by the record.[7] Multiple documents show that Apple stored iCloud data on Apple servers during the Damages Class Period, including Wong Declaration Exhibit A at '89 (███████████████████████████████████████████████████████), all of which were provided to Plaintiffs in discovery. And numerous other Apple disclosures from the Class Period, *supra* Section II.A, repeatedly state that Apple used its own servers and those of third parties for iCloud data storage.

Apple also disclosed this fact in written discovery. For instance, in its Responses to Plaintiffs' Interrogatories served on May 27, 2020, Apple said that "at least some portion of digital assets of iCloud subscribers was stored by Apple in encrypted form in object storage owned by Apple"; and likewise stated in its Responses to Plaintiffs' Requests for Admission, also served on May 27, 2020, that "[i]ndividual iCloud subscribers may have had their data stored by Apple in object storage owned by Apple *or* in object storage that Apple procures through its service contracts with third-parties as determined by an algorithm that takes into account performance and cost at the time the storage request is made." (Wong Decl. Exs. X, Y (emphasis added).)[8]

Additionally, Plaintiffs' interpretation of the text of the iOS Security Guide is absurd. Their entire case is premised on the allegation that Apple breached the Terms by not informing users that iCloud used third-party servers for user data storage. Yet, the purported evidence they cite to support this itself discloses that their iCloud data may be stored "using third-party services." (*See, e.g.*, ECF No. 77-14 at '387.) In the same breath, they also take issue with Apple *not* including its own servers as possible storage locations. Plaintiffs' circular reasoning is factually incorrect and defies logic.

### 2. Determining actual injury requires individualized inquiries

Plaintiffs likewise fail to identify common evidence showing that each class member suffered

---

[7] As described above, not including a reference to Apple servers was unintentional. (Krasts Decl. ¶¶ 28-29.)

[8] Apple produced more than 100 presentations that detail the percentage of cloud storage provided by Apple servers, and countless emails that discuss Apple's use of its own servers for iCloud data. (Wong Decl. ¶ 2.) Plaintiffs served RFPs requesting documents about "Project McQueen," which Plaintiffs recognized as Apple's own cloud storage servers. (*Id.,* Ex W.) Moreover, they were told at the sole deposition they took that Apple had 3 to 6 data centers it used to store iCloud data. (Wong Decl. Ex. V, Bashir Dep. Tr. at 174:3-176:19.) Plaintiffs were informed of the algorithm Apple used to determine the storage location of objects. (*Id.* at 160:20-161:3, 161:15-17, 168:9-12.) Plaintiffs' position is nonsensical and any request for additional time to complete certification briefing should be dismissed.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

9.

APPLE'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
19-CV-04700-LHK

actual damages, as required to succeed on their breach of contract claim. *In re Anthem, Inc. Data Breach Litig.*, 2016 WL 3029783, at *12 (N.D. Cal. May 27, 2016) (Koh, J.) ("To establish contractual damages, a [p]laintiff must establish appreciable and actual damages." (internal quotations and citation omitted and alteration in original).) In such cases, class certification is improper. *Moore*, 309 F.R.D. at 542; *See Gonzales*, 2012 WL 10621, at *19. Plaintiffs cannot show common evidence of injury for at least three independent reasons.

**First**, since Plaintiffs do not identify common evidence that class members' data was stored using third-party servers (i.e., breach), *see* Section IV.A.1, *supra*, they also cannot establish by common evidence that each class member was harmed.[9]  Class treatment is not appropriate in such situations. *Moore*, 309 F.R.D. at 542.

**Second,** a class member (like Mr. Stewart) would not be damaged if he knew prior to paying for the Service that Apple stores iCloud data using third-party servers and still chose to pay. As detailed above, *see* Section II.A, class members could have encountered various Apple documents that plainly state Apple stores iCloud data using third-party servers, as well as widely circulated articles spanning the Class Period that disclosed Apple's practice. (*See* Wong Decl. ¶ 32.)

Named Plaintiffs' testimony perfectly illustrates this problem: Stewart read many of Apple's disclosures, including iCloud and Privacy ("Your [data] are sent and stored on…third-party partners' servers"); Williams did not. Both read the publications with widely circulated articles on this issue. (Stewart Dep. Tr. at 82:10-15, 83:11-18, 93:4-96:2; Williams Dep. Tr. at 32:5-33:9, 45:9-24, 50:8-15, 63:1-64:12.) Both agreed that Apple's statements advise the reader of Apple's use of third-party servers. (Stewart Dep. Tr. at 95:23-96:2; Williams Dep. Tr. at 64:9-65:15, 67:4-8.) This demonstrates that, "determining whether each member of the proposed class suffered an injury will require substantial individualized inquiry" into "whether [class members] knew that" Apple stored iCloud data using third-party servers. *In re Prudential Ins. Co. of Am. SGLI/VGLI Contract Litig.*, 286 F.R.D.

---

[9] Since Apple's records do not allow Apple to determine what portion of a user's objects have historically been stored using third-party servers, even if Plaintiffs could establish breach by common evidence, they would also need to establish that it was appropriate to award the same damages to users with 100% of data stored using third-party servers and those with .1% of data stored using third-party servers.

155, 158 (D. Mass. 2012) (holding no predominance of common issues due to individualized inquiry into what class members knew as to contract claim).

**Third**, a class member is not damaged if someone else, such as a family member, paid for the Service. Thus, even if it were possible to identify every class member whose data Apple stored using third-party servers—which cannot be done with common evidence, *supra* Section IV.A.1—the Court will still need to determine that those users paid for the Service. (*See* FAC ¶ 44 (putative class includes only iCloud users who "***paid*** for an Apple iCloud subscription") (emphasis added).) This is a genuine concern, given that iCloud's Family Sharing feature allows up to six individuals to share an iCloud storage plan. (Krasts Decl. ¶¶ 25-27.) Plaintiff Williams used Family Sharing, and, for at least some point during the class period, her iCloud subscription was paid for using the credit card of her son. (Williams Dep. Tr. at 87:3-88:11 (testifying she shared iCloud account with her son, and his credit card was used to pay for the subscription for at least three months). [10]

### 3.   Determining class members' intent requires individualized inquiries

The Court already held that the contractual term at issue is ambiguous and that extrinsic evidence could be used to interpret the contract. (ECF No. 34 at 18.)[11] As the record amply demonstrates, the fact that Apple used third-party servers to store some iCloud data was publicly disclosed and widely disseminated not only by Apple itself,[12] but by publications like The Wall Street Journal and Fortune. (*See* Section II.A, *supra*.) Thus, what any individual class member knew about

---

[10] The class is also fatally overbroad and cannot be certified for this independent reason. The reasoning in *Moore v. Apple Inc.* is compelling. There, the class included individuals who "by definition, *could not* have been injured by [Apple's] alleged wrongful conduct." 309 F.R.D. at 542 (emphasis in original). This Court held that inclusion of such persons was "not only problematic because it demonstrates the overbreadth of the proposed class, it is also indicative of the individualized inquiries that would be necessary to determine whether a class member has suffered any injury in the first place." *Id.* Here too, the class sweeps in people without standing—either because their data was not stored using third-party servers (i.e., no breach), or because they did not pay for the Service when their data was stored using third-party servers (i.e., no injury). Individual inquiries thus predominate. *Id.* at 543.

[11] Plaintiffs' assertion that "Apple's interpretation [of the iCloud Terms] is fanciful" blatantly disregards this Court's holding that Apple's interpretation is reasonable (i.e., it is "certainly susceptible to Apple's interpretation"). (ECF No. 34 at 18.)

[12] Plaintiffs seem to suggest that the integration clause in the Terms would preclude the Court from considering additional agreements such as Apple's Privacy Policy as extrinsic evidence. (Mot. at 19.) But California law is clear that a court may consider extrinsic evidence even where an integration clause exists if such evidence does not to alter or add to the terms, but instead clarifies their meaning. *Rosenfeld v. Abraham Joshua Heschel Day Sch., Inc.*, 226 Cal. App. 4th 886, 897 (2014).

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

11.

APPLE'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
19-CV-04700-LHK

Apple's approach to iCloud storage prior to accepting the Terms would inform their interpretation of the disputed provision. In such cases, predominance is lacking. *Monaco v. Bear Stearns Cos.*, 2012 WL 10006987, at \*6, \*8 (C.D. Cal. Dec. 10, 2012) (denying class certification when variable extrinsic evidence informing class members' knowledge and understanding was necessary to determine class members' intent at contract formation); *In re Google Inc. Gmail Litig.*, 2014 WL 1102660, at \*16-21 (N.D. Cal. Mar. 18, 2013) (Koh, J.) (considering public news articles and sources to inform the Court's understanding of users' knowledge on issue of consent).

Plaintiffs' own testimony illustrates the individualized nature of the inquiry. On one hand, Mr. Stewart testified that he read a number of disclosures (Section 2.D, *supra*) at the same time as he agreed to the Terms (Stewart Dep. Tr. at 82:10–15, 83:11-18; Wong Decl., Ex. 5), and that they disclosed the exact conduct at issue. (Stewart Dep. Tr. at 95:23-96:2.)[13] On the other hand, Ms. Williams testified that she did not read these disclosures. (Williams Dep. Tr. at 32:5-33:9, 45:9-24, 50:8-15, 63:1-64:12.) Consistent with this testimony, Apple's perception study likewise demonstrates that consumers read terms and conditions at varying rates. (Scott Rep. ¶¶ 11, 64–65.)

Moreover, both Plaintiffs testified that they read many of the news sources during the class period that disclosed this practice. (*Compare* Wong Decl. ¶¶ 32–65 *with* Stewart Dep. Tr. at 178:19-180:20, 181:4-17, 182:6-10, 182:19-25, 183:6-9 (testifying he regularly reads or has read many of these sources); *and* Williams Dep. Tr. at 117:10-16, 117:23-120:7 (same).) Taken together, these numerous, diverse sources of extrinsic evidence will require a user-by-user examination to interpret the Terms, and certification should be denied for this additional reason. *See Monaco*, 2012 WL 10006987, at \*6–7 (denying class certification on predominance grounds when named plaintiffs' understanding of contract term differed and class members' course of performance was relevant to intent); *Gregurek v. United of Omaha Life Ins. Co.*, 2009 WL 4723137, at \*3 (C.D. Cal. Nov. 10,

---

[13] At his deposition, Mr. Stewart attempted to claim that while Apple did disclose its use of third-party servers in the Privacy Policy, Apple was required to provide some additional disclosure because the statement "when we utilize third party storage" did not explain the particular circumstances "when" third-party storage was utilized. (Stewart Dep. Tr. at 83:20-86:7.) But Mr. Stewart's strained reading must be put to rest because he also testified that he read several other disclosures at the time he agreed to the Terms, including the iCloud and Privacy disclosure that states "backup data are sent and stored on Apple's, its subsidiaries', or ***third-party partners' servers*** . . . ." (*Id.* at 93:4-96:2 (emphasis added).)

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

12.

APPLE'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
19-CV-04700-LHK

2009) (no predominance when class members' knowledge was relevant to determining their

understanding of the contract).[14]

### a. Plaintiffs' proffered canons of contract interpretation do not apply

Plaintiffs cannot salvage their Motion here by arguing that California's contract interpretation

rules require the Court to ignore the extrinsic evidence because the Terms is a form contract. (Mot. at

31–19.) These doctrines are inapplicable and erroneous because:

- California courts "construe ambiguities against the drafter ***only if*** the ambiguity cannot be removed through other rules of contract interpretation." *Zhang v. Am. Franchise Reg'l Ctr., LLC*, 766 F. App'x 438, 442 (9th Cir. 2019) (emphasis added); Cal. Civ. Code § 1654 (contract should be resolved against the drafter if uncertainty "not removed by the preceding rules"); *Rainier Credit Co. v. W. Alliance Corp.*, 171 Cal. App. 3d 255, 263–64 (1985) (court should not have construed the contract against the drafter before considering extrinsic evidence to interpret term);

- This Court need not accept the Restatement as binding, *see, e.g.*, *Monaco*, 2012 WL 10006987, at *7 n.4. Even if it does, Section 211 only applies when it is reasonable to do so, which is not the case here given the plethora of documents, policies, articles, and disclosures detailing Apple's use of third-party servers that "importantly differ from customer to customer." *See Rodman v. Safeway, Inc.*, 2014 WL 988992, at *7 (N.D. Cal. Mar. 10, 2014) ("there are times where, even with regard to a form contract, a court will need to inquire into the parties' subjective understanding of an ambiguous term . . . and that that necessity will defeat class certification.").[15]

Equally meritless is Plaintiffs' misconceived argument that a single January 2019 email—written over

three years after the Terms were drafted and first published—can overcome other extrinsic evidence.

Plaintiffs, however, misconstrue both the document and the law. Indeed, the email discusses the

publication of a support article for the Health Records team and *does not mention the Terms*. (Sarkar

Decl. ¶¶ 4-5; ECF No. 77-13.) █████████████████████████████████

████████████████████████████████████████████████████████████

---

[14] This case presents an even stronger argument against predominance than in *Monaco* and *Gregurek*, which concluded that individualized inquiries were required even without out the pervasive, public-facing disclosure at play here. In those cases, the extrinsic evidence that defeated predominance included the testimony of plaintiffs and third parties, and class members' payment records (*Monaco*); and sales presentations that were variable in nature (*Gregurek*). All of that (and more) exists here.

[15] None of Plaintiffs' cited cases involve this kind of widespread disclosure. *See, e.g.*, *Rodman*, 2014 WL 988992, at *7 ("Here, there is no contention that the circumstances surrounding contract formation importantly differ from customer to customer"); *Ewert v. eBay, Inc.*, 2010 WL 4269259, at *7 (N.D. Cal. Oct. 25, 2010) ("eBay has failed to show how extrinsic evidence of ambiguity would affect[] its liability for breach of contract."). These cases are further distinguishable: *Ewert* and *Rodman* contained no finding of ambiguity; the Court in *Bally v. State Farm Life Ins. Co.*, 335 F.R.D. 288 (N.D. Cal. 2020) attempted to resolve the ambiguity with extrinsic evidence before applying § 211; and *Bally and In re Conseco Life Ins. Litig.*, 920 F. Supp. 2d 1050 (N.D. Cal. 2013) applied specific canons of interpretation applicable to insurance contracts, *see Monaco*, 2012 WL 10006987, at *8.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

13.

APPLE'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
19-CV-04700-LHK

1

2

3

4

5

6                                             A single email, written years after the Terms

7 were drafted with no reference to the language used in the Terms, does not provide the Court a basis

8 to resolve the ambiguity without resort to review of individualized evidence as Plaintiffs incorrectly

9 suggest. (Mot. at 18–19); Cal. Civ. Code § 1649 ("it must be interpreted in the sense in which the

10 promisor believed, *at the time of making it*, that the promisee understood it." (emphasis added).).

11                          **4.**     **Determining if waiver or laches apply to class members defeats**

12                                       **predominance**

13         ***Waiver.*** Where a class member, like Mr. Stewart, had knowledge of Apple's third-party storage

14 practices and then still paid for an iCloud subscription, he has taken an affirmative and clear act at

15 odds with this contract claim and therefore has waived it. *See Wind Dancer Prod. Grp. v. Walt Disney*

16 *Pictures*, 10 Cal. App. 5th 56, 78 (2017) (Waiver exists "when a party intentionally relinquishes a

17 right or when that party's acts are so inconsistent with an intent to enforce the right as to induce a

18 reasonable belief that such right has been relinquished."). The Court would thus need to examine on

19 an individual basis: whether and when each class member gained knowledge of Apple's storage

20 practices and whether the class member paid for her iCloud subscription despite this knowledge. Such

21 inquiries defeat predominance. *See In re SFPP Right-of-Way Claims*, 2017 WL 2378363, at \*17 (C.D.

22 Cal. May 23, 2017) (predominance defeated where "evidence of notice" would "likely be highly

23 individualized" in connection with waiver and laches doctrines); *Melton ex rel. Dutton v. Carolina*

24 *Power & Light Co.*, 283 F.R.D. 280, 291 (D.S.C. 2012) (same).

25         ***Laches.*** Class members' knowledge of Apple's use of third-party servers is also relevant to

26 the laches inquiry. *See Magic Kitchen LLC v. Good Things Int'l, Ltd.*, 153 Cal. App. 4th 1144, 1157

27 (2007) (listing elements to laches: "(1) delay in asserting a right or a claim; (2) the delay was not

28 reasonable or excusable; and (3) prejudice to the party against whom laches is asserted.").

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

14.

APPLE'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
19-CV-04700-LHK

Mr. Stewart read Apple's disclosures in 2015 but unreasonably delayed bringing suit until 2019, prejudicing Apple as it continued its iCloud Service. He is barred by laches and an individual inquiry is needed to determine other class members who are similarly barred.[16]

### B.   Plaintiffs' Damages Model Fails to Satisfy *Comcast*

Plaintiffs have not provided this Court with a damages model that satisfies the requirements set forth in *Comcast v. Behrend*, 569 U.S. 27 (2013). Under *Comcast*, "a plaintiff bears the burden of providing a damages model showing that 'damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3).'" *Davidson v. Apple Inc.*, 2018 WL 2325426, at *21 (N.D. Cal. May 8, 2018) (Koh, J.) (quoting *Comcast*, 569 U.S. at 35). This model "'must measure only those damages attributable to' the plaintiff's theory of liability." *Id.* Here, as discussed below, Plaintiffs' damages model is not tethered to their theory of liability and cannot provide a common basis to calculate class-wide damages. As such, individual issues predominate. *See id.* (holding Plaintiffs "fail to satisfy Rule 23(b)(3) predominance because Plaintiffs' damages model is inadequate.").

### 1.   Plaintiffs' damages calculations are inherently flawed

As a threshold matter, Plaintiffs have not demonstrated that their conjoint analysis calculating price premium (e.g., the difference between price paid for a product and value received) is the appropriate measure of damages in a breach of contract action. *Comcast*, 569 U.S. at 35 (damages must be "susceptible of measurement across the entire class"); *see Gulf Ins. Co. v. First Bank*, 400 F. App'x 188, 189 (9th Cir. 2010). Cases allowing a price premium theory involving a contract claim do so when there is also a false advertising component. *See, e.g.*, *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liability Litig.*, -- F. Supp. 3d ---, 2020 WL 6688912, at *7 (N.D. Cal. Nov.

---

[16] Plaintiffs' likely citations to *Ellsworth v. U.S. Bank N.A.*, 2014 WL 2734953, at *29 (N.D. Cal. June 13, 2014), *Dulberg v. Uber Technologies., Inc.*, 2018 WL 932761, at *4–5 (N.D. Cal. Feb. 16, 2018), and *Rodman v. Safeway Inc.*, 2015 WL 2265972, at *3–4 (N.D. Cal. May 14, 2015) do not change this analysis. These cases did not deal with, as here, widespread public disclosure by Apple and numerous media platforms of the challenged conduct. *Ellsworth* involved common evidence of form contracts and notices that all members received. 2014 WL 2734953, at *29. In *Dulberg*, the defendant's examples of individualized evidence consisted of only its own website, email communications, and message boards. 2018 WL 932761, at *4. The court concluded in *Rodman* that "nothing in the record 'suggest[ed] that determining [waiver would] require so much individualized inquiry as to defeat certification" because the defendant had presented evidence that few class members had known of the undisclosed charge and continued to use the service. 2015 WL 2265972, at *3.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

15.

APPLE'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
19-CV-04700-LHK

12, 2020) (using conjoint where claims included those for breach of contract and violation of consumer protection laws). In this case, this Court has long-since dismissed Plaintiffs' false advertising claims and only their breach of contract claim remains, yet their damages analysis proceeds as if their fraud claims remained. (ECF No. 65 at 17; ECF No. 77-21 ¶ 11 (relying on Plaintiffs' false advertising allegations that "[b]y entering into the iCloud agreement with Apple, Plaintiffs and Class Members were misled…").) Plaintiffs attempt to frame their contract damages as if they had brought a claim for fraud. (*See* FAC ¶ 57 ("Had Apple disclosed that instead of Apple being the provider of the iCloud cloud storage service other, non-Apple, third-parties were actually undertaking the cloud storage of class members' data, Plaintiffs and the class members would . . . not have agreed to Pay Apple as much . . .").) But this is a pure breach of contract action and traditional measures of contract damages are necessary. *E.g., Svenson v. Google Inc.*, 2016 WL 8943301, at *6–7 (N.D. Cal. Dec. 21, 2016) (using contingent-value survey to measure contract damages under theories of lost benefit of bargain and diminution in value); *Feller v. Transamerica Life Ins. Co.*, 2017 WL 649680, at *13 (C.D. Cal. Dec. 11, 2017) (computing contract damages by "rote arithmetic calculation" using business records).

Even if price premium is the appropriate measure of damages here (it is not), it is still necessary to determine if "the results of the conjoint analysis performed by Plaintiff[s] provides an adequate basis to calculate damages." *Zakaria v. Gerber Prods. Co.*, 2017 WL 9512587, at *17 (C.D. Cal. Aug. 9, 2017), *aff'd*, 755 F. App'x 623 (9th Cir. 2018). Plaintiffs' experts' models do not do so, because (1) Swain's conjoint survey is methodologically flawed and unreliable; (2) Swain's conjoint survey lacks adequate supply-side factors; and (3) Mangum's report provides a flawed analysis of the appropriate damages methodology and is at odds with Swain's report.

### a.  Swain's conjoint survey is methodologically flawed and unreliable

Swain's conjoint survey fails for numerous reasons. ***First,*** the survey is unreliable because Swain's election of features (or attributes) are not based on features consumers value, but rather are Swain-selected features designed to skew results in Plaintiffs' favor. *MacDougall v. Am. Honda Motor Co.*, 2020 WL 5583534, at *7 (C.D. Cal. Sept. 11, 2020) (choice of attributes is a critical aspect of conjoint study design). Swain's conjoint focused on six artificially selected features: "Brand," "Multi-device Sync," "Storage Location," "Family Share," "Storage Size," and "Monthly Price." (ECF No.

16.

77-20 ¶ 26.) These features were not the result of a pretest survey of attributes that consumers value. Swain selected them following a review of various cloud storage materials that he then purported to corroborate with only six one-on-one interviews that were not conducted pursuant to an interview guide and were not recorded in interview notes. (Scott Rep. ¶ 83.) In short, Swain himself selected the attributes he assumed consumers would value. (ECF No. 77-20 ¶ 35); *Oracle Am., Inc. v. Google, Inc.*, 2012 WL 850705, at *10 (N.D. Cal. Mar. 13, 2012) (striking expert report due in part to expert's selection of features not valued by consumers). By failing to ascertain which attributes consumers value, Swain "omitted important features that would have played an important role in real-world consumers' preferences." *Oracle*, 2012 WL 850705, at *10. Indeed, Dr. Carol Scott's (Apple's expert's) consumer perception study demonstrates not only that Swain did not include the attributes consumers value most—such as automatic sync, comprehensive back up, the ability to restore data, and the seamless integration of iCloud across their Apple devices—but that he included at least one attribute (Family Sharing) that is a less critical factor in consumers' cloud purchasing decisions. (Scott Rep. ¶ 85; *id.* (only 17% of iCloud users use Family Sharing).) By limiting consumers' choice of attributes to those ranked as less important, Swain's conjoint survey "artificially inflated the importance of" the Storage Location feature and increased "the risk that a consumer's perception of value is skewed" *MacDougall*, 2020 WL 5583534, at *7 ("The risk of inflating a feature's value is particularly high when the other features in a survey are ranked as less important by respondents."). Courts have found conjoint analyses unreliable for much less. *Id.* at *7–8 (striking conjoint survey that "skew[ed] respondent preferences" when the expert reduced the product attributes in the final survey from 33 to 4, resulting in part from the expert's "failure to conduct a meaningful pretest survey"); *Oracle*, 2012 WL 850705, at *10 (striking portion of conjoint analysis when expert reduced product attributes in the final survey from 39 to 7 and failed to include important product features).

**Second**, Swain's conjoint analysis generates consumer preferences that are inconsistent with rational consumer behavior. (Hitt Rep. ¶ 24 ("66% of respondents showed at least one irrational preference in Dr. Swain's survey data"), ¶ 109.) His results indicate that many of his survey respondents would prefer to pay a higher price or would prefer the option to sync with fewer (rather than more) operating systems. (*Id.* ¶ 109.) "[T]he irrationality exhibited in individual survey responses

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

APPLE'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
19-CV-04700-LHK

evidences a deeply flawed conjoint study that produced unreliable results . . . ." *MacDougall*, 2020 WL 5583534, at *8; *In re Volkswagen*, --- F. Supp. 3d ---, 2020 WL 6688912, at *8 (holding conjoint inadmissible due in part to "facially unrealistic" results).

Swain makes no effort to explain these results. (*See* Hitt Rep. ¶ 108.) Courts routinely recognize that a "common sense" understanding of real-world consumer behavior is an important check against the reliability of surveys that produce preposterous results[.]" *See, e.g.*, *MacDougall*, 2020 WL 5583534, at *8 (striking survey when "the irrationality exhibited in individual survey responses evidences a deeply flawed conjoint study that produced unreliable results" for 55.4% of individual responses); *Oracle*, 2012 WL 850705, at *11 (striking portion of conjoint survey that produced irrational results for 25% of respondents); *Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*, 103 F. Supp. 2d 268, 286 (S.D.N.Y. 2000) (striking survey that "reaches a result which any average person could readily recognize as preposterous").

### b. Swain's conjoint survey improperly excludes supply-side considerations

Swain's calculation of the alleged price premium violates established Ninth Circuit precedent because it only includes side factors and does not "reflect supply-side considerations and marketplace realities that would affect product pricing."[17] *See Zakaria v. Gerber Prods. Co.*, 755 F. App'x 623, 624 (9th Cir. 2018). "[T]he ultimate price of a product is a combination of market demand and market supply," that is, price is the meeting point between what price a consumer is willing to pay (demand) and at what price a seller is willing to sell (supply). *Apple Inc. v. Samsung Elecs. Co.*, 2014 WL 976898, at *11 (N.D. Cal. Mar. 6, 2014) (Koh, J.). Swain's conjoint analysis only took into account demand—the value iCloud users supposedly place on their data being stored only using Apple's servers. It therefore fails to consider supply and cannot show common proof of damages.

Swain claims that he did, in fact, include supply in his calculations by including the actual prices Apple charged for the iCloud Service. Not so. As explained in the Hitt Report, Swain did not use actual prices in the critical part of his calculations. (Hitt Rep. ¶¶ 22, 41–45.) Specifically, he tested

---

[17] District courts nationwide "have excluded choice-based conjoint analyses that fail to accurately account for supply-side considerations." *MacDougall*, 2020 WL 5583534, at *6 (collecting cases).

consumer preferences for prices at three levels of storage (50GB, 200GB, and 2TB) with 9 different price points (*see* below), but his analysis did not use the prices consumers actually chose at each level in the survey. Instead, he grouped the lower prices for all three storage levels into a "lower" price category and did the same for the "middle" and "higher" categories.[18] (*Id.* ¶ 43; Wong Decl. Ex. Z ("Swain Dep. Tr.") at 139:2-17.)

|        | Lower  | Middle | Higher  |
|--------|--------|--------|---------|
| 30GB   | $0.69  | $0.99  | $1.29   |
| 200GB  | $1.99  | $2.99  | $3.99   |
| 2TB    | $6.99  | $9.99  | $12.99  |

He then used these qualitative factors (e.g., "lower"), *not the actual prices*, in the back-end calculations to determine consumer preferences for each attribute. By collapsing these prices into three qualitative factors, he did not compute actual but relative value. Swain offers no economic rationale for doing so, nor did he pretest to make sure that he could collapse price across products in this manner—for a consumer the lower price of $0.69/month storage may be quite different than paying the lower price of $6.99/month—nor examine what effect doing this would have for integrating supply side considerations into his analysis. What is clear, however, is that Swain did not take actual prices (supply) into consideration and thus fails to identify the market price, dooming his conjoint. *See Samsung*, 2014 WL 976898, at *11–12 ("the survey leaves the Court with no way to compare [expert's] willingness to pay metrics—which relate only to demand for the patented feature—to the market price of the infringing devices, which reflects the real-world interaction of supply and demand for [the products]"); *MacDougall*, 2020 WL 5583534 (excluding conjoint that did not permit the court to calculate true market price); *Zakaria*, 2017 WL 9512587, at *20 (same); *In re NJOY, Inc. Consumer Class Action Litig.*, 2016 WL 787415, at *8 (C.D. Cal. Feb. 2, 2016) (same); *Saavedra v. Eli Lily & Co.*, 2014 WL 7338930, at *6 (C.D. Cal. Dec. 18, 2014) (denying class certification on this basis).[19]

Moreover, Swain does not account for product price fluctuations during the Damages Period.

---

[18] For this reason, this case is distinguishable from the Court's decision in *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084 (N.D. Cal. 2018) because Swain has not adequately accounted for supply side factors in failing to use the actual price in his calculations. *See id.* at 1107; *see also Schechner v. Whirlpool Corp.*, 2019 WL 4891192, at *7–8 (E.D. Mich. Aug. 13, 2019) (holding conjoint failed to satisfy *Comcast* when expert did not account for supply-side prices in but for world).

[19] Swain admitted that he has never calculated a market price using a conjoint analysis, Swain Dep. Tr. at 26:1-3; an admission verified by Mangum (ECF No. 77-21 ¶¶ 48–50 (noting Swain's failure to calculate market equilibrium).)

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

19.

APPLE'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
19-CV-04700-LHK

(Hitt Rep. ¶ 44.) For 22 of the 39 months of the Damages Period, the 2TB iCloud Service plan cost $19.99—not the $9.99 price Swain showed respondents for the entire Period. (*Id.*) Yet Swain's model does not account for this **50% decrease** in price from $19.99 to $9.99, or given that he did not include this in any of the "actual prices" he showed consumers, how the $19.99 price factors into consumers' preferences. (*Id.* ¶¶ 41–45.) This is yet another reason his model fails. *See Davidson v. Apple Inc.*, 2019 WL 6251180, at *11 (N.D. Cal. Nov. 22, 2019) (Koh, J.) (noting expert's use of incorrect risk rate as fatal survey defect).

### c.    Mangum's report highlights the flaws of Swain's conjoint analysis

Mangum's report highlights many of the issues with Swain's report. For instance, Mangum explicitly acknowledges that Swain's analysis does not account for supply-side factors and does not estimate the *equilibrium market price*. (ECF No. 77-21 ¶¶ 48–50.) This is significant because a price premium—Plaintiffs' theory of liability and what Swain purported to calculate—is meant to calculate a market price in the but-for world—i.e., the price of the product without the disputed language. *See Samsung*, 2014 WL 976898, at *11 ("[t]he ultimate price of a product is a combination of market demand and market supply.").

Mangum's Report calls further in to doubt the six Swain-selected iCloud Service attributes. Mangum admits that in constructing a conjoint analysis, best practices is to "include the number and selection of features that provide a meaningful shopping scenario while also disguising the fact that the primary research interest focuses on particular attributes." (ECF No. 77-21 ¶ 43.) Swain's conjoint analysis does neither. (*See* Section IV.B.1.a, *supra*.)

### d.    Mangum's report is flawed because he too fails to account for supply-side factors

Mangum's economic framework of damages—which he refers to as "economic value"[20]— determines only consumers' subjective willingness to pay because it points only to changes in demand. (*See, e.g.*, ECF No. 77-21 ¶ 30 ("[a]ssessing the reduction in economic value received by consumers related to demand…"); ¶ 33 ("[u]se of survey data is a recognized approach for economic impact

---

[20] Economic value is not the same as a market price. (*See* Hitt Rep. ¶ 56.)

assessments, including the demand for a particular feature of a product/service.").) He therefore accounts only for demand-side factors (Hitt. Rep. ¶¶ 55–60), and does not calculate price premium—the market price consumers would have paid for the Service without the disputed language in the Terms. *See Zakaria*, 2017 WL 9512587, at *18 (price premium is the difference between price paid for a product and value received).

Moreover, Mangum's calculations could not estimate a market price in the but-for world where the Service existed without the disputed language, because he restricted the modeling of the but-for world to account only for the result in changed consumer preferences without modeling for how *suppliers* would react to the removal of the disputed statement in the terms, and the impact that would have on market prices. (*Id.* ¶ 60.) Basic economic theory describes market outcomes, such as market prices, as the results of both suppliers and consumers taking actions to maximize their economic value. (*Id.*); *see Samsung*, 2014 WL 976898, at *2 ("[t]he ultimate price of a product is a combination of market demand and market supply."). There is no economic justification for excluding the impact on suppliers in the but-for world, as Mangum did here. (Hitt Rep. ¶ 60.)

### 2. Plaintiffs' damages model cannot calculate class-wide damages because it is not based on the facts of this case

Plaintiffs have not proffered a damages model that properly measures class-wide damages because their conjoint analysis is divorced from the facts of this case. *See Comcast*, 569 U.S. at 37. Swain's conjoint analysis is built on a faulty premise that *every* consumer had at least some of their iCloud data stored using third-party servers during the class period; Swain does not test how consumers value the mere possibility that a user's iCloud data will be stored using third-party servers—i.e., the actual facts of this case.

Various courts in this district—including this one—have concluded that damages models do not satisfy *Comcast* when they do not account for the alleged harm as it occurs in the real world. *See, e.g.*, *Davidson*, 2018 WL 2325426, at *23; *Opperman v. Kong Techs., Inc.*, 2017 WL 3149295, at *12 (N.D. Cal. July 25, 2017).

*Davidson* is dispositive. There, plaintiffs' expert's choice-based conjoint analysis sought to measure how much consumers overpaid for a defect that was certain to manifest in all iPhones, when

the actual purported harm was only the risk that the defect may manifest. 2018 WL 2325426, at *22–23. Because the analysis did not accurately capture the facts of the case, this Court held the damages model did not satisfy *Comcast*. *Id.* The *Opperman* court similarly faulted plaintiffs' expert's model on similar grounds, holding that the conjoint analysis sought "to measure the value to consumers of privacy generally, but 'privacy' encompasses a variety of concepts that are not at issue in this case." 2017 WL 3149295, at *12. Because the conjoint broadly measured the value of privacy instead of the two security features at issue, the court held that plaintiffs had failed to satisfy *Comcast*. *Id.*

Like the flawed damages models in both *Davidson* and *Opperman*, Plaintiffs' conjoint analysis is untethered from the facts of this case. Plaintiffs' theory assumes that at least some portion of all class members' data was stored on third-party servers during the Damages Period. But the assumption that all iCloud data was stored on third-party servers puts Plaintiffs' damages model at odds with how the purported harm could arise if it arose at all and thus Plaintiffs have not satisfied *Comcast*, and individual issues will predominate. *See Davidson*, 2018 WL 2325426, at *24.

### 3. Plaintiffs' damages model is not tied to their theory of liability

Plaintiffs' model also fails because it does not measure class-wide damages resulting from their theory of injury. *See Comcast*, 569 U.S. at 35. Plaintiffs assert price premium theory based on a comparator model—Apple exacts a price premium in comparison to other cloud storage providers. (FAC ¶ 42.) But the purported "comparator products" used in his model do not account for consumers' actual preferences and expectations. Their "comparator model falls short because [Plaintiffs] have not identified an 'appropriate benchmark product'." *Singleton v. Fifth Generation, Inc.*, 2017 WL 5001444, at *20-21 (N.D.N.Y. Sept. 27, 2017). *Singleton* provides persuasive guidance. There, plaintiff's expert sought to calculate an alleged price premium associated with a representation on Tito's vodka that it was "handmade." *Id.* To calculate the alleged price premium, plaintiff's expert used a comparator model, which computes "the difference between the cost of the second best product in the product class (without [the disputed language]) and the cost of the product at issue (with the [disputed language.]" *Id.* Plaintiff's expert compared Tito's prices to two other "benchmark product[s]" the expert believed to share similar characteristics with Tito's, such as the fact that all three vodkas are corn-based. *Id.* The court found that the plaintiff's expert's product selection was

faulty because there was no basis for the "assumption that consumers 'actually differentiate among vodka brands according to the source material used to make the vodka." *Id.* at \*20. The court therefore held that the expert had "not identified an 'appropriate benchmark product' and, "[w]ithout an adequate basis for comparison," plaintiff's expert "cannot isolate the premium associated with the [misrepresentation]" and "ha[d] not shown that the proposed comparator model may be used to measure damages tied to the class's theory of injury." *Id.* at \*21.

Likewise, here, Swain selected no products that would provide an adequate basis for comparison—i.e., a product that "shar[es] most of [iCloud's] other key attributes" apart from storage location. *See id.* While Swain's conjoint survey provided survey respondents with potential alternative brand options of Google Drive, DropBox, and Microsoft OneDrive. (ECF No. 77-20 at 26, Fig. 3. Example Conjoint Task.") These products are not comparable because the Service includes a suite of features that these other products do not, including:

- Comprehensive backup, which includes documents and photos, as well as contacts, calendars, and third-party app data. (Krasts Decl. ¶¶ 13, 16; Scott Rep. ¶¶ 9(b), 49);
- The ability to automatically sync across all of a user's compatible Apple devices. (Krasts Decl. ¶ 15);
- The ability to restore or set up your device from an iCloud backup (Krasts Decl. ¶ 13; Scott Rep. ¶¶ 9(b), 49); and
- The ease of using iCloud, including the fact that iCloud is automatically enabled on Apple devices. (Krasts Decl. ¶¶ 14-15, 18.)

Indeed, no other product on the market provides the same range of functionality as iCloud for Apple device users, (Krasts Decl. ¶ 12), nor do consumers perceive that to be the case. (*See* Scott Rep. ¶¶ 9(b), 52, 67.) And as the data from Scott's consumer perception study makes clear, the attributes consumers care about most with respect to iCloud—seamless integration of iCloud with a user's device, the ability to automatically backup all content and device app settings on an iPhone or iPad, and the ability to restore or set up a device from iCloud backup—Swain failed to include. (Scott Rep. ¶¶ 73, 79–83.) Swain's failure here is also at odds with Plaintiff Stewart's own testimony—that seamless access was the key consideration in his decision to use Apple devices; Stewart Dep. Tr. at 20: 23-25, 25:20-26:3 (identifying iCloud's "seamless access" as key consideration in purchase and use of Apple devices), 170:23-171:3 (iCloud allows users to access data "seamlessly across multiple devices"). Accordingly, his "comparator model falls short because [Plaintiffs] ha[ve] not identified an

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

23.

APPLE'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
19-CV-04700-LHK

'appropriate benchmark product.'" *Singleton*, 2017 WL 5001444, at *21. Without this adequate basis for comparison, Swain cannot isolate the premium associated with statement in the Terms and has not shown that his comparator model may be used to measure damages tied to Plaintiffs' theory of injury. *See id.*; *Comcast*, 569 U.S. at 35.

## C.   Plaintiffs' Testimony Raises Significant Typicality and Adequacy Issues

As noted above, Mr. Stewart is atypical because he is subject to the doctrines of laches and waiver and thus will be preoccupied with his own unique defenses. *See Svenson*, 2016 WL 8943301, at *17 (determining that typicality and adequacy were not satisfied where the plaintiff "assert[ed] injury resulting from her lost expectation of privacy protection, but she purchased the 'SMS MMS to Email' App for a second time on Google Play *after* discovering Google's practice of granting Sellers potential access to Buyers' information and *after* filing this suit") (emphasis in original).

Furthermore, Ms. Williams is inadequate as she is the sister-in-law of class counsel Azra Mehdi, which raises two significant concerns. First, "there is a clear danger that the representative[s] [with familial relationships to class counsel] may have some interests in conflict with the best interests of the class as a whole when making decisions that could have an impact on attorney fees." *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1155 (8th Cir. 1999); *see also Susman v. Lincoln Am. Corp.*, 561 F.2d 86, 91 (7th Cir. 1977) ("Since possible recovery of the class representative is far exceeded by potential attorneys' fees, courts fear that a class representative who is closely associated with the class attorney would allow settlement on terms less favorable to the interests of absent class members."). Here, Ms. Williams' total spending on the iCloud Service over five years totals $60 at most (for a service she is "thrilled" with) (Williams Dep. Tr. at 85:8-11), while her sister-in-law will be seeking attorneys' fees constituting a sizable percentage of the ▮▮▮ million in purported damages.

Second, a close familial relationship raises the very real possibility that a plaintiff may serve as a mere figurehead, not one who will "check[] the otherwise unfettered discretion of counsel in prosecuting the suit," as the class is entitled to. *Cf. Arabian v. Sony Elecs., Inc.*, 2007 WL 627977, at *7 (S.D. Cal. 2007) (citation omitted); *see also Pryor v. Aerotek Scientific, LLC*, 278 F.R.D. 516, 529 (C.D. Cal. 2011) ("Individuals are not adequate . . . when it appears that they have abdicated any role in the case beyond that of furnishing their names as plaintiffs." (internal quotations and citation

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

24.

APPLE'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
19-CV-04700-LHK

1   omitted).) Ms. Williams made clear at her deposition how little agency she has in the prosecution of

2   this suit despite the fact that she is a former litigator.  She did not decide to file this lawsuit of her own

3   accord; she was approached by her sister-in-law who informed her of the basis of the litigation.

4   (Williams Dep. Tr. at 90:3-15.) Williams agreed to be a named plaintiff because she "didn't have any

5   problem [with it]" and "didn't mind." (*Id.* at 130:13-131:9.) More disconcerting, Williams testified

6   that "[she doesn't] think [she's] in a position to disagree" with how her lawyers are handling the case.

7   (*Id*. at 131:23-132:5.) Indeed, Ms. Williams' deference to her counsel is evidenced by the fact that her

8   testimony conflicts with statements made in the complaint. Plaintiffs amended their complaint to state

9   that Williams affirmatively read the Terms both before signing up for iCloud and again in 2017 (FAC

10  ¶¶ 12–13 ("The legal agreement or contract that Ms. Williams and Apple entered into regarding her

11  iCloud subscription, which ***Ms. Williams reviewed and accepted*** immediately before she first became

12  a paying iCloud subscriber…" (emphasis added)) in order to remedy a flaw identified by the Court.

13  (ECF No. 34 at 22-26.) At deposition, however, ***Williams specifically disavowed having any***

14  ***recollection of reviewing the Terms***. (Williams Dep. Tr. at 54:5-55:15, 56:23-57:14.) Her lack of

15  involvement and overreliance on counsel illustrates that her familial relationship makes her inadequate

16  to represent the class. *See*, *e.g.*, *Kirby v. Cullinet Software, Inc*., 116 F.R.D. 303, 310 (D. Mass. 1987).

17  ### D.    Plaintiffs Cannot Certify a Class for Injunctive Relief

18          Plaintiffs' Motion does not address the standards governing the elements required to certify a

19  (b)(2) class nor apply the record of this case to show how such elements are met. This Court has

20  previously found that the failure to raise a (b)(2) argument "in the opening brief means that [Plaintiffs]

21  have waived it." *Davidson*, 2018 WL 2325426, at *25 (citing *Bazuaye v. INS*, 79 F.3d 118, 120 (9th

22  Cir. 1996) ("Issues raised for the first time in the reply brief are waived.")).[21]

23  ## V.    CONCLUSION

24          For all of the reasons set forth above, this Court should DENY Plaintiffs' Motion for Class

25  Certification with prejudice.

26

27  ─────────────────────
    [21] Notably, Plaintiffs amended their complaint to add allegations to demonstrate standing for injunctive
28  relief—that they feared losing their data (FAC ¶ 50)—but then testified that they had no such actual
    fear.  (Section II.D, *supra*.)

Dated:  January 29, 2021

COOLEY LLP


*/s/ Michelle C. Doolin*
Michelle C. Doolin

Attorneys for Defendant
APPLE INC.

26.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

APPLE'S OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION
19-CV-04700-LHK