LATHAM & WATKINS LLP
  Belinda S Lee (SBN 199635)
  *belinda.lee@lw.com*
  Sarah M. Ray (SBN 229670)
  *sarah.ray@lw.com*
  Aaron T. Chiu (SBN 287788)
  *aaron.chiu@lw.com*
  Alicia R. Jovais (SBN 296172)
  *alicia.jovais@lw.com*
505 Montgomery Street, Suite 2000
San Francisco, California 94111-6538
Telephone: +1.415.391.0600

*Attorneys for Defendant Apple Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| JULIANNA FELIX GAMBOA and THOMAS DOROBIALA, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>APPLE INC.,<br><br>    Defendant. | CASE NO. 5:24-cv-01270-EKL<br><br>**DEFENDANT APPLE INC.'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>Date:   June 18, 2025<br>Time:   10:00 a.m.<br>Place:  Courtroom 7<br>Judge:  The Honorable Eumi K. Lee |

1

### NOTICE OF MOTION AND MOTION

2          TO THIS HONORABLE COURT, THE PARTIES, AND THEIR ATTORNEYS OF

3  RECORD, PLEASE TAKE NOTICE THAT on June 18, 2025 in Courtroom 7 of the United States

4  District Court for the Northern District of California, San Jose Division, located at 280 South First

5  Street, San Jose, California, 95113, Defendant Apple Inc. ("Apple") will and hereby does move to

6  dismiss with prejudice the Second Amended Class Action Complaint filed by Plaintiffs Julianna

7  Felix Gamboa and Thomas Dorobiala.

8          This Motion to Dismiss is made pursuant to Federal Rules of Civil Procedure 8(a) and

9  12(b)(6) on the ground that Plaintiffs fail to allege sufficient facts to state a claim for violations of

10  Sections 1, 2, and 3 of the Sherman Act, 15 U.S.C. §§ 1–3, or of California's Unfair Competition

11  Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*  This Motion is based on this Notice of Motion and

12  Motion, the accompanying Memorandum of Points and Authorities, all pleadings and other papers

13  filed in this matter, oral argument of counsel, and such other matters that the Court may consider

14  on this Motion.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ..................................................................................................1

II.  STATEMENT OF ISSUES TO BE DECIDED ..................................................2

III. BACKGROUND ..................................................................................................3

   A.   Factual Overview ......................................................................................3

   B.   Procedural History ....................................................................................4

      1.   The Court's Order Dismissing the FAC .........................................4

      2.   Plaintiffs' Second Amended Complaint .........................................5

IV.  LEGAL STANDARD ..........................................................................................5

V.   ARGUMENT........................................................................................................6

   A.   Plaintiffs' Monopolization Claims Fail ....................................................6

      1.   Plaintiffs Still Cannot Plead a Single-Brand Aftermarket
           Limited to iCloud.............................................................................6

      2.   Plaintiffs' Broader Market for All Cloud Storage Solutions
           Also Fails .......................................................................................15

      3.   Plaintiffs Still Fail to and Cannot Plead that Apple
           Possesses Monopoly Power............................................................17

      4.   Plaintiffs Fundamentally Challenge Product Design
           Decisions Relating to iCloud, Which Is Not Actionable
           Anticompetitive Conduct Under Section 2 ....................................21

      5.   Plaintiffs' Attempted Monopolization Claim Fails Given
           Their Failure to Plead the Requisite Specific Intent......................23

   B.   Plaintiffs' Tying Claim Fails ..................................................................23

   C.   Plaintiffs' UCL Claims Fail....................................................................24

      1.   Plaintiffs Fail to Plead a UCL Claim Under the Unlawful
           Prong...............................................................................................24

      2.   Plaintiffs Still Fail to Allege an "Unfair" UCL Claim ..................24

VI.  CONCLUSION....................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
836 F.3d 1171 (9th Cir. 2016) ...................................................................23, 24

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
592 F.3d 991 (9th Cir. 2010) .............................................................................21

*Apple v. Psystar Corp.*,
586 F. Supp. 2d 1190 (N.D. Cal. 2008) .....................................................*passim*

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .............................................................................................5

*BanxCorp v. Bankrate, Inc.*,
847 F. App'x 116 (3d Cir. 2021) .......................................................................19

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .............................................................................................5

*Berkey Photo v. Eastman Kodak Co.*,
603 F.2d 263 (2d Cir. 1979) ..............................................................................21

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
65 F.3d 1406 (7th Cir. 1995) .............................................................................18

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*,
140 F.3d 494 (3d Cir. 1998)...............................................................................14

*Coal. for ICANN Transparency, Inc. v. Verisign, Inc.*,
611 F.3d 495 (9th Cir. 2010) ...............................................................................5

*De Soto Cab Co., Inc. v. Uber Techs., Inc.*,
No. 16-CV-06385, 2021 WL 5860917 (N.D. Cal. Nov. 18, 2021) ....................20

*Dig. Equip. Corp. v. Uniq Dig. Techs., Inc.*,
73 F.3d 756 (7th Cir. 1996) .................................................................................6

*Dream Big Media Inc. v. Alphabet Inc.*,
No. 22-CV-02314, 2022 WL 16579322 (N.D. Cal. Nov. 1, 2022) ....................13

*Dreamstime.com, LLC v. Google LLC*,
54 F.4th 1130 (9th Cir. 2022) .......................................................................8, 21

*Eastman v. Quest Diagnostics Inc.*,
108 F. Supp. 3d 827 (N.D. Cal. 2015) ...............................................................18

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iii

APPLE INC.'S MOTION TO DISMISS
CASE NO. 5:24-cv-01270-EKL

*Epic Games, Inc. v. Apple, Inc.*,
    67 F.4th 946 (9th Cir. 2023) ................................................................................................13

*Foremost Pro Color, Inc. v. Eastman Kodak Co.*,
    703 F.2d 534 (9th Cir. 1983) ...............................................................................................21

*FTC v. Qualcomm*,
    969 F.3d 974 (9th Cir. 2020) ...............................................................................................22

*Garnica v. HomeTeam Pest Def., Inc.*,
    230 F. Supp. 3d 1155 (N.D. Cal. 2017) ..............................................................................18

*Garrison v. Oracle Corp.*,
    159 F. Supp. 3d 1044 (N.D. Cal. 2016) ..............................................................................22

*Gen. Commc'ns Eng., Inc. v. Motorola Commc'ns and Elec., Inc.*,
    421 F. Supp. 274 (N.D. Cal. 1976) .....................................................................................23

*Glob. Disc. Travel Servs., LLC v. TWA*,
    960 F. Supp. 701 (S.D.N.Y. 1997) ........................................................................................7

*Green Country Food Mkt., Inc. v. Bottling Grp., LLC*,
    371 F.3d 1275 (10th Cir. 2004) .............................................................................................8

*Hernandez v. Select Portfolio*,
    2015 WL 3914741 (C.D. Cal. June 25, 2015) .....................................................................11

*Hicks v. PGA Tour, Inc.*,
    897 F.3d 1109 (9th Cir. 2018) ......................................................................................16, 25

*Imperial Irrigation Dist. v. California Indep. Sys. Operator Corp.*,
    146 F. Supp. 3d 1217 (S.D. Cal. 2015)................................................................................22

*In re Am. Express Anti-Steering Rules Antitrust Litig.*,
    361 F. Supp. 3d 324 (E.D.N.Y. 2019) ...................................................................................7

*In re ATM Fee Antitrust Litigation*,
    768 F. Supp. 2d 984 (N.D. Cal. 2009) ...................................................................................9

*In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*,
    28 F.4th 42 (9th Cir. 2022) ..................................................................................................24

*In re Elevator Antitrust Litig.*,
    502 F.3d 47 (2d Cir. 2007)...................................................................................................22

*In re Gilead Scis. Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008) ...............................................................................................5

*Intellectual Ventures I LLC v. Cap. One Fin. Corp.*,
No. 13-CV-00740, 2013 WL 6682981 (E.D. Va. Dec. 18, 2013) ..........................................18

*Lazy Y Ranch LTD v. Behrens*,
546 F.3d 580 (9th Cir. 2008) ................................................................................................10

*McKenna v. WhisperText*,
No. 5:14-CV-00424, 2015 WL 5264750 (N.D. Cal. Sept. 9, 2015) .....................................24

*New York ex rel. Schneiderman v. Actavis PLC*,
787 F.3d 638 (2d Cir. 2015)..................................................................................................21

*Newcal Indus., Inc. v. IKON Off. Sol.*,
513 F.3d 1038 (9th Cir. 2008) .....................................................................................6, 13, 16

*Ohio v. Am. Express Co.*,
585 U.S. 529 (2018)...............................................................................................................18

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
No. 5:16-cv-06370, 2017 WL 4310767 (N.D. Cal. Sep. 28, 2017)......................................20

*Queen City Pizza v. Domino's Pizza*,
124 F.3d 430 (3d Cir. 1997)..................................................................................................16

*Reilly v. Apple Inc.*,
578 F. Supp. 3d 1098 (N.D. Cal. 2022) ..................................................................................6

*Samsung Elecs. Co., Ltd. v. Panasonic Corp.*,
747 F.3d 1199 (9th Cir. 2014) ..............................................................................................22

*Saroya v. Univ. of the Pac.*,
503 F. Supp. 3d 986 (N.D. Cal. 2020) ..................................................................................10

*SMS Sys. Maint. Servs. v. Dig. Equip. Corp.*,
188 F.3d 11 (1st Cir. 1999)...............................................................................................8, 14

*Sprewell v. Golden State Warriors*,
Nos. 99-15602, 99-17186, 2001 U.S. App. LEXIS 20434 (9th Cir. Dec. 28,
2001) ......................................................................................................................................10

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
No. 09-0560, 2011 WL 2678879 (E.D. Cal. July 7, 2011)....................................................23

*Streamcast Networks, Inc. v. Skype Techs., S.A.*,
547 F. Supp. 2d 1086 (C.D. Cal. 2007) ............................................................................8, 17

*Theme Promotions, Inc. v. News Am. Mktg. FSI*,
546 F.3d 991 (9th Cir. 2008) ................................................................................................11

*Times-Picayune Publ'g Co. v. United States*,
    345 U.S. 594 (1952) .......................................................................................................23

*United States v. E. I. Du Pont de Nemours & Co.*,
    351 U.S. 377 (1956) ......................................................................................................7, 8

*United States v. Microsoft Corp.*,
    147 F.3d 935 (D.C. Cir. 1998) ........................................................................................21

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*,
    540 U.S. 398 (2004) ..................................................................................................21, 22

## STATUTES

15 U.S.C. §§ 1, 2 & 3 .............................................................................................................2

Cal. Bus. & Prof. Code §§ 17200 et seq. ..............................................................................3

## OTHER AUTHORITIES

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust
    Principles & Their Application (Sept. 2021 update) ...........................................7, 9, 22

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

APPLE INC.'S MOTION TO DISMISS
CASE NO. 5:24-cv-01270-EKL

1        **MEMORANDUM OF POINTS AND AUTHORITIES**

2    **I.    INTRODUCTION**

3            This is Plaintiffs' third attempt to plead viable antitrust claims.  Yet this case remains

4    premised on the fundamentally flawed notion that Apple's 2011 product design decision to limit

5    the remote backup of core app data to iCloud Backup is somehow an antitrust violation.  As the

6    Court recognized in dismissing the First Amended Complaint ("FAC"), the fact that (i) numerous

7    alternative storage options (both cloud and local) are available on Apple devices and (ii) owners

8    of Apple devices are not required to use iCloud presents intractable problems for Plaintiffs' case.

9            These realities doomed Plaintiffs' FAC.  Plaintiffs' tying claim failed because Apple

10   neither requires customers to use iCloud nor forbids them from using alternatives as a condition

11   of purchasing an Apple device.  Plaintiffs' monopolization claims failed because the admitted

12   existence of alternatives to iCloud undermined any plausible single-brand aftermarket limited to

13   iCloud, and further precluded Plaintiffs from plausibly alleging that Apple has monopoly power

14   in any cloud storage market.  And Plaintiffs' ancillary UCL claims failed given their reliance on

15   the underlying Sherman Act claims and their failure to plead any unfair conduct.

16           Plaintiffs' Second Amended Complaint ("SAC") contains many "new" allegations, but

17   none fix the fundamental problems with their theory.  The SAC thus fares no better than the FAC.

18           *First*, Plaintiffs still fail to plead a viable monopolization or attempted monopolization

19   claim.  Plaintiffs now invoke a customer survey relating to iCloud from a false advertising case,

20   to suggest that iCloud Backup is a feature so unique that iCloud belongs in its own relevant

21   antitrust market.  But the mere fact that *existing users* of iCloud highly rate iCloud Backup is far

22   from sufficient to support an iCloud-only market.  The continued (and admitted) reality that not

23   all Apple device owners use or buy iCloud storage plans (much less use iCloud Backup) and that

24   many of them use alternatives only confirms what the law recognizes—that the "unique attributes

25   and components" that might make one brand's product more attractive than the alternatives do not

26   provide a basis for exclusion of those alternatives from the market, much less support a highly

27   unusual and extremely rare single-brand aftermarket.

28           *Second*, Plaintiffs still fail to plead that Apple has monopoly power.   The SAC

conspicuously omits prior allegations about the significant percentage of Apple users who do not even use (or buy) iCloud and again fails to allege that iCloud subscription pricing is anything but on par with the competition.  Instead, the SAC doubles-down on the theory that high margins supposedly equal monopoly power.  But that runs headlong into the law recognizing the many problems associated with inferring monopoly power from margins.  And the allegations relating to output—which still suggest, in conclusory fashion, that the inability of rivals to offer iCloud's remote backup feature necessarily equates to reduced output—remain circular and implausible.

*Third*, Plaintiffs still fail to plead a valid tying claim.  Their attempted fix is to now plead their tying claim under Sherman Act Section 2 in addition to Section 1, presumably to avoid Section 1's "concerted action" requirement.  But the root problem in Plaintiffs' theory remains: Apple does not condition the purchase of its devices upon a user's agreement to either use iCloud or not use iCloud alternatives.  That precludes any viable tying claim, whether styled under Section 1 or 2.

*Last*, Plaintiffs' UCL claim remains infirm.  Absent a viable Sherman Act claim, Plaintiffs' unlawful UCL claim must be dismissed.  And as before, Plaintiffs have not and cannot plead that iCloud pricing is higher than the competition, or that the justifications for Apple's design choice to limit the remote backup of the core files and app data necessary to restore one's Apple device to iCloud Backup is pretextual.  Plaintiffs' unfair UCL claim, therefore, fails too.

Plaintiffs' SAC should be dismissed with prejudice.

## II.    STATEMENT OF ISSUES TO BE DECIDED

1.    Whether Plaintiffs' monopolization and attempted monopolization claims under Section 2 of the Sherman Act, 15 U.S.C. § 2, should be dismissed where those claims rest on an implausible, single-brand market gerrymandered around iCloud and given Plaintiffs' failure to otherwise plead that Apple possesses monopoly power in a properly defined relevant market, or any cognizable anticompetitive conduct by Apple.

2.    Whether Plaintiffs' tying claim, now pled under Sections 1, 2, and 3 of the Sherman Act, 15 U.S.C. §§ 1, 2 & 3, should be dismissed given that Apple does not condition the sale of any Apple devices upon a user's agreement to use iCloud or refrain from using iCloud alternatives.

3.     Whether Plaintiffs' UCL claim, Cal. Bus. & Prof. Code §§ 17200 *et seq.*, should be dismissed for the continued failure to allege any unlawful or unfair conduct.

## III.    BACKGROUND

### A.    Factual Overview

Apple debuted iCloud in 2011.  SAC ¶¶ 3, 35.  From day one, Apple made a design decision with respect to iCloud Backup, limiting the read and write privileges of third-party cloud storage apps, preventing them from remotely backing up certain core app data and device settings.  *Id.* ¶¶ 3, 29, 49.  That design decision was and always has been a feature grounded in security and privacy considerations, given the sensitivity of the data required to restore one's Apple device. There are no allegations that Apple has ever changed or reconsidered this product design decision, or changed any policy with respect to limiting the remote back-up of core app data to iCloud Backup.

While Plaintiffs conspicuously deleted their FAC allegations about the significant percentage of Apple device owners who do not use or buy iCloud at all, they continue to admit, as they must, that no one with an Apple device is required to use iCloud, much less iCloud Backup. *Id.* ¶ 128 ("[A]pproximately 29% of U.S. consumers do not use a cloud storage service at all."); ¶ 157 ("[C]onsumers can buy smartphones and tablets without also purchasing or using any cloud storage.").  Plaintiffs also acknowledge that iCloud remains free for many users.  *Id.* ¶¶ 37–38. And Plaintiffs concede that many Apple device owners use alternatives to iCloud—including other remote storage options as well as non-remote back-up methods.  *Id.* ¶ 32 ("All major technology companies offer a cloud-storage service and there are numerous technology companies specializing in cloud storage.").  Plaintiffs still do not and cannot allege that iCloud subscription pricing is anything but competitive with the numerous other options available on Apple devices. *Id.* ¶ 123 n.67 (alleging, despite citing public information on Apple pricing, that "[i]t is not possible in this case to compare Apple's iCloud prices to other cloud platform pricing on an apples-to-apples basis prior to discovery.  Storage tiers across cloud platforms do not align in a manner that permits a pre-discovery estimate of the effective per-GB price charged across platforms").

**B.    Procedural History**

1.    The Court's Order Dismissing the FAC

The Court held that Plaintiffs' FAC failed to plead a tying claim because (i) Plaintiffs alleged only unilateral conduct by Apple to "restrict access to certain files," ECF No. 62 ("Order") at 7, and (ii) did not allege that "Apple conditions the sale of its mobile devices on buyers' agreement to purchase iCloud from Apple (a 'positive' tie) or on their agreement not to purchase cloud storage from Apple's rivals (a 'negative' tie)," *id.* at 8.

The Court also dismissed Plaintiffs' monopolization and attempted monopolization claims, on several grounds.  First, the Court explained, Plaintiffs' "full-service" cloud storage market implausibly failed to include economic substitutes—principally, cloud storage services offered by Apple's rivals.  *Id* at 11.   The FAC further "lack[ed] any plausible allegation that Apple device users value this single feature so much that it distinguishes iCloud from all other cloud storage options."  *Id*. at 11–12.   Second, because Plaintiffs acknowledged (as they do again here) "that Apple device users can substitute between iCloud and other cloud storage options for all other data storage needs," the Court concluded that "it is implausible that iCloud faces no meaningful competition from the numerous other cloud storage options available to Apple mobile device users."  *Id.* at 12.   Third, Plaintiffs also failed to plead monopoly power—specifically, they failed to plausibly allege "that Apple has restricted output of cloud storage for Apple mobile devices."  *Id*. at 15.   The Court held that Plaintiffs' claim that "Apple restricts the output of *other* cloud storage providers by preventing them from storing restricted files . . . is circular and conclusory."  *Id.*   The Court held that, given their inability to plausibly plead monopoly power, Plaintiffs' attempted monopolization claim also failed.  *Id*. at 18–19.   Last, Plaintiffs failed to adequately plead monopoly share; the Court held that Plaintiffs' 70% market share statistic was unsupported "by any direct measure of Apple's share of the relevant market" and was "both mathematically and analytically wrong."  *Id.* at 17.

Plaintiffs' failure to plead a Sherman Act claim also warranted dismissal of Plaintiffs' unlawful UCL claim.  *Id.* at 22.   And Plaintiffs' unfair UCL claim faltered because they could not allege any impact on consumers:  (i) consumers are not required to purchase iCloud, (ii) iCloud is

1    not priced more than other cloud storage options, and (iii) the security justifications for Apple's

2    iCloud Backup "restriction" outweigh this minimal impact on consumers. *Id.*.

3    　　　　The Court did not decide whether Plaintiffs' claims are timely, but noted that Plaintiffs'

4    claims can only be timely if they satisfy the continuing violation exception to the antitrust four-

5    year statute of limitations. *Id.* at 5 & n.1. As the Court explained, Plaintiffs cannot merely rely

6    on the fact that they sued "within four years of purchasing iCloud" because that would "effectively

7    swallow[] the statute of limitations rule." *Id.* (citations omitted).

8    　　　　　　　　　2.　　Plaintiffs' Second Amended Complaint

9    　　　　Plaintiffs' SAC asserts the same causes of action as before. *See* SAC ¶¶ 187–226. First,

10   Plaintiffs reassert claims for monopolization and attempted monopolization, premised on dueling

11   (and still inconsistent) markets: an aftermarket limited to iCloud only and a broader market

12   consisting of all cloud storage solutions available on Apple devices. *Id*. ¶¶ 187–208. Plaintiffs

13   added allegations regarding consumer surveys, which they claim suggest sufficiently unique

14   demand for iCloud's back-up feature to isolate it into its own market. *Id*. ¶¶ 40–48. Plaintiffs also

15   added allegations purportedly supporting a SSNIP, as well as monopoly power. *Id*. ¶¶ 79–92.

16   Second, Plaintiffs reassert a tying claim, this time under Sections 1, 2, and 3 of the Sherman Act.

17   *Id*. ¶¶ 209–19. Finally, Plaintiffs continue to advance a UCL claim, under both the unlawful and

18   the unfair prongs. *Id*. ¶¶ 220–26.

19   **IV.　LEGAL STANDARD**

20   　　　　A complaint must contain sufficient factual matter, accepted as true, "to state a claim to

21   relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007). A

22   court need not accept as true "allegations that are merely conclusory, unwarranted deductions of

23   fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir.

24   2008) (citation omitted). "Where a complaint pleads facts that are merely consistent with a

25   defendant's liability, it stops short of the line between possibility and plausibility of entitlement to

26   relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). And "a court must

27   determine whether an antitrust claim is plausible in light of basic economic principles." *Coal. for*

28   *ICANN Transparency, Inc. v. Verisign, Inc.*, 611 F.3d 495, 501 (9th Cir. 2010) (citations omitted).

## V.    ARGUMENT

### A.    Plaintiffs' Monopolization Claims Fail

#### 1.    Plaintiffs Still Cannot Plead a Single-Brand Aftermarket Limited to iCloud

Plaintiffs continue to advance the theory that iCloud constitutes a single-brand aftermarket for "full-service cloud storage" due to the provision of iCloud Backup.  SAC ¶¶ 10, 14, 40–115.  But "[s]ingle-brand markets are, at a minimum, extremely rare[,] [e]ven where brand loyalty is intense . . . ."  *Apple v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1198 (N.D. Cal. 2008) (citations omitted); *see also Reilly v. Apple Inc.*, 578 F. Supp. 3d 1098, 1107 (N.D. Cal. 2022) (same).  The law recognizes an exception to the general prohibition of single-brand aftermarkets only where a defendant changes its policy relating to the aftermarket product (here, iCloud) after a customer is locked in by having first purchased the foremarket product (an Apple mobile device). *See Newcal Indus., Inc. v. IKON Off. Sol.*, 513 F.3d 1038, 1050 (9th Cir. 2008); *Dig. Equip. Corp. v. Uniq Dig. Techs., Inc.*, 73 F.3d 756, 762–63 (7th Cir. 1996) ("The material dispute [in *Kodak*] [regarding an aftermarket] . . . was whether the change in policy enabled Kodak to extract supra-competitive prices from customers who had already purchased its machines.").

To establish a single-brand aftermarket, Plaintiffs must plead facts sufficient to show that consumers are locked in, such that they "did not knowingly bind themselves to a single brand of the aftermarket and market imperfections (information costs and switching costs) prohibited customers from imposing market discipline in the *aftermarket* by switching among competitors in the *primary* market."  *Psystar*, 586 F. Supp. 2d at 1201.  Courts examine the alleged aftermarket under *Twombly* pleading standards, assessing whether plaintiffs' factual allegations regarding the cross-elasticity of demand for a product establish "rare and unforeseen circumstances, [indicating that] a relevant market may consist of only one brand of a product."  *Id*. at 1198.

Courts have long cautioned against distinguishing a single-brand aftermarket based on the unique features of products.  As the Supreme Court noted:

> A retail seller may have in one sense a monopoly on certain trade because of location, as an isolated country store or filling station, or because no one else makes a product of just the quality or attractiveness of his product . . . .  Thus one can theorize that we have monopolistic competition in every nonstandardized commodity with each manufacturer having power over the price and production of his own product.  However, this power that, let us say, automobile or soft-drink

1    manufacturers have over their trademarked products is not the power that makes an
2    illegal monopoly.  Illegal power must be appraised in terms of the competitive
     market for the product.

3    *United States v. E. I. Du Pont de Nemours & Co*., 351 U.S. 377, 392–93 (1956).

4        To overcome the "heavy presumption" against single-brand aftermarkets, a "plaintiff must

5    point to 'exceptional market conditions' that have created a market for a single brand that would

6    otherwise be just 'one brand in a market of competing brands.'"  *In re Am. Express Anti-Steering*

7    *Rules Antitrust Litig*., 361 F. Supp. 3d 324, 343 (E.D.N.Y. 2019) (citation omitted).  Brands often

8    and regularly compete by offering different features, leading to consumer preferences for one

9    brand's suite of features over another's.  Such consumer preference is not enough to distinguish

10   one brand's product as a single-brand aftermarket.[1]  In most cases, as here, "the product at issue—

11   even if distinguishable from other products due to its brand or certain features—will have possible

12   substitutes such that a single-brand market definition is inappropriate."  *Id*. at 344 (citing IIA

13   Areeda et al., *infra*, ¶ 563d, at 413–14).

14       Here, as in *Psystar*, Plaintiffs "allege[] not a single-brand aftermarket dependent on and

15   derivative of a specific company's primary product but instead that a single brand of primary

16   product [Apple's iCloud] . . . constitutes an independent market.  Neither *Newcal Industries* nor

17   *Kodak* addressed such a situation."  *Psystar*, 586 F. Supp. 2d at 1197.  Despite attempts to connect

18   iCloud to iPhones and iPads, Plaintiffs admit that these "primary products" do not constrain

19   iCloud, exposing the guise of their attempt to silo their true focus—iCloud and its backup feature—

20   into a market that is devoid of competition.  SAC ¶ 157 ("[C]onsumers can purchase a cloud

21   storage plan (including iCloud) without also purchasing a smartphone or tablet. . . . Other cloud

22   storage providers likewise offer cloud storage plans as a freestanding product.").  The Ninth Circuit

23   has not acknowledged this construction of an aftermarket.  *Psystar*, 586 F. Supp. 2d at 1197.

24   Plaintiffs' attempts to allege an aftermarket fail for this core reason and many others.

25

26   [1] *Glob. Disc. Travel Servs., LLC v. TWA*, 960 F. Supp. 701, 705 (S.D.N.Y. 1997) ("The plaintiff's
     argument is analogous to a contention that a consumer is 'locked into' Pepsi because she prefers
27   the taste, or NBC because she prefers 'Friends,' 'Seinfeld,' and 'E.R.'  A consumer might choose
     to purchase a certain product because the manufacturer has spent time and energy differentiating
28   his or her creation from the panoply of products in the market, but at base, Pepsi is one of many
     sodas, and NBC is just another television network.").

1          *a.*      *The Cited Customer Surveys and Expert Reports Fail to Establish*
2                   *that the iCloud Backup Feature Suffices to Isolate iCloud Into Its Own Market*

3         In its Order, the Court found that "the complaint lacks any plausible allegation that Apple

4    device users value [iCloud Backup] so much that it distinguishes iCloud from all other cloud

5    storage options." Order at 11–12. To overcome the Court's rejection of this theory, Plaintiffs cite

6    two expert reports from an unrelated false advertising lawsuit. But Plaintiffs' invocation of

7    customer surveys confirming that iCloud users value iCloud Backup does not suffice to plausibly

8    allege that iCloud does not compete with any other storage platforms or tools.[2] The Supreme Court

9    confirmed as much long ago, instructing that "where there are market alternatives that buyers may

10   readily use for their purposes, illegal monopoly does not exist merely because the product said to

11   be monopolized differs from others. If it were not so, only physically identical products would be

12   a part of the market." *E. I. Du Pont de Nemours & Co.*, 351 U.S. at 394.

13        *First*, as the Court recognized, "[m]arkets often include products that differ in some regard

14   but still 'compete with one another sufficiently' to constrain pricing." Order at 12. There is

15   nothing anticompetitive about "a company using a competitive advantage gained from establishing

16   an infrastructure that renders [it] uniquely situated to serve [its] customers or from a consequence

17   of a superior product.'" *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1142 (9th Cir.

18   2022) (simplified); *see also Streamcast Networks, Inc. v. Skype Techs., S.A.*, 547 F. Supp. 2d 1086,

19   1095 (C.D. Cal. 2007) ("unique attributes and components" that make a product "more attractive

20   and efficient" do not distinguish it from other products that "permit users to accomplish the same

21   basic task"). The mere fact that Apple device owners who use iCloud *value* the iCloud Backup

22   feature is not enough to support the highly unusual exception of a single-brand aftermarket limited

---

23   [2] *See also SMS Sys. Maint. Servs. v. Dig. Equip. Corp.*, 188 F.3d 11, 23 (1st Cir. 1999) ("In a
24   product-differentiated market . . . , there always will be a subset of customers whose subjective
     preferences, given their specific business needs, will align them more closely with one
25   manufacturer. . . . [H]owever, this kind of preference does not translate into the kind of economic
     power that antitrust law aims to mitigate. . . . What would be of concern is if a firm were able to
26   extend its control by improper means over a sufficiently sizable number of customers who did not
     have such a preference. The facts at hand do not fit this model.") (citations omitted); *Green
27   Country Food Mkt., Inc. v. Bottling Grp., LLC*, 371 F.3d 1275, 1282 (10th Cir. 2004) ("[W]e have
     said that a company does not violate the Sherman Act by virtue of the natural monopoly it holds
28   over its own product. Even where brand loyalty is intense, courts reject the argument that a single
     branded product constitutes a relevant market.") (citations and quotations omitted).

to iCloud.  What is key to establishing an aftermarket—and what Plaintiffs continue to avoid—is whether a consumer is *compelled to purchase* the aftermarket product by virtue of being locked-in after purchasing the foremarket product.  *See In re ATM Fee Antitrust Litigation*, 768 F. Supp. 2d 984, 997 (N.D. Cal. 2009); *see also* Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles & Their Application ¶ 564b (Sept. 2021 update) ("[W]hen the primary good and the 'aftermarket' good are sold at the same time, such as a computer together with its bundled software, there is no lock-in.").

*Second*, Plaintiffs overstate and misrepresent the reports, which acknowledge that iCloud faces competition and that many Apple device users use competing cloud storage solutions.  The Scott Report,[3] for example, notes that, even among consumers who used iCloud's free service, "many are aware of other cloud storage providers and some either currently use or have used them in the past."  Scott Report ¶ 8(a), ECF No. 64-1.  And while "ease of use" and "the ability to restore or set up your device from an iCloud backup" was one of "many features that factor into [iCloud Purchasers'] reasons for purchasing an iCloud Service subscription," consumers still considered competing cloud storage services.  *Id.* ¶ 8(b).  Indeed, Dr. Scott found that "64.4% of all respondents in the survey had used or currently use Dropbox, 58.1% had used or currently use Google Drive, and 40.7% had used or currently use Microsoft OneDrive/Azure."  *Id.* ¶ 41.

Additionally, users often use more than one cloud storage service.  Dr. Scott found that "[a]pproximately 42% of iCloud Purchasers in my study also use Google Drive, and 31% use Dropbox [and a] smaller percentage, 25%, use Microsoft OneDrive as well as a paid version of the iCloud Service."  *Id.* ¶ 9(a).  Plaintiffs' reliance on the Scott Report's analysis of pre-existing iCloud users who did not consider switching also fails because it confirms that there is an appreciable percentage of iCloud subscribers—just under 30% of those surveyed—who *do* consider other options as alternatives.  SAC ¶ 76.  The Scott Report's survey is far from the silver bullet Plaintiffs need it to be; its findings actually defeat any plausible notion that iCloud exists in its own market, with zero competition.

---

[3] Expert Report of Dr. Carol Scott, *Williams v. Apple Inc.*, Case No. 3:19-cv-4700-LHK (N.D. Cal.), ECF No. 82-11 ("Scott Report") (attached to Second Amended Complaint as Ex. A).

1    Plaintiffs also mischaracterize the Hitt Report[4] in alleging that it "criticized a competing
2    expert for failing to account for the 'switching costs' of purchasing a cloud service other than
3    iCloud."  SAC ¶ 47.  The Hitt Report in fact criticized another expert's report for "ignor[ing]
4    significant heterogeneity in preferences, switching costs, and information across putative class
5    members that render his study irrelevant for measuring the alleged damages."  Hitt Report ¶ 88.
6    But the Hitt Report goes on to note that:  "Once this heterogeneity is considered, [the other
7    expert's] results reveal that the majority of his respondents ***do not have a preference between in-***
8    ***house storage and partly outsourced storage***."  *Id.* (emphasis added).  The Hitt Report also
9    maintains that "there is large variation in how and why consumers use the iCloud Service,"
10   contrary to Plaintiffs' focus on one iCloud feature.  *Id.* ¶¶ 90–92.

11   Rather than support Plaintiffs' claims, the expert reports actually undermine and are
12   inconsistent with the notion that iCloud faces zero competition from the other available cloud (and
13   even non-cloud) storage options available to Apple device users.  The Court "need not accept as
14   true allegations contradicting documents that are referenced in the complaint."  *Lazy Y Ranch LTD*
15   *v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008); *see also Saroya v. Univ. of the Pac.*, 503 F. Supp.
16   3d 986, 994 (N.D. Cal. 2020) ("Once a document is deemed incorporated by reference, the entire
17   document is assumed to be true for purposes of a motion to dismiss, and both parties—and the
18   Court—are free to refer to any of its contents."); *Sprewell v. Golden State Warriors*, Nos.
19   99-15602, 99-17186, 2001 U.S. App. LEXIS 20434, *12 (9th Cir. Dec. 28, 2001) ("Nor is the
20   court required to accept as true allegations that are merely conclusory, unwarranted deductions of
21   fact, or unreasonable inferences.").

22                   b.       *Plaintiffs Fail to Plausibly Allege a SSNIP Supporting Their Alleged*
23                            *"Full Service" Cloud Storage Market*

24   The Court previously found that Plaintiffs' alleged SSNIP test had "a host of deficiencies."
25   Order at 13.  This remains true with the SAC.  A proper SSNIP test seeks to answer "whether a
26   monopolist *in the proposed market* could profitably impose a small but significant and

27

28   _____
     [4] Expert Report of Dr. Lorin M. Hitt, *Williams v. Apple Inc.*, Case No. 3:19-cv-4700-LHK (N.D.
     Cal.), ECF No. 82-7 ("Hitt Report").

1  nontransitory price increase." *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1002

2  (9th Cir. 2008) (emphasis added).  The test assesses whether "a significant number of customers

3  would respond to a SSNIP by purchasing substitute products," rendering the SSNIP unprofitable

4  and warranting expansion of the market definition "to include those substitute products that

5  constrain the monopolist's pricing."  *Id*.

6         *First*, the Court previously concluded that Plaintiffs did "not allege that iCloud's price

7  increased *relative to* other products in the market, which is a necessary condition for a SSNIP test."

8  Order at 13 (emphasis in original).  Doing the bare minimum to address this defect, Plaintiffs now

9  allege—in conclusory fashion, with zero supporting facts—that the UK "price increase on iCloud

10  was not accompanied by or commensurate with any observable increase in the price of plans for

11  other cloud providers in the UK."  SAC ¶ 83.  But Plaintiffs allege no specifics about what

12  competing cloud providers, "including Google Drive, Microsoft OneDrive, Dropbox, pCloud or

13  Sync" actually charged before or after the iCloud price increase, *id*., or how those prices relate to

14  iCloud prices, *see* Order at 13, instead hoping the Court will take Plaintiffs at their word.  Though

15  Plaintiffs try to cast these as "factual" allegations, they are plainly conclusory and insufficient to

16  plead the requisite condition for a SSNIP.  *See* Order at 3 ("[T]he court need not 'assume the truth

17  of legal conclusions merely because they are cast in the form of factual allegations.'") (citation

18  omitted); *Psystar*, 586 F. Supp. 2d at 1195 ("[C]onclusory allegations of law and unwarranted

19  inferences are insufficient to defeat a motion to dismiss for failure to state a claim.").

20         Plaintiffs elsewhere argue that "[i]t is not possible in this case to compare Apple's iCloud

21  prices to other cloud platform pricing on an apples-to-apples basis prior to discovery.  Storage tiers

22  across cloud platforms do not align in a manner that permits a pre-discovery estimate of the

23  effective per-GB price charged across platforms."  SAC ¶ 123 n.67.  These internally contradictory

24  allegations—which assert on one hand that competitors' prices remained constant and on the other

25  that Plaintiffs cannot assess competitors' pricing prior to discovery—cannot support any plausible

26  inference that the alleged iCloud subscription prices in the UK increased relative to the

27  competition.  Again, such "internally contradictory" allegations cannot stand.  *Psystar*, 586 F.

28  Supp. 2d at 1200; *Hernandez v. Select Portfolio*, 2015 WL 3914741, at *10 (C.D. Cal. June 25,

1    2015) ("Contradictory allegations . . . are inherently implausible.").

2        Plaintiffs' reliance upon a graph that shows roughly steady market share for all cloud

3    storage providers, SAC at 26, also is not enough.  Absent plausible allegations that the competing

4    cloud service providers' prices remained the same, it is equally plausible that competitors made

5    price adjustments.  Indeed, Plaintiffs' second graph (SAC at 27) shows a drop in iOS market share

6    following the price increase, followed by an eventual increase.  Such an occurrence could just as

7    plausibly be attributed to competitors adjusting their prices commensurate with Apple's.  As the

8    Court noted:  "[i]f the price of iCloud increased, but at the same time all other cloud storage

9    services increased their prices comparably (*e.g.*, due to a market-wide cost increase), the fact that

10   consumers did not change their purchasing behavior tells us nothing about substitutability because

11   the relative prices have not changed."  Order at 13.  This logic remains true notwithstanding

12   Plaintiffs' additional allegations.

13       *Second*, Plaintiffs' continued reliance on allegations regarding UK prices cannot supply

14   what is required to demonstrate a valid SSNIP as applied to the U.S. geographic market alleged in

15   this case.  As the Court explained, "the price change was imposed in 'the UK and other regions,'

16   but here the relevant geographic market is the United States."  *Id.*  As before, Plaintiffs fail to

17   allege any price increase in the United States.  SAC ¶ 90 ("The foregoing SSNIP analysis focuses

18   on the UK because that is where Apple has recently increased prices and a SSNIP can, accordingly,

19   be constructed pre-discovery from publicly available information . . . .").  Plaintiffs' lack of

20   allegations regarding U.S. price increases does not create an exception that permits an inference

21   based on allegations of pricing in a different geographic market.  And like the FAC, in the SAC

22   "Plaintiffs do not allege any facts to establish that even a *valid* SSNIP test conducted in the UK

23   would apply to the United States geographic market."  Order at 13.  That is fatal to Plaintiffs'

24   ability to allege a SSNIP test supporting their claimed U.S.-based, iCloud-only market.

25       *Third*, the Court previously noted that Plaintiffs' SSNIP test failed because Plaintiffs did

26   not "allege that the price change in the UK was profitable."  *Id*. at 13.  Plaintiffs attempt to address

27   this concern in one line, alleging that "[t]he absence of switching away from iCloud in response to

28   its significant price increase in the UK also demonstrates that the price increase was profitable for

1    Apple." SAC ¶ 86.  This allegation is conclusory and unsupported by any actual facts.  Plaintiffs'

2    only support for this allegation is a graph that supposedly depicts fluctuations in market share of

3    Apple's iOS devices—not iCloud—over a period during which the alleged UK price shifts for

4    iCloud subscriptions went into effect.  *See* SAC ¶¶ 86–87.  But (as Plaintiffs continue to admit)

5    because Apple device users are not required to use iCloud at all and can use alternatives on iOS,

6    there is no basis to infer that any alleged increase in market share of Apple's iOS devices

7    corresponds with a lack of "discernable switching away from iCloud," *id.* ¶ 87, in response to the

8    alleged UK iCloud price increases.  Market share statistics regarding iOS do not provide any

9    indication as to whether and to what extent the users of those iOS devices switch from iCloud to

10   alternative cloud storage options available on iOS.  In other words, Plaintiffs' reliance on *iOS*

11   market share in the UK fails to provide what is required to plausibly infer that customers were

12   unable to or did not meaningfully switch from iCloud to other storage options available *on iOS*,

13   and thereby fails to establish that the alleged UK price adjustments were profitable.

14                   *c.    Plaintiffs Fail to Plead the Requisite* Newcal *Factors.*

15          Plaintiffs next turn to a recitation of the *Newcal* factors, seeking to shore up the flaws in

16   their market theory.  But recitations of the elements set forth in *Epic Games, Inc. v. Apple, Inc.*, 67

17   F.4th 946 (9th Cir. 2023), and *Newcal Indus., Inc. v. IKON Off. Sol.*, 513 F.3d 1038 (9th Cir. 2008),

18   are not enough to plead an aftermarket.  *See Epic*, 67 F.4th at 977 ("[T]he aftermarkets inquiry

19   does not end as soon as a plaintiff checks the *Kodak*-based boxes related to consumer knowledge,

20   information costs, and switching costs."); *Dream Big Media Inc. v. Alphabet Inc.*, No. 22-CV-

21   02314, 2022 WL 16579322, at *2 (N.D. Cal. Nov. 1, 2022) ("[F]ormulaic recitation of the elements

22   of a cause of action will not do.").  To properly allege a single-brand aftermarket, Plaintiffs must

23   show: "(1) the challenged aftermarket restrictions are 'not generally known' when consumers

24   make their foremarket purchase; (2) 'significant' information costs prevent accurate life-cycle

25   pricing; (3) 'significant' monetary or non-monetary switching costs exist; and (4) general market-

26   definition principles regarding cross-elasticity of demand do not undermine the proposed single-

27   brand market."  *Epic*, 67 F.4th at 977.

28          When it comes to information costs, consumers need not be all-knowing regarding the

features of the products that they use; "perfect information about the aftermarket is not required." *SMS Sys. Maint. Servs. v. Dig. Equip. Corp*. 188 F.3d 11, 19 n.3 (1st Cir. 1999). Rather, courts look to "whether the primary market is in possession of information that sufficiently reveals the anticompetitive tendencies of a manufacturer in its aftermarket." *Id*. Here, Plaintiffs attempt to plead that the restriction on iCloud files is not generally known by consumers when they make their foremarket (Apple device) purchases. SAC ¶¶ 94–100. But this is contradicted by Plaintiffs' reliance on Apple's expert reports. Plaintiffs cannot plausibly rely on expert reports to plead that "[t]he ability to automatically backup *all content and device and app settings* was the feature most frequently ranked as one of the four most important iCloud service features" (SAC ¶ 104 (citing Scott Report ¶ 48)) for consumers deciding whether to purchase an iCloud subscription while also contending that the same consumers were somehow unaware of the restriction. SAC ¶¶ 94–95. Indeed, the same report establishes that over half of iCloud purchasers surveyed understood that Google, Amazon, Microsoft, and Dropbox cloud storage providers could not be used to "restore or set up a new Apple device with all your backup content." Scott Report ¶¶ 9(b), 54.

Plaintiffs also fail to plausibly allege high switching costs. Plaintiffs allege that switching costs include (1) the cost of mobile devices or tablets being "hundreds of dollars," and (2) the inconvenience of consumers' inability to transfer iCloud files over to an Android-based cloud-storage solution without separately downloading them. SAC ¶¶ 63, 101. But these do not represent switching costs sufficient to impose the necessary lock in to plead an aftermarket. *See Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 514 (3d Cir. 1998) (market definition does not turn on ability to "switch effortlessly").

*First*, Plaintiffs' argument is nonsensical. The restricted files Plaintiffs complain about are iOS-specific core app data ("mainly app data and settings") for apps downloaded through Apple's App Store. As alleged, these files are iOS-specific and are not transferable to (and would be useless on) non-iOS devices. *See* SAC ¶ 63 ("[T]he Android operating system cannot be run from an Apple device. . . . iCloud is not available on Android devices, which means a user cannot transfer iCloud files over to an Android-based cloud storage solution without separately downloading them."); *Id.* ¶ 64 ("[M]uch app and in-app content is specific to Apple's operating

systems and cannot be ported to a new device utilizing a different operating system.").  On the other hand, all files that are readable across different operating systems can be stored on every other cloud service that competes with iCloud and that is available on Apple devices.  Plaintiffs continue to admit as much, noting that consumers have the "option [] to retain iCloud for hosting Restricted Files and then use one of [the many] alternative providers to back up Accessible files (like photos and videos)."  SAC ¶ 73.[5]  Therefore, removing the alleged restrictions with respect to iCloud Backup would not alleviate the switching costs of having to set up an Android device with one's personal settings and download Android-compatible apps.

*Second*, the Hitt Report cited by Plaintiffs indicates that switching costs are variable among consumers based on their product preferences.  Hitt Report ¶ 96 ("Switching costs can vary because of different use cases across iCloud Service users.").  As was the case in *Psystar*, "[u]nlike in Kodak – where customers did not knowingly bind themselves to a single brand of the aftermarket and market imperfections (information costs and switching costs) prohibited customers from imposing market discipline in the *aftermarket* by switching among competitors in the *primary* market – here Apple asks its customers to purchase [iCloud Subscriptions] knowing that [the backup feature] is to be used only with [Apple devices]."  *Psystar*, 586 F. Supp. 2d at 1201 (emphasis in original).  As the Court in *Psystar* found, Apple "is certainly entitled to do so." *Id*.  Plaintiffs' own pleadings and the expert reports on which they rely acknowledge that customers are aware of the benefits and limitations of iCloud and other cloud storage services—and make value determinations when selecting which of the alternatives to use.  Whether a customer endures "switching costs" when changing devices depends entirely on their individual valuations and use of iCloud backup, a limitation they knowingly took on.

### 2.    Plaintiffs' Broader Market for All Cloud Storage Solutions Also Fails

Plaintiffs' broader market—which includes all cloud storage solutions available on Apple devices—is also infirm because Plaintiffs have not plausibly alleged that non-cloud options are

---

[5] *See* Order at 12 ("Here, Plaintiffs acknowledge that Apple device users can substitute between iCloud and other cloud storage options for all other data storage needs.  Thus, it is implausible that iCloud faces no meaningful competition from the numerous other cloud storage options available to Apple mobile device users." (citations omitted)).

1    sufficiently distinct to be excluded from the market.  As for Plaintiffs' attempts to distinguish local

2    storage and external drives, which enable Apple device owners to fully backup their devices,

3    Plaintiffs' added allegations continue to speak only to "functional and quality differences between

4    iCloud and other storage options."  Order at 12.

5          The outer contours of a relevant market are defined by cross-elasticity of demand (the

6    propensity of consumers to switch to a competing product following a price increase) and

7    reasonable interchangeability of use between the product and its substitutes.  *Psystar*, 586 F. Supp.

8    at 1196.  Interchangeability of use compares products, to assess whether "one product is roughly

9    equivalent to another for the use to which it is put."  *Queen City Pizza v. Domino's Pizza*, 124 F.3d

10   430, 437 (3d Cir. 1997).  Products and their features can vary:  "while there may be some degree

11   of preference for the one over the other, either would work effectively."  *Id*.  A plausible relevant

12   market therefore must "encompass the product at issue as well as all economic substitutes for the

13   product."  *Newcal*, 513 F.3d at 1045.  If the plaintiff's alleged market fails to include "reasonably

14   interchangeable" products, it is "facially unsustainable," and the SAC should be dismissed.  *Hicks*

15   *v. PGA Tour, Inc.*, 897 F.3d 1109, 1122–23 (9th Cir. 2018) (citations omitted).

16         Plaintiffs admit that "[a]n iPhone or iPad can . . . be backed up locally to a hard drive on a

17   Mac or PC . . . ."  SAC ¶ 66.  Plaintiffs nevertheless attempt to distinguish local storage from cloud

18   storage based on (1) the potential that a local storage device might get damaged; (2) the burden of

19   cables and co-location; (3) the "laborious" effort required to plug one's phone in and click through

20   prompts; (4) the need to initiate a manual backup; (5) portability.  *Id.* ¶¶ 66–68.  But none of these

21   speak to the function of actually backing up a phone and saving its data, for which local backup

22   serves the same functional purpose, which is to preserve one's mobile device data for purposes of

23   porting to or restoring an Apple device.  Indeed, while Plaintiffs cite the Scott Report's findings

24   that respondents—purchasers of iCloud—found these features to be attractive, *id.* ¶¶ 69, Plaintiffs

25   fail to account for the 29% of the respondents—and Apple device customers—who do not use a

26   cloud storage service at all, *see id.* ¶ 129.  For these users, the alternative they have chosen—

27   should they choose to back up their Apple devices—is local storage, proving the interchangeability

28   between cloud and local storage options.  Feature and quality differences are not a sufficient basis

to exclude these alternatives from the market. *E.g.*, *Streamcast Networks, Inc.*, 547 F. Supp. 2d at 1095 (finding that products that allow the user to "accomplish the same basic task" despite one having "distinct attributes and components that may make it more attractive and efficient" warrants inclusion of both products in the market).

        3.    <u>Plaintiffs Still Fail to and Cannot Plead that Apple Possesses Monopoly Power</u>

            *a.*    *Plaintiffs Fail to Plead Monopoly Power Directly*

**Failure to plead supracompetitive pricing.** Plaintiffs attempt to allege supracompetitive pricing despite admitting that "[i]t is not possible in this case to compare Apple's iCloud prices to other cloud platform pricing on an apples-to-apples basis prior to discovery. Storage tiers across cloud platforms do not align in a manner that permits a pre-discovery estimate of the effective per-GB price charged across platforms." SAC ¶ 123 n.67. This admission erodes Plaintiffs' attempts to allege that iCloud is priced above competitive levels in the market as conclusory and implausible.

Additionally, the Hitt Report cited by Plaintiffs actually shows that iCloud prices decreased or remained steady between 2015 and 2018. Hitt Report at 29.



This further undermines any plausible inference that Apple prices iCloud supracompetitively.

Plaintiffs again attempt to rely on gross margins to plead supracompetitive prices, but say nothing about those margins relative to their defined market. SAC ¶¶ 117–24. Plaintiffs add an unsubstantiated allegation that "[a]ccounting for storage infrastructure costs Apple incurs for users of its free (0-5GB) plan, the margins reported above for Apple's paid plans yield gross margins of

1    approximately 65%." SAC ¶ 122. But this line of reasoning, involving "inferring market power

2    from gross margins," remains "a dicey proposition." *Garnica v. HomeTeam Pest Def., Inc.*, 230

3    F. Supp. 3d 1155, 1159 (N.D. Cal. 2017). That is because "competitive firms may be highly

4    profitable merely by virtue of having low costs as a result of superior efficiency." *Blue Cross &*

5    *Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1412 (7th Cir. 1995) (Posner, J.)

6    ("[I]t is always treacherous to try to infer monopoly power from a high rate of return.").

7         Plaintiffs' allegations of supracompetitive pricing, based entirely on dubious allegations

8    regarding margins, remain implausible. *See Eastman v. Quest Diagnostics Inc.*, 108 F. Supp. 3d

9    827, 835 (N.D. Cal. 2015) (dismissing monopolization claim in part for failure to allege "how

10   [defendant's prices] compare to competitive prices"); *Intellectual Ventures I LLC v. Cap. One Fin.*

11   *Corp.*, No. 13-CV-00740, 2013 WL 6682981, at *6 (E.D. Va. Dec. 18, 2013) (dismissing

12   monopolization claim where "[plaintiff] does not allege specifically that [defendant] charges or

13   demands . . . fees higher than other [competitors]"); *see also Ohio v. Am. Express Co.*, 585 U.S.

14   529, 548 (2018) (no unreasonable restraint where, *inter alia*, "the evidence about whether Amex

15   charges more than its competitors was ultimately inconclusive").

16        **No Restricted Output.** Plaintiffs do not meaningfully address any of the deficiencies in

17   their FAC regarding output. Plaintiffs now allege that, absent Apple's product feature, "[o]ther

18   cloud providers would be highly incentivized to provide Full-Service Cloud Storage and

19   participate in the lucrative . . . market . . . with historic returns." SAC ¶ 125. But these remain the

20   kind of circular and conclusory allegations regarding restricted output that the Court previously

21   found problematic, as the SAC continues to "[a]ssume the answer to [Plaintiffs' own] question by

22   alleging, without any basis, that Apple's cloud storage competitors would produce more cloud

23   storage in the absence of Apple's file restrictions." Order at 15. And when Plaintiffs expand their

24   market definition to all cloud service providers, their circularity persists, as they allege that

25   "Apple's restraint would likewise suppress output in this larger market . . . because Apple has

26   prevented would-be competitors from offering the core full-service functionality Apple admits its

27   customers value." SAC ¶ 127. This is the same argument with different dressing. At bottom, the

28   SAC's allegations regarding restricted output amount to nothing more than the conclusion "that

1  Apple's cloud storage competitors would produce more cloud storage in the absence of Apple's

2  file restrictions."  Order at 15.  That "does not permit an inference that market-wide output has

3  been restricted."  *Id.*

4      Plaintiffs confoundingly blame Apple for the fact that 29% of U.S. consumers choose not

5  to use any cloud storage service at all, alleging that this is due to Apple's restrictions.  SAC ¶ 128.

6  Instead of alleging restricted output, Plaintiffs offer illogical and contradictory assertions that

7  Apple's competitors somehow cannot reach consumers—whom Plaintiffs simultaneously allege

8  are unaware of the backup restriction when those customers first adopt a cloud service given

9  Apple's design choices over iCloud, its own product.  *Id.* ¶ 95 ("Consumers have no reason to

10  know, and generally do not know, that these otherwise ubiquitous and highly functioning cloud

11  storage solutions are incapable of hosting certain files. . . . Consumers generally learn of this

12  limitation only *after* they have purchased their mobile device and attempt to use alternative cloud

13  storage platforms to back up Restricted Files, or the entirety of their files.").  Nevertheless, it

14  remains unclear how Apple would or could restrict output, given the many cloud service products

15  that are widely available on iOS.  *See* Order at 15.  Unable to allege facts that Apple has restricted

16  output, Plaintiffs instead aver that "Apple does not need to directly restrict output to earn monopoly

17  profits—it can simply increase prices."  *Id.* ¶ 129.  But, as explained above, Plaintiffs allege zero

18  facts that Apple actually raised prices in the U.S. and, in fact, reference a study showing that Apple

19  actually decreased iCloud subscription pricing.  Hitt Report ¶ 73 (cited at SAC ¶ 47 n.23).

20      Even so, as the Court recognized in its prior order, "[b]oth elements [*i.e.*, supracompetitive

21  pricing *and* restricted output] are required."  Order at 14.  Plaintiffs advance no plausible theory

22  of how Apple's restriction on iCloud Backup could prevent its competitors from reaching these

23  customers and growing their market share.  Instead, Plaintiffs argue that there is "no evidence that

24  other cloud providers can offset a decrease in Apple's iCloud output by increasing their own

25  output."  SAC ¶ 133.  Plaintiffs' allegations of restricted output are conclusory, contradictory, and

26  illogical, rendering the theory they advance implausible.  *BanxCorp v. Bankrate, Inc.*, 847 F.

27  App'x 116, 120 (3d Cir. 2021) ("Even assuming the prices were supracompetitive," absent

28  "restrict[ed] output during the challenged period," the plaintiff failed to prove "monopoly power

1    through direct evidence.").

2              b.    *Plaintiffs Fail to Plead Monopoly Power Indirectly*

3        **Failure to plead monopoly share.**  Plaintiffs again use convoluted math to assert that

4    "33% of the U.S. population used iCloud" in 2020, "71% of people in the U.S. used some cloud

5    storage," and therefore iCloud has a "46.5% share (33% ÷ 71% = 46.5%)."  SAC ¶ 110.  While

6    Plaintiffs claim this underestimates iCloud's share (*id.*), it actually overestimates iCloud's market

7    share because it does not account for the users who may use both iCloud and another cloud service.

8    This is true even with Plaintiffs' continued strained math limiting the market to Apple products.

9    Further, the consumer survey data similarly "does not represent a market share," "because each

10   consumer may purchase a different amount of cloud storage, and even the consumers that use

11   iCloud may use other cloud storage services as well."  Order at 17.

12       **Failure to plead barriers to entry and expansion.**  The thrust of Plaintiffs' argument

13   remains that Apple's restrictions prevent competitors from offering a "Full-Service Cloud Storage"

14   product, which in turn prevents them from expanding in the market.  SAC ¶¶ 101–06.  In other

15   words, they claim that the inability to offer a comprehensive product is both the cause and the

16   effect of their alleged barriers to expansion.  *See De Soto Cab Co., Inc. v. Uber Techs., Inc.*, No.

17   16-CV-06385, 2021 WL 5860917, at *2 (N.D. Cal. Nov. 18, 2021) (dismissing complaint where

18   "allegations concerning market barriers" were "deficient").  Plaintiffs' barriers to entry and

19   expansion allegations, therefore, remain "circular and conclusory."  Order at 15.

20       Plaintiffs' circular reasoning is not enough, and they fail to allege that "the major

21   technology companies and numerous cloud-storage specialists that have entered the market are all

22   operating at full capacity, such that they could not increase production to constrain Apple's

23   exercise of monopoly power."  *Id.* at 18; *see also Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,

24   No. 5:16-cv-06370, 2017 WL 4310767, at *25 (N.D. Cal. Sep. 28, 2017) (dismissing complaint

25   where plaintiffs had not alleged "why [competitors] cannot increase their own output in response

26   to a contraction by [d]efendants").

27       And Plaintiffs' allegations regarding barriers to expansion are implausible.  Apple enables

28   cloud service providers to reach Apple's users through its App Store, entitling them to win

1  consumers based on the merits of their products.  That Apple has designed a product that is

2  attractive to consumers is not a sufficient barrier to expansion of its customers to warrant treating

3  iCloud as a single-brand aftermarket.  *See Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130,

4  1142 (9th Cir. 2022).

5           4.    Plaintiffs Fundamentally Challenge Product Design Decisions Relating to
                  iCloud, Which Is Not Actionable Anticompetitive Conduct Under Section 2
6

7           The SAC continues to make clear that "[w]hat Plaintiffs are really challenging is Apple's

8  product design decision to shield restricted files from third-party cloud storage providers" to

9  safeguard user security and privacy.  *See* Order at 9, 20.  But "[a]ntitrust scholars have long

10  recognized the undesirability of having courts oversee product design, and any dampening of

11  technological innovation would be at cross-purposes with antitrust law."  *Allied Orthopedic*

12  *Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 1000 (9th Cir. 2010) (citing *United*

13  *States v. Microsoft Corp.*, 147 F.3d 935, 948 (D.C. Cir. 1998)).  Indeed, "courts are 'very skeptical'

14  of claims that a firm's product design is anticompetitive," Order at 20 (quoting *New York ex rel.*

15  *Schneiderman v. Actavis PLC*, 787 F.3d 638, 652 (2d Cir. 2015), because it is well established that

16  "any firm, even a monopolist, may bring its products to market whenever and however it chooses."

17  *Berkey Photo v. Eastman Kodak Co.*, 603 F.2d 263, 286 (2d Cir. 1979).   And "the introduction of

18  technologically related products, even if incompatible with the products offered by competitors, is

19  alone neither a predatory nor anticompetitive act."  *Foremost Pro Color, Inc. v. Eastman Kodak*

20  *Co.*, 703 F.2d 534, 544 (9th Cir. 1983).  Plaintiffs' attempt to challenge Apple's product design

21  therefore lacks merit under established antitrust principles.

22          At bottom, Plaintiffs are asking the Court to allow other cloud storage providers access to

23  core app data and device files in order to provide the same backup feature as iCloud Backup—in

24  other words, to compel Apple to share its core app data and device files.  Such demands are

25  typically evaluated under refusal-to-deal principles, which control a firm's right to refuse to deal

26  with competitors.  *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398,

27  408 (2004) (finding that "the Sherman Act does not restrict the long-recognized right of a trader

28  or manufacturer engaged in an entirely private business, freely to exercise his own independent

discretion as to parties with whom he will deal"). "Liability for denying another access to one's goods, services, or facilities should be exceptional," and "[t]here is no general duty to share one's resources." Areeda ¶ 773. Plaintiffs do not (and cannot) plausibly allege that such core data is "essential." *Id.* Indeed, "a resource is not 'essential' if the [competitor] can compete effectively without it. The plaintiff must show that the desired resource is not just helpful but vital to its competitive viability." *Id.* ¶ 773b1. This is directly undermined by Plaintiffs' own admission that Apple device users who choose to use cloud storage can select from many different options. *See id.* ("evidence that the plaintiff is already profitably in the market in which the essential facility is claimed suggests that the claimed facility is not essential").

Further, "the sole exception to the broad right of a firm to refuse to deal with its competitors" is where a plaintiff alleges that defendants terminated a prior course of dealing. *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007); *see also FTC v. Qualcomm*, 969 F.3d 974, 993–94 (9th Cir. 2020) (no right of refusal to deal when a defendant: (1) unilaterally terminates a *prior*, profitable course of dealing; (2) the only rationale of which is to sacrifice short-term benefits for higher long-run profits after excluding competition; and (3) the refusal-to-deal involves products the defendant already sells). Critical to the analysis here is the fact that the product-design decision discussed above was made at the inception of iCloud in 2011 and has remained unchanged since,[6] which means that there is no prior course of dealing to speak of, and therefore no duty to deal. *See Trinko*, 540 U.S. at 409; *Imperial Irrigation Dist. v. California Indep. Sys. Operator Corp.*, 146 F. Supp. 3d 1217, 1234–35 (S.D. Cal. 2015) (no essential facility violation when there had not been a prior course of voluntary cooperation). The Court should reject Plaintiffs' attempt to misuse the antitrust laws to change Apple's design for backing up and

---

[6] Plaintiffs' claims continue to be time-barred under the four-year statute of limitations. The Court previously noted that Plaintiffs must demonstrate a continuing violation to make their claims timely, and that merely purchasing iCloud subscriptions within the last four years is not enough. Order at 5 n.1. Plaintiffs have not alleged any new and independent "overt act" by Apple within the limitations period that would inflict new and accumulating injury. *See Samsung Elecs. Co., Ltd. v. Panasonic Corp.*, 747 F.3d 1199, 1202 (9th Cir. 2014). The sole conduct underlying Plaintiffs' claims remains Apple's product design decision to limit cloud backup of core app data and device settings—a decision made and implemented in 2011. But "[m]erely carrying out during the limitations period a final, binding decision made prior to the limitations period does not qualify as a new overt act" to trigger the continuing violation doctrine. *Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044, 1071–72 (N.D. Cal. 2016).

1    restoring its devices.

2              5.   Plaintiffs' Attempted Monopolization Claim Fails Given Their Failure to Plead
3                   the Requisite Specific Intent

4         Plaintiffs' insufficient allegations of monopoly power doom their attempted

5    monopolization claim.  That claim also fails independently because Plaintiffs do not allege that

6    Apple ever had a specific intent to monopolize either the implausible "Full-Service Cloud Storage"

7    aftermarket or the alternative (and inconsistent) "cloud storage platforms" market on Apple's

8    mobile devices.  Attempted monopolization requires the "specific intent to prevail in the market

9    by some untoward means." *Gen. Commc'ns Eng., Inc. v. Motorola Commc'ns and Elec., Inc.*, 421

10   F. Supp. 274, 286 (N.D. Cal. 1976); *see also* Order at 18.  It cannot be inferred from legitimate

11   business practices, *see Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 627 (1952), and

12   there must be more than conclusory allegations that a defendant had the specific intent to "exclude

13   competition or control prices."  *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, No. 09-0560,

14   2011 WL 2678879, at *12 (E.D. Cal. July 7, 2011).  Like all its prior complaints, the SAC still

15   fails to plead that Apple ever had the specific intent to exclude competition or control prices.  *See*

16   Order at 18.

17        **B.   Plaintiffs' Tying Claim Fails**

18        The Court concluded that Plaintiffs' tying claim "failed at the outset because Plaintiffs do

19   not allege concerted conduct, which is a requirement for a Section 1 claim."  Order at 7.  To try to

20   sidestep this, Plaintiffs now rebrand their tying claim under Section 2.   But Plaintiffs

21   misunderstand both tying law and the Court's Order.

22        Plaintiffs persist in alleging a "negative" tie that "prevents device holders from using any

23   service other than iCloud [from] hosting Restricted files."  SAC ¶ 12; *see also id.* ¶ 155.  Whether

24   challenged under Section 2 or 1, by its very nature, a "negative" tie still requires a customer's

25   promise "not to take the tied product from the defendant's competitor."  *Aerotec Int'l, Inc. v.*

26   *Honeywell Int'l, Inc.*, 836 F.3d 1171, 1178 (9th Cir. 2016).  Such ties are "rarely encounter[ed]"

27   by courts.  *Id.*  More importantly, both positive and negative ties require that "a seller explicitly

28   or implicitly imposes conditions linking the sale of a tying product with the sale of the tied

product." *Id*. Regardless of how their tying claim is styled, Plaintiffs still have not and cannot allege that Apple imposes such a condition, or requires a "promise[] not to take the tied product from the defendant's competitor." *Id*.

Plaintiffs' amended allegations again concede that "consumers can buy smartphones and tablets without purchasing or using any cloud storage," and that "consumers can purchase a cloud storage plan (including iCloud) without also purchasing a smartphone or tablet." SAC ¶ 157. Plaintiffs also acknowledge that "Apple device holders are given 5GB of free iCloud storage space." *Id.* ¶ 37. While Plaintiffs no longer allege that "approximately 30-48% of Apple users do not purchase an iCloud subscription" (FAC ¶ 67), they cannot escape this admission.[7] Elsewhere, they admit "[s]urveys indicate . . . that approximately 29% of U.S. consumers do not use a cloud storage service at all." SAC ¶ 128. And they continue to allege that "many well-known technology firms offer[] cloud storage products that are available on Apple's mobile devices." *Id.* ¶ 95. All told, nothing in Plaintiffs' SAC alters the conclusion that Plaintiffs' own "allegations foreclose a negative tying claim." Order at 8. Despite amendment, the Court's finding that "Apple device buyers are free to: (1) purchase iCloud, (2) purchase cloud storage from Apple's rivals, or (3) choose not to purchase cloud storage at all," still holds true. *Id*. Plaintiffs' tying claim should be dismissed, regardless of which section of the Sherman Act Plaintiffs attempt to force it into.

## C.    Plaintiffs' UCL Claims Fail

### 1.    Plaintiffs Fail to Plead a UCL Claim Under the Unlawful Prong

Because Plaintiffs fail to allege any claims under the Sherman Act, they cannot sustain a claim under the UCL's unlawful prong. *See* Order at 19 (citing *In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig*., 28 F.4th 42, 54 n.7 (9th Cir. 2022)).

### 2.    Plaintiffs Still Fail to Allege an "Unfair" UCL Claim

As the Court noted, "as a practical matter, Sherman Act and UCL unfair prong claims may fail for the same reasons." Order at 22. That was the case with the FAC, and it remains the case

---

[7] "[W]hen evaluating an amended complaint, '[t]he court may also consider the prior allegations as part of its "context-specific" inquiry based on its judicial experience and common sense to assess whether' an amended complaint 'plausibly suggests an entitlement to relief.'" *McKenna v. WhisperText*, No. 5:14-CV-00424, 2015 WL 5264750, at *3 (N.D. Cal. Sept. 9, 2015) (citation omitted).

1    here.  *See Hicks*, 897 F.3d at 1124 ("[T]he determination that [] conduct is not an unreasonable

2    restraint of trade necessarily implies that [it] is not 'unfair' towards consumers").

3         Plaintiffs still fail to allege any impact on consumers because, as the SAC continues to

4    admit, Apple mobile device users are not required to purchase iCloud and are free to purchase any

5    other cloud storage service from Apple's many competitors.  Order at 22; SAC ¶ 128, 157.

6    Plaintiffs also fail to allege any impact on consumers by virtue of higher prices.  Plaintiffs

7    themselves acknowledge "[i]t is not possible in this case to compare Apple's iCloud prices to other

8    cloud platform pricing on an apples-to-apples basis." SAC ¶ 123 n.67.  This precludes any

9    plausible allegation of the impact on consumers necessary to plead an unfair practice under the

10   UCL.

11        Finally, Plaintiffs continue to "fail to plausibly allege that the impact on consumers, if any,

12   outweighs the security justifications for Apple's file restriction."  Order at 22.  While Plaintiffs

13   now include allegations tied to hacking and cybersecurity, attempting to compare iCloud's

14   cyberthreat security to that of Samsung's and Google's cloud backup features, *see* SAC ¶¶ 139–

15   54, those allegations entirely miss the point.  The security justifications undergirding Apple's

16   design decision have to do with consumer privacy and information security with respect to the

17   businesses consumers interact with by downloading apps through Apple's App Store.  Apple

18   restricts read and write permissions for core app data and device settings, restricting the ability to

19   backup these files to iCloud only, but more importantly preventing third-party apps from "seeing"

20   the data associated with other third-party apps.  This serves to protect consumers from third parties

21   who may use information regarding their app usage (*e.g.*, a consumer's use of a competitor's app)

22   to nefarious ends.

23   **VI.    CONCLUSION**

24        For the foregoing reasons, Plaintiffs have failed to plead a plausible antitrust violation with

25   their third bite at the apple.  Plaintiffs' SAC should be dismissed with prejudice.

26

27

28

1   Dated:  April 11, 2025                    LATHAM & WATKINS LLP

2

3                                            By:   */s/  Aaron T. Chiu*
                                                   Aaron T. Chiu

4
                                             Belinda S Lee (SBN 199635)
5                                             *belinda.lee@lw.com*
                                             Sarah M. Ray (SBN 229670)
6                                             *sarah.ray@lw.com*
                                             Aaron T. Chiu (SBN 287788)
7                                             *aaron.chiu@lw.com*
                                             Alicia R. Jovais (SBN 296172)
8                                             *alicia.jovais@lw.com*
                                             505 Montgomery Street, Suite 2000
9                                             San Francisco, California 94111-6538
                                             Telephone: +1.415.391.0600
10                                            Fax: +1.415.395.8095

11                                            *Attorneys for Defendant Apple Inc.*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28