1  Ben M. Harrington (SBN 313877)
   Benjamin J. Siegel (SBN 256260)
2  HAGENS BERMAN SOBOL SHAPIRO LLP
3  715 Hearst Avenue, Suite 300
   Berkeley, CA 94710
4  Telephone: (510) 725-3000
   Facsimile: (510) 725-3001
5  benh@hbsslaw.com
   bens@hbsslaw.com
6
7  *Attorneys for Plaintiff and the Proposed Class*
   *[Additional counsel on signature page]*
8
9              UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF CALIFORNIA
10                  SAN JOSE DIVISION
11 JULIANNA FELIX GAMBOA and THOMAS        Case No. 5:24-cv-01270-EKL
12 DOROBIALA, individually and behalf of all
   others similarly situated,                **PLAINTIFFS' OPPOSITION TO**
13                                           **DEFENDANT APPLE INC.'S**
                    Plaintiff,               **MOTION TO DISMISS SECOND**
14                                           **AMENDED CLASS ACTION**
           v.                                **COMPLAINT**
15
   APPLE INC.,                               Date:    June 18, 2025
16                                           Time:    10:00 a.m. PDT
                    Defendant.               Dept:    Courtroom 7, 4th Floor
17                                           Judge:   Honorable Eumi K. Lee
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**

Page

I.     PRELIMINARY STATEMENT ............................................................................1

II.    FACTUAL ALLEGATIONS................................................................................3

       A.     Apple Dominates Cloud Storage on its Devices By Restraining Competition. ..........3

       B.     The Second Amended Complaint Contains Additional Detailed Factual
              Allegations That Address the Court's Motion to Dismiss Order. .............................4

III.   LEGAL STANDARD .......................................................................................6

IV.    ARGUMENT .................................................................................................6

       A.     Plaintiffs Have Plausibly Alleged Monopolization Claims..........................................6

              1.     Plaintiffs Have Alleged a Relevant Antitrust Market for Full-
                     Service Cloud Storage on Apple Mobile Devices. ..........................................6

                     a.     Apple's Own Studies and Admissions Forcefully Support
                            Plaintiffs' Market Definition. ...............................................7

                     b.     While Not Required at the Pleading Stage, Plaintiffs Have
                            Alleged a SSNIP Supporting Their Market Definition........................9

                     c.     Apple Distorts the Elements of Single-Brand Aftermarkets,
                            Which Plaintiffs More than Adequately Allege..............................10

              2.     In the Alternative, Plaintiffs Have Alleged a Relevant Antitrust
                     Market for All Cloud Storage on Apple's Mobile Devices .........................13

              3.     Plaintiffs Have Alleged Apple's Monopoly Power......................................14

                     a.     Apple Has Monopoly Power in the Market for Full-Service
                            Cloud Storage on Apple Mobile Devices. ..........................................14

                     b.     Apple Has Monopoly Power Even if the Market Were
                            Improperly Expanded to Include all Cloud Services on
                            Apple's Mobile Devices. ..............................................15

              4.     Plaintiffs Continue to Allege a Specific Intent to Monopolize.....................19

              5.     Apple's "Product Design" and "Refusal to Deal" Defenses are
                     Without Merit. ..............................................................20

       B.     Plaintiffs Have Alleged Actionable Tying. ..............................................22

       C.     Plaintiffs Allege a UCL Claim. ..............................................................23

       D.     Apple's Statute of Limitations Defense Remains Meritless...............................24

V.     CONCLUSION..............................................................................................25

1

2

**TABLE OF AUTHORITIES**

3

<u>Page(s)</u>

4

CASES

5

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
   836 F.3d 1171 (9th Cir. 2016) ............................................................22, 23

6

7

*Affinity v. Apple*,
   4:22-cv-4174 (N.D. Cal.)............................................................................11, 21

8

*In re Aggrenox Antitrust Litig.*,
   199 F. Supp. 3d 662 (D. Conn. 2016) ...........................................................17

9

10

*AliveCor, Inc. v. Apple Inc.*,
   592 F. Supp. 3d 904 (N.D. Cal. 2022)...........................................................11

11

*Allied Orthopedic v. Tyco Health Care Grp. LP*,
   592 F.3d 991 (9th Cir. 2010).......................................................................20

12

13

*In re Am. Express Anti-Steering Rules Antitrust Litig.*,
   361 F. Supp. 3d 324 (E.D.N.Y. 2019) ...........................................................11

14

15

*In re Animation Workers Antitrust Litig.*,
   87 F. Supp. 3d 1195 (N.D. Cal. 2015)...........................................................24

16

*In re Apple & AT & TM Antitrust Litig.*,
   596 F. Supp. 2d 1288 (N.D. Cal. 2008)...........................................................11

17

18

*Apple, Inc. v. Psystar Corp.*,
   586 F. Supp. 2d 1190 (N.D. Cal. 2008)...........................................................11

19

20

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................................6

21

*Backus v. Gen. Mills, Inc.*,
   122 F. Supp. 3d 909 (N.D. Cal. 2015)...........................................................24

22

23

*Brightpoint Distribution, LLC v. Aliphcom*,
   2016 WL 10842589 (N.D. Cal. Nov. 8, 2016) .................................................6

24

*Cascade Health Sols. v. PeaceHealth*,
   515 F.3d 883 (9th Cir. 2008).......................................................................22

25

26

*Catch Curve, Inc. v. Venali, Inc.*,
   519 F. Supp. 2d 1028 (C.D. Cal. 2007) .......................................................19

27

28

*Ceiling & Interior Sys. Supply, Inc. v. USG Interiors, Inc.*,
   878 F. Supp. 1389 (W.D. Wash. 1993) ...................................................21

*Chase Mfg., Inc. v. Johns Manville Corp.*,
   84 F.4th 1157 (10th Cir. 2023) .............................................................21

*Colucci v. ZonePerfect Nutrition Co.*,
   2012 WL 6737800 (N.D. Cal. Dec. 28, 2012) .........................................6

*Daniels-Hall v. Nat'l Educ. Ass'n*,
   629 F.3d 992 (9th Cir. 2010) ...................................................................6

*DAT Sols., LLC v. Convoy, Inc.*,
   2023 WL 3058057 (D. Or. Apr. 24, 2023) ............................................16

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
   504 U.S. 451 (1992) ...............................................................11, 20, 22

*Eastman v. Quest Diagnostics Inc.*,
   108 F. Supp. 3d 827 (N.D. Cal. 2015) ..................................................18

*Epic Games, Inc. v. Apple Inc.*,
   559 F. Supp. 3d 898 (N.D. Cal. 2021) ..............................................8, 21

*Epic Games, Inc. v. Apple, Inc.*,
   67 F.4th 946 (9th Cir. 2023) ........................................................*passim*

*In re Flash Memory Antitrust Litig.*,
   643 F. Supp. 2d 1133 (N.D. Cal. 2009) ..........................................18, 19

*Foremost Pro Color, Inc. v. Eastman Kodak Co.*,
   703 F.2d 534 (9th Cir. 1983) ................................................................22

*Friedman v. AARP, Inc.*,
   855 F.3d 1047 (9th Cir. 2017) ..............................................................24

*Giuliano v. SanDisk Corp.*,
   2014 WL 4685012 (N.D. Cal. Sept. 19, 2014) .....................................14

*Glob. Disc. Travel Servs., LLC v. Trans World Airlines, Inc.*,
   960 F. Supp. 701 (S.D.N.Y. 1997) .......................................................11

*Hanover Shoe, Inc. v. United States Mach. Corp.*,
   392 U.S. 481 (1968) .............................................................................24

*IFIXITUSA LLC v. iFixit Corp.*,
   2022 WL 2117845 (D. Ariz. June 13, 2022) .....................................9, 10

*Intell. Ventures I LLC v. Cap. One Fin. Corp.*,
   2013 WL 6682981 (E.D. Va. Dec. 18, 2013) .......................................17

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*,
    466 U.S. 2 (1984) ...............................................................................................22

*In re Juul Labs, Inc., Antitrust Litig.*,
    555 F. Supp. 3d 932 (N.D. Cal. 2021)................................................................18

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018)..........................................................................6, 17

*Klein v. Facebook, Inc.*,
    580 F. Supp. 3d 743 (N.D. Cal. 2022)................................................................14

*Lambrix v. Tesla, Inc.*,
    737 F. Supp. 3d 822 (N.D. Cal. 2024)................................................................16

*Le v. Zuffa, LLC*,
    2023 WL 5085064 (D. Nev. Aug. 9, 2023).......................................................16

*Lorain J. Co. v. United States*,
    342 U.S. 143 (1951) ...........................................................................................21

*Mayor of Baltimore v. Actelion Pharms. Ltd.*,
    995 F.3d 123 (4th Cir. 2021)..............................................................................24

*Montana Consumer Couns. v. FERC*,
    659 F.3d 910 (9th Cir. 2011)..............................................................................17

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*,
    2014 WL 1949804 (N.D. Cal. May 12, 2014)....................................................14

*Newcal Indus., Inc. v. Ikon Off. Sol.*,
    513 F.3d 1038 (9th Cir. 2008) ..................................................................7, 11, 14

*Novell, Inc. v. Microsoft Corp.*,
    731 F.3d 1064 (10th Cir. 2013)..........................................................................20

*Oahu Gas Serv., Inc. v. Pac. Res., Inc.*,
    838 F.2d 360 (9th Cir. 1988)................................................................................6

*Ohio v. American Express Co.*,
    585 U.S. 529 (2018) ...........................................................................................18

*Pace Indus., Inc. v. Three Phoenix Co.*,
    813 F.2d 234 (9th Cir. 1987)..............................................................................25

*Petra Presbyterian Church v. Vill. of Northbrook*,
    489 F.3d 846 (7th Cir. 2007)..............................................................................24

*Rebel Oil Co. v. Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995).........................................................................14, 16

*Reilly v. Apple Inc.*,
    578 F. Supp. 3d 1098 (N.D. Cal. 2022) ...................................................................11

*SaurikIT, LLC v. Apple Inc.*,
    2022 WL 1768845 (N.D. Cal. May 26, 2022) ........................................................25

*Smith v. eBay Corp.*,
    2012 WL 27718 (N.D. Cal. Jan. 5, 2012) ...............................................................22

*Spectrum Sports, Inc. v. McQuillan*,
    506 U.S. 447 (1993) ...............................................................................................19

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*,
    676 F.2d 1291 (9th Cir. 1982) ..................................................................................7

*United States v. E. I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956) ........................................................................................6, 8, 11

*United States v. Google LLC*,
    2025 WL 1132012 (E.D. Va. Apr. 17, 2025) ..............................................20, 21, 22

*United States v. Google LLC*,
    747 F. Supp. 3d 1 (D.D.C. 2024) ...........................................................................19

*United States v. Visa U.S.A., Inc.*,
    163 F. Supp. 2d 322 (S.D.N.Y.) ...............................................................................8

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) ...............................................................................................20

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
    401 U.S. 321 (1971) ...............................................................................................24

**I.    PRELIMINARY STATEMENT**

Apple is most known as the manufacturer of hardware, with the iPhone and iPad being its flagship mobile devices. Increasingly, however, Apple has relied on a suite of aftermarket apps (iCloud, Music, Apple Pay, to name a few) to drive profits. ¶ 30.[1] With control over the mobile ecosystem in which its proprietary apps are offered, Apple has the unique ability to impede competition to self-privilege its own products. ¶ 31. Apple abused this control to secure a monopoly for iCloud. That is what this case is about.

Apple's challenged restraints are surgical. As Apple knows, its customers want a cloud storage service capable of *comprehensively* backing up all files on a device so that, among other things, the device can be restored from the "cloud" as necessary. ¶¶ 40-48. There can no longer be any legitimate dispute about this. As the SAC shows, Apple's own marketing expert surveyed Apple's customers and confirmed (in other litigation) that the "most important" cloud features are the ability to "create a backup of all data" and use it to restore the device. *See* ¶ 44. On Apple's devices, this critical functionality is unique to iCloud and not available on any other cloud service. But this is not by chance. It is because Apple (unlike Samsung and other device manufacturers) arbitrarily precludes other cloud services from accessing all user files, including app data and settings ("Restricted Files"), necessary to provide a comprehensive backup. ¶¶ 49, 52, 139. This gives iCloud an unbeatable advantage over all would-be cloud rivals, who by virtue of Apple's restraints, cannot offer consumers the comprehensive backup functionality they demand. ¶ 50. The numbers bear this out, with iCloud maintaining a remarkably dominant market share of cloud storage on its iOS devices—96% of revenues—and enduring monopoly power to charge supracompetitive prices. ¶¶ 112, 122.

Relying on its marketing expert's analysis, Apple previously admitted that other cloud services are "not comparable" to iCloud because they cannot offer a comprehensive backup of all files. ¶ 48. Apple cannot now credibly assert (much less on the pleadings) that these services are essentially interchangeable with iCloud. Yet that is precisely the argument that pervades Apple's motion to dismiss. In addition to contradicting its prior judicial admissions and expert findings, Apple's motion

---

[1] All ¶ citations are to the Second Amended Class Action Complaint ("SAC") (ECF No. 64).

is premised on asserted factual claims (e.g., regarding "security" and "product design") that contradict the SAC and cannot be accepted at this stage, when all inferences must be drawn in Plaintiffs' (not Apple's) favor. For these overarching reasons, and others below, all of Apple's arguments fail.

*First*, market definition is factual, and the SAC more than adequately defines a relevant antitrust market for Full-Service Cloud Storage on Apple Mobile Devices, particularly given the overriding importance consumers place on full-service functionality. In the alternative, there is a relevant market for all cloud storage on Apple's mobile devices. Apple's efforts to lump local storage into this market defy its own expert's findings, common sense, and the data. *See infra* § IV.A(1)-(2).

*Second,* the monopoly power element of Plaintiffs' claims is likewise factual and sufficiently alleged. Depending on how the market is defined, Apple's market share varies between 96% and 100% of revenues, which is far above any monopoly threshold. And by fundamentally degrading the functionality of all would-be competitors, Apple has erected demonstrably effective barriers to entry and expansion. The SAC also pleads Apple's monopoly power directly with proof of supracompetitive prices and suppressed output. On all of these issues, Apple's motion generally parrots the Court's prior Order without confronting the SAC's supplemental analyses, data, and facts that fully address the pleading gaps the Court identified. *See infra* § IV.A(3).

*Third*, as for attempted monopolization, the SAC cannot be read to allege anything but a specific intent to monopolize. Apple's argument to the contrary is a nonstarter. *See infra* § IV.A(4).

*Fourth,* Apple's "product design" and "refusal to deal" defenses, asserted as an afterthought, are legally flawed and not applicable on the facts of this case. No antitrust doctrine extends Apple the blanket immunity it seeks. As with other restraints, its restrictions on cloud storage must be evaluated under the rule of reason. *See infra* § IV.A(5).

*Fifth*, Plaintiffs' tying claim should also be upheld. As repleaded under Section 2, the absence of concerted action does not defeat this claim. Moreover, while Apple contends tying requires an express tying condition, this is not an indispensable requirement. *See infra* § IV.B.

*Sixth,* Plaintiffs have alleged a UCL claim. The applicable balancing test under the UCL's "unfair" prong requires weighing disputed facts, which cannot be done here on a Rule 12(b)(6) motion. Plaintiffs' well-pleaded allegations control, and they demonstrate that Apple's asserted security

1    "justification" for the challenged restraint is pretextual, not pro-competitive, and substantially

2    outweighed by the demonstrable harms to consumers. *See infra* § IV.C.

3        *Last,* Apple's statute of limitations defense defies controlling law (*Hannover Shoe*) and first

4    principles of claim accrual. It should be rejected. *See infra* § IV.D.

5        For all these reasons, and those that follow, Apple's motion to dismiss should be denied.

6                    **II.     FACTUAL ALLEGATIONS**

7    **A.     Apple Dominates Cloud Storage on its Devices By Restraining Competition.**

8        Cloud storage is big business. Given the limited native storage on mobile devices, users rely

9    increasingly on cloud storage to retain files and ensure that their device is comprehensively backed up

10   for restoration. ¶¶ 1, 40. iCloud is one of Apple's most widely used subscription services. ¶ 36.

11       In a functioning market, iCloud would face stiff competition from rival cloud providers

12   incentivized to compete with innovative and price-competitive offerings. ¶ 124. But the market

13   demonstrably is not competitive. Apple has a durable monopoly share exceeding 96% of all cloud

14   services available on Apple's mobile devices (measured by share of revenue). ¶ 112. This is not

15   because Apple built a better product. Analysts describe iCloud as a "fairly sparse offering, with lots of

16   common cloud storage features missing completely" and "serious privacy and security concerns."

17   ¶ 134. Rather, Apple dominates by restricting competition from would-be rivals.

18       Apple does this by maintaining two sets of rules for cloud services—one set for iCloud, and a

19   different set for would-be iCloud competitors. Apple permits iCloud access to all of its users' files so

20   that iCloud can provide a comprehensive backup. If the device is lost or replaced, it can be restored

21   from iCloud. While multiple cloud providers offer this comprehensive backup functionality on

22   Samsung's mobile devices, ¶¶ 139, 146, not so in Apple's ecosystem. Instead, Apple has a different

23   set of rules for third-party cloud services (including Google, Dropbox, and Microsoft) preventing them

24   from accessing all user files (including "Restricted Files"). ¶ 49. An iOS user with one of these services

25   cannot use it to back up the entirety of their device. They need iCloud for that.

26       This is a fundamental difference in functionality, as Apple's own analyses show. Apple's own

27   marketing expert in other iCloud-related litigation, Dr. Carol A. Scott, conducted a consumer survey

28   to compare iCloud to "other cloud storage providers in the marketplace." ¶ 42. She found that *"[t]he*

1    *ability to automatically backup all content and device and app settings was the feature most frequently*

2    *ranked as one of the four most important iCloud Service features*." ¶ 43 (emphasis added). Dr. Scott

3    found that this core functionality, which Apple prevents other cloud services from offering, makes

4    iCloud "unique" as a "one-stop shop" option for cloud storage. *Id.* Dr. Scott concluded that her survey

5    results even "call into question whether iCloud Purchasers consider [] other storage providers to be

6    true competitors in the sense of being substitutes for the iCloud Service." ¶ 45.

7    Although Apple is now singing a different tune, it relied on Dr. Scott's findings in other

8    litigation to distinguish iCloud from all other cloud services. Apple specifically acknowledged that

9    iCloud's ability to provide a "comprehensive back up" of all files, the feature Apple denies to other

10   cloud providers, is a feature that "consumers value most." ¶ 48. While Apple now tries to lump all

11   cloud providers in the same antitrust market as iCloud, Apple admitted previously that other cloud

12   services accessible on Apple's devices, including Google Drive, DropBox, and Microsoft OneDrive,

13   were "*not comparable*" to iCloud due to this difference in functionality. *Id.* (emphasis added).

14   Unable to offer an even "comparable" product, other cloud services have been unable to seize

15   any market share from iCloud. ¶¶ 102-06, 112-14. Using supplemental data, the SAC shows that

16   iCloud commands a staggering 96% share of all cloud storage revenue on Apple's mobile devices.

17   ¶ 112. This overwhelming market share demonstrates that the market is not competitive, however

18   defined. Facing no serious competitive constraints, Apple has diminished incentives to innovate its

19   iCloud product to better serve the needs of consumers, ¶¶ 134, 152, and Apple can maintain

20   supracompetitive prices. The data confirm this. As reported in the SAC, Apple's iCloud gross margins

21   likely exceed *80%*, meaning the vast majority of iCloud's revenues are pure profit for Apple. ¶ 122.

22   That is the textbook definition of a supracompetitive price. *See infra* § IV.A(3)(b)(3).

23   **B.    The Second Amended Complaint Contains Additional Detailed Factual Allegations
         That Address the Court's Motion to Dismiss Order.**

24   The Second Amended Complaint contains a host of supplemental factual allegations that

25   support Plaintiffs' claims and address the Court's prior Motion to Dismiss Order ("MTD Order").

26   **Market Definition – Importance of Full-Service Storage Functionality**. In rejecting

27   Plaintiffs' proposed market definition for "full-service" cloud storage, the Court found that Plaintiffs'

28

prior complaint lacked "any plausible allegation that Apple device users value this single feature so much that it distinguishes iCloud from all other cloud storage options." MTD Order at 11-12. The SAC incorporates these allegations, with great specificity, including with Apple's own expert analyses and judicial admissions, as addressed above. ¶¶ 40-48.

**Market Definition – SSNIP Test**. The SAC also includes all facts the Court considered necessary to plead a SSNIP test, including as to Apple's sizable (20-29%) UK iCloud price increase, its profitability, and the comparability of the UK market. ¶¶ 79-92. In addition to exhibiting comparable competitive conditions, studies show that demand in the UK is significantly more elastic than the US (*i.e.*, consumers are "far more likely to switch brands in search of a good deal"), such that a SSNIP in the UK is particularly probative as to the US market. ¶ 91.

**Monopoly Power – Market Share**. The Court held that if the market were expanded to all cloud services on Apple's mobile devices, Plaintiffs had not pleaded Apple's monopoly share of that market. *See* MTD Order at 17. Using additional data, Plaintiffs demonstrate that their original share calculation (72.5%) for this expanded market was conservative, as originally reported, and that Apple's share in fact likely exceeds 80% of users and 96% of revenues. ¶ 112. That is a monopoly share.

**Barriers to Expansion**. Unlike the prior complaint, *see* MTD Order at 18, the SAC expressly addresses barriers to expansion, demonstrating that Apple has thwarted expansion by other cloud providers by denying them the full-service functionality Apple's customers highly prioritize in selecting a cloud platform. ¶¶ 102-06.

**Output**. Although output-suppression need not be alleged if there is indirect proof of market power, as there is here, the SAC includes additional output allegations demonstrating that output is diminished by virtue of Apple's restraints. ¶¶ 125-134.

**Tying.** The Court dismissed Plaintiffs' tying claim in part because it did not involve concerted action required by Section 1. *See* MTD Order at 9. The SAC addresses this by repleading under Section 2, which also supports tying claims and does not require concerted action. ¶¶ 155-172, 209-219. Further legal arguments supporting Plaintiffs' tying claim appear below. *See infra* § IV.B.

**UCL Claim.** The SAC more directly addresses the UCL's fact-intensive balancing test for claims asserted under the "unfair" prong. In particular, the SAC pleads with greater specificity how

1    any security justification Apple may offer for its challenged conduct—in addition to being inherently

2    factual and contrary to the SAC—is pretextual, not pro-procompetitive, and substantially outweighed

3    by the harm to consumers. ¶¶ 139-154.

### III.    LEGAL STANDARD

5        On a motion to dismiss, the court must "accept as true all well-pleaded allegations of material

6    fact and construe them in the light most favorable to the non-moving party." *Daniels-Hall v. Nat'l Educ.*

7    *Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). A claim must be "plausible" to survive a 12(b)(6) motion, but

8    this is not a "probability requirement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Even if the court has

9    doubts, so long as a claim has "facial plausibility," it cannot be dismissed. *See id.* The plausibility inquiry

10   is not an invitation for the court to "assume the role of fact-finder" or deny the plaintiff all reasonable

11   inferences. *See Colucci v. ZonePerfect Nutrition Co*., 2012 WL 6737800, at *8 (N.D. Cal. Dec. 28, 2012);

12   *Brightpoint Distribution, LLC v. Aliphcom*, 2016 WL 10842589, at *5 (N.D. Cal. Nov. 8, 2016). Nor

13   may a Court credit a defendant's "own version of the facts at the pleading stage," for this would make it

14   "near impossible for even the most aggrieved plaintiff to demonstrate a sufficiently 'plausible' claim for

15   relief. *Khoja v. Orexigen Therapeutics, Inc*., 899 F.3d 988, 999 (9th Cir. 2018) (internal quotation marks

16   and citations omitted here and throughout this submission).

### IV.    ARGUMENT

**A.    Plaintiffs Have Plausibly Alleged Monopolization Claims**

**1.    Plaintiffs Have Alleged a Relevant Antitrust Market for Full-Service Cloud Storage on Apple Mobile Devices.**

"A determination of the relevant market typically requires an inquiry into the nature of the

product." *Oahu Gas Serv., Inc. v. Pac. Res., Inc*., 838 F.2d 360, 364 (9th Cir. 1988). Among other

functionality considerations, courts evaluate the "product's peculiar characteristics and uses." *Epic*

*Games, Inc. v. Apple, Inc*., 67 F.4th 946, 976 (9th Cir. 2023) (citing *Brown Shoe*). The aim is to draw

relevant markets to include only those products that are "functionally interchangeable." *United States*

*v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 403 (1956).

The relevant market "is typically a factual element rather than a legal element," and thus

"alleged markets may survive scrutiny under 12(b)(6) subject to factual testing by summary judgment

or trial." *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008); *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1299 (9th Cir. 1982) ("[R]elevant market is basically a fact question dependent upon the special characteristics of the industry involved.").

### a.    Apple's Own Studies and Admissions Forcefully Support Plaintiffs' Market Definition.

Having admitted that other cloud services on iOS devices are "***not comparable***" to iCloud, ¶ 48 (emphasis added), Apple cannot now credibly assert that these services are reasonably interchangeable. Remarkably, however, that is the argument Apple is making. The argument defies not only Apple's own admissions, but also the findings of its own marketing expert. Understandably, Apple attempts to downplay those findings now, suggesting they merely confirm consumers "value the iCloud Backup." MTD at 8. But that is not how Apple characterized the findings before, ¶ 48, nor is it remotely accurate. In reality, and as addressed above, Apple's expert concluded that iCloud's unique ability to provide a "backup of all content and device and app settings was ***the*** feature most frequently ranked as one of the four most important iCloud Service features." ¶ 43 (emphasis added).

Unable to offer this critical functionality, other cloud providers are simply not offering the same service as iCloud. Their functionally degraded offerings are not reasonably interchangeable with iCloud because, by virtue of Apple's restraints, they cannot be used to accomplish the tasks consumers demand above all else: "create[ing] a backup of all data and device and app settings on an iPhone or iPad and [using it] to restore or set up a new Apple mobile device." ¶ 44.

In addition to downplaying its expert's analyses, Apple misrepresents their import. For instance, Apple asserts that survey results identifying users with both iCloud and other cloud service accounts means these products are in the same antitrust market. *See* MTD at 9. But that is exactly backwards, as Apple's expert recognized. If consumers are using multiple cloud products, they are not treating them as *substitutes*, but rather as "*complements*." *See* SAC, Ex. A at ¶ 52 (emphasis added"). Complements do not belong in the same antitrust market. *See* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, ¶ 565 (2024 Supp.).  Apple also implies that its other expert, Loren Hitt, opined that customers do not "have a preference" between storage options. MTD at 10. This is not the case. Hitt actually opined that most customers do not have

a preference on whether their *iCloud* backup is stored by Apple, or outsourced buy Apple to others (what he called "in-house storage and partly outsourced storage"). Hitt Report ¶ 88.

Continuing to mischaracterize its experts' analyses, Apple next claims that because 30% of users merely "considered" an alternative to iCloud, this means these products are in the same market. MTD at 9. But Apple's expert correctly identified this as a "low probability of consideration," SAC Ex. A ¶ 57, and drew the opposite conclusion Apple asks the Court to extract. Specifically, she concluded that this "call[s] into question whether iCloud Purchasers consider these other storage providers to be true competitors in the sense of being substitutes for the iCloud Service." *Id.* ¶ 51. Moreover, that some users merely "consider" a different product does not mean the product is interchangeable for market definition purposes, particularly in a market, such as this one, where one provider commands 96% of all revenues.

To the extent Apple is arguing that surveys on consumer preference are immaterial to market definition, Apple is wrong. Surveys are widely used to evaluate the degree of substitution and interchangeability between products. *See, e.g., United States v. Visa U.S.A., Inc*., 163 F. Supp. 2d 322, 336 (S.D.N.Y.), *modified*, 183 F. Supp. 2d 613 (S.D.N.Y. 2001) (finding market for "general purpose" credit cards based on survey data indicating that "[i]n many circumstances, consumers strongly prefer to use credit and charge cards rather than cash or checks"); *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 959 (N.D. Cal. 2021) (addressing Apple's use of surveys on market definition), *aff'd* 67 F.4th at 975 ("consumer-survey responses" often used to define market)

As with all things related to market definition, consumer preference is a question of degree, a nuance Apple disregards. *See, e.g., Du Pont.*, 351 U.S. at 393 (markets defined based on "how different" candidate products are in term of "character or use"). No one disputes that marginal consumer preferences between functionally interchangeable products (Coke vs. Pepsi) are not enough to define a market. But marginal differences are not at issue here. Apple's own survey shows that other cloud services are not functionally interchangeable (or even "comparable," to use Apple's word) with iCloud because they cannot provide the comprehensive backup functionality Apple's customers value above all else. Unlike the product at issue in *Du Pont* (Cellophane), the case Apple primarily relies on, iCloud does *not* "meet competition from other materials in every one of its uses." *Id.* at 399. In terms

of use and character, iCloud is a distinct product, as further corroborated by its 96% market share of all cloud options on iOS devices and further empirical testing, addressed below.

> **b.     While Not Required at the Pleading Stage, Plaintiffs Have Alleged a SSNIP Supporting Their Market Definition.**

A SSNIP test evaluates the extent to which consumers would switch away from a product in response to a "<u>S</u>mall, <u>S</u>ignificant, <u>N</u>on-transitory <u>I</u>ncrease in <u>P</u>rice above a competitive level." *Epic Games*, 67 F.4th at 975. If a hypothetical monopolist could not sustain a SSNIP without consumers switching in significant numbers to alternative products (in amounts rendering the SSNIP unprofitable), the market must be expanded to include those alternatives. *See id.* SSNIP tests are the conventional empirical means of defining a market, but they are not required to plead one, MTD Order at 12, as this is rarely possible pre-discovery. Here, however, Apple's confirmed 2023 price increase in the UK provides the basis of an informative, albeit conservative, SSNIP. ¶¶ 79-92. It is conservative because SSNIP tests typically posit a hypothetical 5-10% price increase, whereas Apple increased prices by 20-29%.

The SAC substantially develops Plaintiffs' SSNIP allegations in response to the Court's MTD Order. *First*, contrary to Apple's contentions, the SAC alleges that Apple's price increase was "not accompanied by or commensurate with any observable increase in the price of plans for other cloud providers in the UK (including Google Drive, Microsoft OneDrive, Dropbox, pCloud or Sync," such that iCloud's price increase was "relative to other cloud services." ¶ 83. Apple claims this to be conclusory, but Plaintiffs have not identified any measurable increase in would-be competitor pricing in the UK, as the SAC states, and Plaintiffs cannot reasonably be required to say more to adequately plead that negative. *See IFIXITUSA LLC v. iFixit Corp.*, 2022 WL 2117845, at *4 (D. Ariz. June 13, 2022) ("[I]t is hard to plead a negative with great specificity.").[2]

*Second*, the SAC demonstrates that a SSNIP in the UK is generally probative of the boundaries of meaningful competition, particularly for the US market. For one, the same cloud storage platforms

---

[2] There is also nothing contradictory in Plaintiffs' pricing allegations. *See* MTD at 11. Storage tiers do not align across providers to permit accurate per-GB comparisons pre-discovery, ¶ 123 n.67, but *changes* in tier pricing are identifiable. Plaintiffs have not identified any such change in response to iCloud's SSNIP, indicating that iCloud's price increased relative to other services. *Id.* ¶ 83.

are available in the US and the UK and Apple imposes the same restraint in both regions. ¶ 90. Moreover, studies show that UK consumers are *less* brand loyal, such that they "are far more likely to switch brands in search of a good deal." ¶ 91. Accordingly, if a SSNIP would be profitable in the UK where consumers are *more* inclined to switch, it is highly likely to be profitable in the US where demand is less elastic. *See id.* Apple does not address these facts.

**Third**, using new data, the SAC demonstrates that consumers did *not* switch from iCloud to other cloud services in response to the UK SSNIP. ¶¶ 84-86. This shows that the SSNIP was profitable and, ultimately, that other cloud services are not meaningfully constraining iCloud's pricing—i.e., not in the relevant market. *See id.* If they were, users would shift to these services in substantial numbers in response to iCloud's SSNIP. This demonstrably did not happen:



Apple has no response to this detailed analysis. Instead, Apple quibbles with portions of the SAC addressing switching at the device level. *See* MTD at 13; ¶ 86. As the SAC states, these device-level data function to "further corroborate" the more germane cloud-service switching analysis Apple disregards. *See id.*

### c.    Apple Distorts the Elements of Single-Brand Aftermarkets, Which Plaintiffs More than Adequately Allege.

Apple's motion conflates single-brand primary markets (which are disfavored) from single-brand aftermarkets (which are not). While Apple users the term "aftermarket" in its descriptions, the

1    cases Apple relies upon (MTD at 6-7) address the entirely inapt question of whether a *primary* market

2    can be defined around the features of a single brand. *See, e.g., E. I. du Pont de Nemours & Co*., 351

3    U.S. at 378 (alleged primary market for "Cellophane"); *Apple, Inc. v. Psystar Corp*., 586 F. Supp. 2d

4    1190, 1198 (N.D. Cal. 2008) (alleged primary market for "Mac OS"); *In re Am. Express Anti-Steering*

5    *Rules Antitrust Litig*., 361 F. Supp. 3d 324, 331 (E.D.N.Y. 2019) (alleged "Amex-only" primary

6    market); *Glob. Disc. Travel Servs., LLC v. Trans World Airlines, Inc.*, 960 F. Supp. 701, 705 (S.D.N.Y.

7    1997) (alleged primary market for TWA tickets).

8    These decisions have nothing to do with single-brand "aftermarkets," which are a special case.

9    An aftermarket is a derivative market for products tied to a manufacturer's durable goods. Single-

10   brand aftermarkets are widely recognized and upheld. *See Newcal*, 513 F.3d at 1048 (holding that, in

11   the aftermarkets context, "the law permits an antitrust claimant to restrict the relevant market to a

12   single brand of the product at issue as in (*Eastman Kodak*)"); *Epic Games*, 67 F.4th at 976 ("[T]he

13   relevant market for antitrust purposes can be an *aftermarket*—where demand for a good is entirely

14   dependent on the prior purchase of a durable good in a *foremarket*."). In fact, Apple's authorities go

15   out of their way to distinguish aftermarkets as a special case where single-brand markets *are* widely

16   recognized. *See, e.g., Amex Anti-Steering Rules Antitrust Litig.*, 361 F. Supp. at 331 ("There is one

17   situation in which courts generally agree that single-brand markets can succeed: an 'aftermarket'");

18   *Reilly v. Apple Inc*., 578 F. Supp. 3d 1098, 1107 (N.D. Cal. 2022) ("[T]he word 'aftermarket' does not

19   appear in Plaintiff's complaint."). These authorities recognize that aftermarkets are often narrowly

20   drawn because the purchase of a foremarket product will inherently restrict choice in the aftermarket.

21   This is an aftermarket case. ¶ 10. The alleged foremarkets are for Apple's mobile devices

22   (iPhones and iPads), and the alleged relevant market—Full-Service Cloud Storage *on Apple Mobile*

23   *Devices*—is a derivative aftermarket tied to those durable goods. ¶¶ 93-101; 161-71. Courts have

24   regularly upheld similar single-brand aftermarkets defined around apps and services accessible on

25   Apple's devices. *See Affinity v. Apple*, 4:22-cv-4174 (N.D. Cal.), ECF No. 64 at 6-7 (upholding single-

26   brand aftermarket for "tap-and-pay iOS mobile wallets"); *AliveCor, Inc. v. Apple Inc*., 592 F. Supp. 3d

27   904, 916 (N.D. Cal. 2022) (upholding single-brand aftermarket for watchOS apps); *In re Apple & AT*

28   *& TM Antitrust Litig.*, 596 F. Supp. 2d 1288, 1304 (N.D. Cal. 2008) (upholding single-brand

aftermarket for "iPhone applications"); *In re Apple iPhone Antitrust Litig.,* 4:11-cv-6714-YGR (N.D. Cal.), ECF No. 789 (granting class certification on single-brand aftermarket for "sale of iOS apps and in-app content").

Defying the facts, Apple asserts that Plaintiffs have not alleged an aftermarket tied to a "primary product." MTD at 7. This is false, as the Court has already recognized. *See* MTD Order at 11 (observing that Plaintiffs allege a "'foremarket good' (here, an Apple mobile device) that restricts buyer's choice in the aftermarket"). By definition, Full-Service Cloud Storage *on Apple Mobile Devices* is not a freestanding market. It is a market that exists only because of, and derivative to, the foremarkets for Apple's mobile devices. No one can acquire Full-Service Cloud Storage on Apple Mobile Devices without first obtaining an Apple Mobile Device.

Apple's remaining arguments on aftermarkets misstate the law, the SAC, or both. **First**, Apple claims that aftermarkets exist "only where a defendant changes its policy relating to the aftermarket product." MTD at 6. As the Court already held, the "Ninth Circuit has expressly rejected this argument." MTD Order at n.5 (citing *Epic Games,* 67 F.4th at 979). **Second,** Apple asserts that an aftermarket only exists when a consumer is "compelled to purchase the aftermarket product." MTD at 9. Again, this is not the law. *See* MTD Order at n.5 ("Apple has not cited any legal authority holding that a 'compelled purchase' is a necessary element of an aftermarket.").

**Third**, Apple contends that its expert's survey somehow establishes that consumers are aware of its aftermarket restraint when they make their foremarket purchase. MTD at 14. Not so. The survey was conducted of "current and past paid users of the iCloud Service" and not one of the survey questions queried respondents' relevant knowledge at the operative point in time—i.e., when they made their foremarket purchase. *See* SAC, Ex. A at ¶¶ 17-35.

**Fourth**, to ensure that competition in the foremarket does not discipline the aftermarket, courts require that the cost of switching foremarket products (here from iPhone to Android) be "significant." *Epic Games,* 67 F.4th at 979. The "showing need not be extensive" and can be satisfied with a "heavy initial outlay of the foremarket good and brand-specific purchases." *Id.* at 979-80. Plaintiffs show more. *See* ¶ 63 (costs of "new device" high); ¶¶ 63-64 (highlighting brand-specific app and in-app content that cannot be ported across operating systems); ¶ 62 (relearning new operating is "labor-

intensive"). Apple has no coherent response. Apple in fact acknowledges that much in-app content cannot be ported from iOS to Android (a switching cost), but oddly argues that this cost must be *caused* by the restraint to matter. *See* MTD at 15. That is not a requirement, *see Epic Games,* 67 F.4th at 979-80, nor would such a requirement bear on the relevant economic question of whether foremarket competition restrains the aftermarket.[3]

### 2.    In the Alternative, Plaintiffs Have Alleged a Relevant Antitrust Market for All Cloud Storage on Apple's Mobile Devices

Apple now asserts that the relevant market should include not just cloud storage, but also "local storage," *i.e.*, the ability to manually backup an iPhone or iPad onto an external drive. MTD at 15-16. Apple's contention that local storage is interchangeable with cloud storage, in addition to implicating factual questions on the cross-elasticity of demand, is deeply flawed for reasons outlined in the SAC.

Putting aside that local storage does not provide a comprehensive backup, ¶ 66, local storage lacks core functionality that fundamentally distinguishes cloud storage. Importantly, cloud storage is automatic, ensuring that the user's files are always backed up as accumulated, whereas local storage is a manual process that must be repeated (over and over again) to maintain an up-to-date backup. ¶ 70. In addition, local storage is a highly manual process, requiring that the user connect the device to an external drive and complete 7-8 time-consuming steps. ¶ 67. Another key functionality of the "cloud" is the ability to access files from multiple devices, including while on the move. ¶ 68. Apple's own marketing expert demonstrated that these are all important functions that distinguish cloud from local storage. Indeed, among the most important features cited by Apple's cloud customers is "automatically syncing and accessing data on all Apple devices" and the ability to "automatically synchronize all of [their] data between multiple computer and mobile devices with one cloud service." ¶ 69. The SAC more than adequately pleads that, without this basic and valued functionality, local storage cannot be considered reasonably interchangeable with cloud storage.

What is more, local storage has always been free, whereas cloud storage is not, and can reach

---

[3] Citing the Hitt Report, Apple claims "switching costs are variable," MTD at 15, but the question is whether switching costs are "significant" not whether they vary. Regardless, Dr. Hitt was addressing the cost of switching in the *aftermarket* for cloud services, *see* Hitt Report ¶ 70, whereas for market definition purposes, switching costs in the device *foremarkets* are what matter.

up to $60 a month. ¶ 37. Even if cloud and local storage were functionally interchangeable—they are not—they would not be *reasonably* interchangeable for market definition purposes given this stark disparity in price. *See In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 2014 WL 1949804, at *3 (N.D. Cal. May 12, 2014) (price disparity alone is enough to put products in different antitrust markets). Indeed, if local storage were reasonably interchangeable and meaningfully constrained cloud storage, Apple would not have been able to introduce iCloud at a substantial non-zero price. ¶ 92. Apple's ability to introduce and sustain significant subscription fees on iCloud, despite the availability of free local storage, demonstrates that local storage is not constraining the cloud to a degree sufficient to place it in the same antitrust market. *See id.*

Apple argues (MTD at 16) that because 29% of consumers reportedly do not use cloud storage, this means local storage is interchangeable. But there is no basis to assert (from the SAC or otherwise) that any portion of the 29% use local storage, much less that the use of local storage by some indeterminate number of consumers reflects significant cross-elasticity of demand.

### 3.    Plaintiffs Have Alleged Apple's Monopoly Power.

Monopoly power is "the substantial ability to control prices or exclude competition." *Epic Games*, 67 F.4th at 998. It is most commonly established indirectly with proof of a "dominant share" of the relevant market with "significant barriers to entry." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995). It can also be shown directly with evidence of "restricted output and supracompetitive prices." *Id.* Monopoly power need "not be pled with specificity, and whether a defendant actually possesses monopoly power is a factual question." *Giuliano v. SanDisk Corp.*, 2014 WL 4685012, at *6 (N.D. Cal. Sept. 19, 2014); *Newcal*, 513 F.3d at 1045. When market power is pleaded indirectly, "a rough estimate of the defendant's market share is sufficient at the pleading stage," with or without underlying calculations. *Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 777-78 (N.D. Cal. 2022).

#### a.    Apple Has Monopoly Power in the Market for Full-Service Cloud Storage on Apple Mobile Devices.

There can be no dispute that the SAC pleads Apple's monopoly power in the market for Full-Service Cloud Storage on Apple Mobile Devices. Apple's share of that market is 100%, and the barriers to entry and expansion are not just significant but absolute: Apple's restraints strictly bar all comers from

offering the relevant product, *i.e.*, Full-Service Cloud Storage on Apple Mobile Devices. ¶ 103.

> **b.    Apple Has Monopoly Power Even if the Market Were Improperly Expanded to Include all Cloud Services on Apple's Mobile Devices.**
>
> **(1)    Apple iCloud Has a *96 Percent* Monopoly Share of All Cloud Storage on Apple's Mobile Devices.**

Plaintiffs' prior complaint estimated that iCloud had a 72.5% market share of cloud-storage users on Apple's mobile devices, a figure that aligns with public reports. *See* ¶ 110 (Deutsche Bank analysis indicating that 70% of respondents had an iCloud plan). This estimate was conservative because it presumed that the 27.5% of consumers without an iCloud plan used a different service (instead of not using cloud storage at all). *See* ¶ 111.[4]

Using further data, including from a leading aggregator of app distribution data (Sensor Tower), Plaintiffs have supplemented their market share calculations, including by estimating iCloud's share of total revenues in response to the MTD Order. Plaintiffs' supplemental revenue-based approach addresses the Court's stated concern that the percentage of iCloud users does not account for people who may "use other cloud storage services as well." MTD Order at 17. That is, by looking at total consumer spend on cloud storage on Apple's mobile devices, Plaintiffs' supplemental calculations account for any consumers with more than one service. The SAC shows that iCloud has a 96.1% share of total revenues, which is far above any monopoly share threshold. ¶¶ 112-14.

Apple has no response. In fact, Apple's motion *does not even acknowledge* Plaintiffs' supplemental calculations. Instead, Apple rehashes challenges to Plaintiffs' prior market share estimate of 72.5%, and only by overtly misrepresenting the math. Apple claims that Plaintiffs calculations lead to a 46.5% share. But as the SAC (and prior complaint) make clear, that is Apple's share of users across *all* devices, whereas the relevant market is limited to Apple's mobile devices, and Apple's share of that narrower market is naturally much higher. Apple also asserts that Plaintiffs have not accounted for "users who may use both iCloud and another cloud service." MTD at 20. But this is exactly what Plaintiffs' supplemental revenue-based calculations accomplish. Apple just ignores them.

---

[4] While mathematically correct, Plaintiffs' original market share equation contained a typographical error that was corrected in the SAC. *See* SAC fn. 58.

**(2)    Plaintiffs Allege Formidable Barriers to Entry and Expansion in the Market for Cloud Storage on Apple Mobile Devices.**

The Court held that while Plaintiffs' prior pleading alleged barriers to entry, it did not directly address barriers to expansion. *See* MTD Order at 17-18. The SAC does so. ¶¶ 102-06.

Barriers to expansion are generally demonstrated by the inability of competitors "to increase output." *Rebel Oil*, 51 F.3d at 1439. Such is the case here. Would-be cloud competitors have been persistently unable to increase their output of cloud storage on Apple's mobile devices. ¶ 105. This is confirmed in the data marshalled by the SAC, which Apple ignores. *Id.* Despite having every natural incentive to compete with iCloud, other cloud platforms' individual and collectively output is "essentially flat, even mostly declining." *Id.* If barriers to entry and expansion "were low, other cloud storage platforms would be expanding their user base during the class period to erode iCloud's dominant position—yet they demonstrably have not." ¶ 106.

The SAC further explains in detail why other cloud services have been unable to expand output. Due to Apple's challenged restraints, these cloud providers are unable to offer consumers the comprehensive backup functionality that Apple's own surveys demonstrate consumers demand. ¶ 104. By virtue of the challenged restraints, other cloud providers are forced to market an inferior cloud product that does not provide essential functionality needed to discipline Apple and acquire a significant number of its customers. *Id.*; *see also* ¶¶ 40-48.

Apple appears to contend that its conduct cannot create barriers to entry or expansion in a market, *see* MTD at 20, but this is not the law. Courts routinely rely on barriers to entry or expansion erected by the defendant. *See, e.g., Lambrix v. Tesla, Inc.*, 737 F. Supp. 3d 822, 846-47 (N.D. Cal. 2024); *Le v. Zuffa, LLC*, 2023 WL 5085064, at *20 & n.32 (D. Nev. Aug. 9, 2023) (noting that barriers to entry can be both "natural" and "artificial"); *DAT Sols., LLC v. Convoy, Inc.*, 2023 WL 3058057, at *16 (D. Or. Apr. 24, 2023) (recognizing that defendant's conduct could "create barriers to entry into the market"); *see also* Areeda & Hovenkamp, *Antitrust Law*, *supra* ¶ 420a ("For antitrust purposes, a barrier to entry is best defined as *any factor* that permits firms already in the market to earn returns above the competitive level while deterring outsiders from entering.") (emphasis added).

Apple also asserts that, rather than erect barriers to expansion, it has provided a neutral platform

where anyone can "win consumers based on the merits of their products." MTD at 20-21. The SAC alleges the opposite, and with specificity. ¶¶ 49-54, 134-138. Apple cannot win dismissal with factual claims contrary to the SAC's well-pleaded allegations. *See Khoja,* 899 F.3d at 999.

### (3) Apple's Ability to Charge Supracompetitive Prices and Restrict Output Provide Direct Proof of its Monopoly Power.

Plaintiffs have also alleged direct proof of Apple's monopoly power in the form of supracompetitive prices and suppressed output.

**Supracompetitive Prices**. The Court has already held that "Plaintiffs plausibly allege supracompetitive pricing." MTD Order at 15. In moving to dismiss the SAC, Apple rehashes arguments the Court already considered and rejected. To reiterate, the textbook definition of a supracompetitive price is one set above marginal costs. *See Montana Consumer Couns. v. FERC*, 659 F.3d 910, 916 (9th Cir. 2011) (recognizing that "in a competitive market," "price is close to marginal cost"); *In re Aggrenox Antitrust Litig.*, 199 F. Supp. 3d 662, 667 (D. Conn. 2016) ("[P]rices in a competitive market will tend (perhaps asymptotically) toward marginal cost, so prices substantially above that cost are supracompetitive by definition"); *see also* Areeda & Hovenkamp, *Antitrust Law, supra* ¶ 503.

Marginal costs can sometimes be difficult to isolate, but not here. Apple reportedly pays Google $0.0031 per-GB per month to host iCloud data. ¶ 119. This is an accurate estimate of Apple's marginal costs for iCloud, *i.e.*, the cost Apple bears to sell each additional GB of cloud storage. *See id.* Apple's per-GB iCloud prices dwarf these marginal costs, ¶ 120, yielding gross margins that, conservatively measured, are likely to exceed 70-80%. ¶ 122. Such prices, in gross excess to its marginal costs, are by definition supracompetitive.

Apple continues to assert that, to allege supracompetitive prices, an antitrust plaintiff must offer a price comparison with other products. *See* MTD at 17. But there is no such pleading or proof requirement. The cases Apple cites are distinguishable because they involved barren allegations with nothing like the detailed gross margins analysis Plaintiffs have offered here. *See Intell. Ventures I LLC v. Cap. One Fin. Corp.*, 2013 WL 6682981, at *6 (E.D. Va. Dec. 18, 2013) ("nothing other than conclusory allegations" of "supracompetitive prices"); *Eastman v. Quest Diagnostics Inc.*, 108 F. Supp.

1    3d 827, 835 (N.D. Cal. 2015) (plaintiff only asserted that defendant "must add a monopoly premium").

2    Apple also cites *Ohio v. American Express Co.*, 585 U.S. 529 (2018), but that post-trial decision proves

3    Plaintiffs' point by confirming that "profit margin[s]" can supply proof of supracompetitive profits. *See*

4    *id.* at 548.

5          Pleading prices comparatively would also not make sense in a case like this. Cloud storage

6    pricing is offered in tiered prices that do not align across the industry, and firms do not report their

7    effective per-GB price. *See* SAC n.67. Discovery is required to meaningfully compare iCloud's pricing

8    on an apples-to-apples basis to other cloud services. *See id.*; *see also Epic Games*, 67 F.4th at 985 (pricing

9    analysis based on "headline" prices "suspect" because what matters is the "effective" prices in the

10   market).

11         Straining even further, Apple relies on an unverified chart from its own expert's report

12   suggesting that, for a three-year period (2015-2018) iCloud prices supposedly remained steady or

13   decreased. *See* MTD at 17. To the extent this chart is considered, it proves nothing. Whether a price is

14   "supracompetitive" is not determined by the nominal direction in which it is trending, much less a

15   decade ago. Falling prices can be supracompetitive, *see In re Juul Labs, Inc., Antitrust Litig.*, 555 F.

16   Supp. 3d 932, 958 (N.D. Cal. 2021), and increasing prices may not be, *see In re Flash Memory Antitrust*

17   *Litig.*, 643 F. Supp. 2d 1133, 1145 (N.D. Cal. 2009). What matters is whether the price, whatever it is,

18   is set substantially above marginal costs.

19         **Suppressed Output**. The SAC contains additional output allegations that Apple likewise fails

20   to confront. ¶¶ 125-133. To begin with, there should be no dispute that Apple restricts output in the

21   market for Full-Service Cloud Storage on Apple Mobile Devices, given that Apple admittedly bars

22   any other provider from offering this product. ¶ 126.

23         The SAC also demonstrates that the same challenged restraint suppresses output in the larger

24   market for all cloud storage on Apple's devices, because the restraint denies would-be competitors the

25   full-service functionality they need to appeal to Apple's users and sell cloud storage subscriptions (i.e.,

26   increase output). ¶¶ 127-28. Contrary to Apple's assertions, there is nothing circular or conclusory

27   about this. The barrier to expansion is not predicated on mere say so, but rather Apple's own analyses

28   demonstrating that users demand the comprehensive backup functionality that Apple has ensured only

1    iCloud can offer, rending all other options "not comparable." ¶¶ 40-48.[5]

2        Apple's own output is also reduced by virtue of its supracompetitive prices. ¶ 132. All products

3    are subject to this "law of demand," except those for which demand is perfectly inelastic, and demand

4    for cloud storage is not that. *See id.* There also is no evidence that other cloud services are increasing

5    output to offset Apple's reduction, as seen in Apple's durable monopoly share of the market (96% of

6    revenues). ¶¶ 112-114, 133. Apple faults Plaintiffs for not alleging that Apple decreased output by

7    starving supply of iCloud, but Apple cites no authority requiring output suppression to be pleaded (or

8    proven) in that fashion, much less with respect to a digital good like cloud storage. Nor would it make

9    sense because Apple has virtually zero marginal costs and they do not increase with volume. ¶ 129. As

10   a matter of antitrust economics, a monopolist with this cost structure has no incentive "to artificially

11   reduce output in an effort to drive up prices—and would instead simply increase prices." *Id.*; *United*

12   *States v. Google LLC*, 747 F. Supp. 3d 1, 123 (D.D.C. 2024) (noting that with respect to digital product

13   with decreasing marginal costs, increasing output is "not inconsistent with monopoly power").

14       **4.    Plaintiffs Continue to Allege a Specific Intent to Monopolize.**

15       Apple asserts that the SAC does not allege a "specific intent to monopolize." MTD at 23. The

16   SAC does so, repeatedly. *See* ¶ 200 ("Apple has a specific intent to achieve monopoly power"); ¶ 54

17   ("Apple has rigged the competitive landscape"); *id.* (Apple "degraded would-be competitor products

18   to give iCloud an unbeatable advantage"); *id.* ¶ 193 ("Apple's actions are designed to destroy

19   competition"). These allegations, and more, plead a specific intent to monopolize. Even if they did not,

20   an intent to monopolize can be inferred from "unfair or predatory" tactics, *see Spectrum Sports, Inc.*

21   *v. McQuillan*, 506 U.S. 447, 459 (1993), or "anticompetitive conduct alone," *Catch Curve, Inc. v.*

22   *Venali, Inc.*, 519 F. Supp. 2d 1028, 1035 (C.D. Cal. 2007). Plaintiffs allege this as well. ¶¶ 40-54.

23

24

25

26   [5] Apple also argues that output could not be reduced because Plaintiffs supposedly admitted that

     consumers are unaware of the restraint when they "adopt a cloud service." MTD at 19. The SAC states

27   the opposite. It states that consumers are generally unaware of the restraint when they *buy their mobile*

     *device*, and that they subsequently learn of the restraint "*after* they have purchased their mobile device

28   and attempt to use alternative cloud storage." ¶ 95.

1

**5.      Apple's "Product Design" and "Refusal to Deal" Defenses are Without Merit.**

2          Apple attempts to recast this as a "product design" case and asserts that—so framed—Plaintiffs

3     claims are not even "[a]ctionable." MTD at 21. But Plaintiffs challenge not a product design, but rather

4     an ongoing policy and practice by Apple of denying cloud storage providers permissions to access

5     certain user files. As the SAC alleges, and Apple ignores, Apple could readily abolish this policy

6     without affecting the "design of Apple's products." ¶ 160.

7          Even if this case were about "product design" in some abstract sense, that would not shield

8     Apple's conduct from full rule-of-reason scrutiny. Firms do not get a free pass under the Sherman Act

9     if they happen to implement an anticompetitive restraint through a product. Rather, the cases Apple

10    invokes deal with the specialized and inapt circumstance of product "design changes"—*i.e.*, the

11    *re*design of a product limiting previously existing interoperability. *Allied Orthopedic v. Tyco Health*

12    *Care Grp. LP*, 592 F.3d 991, 998 (9th Cir. 2010). No product redesign is alleged in the SAC, and

13    Apple appears to disclaim one. *See* MTD at 3. Regardless, even "changes in product design are not

14    immune from antitrust scrutiny." *Allied*, 592 F.3d at 998. Only "genuine product improvements"

15    without any "associated anticompetitive conduct" receive protection. *Id.* These are fact questions, and

16    they could not be adequately resolved now even if the "design change" framework were improperly

17    applied. *See Apple iPod iTunes Antitrust Litig.*, 2014 WL 12719194, at *2 (N.D. Cal. Nov. 25, 2014).

18         Apple's attempt to repackage this as a "refusal to deal" case fares no better. *See* MTD at 21-

19    22. Refusal to deal jurisprudence recognizes that even a monopolist has "discretion as to parties with

20    whom he will deal." *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408

21    (2004). But the law only protects a monopolists' "unilateral" or "simple" refusal to deal with rivals.

22    *See Eastman Kodak Co. v. Image Tech. Servs., Inc.,* 504 U.S. 451, 463 n.8 (1992); *United States v.*

23    *Google LLC*, 2025 WL 1132012, at *43 (E.D. Va. Apr. 17, 2025).

24         The "refusal to deal" framework does not apply where, as here, a monopolist prevents its

25    customers from dealing with a rival. That type of restraint is simply not a unilateral refusal to deal with

26    a rival—it is intervention into the market preventing third parties from dealing with would-be rivals.

27    For more than thirty years, Courts have refused to extend "refusal to deal" doctrine to such conduct.

28    *See Eastman Kodak*, 504 U.S. at 463 n.8 (holding that "sale of parts to third parties on condition that

they buy service from kodak" is not a unilateral refusal to deal); *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1072 (10th Cir. 2013) (Gorsuch, J.) (contrasting unilateral refusal to deal with actionable conduct that "limit[s] the abilities of third parties to deal with rivals"); *Google LLC*, 2025 WL 1132012, at *43 (rejecting refusal to deal framework to Google conduct that effectively "compelled its ad publisher customers to use [Google's services]"); *Ceiling & Interior Sys. Supply, Inc. v. USG Interiors, Inc.*, 878 F. Supp. 1389, 1396 (W.D. Wash. 1993), *aff'd*, 37 F.3d 1504 (9th Cir. 1994) ("[T]he refusal to deal with third parties conditioned on failure to purchase other goods or services, however, is not a unilateral refusal."); *Chase Mfg., Inc. v. Johns Manville Corp.*, 84 F.4th 1157, 1173 (10th Cir. 2023) (recognizing that the "refusal-to-deal framework applies to narrow situations" and refusing to extend it); *Lorain J. Co. v. United States*, 342 U.S. 143, 152 (1951) (newspaper that prevented advertisers from dealing with competing radio stations held to violate Section 2); *Epic Games*, 559 F. Supp. 3d at 1036 (citing *Eastman Kodak* for the proposition that "conditioning sales is not a 'unilateral refusal to deal'").

Apple's "refusal to deal" argument was rejected most recently in *Affinity v. Apple*, 4:22-cv-4174 (N.D. Cal.), ECF No. 64. Plaintiffs there alleged that Apple has monopolized the market for iOS digital wallets by preventing would-be competitor iOS wallets (e.g., PayPal) from accessing technology they require to offer "tap" payments, a functionality that (similar to full-service cloud storage) Apple's customers demand. *See id.* at 2. Apple moved to dismiss on "refusal to deal" grounds and Judge White summarily rejected the defense, holding that Plaintiffs "have plausibly alleged monopolization and attempted monopolization under the Sherman Act." *Id.* at 11.

Apple's attempt to shoehorn this case into the "refusal to deal" framework is not without irony given that Apple *is* contracting with would-be rivals (currently Google) to store user data saved to iCloud. ¶ 141. Apple is thus *not* refusing to deal with its would-be cloud storage competitors—it has been doing that for years. Apple just prevents these would-be rivals from dealing with Apple's customers (and vice versa) to offer the comprehensive backup solution that, but for Apple's restraints, they could provide. That simply is not the type of "unilateral" or "simple" refusal to deal with a rival that warrants protection from Sherman Act scrutiny. It is exclusionary conduct interfering in the free operation of the market. It must be evaluated, like other exclusionary conduct, under the rule of reason.

1    **B.    Plaintiffs Have Alleged Actionable Tying.**

2        Having reasserted their tying claim under Section 2, Plaintiffs need not establish concerted

3    action to prevail. *Smith v. eBay Corp.*, 2012 WL 27718, at *6 (N.D. Cal. Jan. 5, 2012) (courts permit

4    tying claims "under Section 2"). The viability of Plaintiffs' tying allegations now boils down to one

5    issue: whether actionable ties require a communicated or express tying condition (positive or negative).

6    If such an express tying condition is required, as the Court reasoned previously (*see* MTD Order at 8-

7    9), Plaintiffs agree their tying claim is not sustainable. While this is a nuanced question, with unsettled

8    law, Plaintiffs respectfully submit that express tying conditions are not a necessary element of unlawful

9    tying, at least under Section 2.  *See* Areeda & Hovenkamp, *Antitrust Law*, *supra* ¶ 1755 (acknowledging

10   that "[p]recedent gives no clear answer" to whether tying condition can be uncommunicated).

11       The touchstone of illegal tying is coercion that forecloses competition in the tied product

12   market. *See Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 914 (9th Cir. 2008); *see also Jefferson*

13   *Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984). To be sure, coercion and foreclosure are often

14   established with express conditions (positive or negative) imposed on the sale of the tying product.

15   But while common, express conditions are not indispensable for actionable tying. For example,

16   technological ties are typically implicit, involving no expressly conditioned sale. *See Foremost Pro*

17   *Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 541, 543 (9th Cir. 1983) (recognizing viability of

18   technological tying claims where "dominant purpose" of tie was to coerce purchase of tied product).

19   In other contexts, courts have recognized tying where "for all practical purposes" there was coercion

20   in the tied product market, but without any evidence of an expressly communicated tying condition.

21   *See Google LLC*, 2025 WL 1132012, at *39.  Substantively, the foreclosure caused by a tie does not

22   depend on whether the tie was communicated when the tying product was purchased. Here, for

23   example, Apple's restraints would not be *more* injurious to competition if they were communicated to

24   consumers when they purchased their mobile devices. Application of the antitrust laws should be

25   driven by these "actual market realities" and not "formalistic distinctions," which courts disfavor. *See*

26   *Eastman Kodak*, 504 U.S. at 467.

27       Apple relies heavily on *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171 (9th Cir.

28   2016), but *Aerotec* is distinguishable. *Aerotec* recognized that ties can be "implicit" and need "not be

1    spelled out in express contractual terms." *Id.* at 1179. The root issue in *Aerotec* was that there was no

2    tie of any sort. *Id.* at 1180 ("Honeywell allows airlines to purchase parts and services in separate

3    transactions from whichever supplier they please."). Instead, the plaintiff in *Aerotec* alleged that the

4    defendant had engaged in tactics that only made purchasing from competitors "less desirable." *Id.*

5    Here, unlike in *Aerotec*, there is an actual tie—consumers are strictly foreclosed from purchasing full-

6    service cloud storage from anyone but Apple. It is not just difficult, or less desirable, to make these

7    purchases. It is impossible by virtue of Apple's restraints. In addition to this factual distinction, *Aerotec*

8    is legally distinct because it involved a Section 1 tying claim, where communicated conditions may

9    well be necessary to establish the agreement element. That logic does not hold for Section 2, where no

10   agreement is required. Plaintiffs submit that their tying claim should be upheld.

11   **C.    Plaintiffs Allege a UCL Claim.**

12        Plaintiffs assert a UCL claim under the "unlawful" and "unfair" prongs. Apple's conduct is

13   unlawful because, as set forth above, it violates the Sherman Act. Plaintiffs have also sufficiently alleged

14   "unfair" competition under the applicable "balancing test," which "weighs the utility of the defendant's

15   conduct against the gravity of the harm to the alleged victim." *Epic Games*, 67 F.4th at 1000.

16        The SAC addresses the balancing test in detail. ¶¶ 139-154. Failing to confront this, Apple invites

17   the Court to (1) disregard the SAC's developed allegations of consumer harm, and (2) credit Apple's

18   asserted "justifications," which are contrary to the SAC. Neither is permissible on a Rule 12(b)(6)

19   motion. With respect to the harms, the Court has already held that Plaintiffs have pleaded

20   supracompetitive prices, and the SAC does so again. *See* MTD Order at 15; ¶¶ 122-24. Beyond that, the

21   Plaintiffs allege with specificity other cognizable forms of consumer harm, including suppressed

22   choice of market alternatives (¶ 151) and diminished innovation (¶¶ 134, 152-53).

23        Ignoring the harms, Apple presents a dubious "security" counternarrative with no anchor in the

24   SAC. *See* MTD at 25. While claiming it would undermine security if its customers used other cloud

25   services to store Restricted Files, Apple *itself* uses the same cloud providers on the backend to host all

26   iCloud data. ¶ 141. Apple just charges a supracompetitive fee as the monopolist intermediary. *See id.*

27   Apple's security claims are further belied by a host of considerations Apple ignores. ¶ 134 (analyst

28   reports that iCloud has "serious privacy and security concerns"); ¶ 143 (Apple's own survey indicating

1    that just 5.4% of iCloud subscribers thought the service "is more secure"); ¶¶ 144-45 (addressing

2    weaknesses in iCloud encryption and reports that other cloud products are "typically more secure than

3    iCloud Backup"); ¶ 146 (Samsung permits users to select between competing full-service cloud

4    options while maintaining "defense grade" cloud security).

5         Apple may attempt to mount a security defense at trial, but at this stage, Apple's claims should

6    not be accepted uncritically, nor can they be deemed to outweigh the well-pleaded harm to consumers.

7    *See Friedman v. AARP, Inc.*, 855 F.3d 1047, 1055 (9th Cir. 2017) (UCL "unfairness" claims implicate

8    questions of fact that are appropriate for resolution on a motion to dismiss only in rare situations");

9    *Backus v. Gen. Mills, Inc.*, 122 F. Supp. 3d 909, 929 (N.D. Cal. 2015) (balancing test "involves weighing

10   evidence" that is not appropriate on a 12(b)(6) motion).

11   **D.    Apple's Statute of Limitations Defense Remains Meritless.**

12        While the Court deferred resolving timeliness issues, *see* MTD Order at 6, Apple raises the

13   statute of limitations in a footnote (MTD at n.6) and thus Plaintiffs make two observations. *First*,

14   Plaintiffs are challenging "ongoing, affirmative restraints" imposed as a matter of policy by Apple.

15   ¶ 49. This is a quintessential a "continuing violation" of the Sherman Act, and thus Plaintiffs' claims

16   are timely. *See Hanover Shoe, Inc. v. United States Mach. Corp.*, 392 U.S. 481, 502 n.15 (1968).

17        *Second,* Plaintiff Gamboa's claims do not depend on the continuing violations doctrine because

18   she brought suit within four years of purchasing her first iCloud plan and sustaining an injury. *See*

19   ¶ 26. As is typical, "antitrust claims accrue at the time of injury." *See In re Animation Workers Antitrust*

20   *Litig.*, 87 F. Supp. 3d 1195, 1209 (N.D. Cal. 2015). There is no antitrust or other legal doctrine by which

21   a plaintiff's claim can accrue *before* her injury. The reason is straightforward: "[B]efore there is an injury,

22   there is no standing to sue for damages because no damages have accrued . . ., and obviously a statute of

23   limitations cannot begin to run before the prospective plaintiff could sue." *Petra Presbyterian Church*

24   *v. Vill. of Northbrook*, 489 F.3d 846, 850 (7th Cir. 2007) (Posner, J.); *accord Mayor of Baltimore v.*

25   *Actelion Pharms. Ltd.*, 995 F.3d 123, 131 (4th Cir. 2021) ("[B]ecause the plaintiffs were not injured

26   in 2014, they had no [antitrust] cause of action in 2014, and thus limitations could not have begun to

27   run in 2014."). As the Supreme Court put it, "if a plaintiff feels the adverse impact of an antitrust

28   conspiracy on a particular date, a cause of action immediately accrues to him to recover all damages

incurred by that date." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 339 (1971). Sometimes the defendant's wrongful act and the injury will coincide, but in all cases, "each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act." *Id.*; *Pace Indus., Inc. v. Three Phoenix Co.,* 813 F.2d 234, 237 (9th Cir. 1987).

Plaintiffs acknowledge that, without the benefit of full briefing, this Court read *SaurikIT* to apply a different rule. MTD Order at 5; *see SaurikIT, LLC v. Apple Inc.*, 2022 WL 1768845, at *3 (N.D. Cal. May 26, 2022), *aff'd*, 2023 WL 8946200 (9th Cir. Dec. 28, 2023). But respectfully, *SaurikIT* addressed a different situation. The plaintiff in *SaurikIT* (Cydia) was a rival app store that was injured in 2008 based on exclusionary conduct in 2008. *See* 2023 WL 8946200 at *1; Appl't. Rep. Br., 2023 WL 2898558, at *1. Cydia elected not to bring suit until 2020, and thus the timeliness of its claims rested entirely on the continuing violations doctrine, which the Court held did not apply on the facts there. *See* 2023 WL 8946200. Whatever *SaurikIT* has to say on the continuing violations doctrine, it did not address the situation presented by Plaintiff Gamboa, who brought suit within four years of her first cognizable injury. Her claims, unlike Cydia's, are timely on their face.

## V.     CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss should be denied.

DATED: April 25, 2025                    Respectfully submitted,

                                         HAGENS BERMAN SOBOL SHAPIRO LLP

                                         By /s/ Ben M. Harrington
                                             Ben M. Harrington (SBN 313877)

                                         Ben M. Harrington (SBN 313877)
                                         Benjamin J. Siegel (SBN 256260)
                                         HAGENS BERMAN SOBOL SHAPIRO LLP
                                         715 Hearst Avenue, Suite 300
                                         Berkeley, CA 94710
                                         Telephone: (510) 725-3000
                                         Facsimile:  (510) 725-3001
                                         benh@hbsslaw.com
                                         bens@hbsslaw.com

                                         Mark Vazquez (*pro hac vice*)
                                         HAGENS BERMAN SOBOL SHAPIRO LLP
                                         455 N. Cityfront Plaza Dr., Suite 2410
                                         Chicago, IL 60611
                                         Telephone: (708) 628-4962
                                         Facsimile:  (708) 628-4950
                                         markv@hbsslaw.com

                                         *Attorneys for Plaintiffs and the Proposed Class*